**2016-1229, -1230**

# United States Court of Appeals
# for the Federal Circuit

DATATREASURY CORPORATION,

*Appellant,*

*v.*

FISERV, INC.,

*Appellee.*

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. CBM2014-00087 and CBM2014-00088.*

## BRIEF FOR APPELLANT

DEREK T. GILLILAND
NIX PATTERSON & ROACH, LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333
dgilliland@nixlawfirm.com

CHRISTIAN JOHN HURT
NIX PATTERSON & ROACH, LLP
5215 N. O'Connor Boulevard
Suite 1900
Irving, TX 75039
(972) 831-1188
christianhurt@nixlawfirm.com

*Counsel for Appellant*

FEBRUARY 9, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## DataTreasury Corporation v. Fiserv, Inc.

## Nos. 2016-1229, -1230

### CERTIFICATE OF INTEREST

Counsel for Appellant, Christian Hurt, certifies the following:

1. The full name of every party or amicus represented by me is:

   DataTreasury Corp.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4. The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Abraham Hershovitz; Hershkovitz & Associates, PLLC.

   The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in co-pending trial court litigation involving the patents subject to this appeal are:

   Nix Patterson & Roach, LLP; Nelson James Roach; Derek Tod Gilliland; Andrew Joseph Wright (former); Christian J. Hurt; Edward K Chin (former); Kirk Austin Voss; Robert Winn Cutler; Ross Leonoudakis; Ben King

   Kendall Law Group, LLP; Elton Joe Kendall; Karl A. Rupp
   Albritton Law Firm; Eric M Albritton

Ward, Smith & Hill, PPLC; Thomas John Ward, Jr.

DATED: February 9, 2016.                Respectfully submitted,

_____
CHRISTIAN HURT
*Attorney for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

STATEMENT OF RELATED CASES...................................................................1

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES .........................................................................2

STATEMENT OF THE CASE ............................................................................2

STATEMENT OF THE FACTS ..........................................................................3

    I.    The Technology of the '988 and '137 Patents .....................................3

    II.    DataTreasury's Litigation Against the Banking Industry and Fiserv.................................................................................................8

    III.    The CBM Review Proceedings and the Board Decisions .................11

        A. Determinations in DBM2014-00087 regarding the '988 Patent ...................................................................................11

        B. Determinations in DBM2014-00088 regarding the '137 Patent ...................................................................................13

    IV.    Discussion of Campbell, the Prior Art Referenced Relevant to DataTreasury's Appeal of the Board Decisions.................................15

SUMMARY OF THE ARGUMENT....................................................................16

        ARGUMENT......................................................................................19

    I.    Standard of Review............................................................................19

    II.    Legal Overview.................................................................................20

    III.    Patents Claim Technological Innovations and Thus Are Not Covered Business Methods.................................................................21

i

IV.  The Board erred in its determination that '988 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 41, 58 – 60, 66 – 69, 84, 88 – 91, 119 – 120, and 122 and '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, and 62 - 63 are anticipated by Campbell because Campbell fails to disclose the claimed "subsystem identification information." ...........................................21

    A. The '"subsystem identification information" must identify a remote data access subsystem ..................................23

    B. The Board's rejection is improper because Campbell does not disclose the claimed "subsystem identification information"..........................................................................28

    C. The Board's rejection is improper because Campbell does not disclose Encryption of "subsystem identification information."..........................................................................29

V.  The Board erred in its determination that '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36 – 41, 50 – 51, and 55 are anticipated by Campbell because it failed to make any findings regarding whether Campbell disclosed the capture of a "payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information and a payee's account number."........................31

VI.  The Board erred in determination that '988 Patent Claims 36, 38 – 42, 46 – 49, 73 – 74, 80, 82 – 84, and 118 – 123 and '137 Patent claims 38 – 41 are anticipated by Campbell because Campbell does not disclose the claimed transmission of data within each "intermediate data collecting subsystem." .....................33

VII.  Discussion The Board erred in its determination that '988 Patent claims 102 and 106 – 109, 110, and 114 – 117 are anticipated by Campbell because it failed to make any findings regarding whether Campbell disclosed the claimed "credit card data" and "internet transaction data. .................................35

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................36

# ADDENDUM

Board Final Written Decision for '988 Patent........................................................A1

U.S. Patent No. 5,910,988 .....................................................................................A40

Board Final Written Decision for '137 Patent......................................................A85

U.S. Patent No. 6,032,137 ...................................................................................A121

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)....................................................20

*Connell v. Sears, Roebuck & Co*
  722 F.2d 1542 (Fed. Cir. 1983)....................................................20

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938) .........................19

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012)....................................................19

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999)....................................................24

*In re Cuozzo Speed Techs., LLC.*,
  793 F.3d 1268 (Fed. Cir. 2015)....................................................19

*In re Kotzab*,
  217 F.3d 1365  (Fed. Cir. 2000)....................................................20

*In re Mettke*,
  570 F.3d 1356 (Fed. Cir. 2009)....................................................20

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011)................................................19,24

*In re Skvorecz*,
  580 F.3d 1262 (Fed. Cir. 2009)....................................................23

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010)................................................23,24

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015)....................................................19

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)........................................................20, 29, 32

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed.Cir.2005)(en banc)) ...............................................20,26

*Sightsound Technologies, LLC v. Apple, Inc.*,
    2015 U.S. App. LEXIS 21640, at *14 (Fed. Cir. Dec. 2015) .....................19

*Xerox Corp. v. 3Com Corp.*,
    458 F.3d 1310, 1322 (Fed. Cir. 2006)........................................................20

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1295(a)(4)(A)................................................................................2, 15

35 U.S.C. § 102 ............................................................................................9, 14

35 U.S.C. § 103(a)..........................................................................................2, 19

35 U.S.C. § 141(c),............................................................................................2

35 U.S.C. § 321 ................................................................................................11

35 U.S.C. § 328(a)..............................................................................................2

35 U.S.C. § 329 ..................................................................................................2

37 C.F.R. § 42.73 ................................................................................................2

## STATEMENT OF RELATED CASES

There are a number of related proceedings pending before this Court involving proceedings from the Patent Trial & Appeal Board ("Board") with regard to the same two patents: U.S. Patent No. 5,910,988 ("the '988 Patent") and U.S. Patent No. 6,032,137 ("the '137 Patent") (collectively, "the Patents"). Specifically, the Court has deemed related to this consolidated appeal the following pending appeals: *DataTreasury Corp. v. Jack Henry & Assoc., Inc.*, Case Nos. 16-1050, -1052; *DataTreasury Corp. v. Fidelity Nat'l Info. Servs, Inc.*, Case No. 16-1046; and *In re DataTreasury Corp.*, Case No. 16-1250.

In addition, Appellant DataTreasury Corporation ("DataTreasury") has asserted infringement of the '988 and '137 Patents in the following actions pending in the U.S. District Court for the Eastern District of Texas: *DataTreasury Corp. v. Fiserv, Inc.*, Case No. 2:13-CV-00431-JRG-RSP, *DataTreasury Corp. v. Fidelity Nat'l Information Servs., Inc.*, Case No. 2:13-CV-00432-JRG-RSP, and *DataTreasury Corp. v. Jack Henry & Assoc., Inc.*, Case No. 2:13-CV-00433-JRG-RSP. Those actions are presently stayed.

## JURISDICTIONAL STATEMENT

This consolidated appeal arises from two covered business method ("CBM") review proceedings under § 18 of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011). Under Section 18(a)(1) of the AIA,

CBM review proceedings "shall be regarded as, and shall employ the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code," subject to some exceptions. The Board concluded it had the power to institute CBM review proceedings, and issued a final written decision in each CBM review proceeding on September 1, 2015 pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73. This Court thus has jurisdiction under 35 U.S.C. § 329, 35 U.S.C. § 141(c), and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

DataTreasury's appeal presents three issues:

(1) Did the Board err by concluding that the '988 and '137 Patents are eligible for covered business method patent review?

(2) Did the Board err by finding that U.S. Patent No. 5,373,550 ("Campbell") anticipates claims 1, 2, 16, 18, 22, 26, 29, 36, 38 – 42, 46 – 49, 58 – 60, 66 – 69, 73 – 74, 80, 82 – 84, 88 – 91, 102, 106 – 110, and 114 – 123 of the '988 Patent?

(3) Did the Board err by finding that Campbell anticipates claims 1, 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, and 62 – 63 of the '137 Patent?

## STATEMENT OF THE CASE

This appeal challenges the Board's Final Written Decision for the '988 Patent, Joint Appendix ("J.A.") 5938 – 5976 ("the '988 Decision"), and the

Board's Final Written Decision for the '137 Patent, J.A. 11855 – 11890 ("the '137

Decision").  In particular, DataTreasury challenges the Board's determination that

1) the '988 Patent and the '137 Patent are eligible for covered business method

patent review; 2) claims 1, 2, 16, 18, 22, 26, 29, 36, 38 – 42, 46 – 49, 58 – 60, 66 –

69, 73 – 74, 80, 82 – 84, 88 – 91, 102, 106 – 110, and 114 – 123 of the '988 Patent

are anticipated by Campbell; and 3) claims 1, 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50,

51, 55, and 62 – 63 of the '137 Patent are anticipated by Campbell.

## STATEMENT OF THE FACTS

### I.    The Technology of the '988 and '137 Patents

The Patents relate to a multi-tiered networked computer system used to

capture, process, transmit, and encrypt data collected from a document, such as a

receipt image or a check image.[1]  The specification discloses a three-tier system,

with a computer system at each tier.  The top-tier is what the Patents refer to as the

DataTreasury™ Processing Concentrator ("DPC").  J.A. 197, '988 Patent, Fig. 1.

Below that tier is a tier of DataTreasury™ Access Collector ("DAC") computer

systems distributed in a number of regions.  *Id.*  Both the DPC and the DAC are

driven by servers, such as Windows-based servers.  J.A. 212, '988 Patent, col. 11

---

[1] The '137 Patent is a continuation-in-part of the '988 Patent but contains some
additional disclosure.  Thus, for ease of reference, this brief will generally cite to
the specification of the '988 Patent.

ll. 12–43; J.A. 213, '988 Patent, col. 14 ll. 19–33. Lastly, under the DAC tier is a tier of DataTreasury™ Access Terminal ("DAT") computer systems, which are remote terminals. The DAT is a workstation-based computer system. J.A. 209, '988 Patent, col. 5 ll. 26–38. The multi-tiered structure of the system is shown below.



J.A. 197, '988 Patent, Fig. 1.

The system generally captures, encrypts, and transmits two pieces of digital data—transaction data and identification data. The process begins at the DAT, which is depicted below.



J.A. 198, '988 Patent, Fig. 2.

The DAT scanner (202) scans a document, such as a receipt, and reads data from the document. J.A. 209, '988 Patent, col. 5 ll. 46–57. The DAT can read images, text, and other data, such as the bits represented by a DataGlyph<sup>TM</sup>. J.A. 209, '988 Patent, col. 5 l. 58–col. 6 l. 6. The DAT converts the document into a bitmap image. J.A. 209, '988 Patent, col. 5 ll. 46–57. A portion of an exemplary image of a receipt is shown below.

5



J.A. 200, '988 Patent, Fig. 3B

The exemplary receipt contains two sets of data (1) transaction information, such as the item purchased or its price (labeled 376); and (2) identification information, such as the identifier of the credit card terminal used to print the receipt (labeled 372). Though not specifically depicted in the exemplary receipt in Figure 3B, the Patents teach that the receipt can contain "appropriate identification information such as the transaction amount, the customer, the DAT 200, the transaction date, the transaction tax, the credit card number, the credit card expiration date, etc." J.A. 211, '988 Patent, col. 10 ll. 61–67. The "DAT 200" is

the identification information for the DAT terminal associated with the scanning of the image.  J.A. 211, '988 Patent, col. 10 ll. 31–33.

The DAT controller (labeled WORKSTATION 210 in Figure 2) then encrypts the data received from the document.  J.A. 210, '988 Patent, col. 7 ll. 31–40.  In the bitmap image embodiment, the DAT controller compresses, encrypts, and tags the bitmap image data.  J.A. 210, '988 Patent, col. 7 ll. 31–40, col. 7 l. 51–col. 8 l. 22.  The DAT can store that data and, over the network, when polled, transmit the encrypted data and the tag to the DAC in the hierarchy.  J.A. 210, '988 Patent, col. 7 ll. 41–51.

The DAC first polls each DAT in its region.  J.A. 202, '988 Patent, Fig. 5; J.A. 213, '988 Patent, col. 13 l. 16–col. 14 l. 18.  If the DAT contains additional encrypted data and tags, it transmits that data to the DAC.  *Id.*  The DAC then stores the encrypted data and tags.  *Id.*  A core concern of the system is security, J.A. 208, '988 Patent, col. 3 ll. 26–29, and the communications between the DAT and DAC can occur on an open communications channel (such as a carrier cloud).  As a result, the DataTreasury system employs encryption to secure the communications.  *See* J.A. 209 – 210, '988 Patent, col. 6 ll. 3–6, col. 7 ll. 31–40.

The DPC then retrieves the data in a similar fashion.  J.A. 204, '988 Patent, Fig. 7; J.A. 216, '988 Patent, col. 20 ll. 11–65.  It polls each DAC in its region, and, if a DAC contains additional data, it transmits that DAC to the DPC.  *Id.*

After retrieving the data from the DAC, the DPC processes the data so it can be reproduced for authorized users. J.A. 205, '988 Patent, Fig. 8; J.A. 216 – 217, '988 Patent, col. 20 l. 66–col. 21 l. 32.

The DPC first extracts the tag header from the data, which includes sensitive information such as the customer identifier and the encryption keys to be applied to the data. J.A. 217, '988 Patent, col. 21 ll. 2–6. Using the encryption keys, the DPC decrypts the encrypted data received from the DAC. *Id.* After decompressing the data and engaging in further processing, the DPC is able to reproduce the data initially captured at a remote DAT. J.A. 205, '988 Patent, Fig. 8; J.A. 216 – 217, '988 Patent, col. 20 l. 66–col. 21 l. 32. This process repeats across the tiers to provide a secure, distributed remote image capturing system.

## II.    DataTreasury's Litigation Against the Banking Industry and Fiserv

The '988 and '137 Patents are some of the most thoroughly vetted and valuable patents in the United States. The '988 and '137 Patents are foundational to modern image-based check processing, and the vast majority of the top twenty-five banking institutions in the United States have paid hundreds of millions of dollars to license the '988 and '137 Patents.

Because of the value of the patents, many banks have fought incessantly to avoid compensating DataTreasury for use of the '988 and '137 Patents. When

DataTreasury began filing suit to protect its intellectual property, the banks instituted ex parte reexaminations against both patents in 2005. *See* U.S. Ex Parte Reexamination Control No. 90/007,829 ('988 Reexamination); and U.S. Ex Parte Reexamination Control No. 90/007,830 ('137 Reexamination). By 2007, when the Patents were set to emerge from reexamination unchanged, the banks turned to Congress who proposed legislation that would eliminate all remedies for financial institutions' use of infringing check collection systems—such as those in the '988 and '137 Patents. Patent Reform Act of 2007, S. 1145, 110th Cong. § 14 (2007) (*available* at https://www.congress.gov/bill/110th-congress/senate-bill/1145/text#toc-id0CE1A9293A5549E1A3C61F1CAD5FC7A4, last visited on Jan. 6, 2015). That legislation failed to pass, however, after the Congressional Budget Office independently estimated that the legislation would result in a $1 billion taking. Congressional Budget Office, cost estimate for S. 1145, the Patent Reform Act of 2007 (Feb. 15, 2008), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/costestimate/s114500.pdf.

In 2010, the banks, led by US Bank, attempted unsuccessfully to invalidate the '988 and '137 Patents through a jury trial in federal court. In that trial, US Bank raised the same arguments asserted in this instance—invalidity of the '988 and '137 Patents under 35 U.S.C. § 102. In fact, the defense asserted under 35 U.S.C. § 102, anticipation by Campbell, was the exact same argument raised in this

proceeding, yet the jury and the court soundly rejected it along with all of the other defenses. As had occurred in every instance up to this point, the resisting parties failed to invalidate the '988 and '137 Patents, and instead succeeded in reinforcing the validity and value of the patents.

Despite the herculean efforts by some entities to avoid compensating DataTreasury for the use of its intellectual property, many other banks properly obtained a license to the inventions. Large banks such as J.P. Morgan Chase Bank and PNC Bank have confessed in open court that the '988 and '137 Patents are valid. And as disclosed in open court during the trial against U.S. Bank, several banks have collectively paid in excess of $300 million to use the Patents.

DataTreasury's efforts to protect its patent rights eventually lead it to Fiserv, Inc. ("Fiserv"). While working to protect its property against infringement, DataTreasury discovered that many banks were simply relying on third-party companies, such as Fiserv, to provide the infringing check processing systems. Despite attempts by DataTreasury to license its property to Fiserv, Fiserv refused. DataTreasury had little choice but to protect its intellectual property by filing suit in 2013 against Fiserv and others. In response, Fiserv filed two petitions for CBM review, which resulted in the present action. It is the final decisions on the two CBM reviews that resulted in this appeal.

### III.    The CBM Review Proceedings and the Board Decisions

On March 12, 2014, Fiserv filed two petitions requesting post-grant review under 35 U.S.C. § 321 and § 18 of the AIA.  J.A. 100 – 194, '988 Patent Petition; J.A. 6082 – 6176, '137 Patent Petition.   One petition was assigned case number CBM2014-00087, and sought CBM review of the '988 Patent.  J.A. 5411, Notice of Filing Date Accorded to '988 Petition, 1.  The other petition was assigned case number CBM2014-00088 and sought CBM review of the '137 Patent.  J.A. 11372, Notice of Filing Date Accorded to '137 Patent Petition, 1.

### A.    Determinations in CBM2014-00087 regarding the '988 Patent

CBM2014-00087 petition made the following assertions:

- That the '988 Patent was a covered business method patent;

- That claims 1 – 2, 9, 16 – 19, 22 – 27, 29, 36, 38 – 44, 46 – 50, 55 – 60, 64 – 75, 78 – 86, 88 – 95, 97 – 100, 102, 106 – 110, and 114 – 123 were unpatentable under 35 U.S.C. § 102 over various references, including Campbell; and

- That claims 1 – 2, 9, 16, 18 – 19, 22, 26, 29, 36, 38 – 42, 46 – 49, 55 – 56, 60, 64, 66 – 67, 70 – 71, 73 – 75, 78 – 80, 82 – 84, 88 – 91, 93, 97 – 100, 102, 106 – 110, 112, and 114 – 123 were unpatentable

under 35 U.S.C. §§ 102 and 103 in view of various prior art references including Campbell.

On September 4, 2014, the Board issued its decision instituting a CBM review of the '988 Patent.  J.A. 5556 – 5574, '988 Patent Institution Decision.  In that decision, the Board construed "subsystem identification information" as "information that identifies a subsystem."  J.A. 5563, '988 Patent Institution Decision, 8.  The Board also held that that '988 Patent was eligible for CBM review because it is directed to a financial activity, and is not a technological invention.  J.A. 5562, '988 Patent Institution Decision, 7.  The Board then instituted CBM review of '988 Patent claims 1 – 2, 16, 18, 22, 25 – 26, 29, 36, 38 – 42, 45 – 49, 55, 58 – 60, 64, 66 – 70, 73 – 75, 78, 80, 82 – 84, 88 – 91, 102, 105 – 110, and 114 – 123.  J.A. 5573, '988 Patent Institution Decision, 18.

On September 1, 2015, the Board issued its '988 Patent Decision.  J.A. 5938 – 5976, '988 Patent Decision.  In it, the Board found that claims 1 and 42 are illustrative of the challenged claims, J.A. 5944, '988 Patent Decision, 7, reaffirmed the claim constructions from its Institution Decision, J.A. 5946 – 5948, '988 Patent Decision, 9 – 11, and reaffirmed its institution decision that the '988 Patent was eligible for CBM review and not a technological invention.  J.A. 5945 – 5946, '988 Patent Decision, 8 – 9.  The Board then determined that claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 42, 46 – 49, 58 – 60, 66 – 69, 73 – 74, 80, 82 – 84, 88 – 91, 102,

12

106 – 110, and 114 – 123 were unpatentable under 35 U.S.C. § 102 over Campbell.

J.A. 5975, '988 Patent Decision, 38.    Finally, the Board rejected Fiserv's

unpatentability assertions for claims 25, 45, 55, 64, 70, 75, 78, and 105.  *See id.*

### B.    Determinations in CBM2014-00088 Regarding the '137 Patent

CBM2014-00088 petition made the following assertions:

- That the '137 Patent was a covered business method patent;

- That claims 1 – 2, 9, 16, 18 – 19, 22, 25 – 27, 29, 36, 38 – 43, 48 – 51, 54 – 55, 60 – 63, and 66 were unpatentable under 35 U.S.C. § 102 over various prior art references, including Campbell; and

- That claims 1 – 2, 9 – 10, 16, 18 – 19, 22, 26, 29, 36, 38 – 43, 48 – 51, 54 – 55, 60 – 63, and 66 were unpatentable under 35 U.S.C. §§ 102 and 103 in view of various prior art references including Campbell.

On September 4, 2014, the Board issued its decision instituting a covered

business method review of the '137 Patent.   J.A. 11488 – 11503, '137 Patent

Institution Decision.   In that decision, the Board construed the term "subsystem

identification information" as "information that identifies a subsystem."   J.A.

11495, '137 Patent Institution Decision, 8.   The Board also held that the '137

Patent was eligible for CBM review because it is directed to a financial activity,

and is not a technological invention.  J.A. 11494, '137 Patent Institution Decision, 7.  The Board then instituted CBM review of claims 1, 2, 9, 16, 18 – 19, 22, 25 – 26, 29, 36, 38 – 43, 48, 50 – 51, 54 – 55, 60 – 63, and 66 as anticipated by Campbell under 35 U.S.C. § 102.  J.A. 11502, '137 Patent Institution Decision, 15. The Board denied all other asserted grounds of invalidity directed to the '137 Patent.  *See id.*

On September 1, 2015, the Board issued its '137 Patent Decision.  J.A. 11855 – 11890.  In it, the Board found that claims 42 and 43 are illustrative of the challenged claims, J.A. 11861, '137 Patent Decision, 7, affirmed its initial construction of "subsystem identification information" from its institution decision, J.A. 11863 – 11865, '137 Patent Decision, 9 – 11, and reaffirmed its institution decision that the '137 Patent was eligible for CBM review and not a technological invention.  J.A. 11862, '137 Patent Decision, 8.  The Board then found that claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, 62, and 63 were unpatentable under 35 U.S.C. § 102 over Campbell.  J.A. 11882, 11889, '137 Patent Decision, 28, 35.[2]  The Board finally rejected Fiserv's unpatentability assertions for claims 9, 19, 25, 48, 54, 60, and 66.  *See id.*

_____

[2]  The Board incorrectly included claim 25 in its summary of claims ordered unpatentable, J.A. 11889, '137 Patent Decision, 35.  The Board actually found claim 25 to be patentable, pursuant with its actual analysis of this claim.  J.A. 11882, '137 Patent Decision, 28.

DataTreasury timely perfected its appeal of all of the holdings of the Board.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A). DataTreasury challenges the Board's decisions.

## IV. Discussion of Campbell, the Prior Art Reference Relevant to DataTreasury's Appeal of the Board's Decisions

Campbell, which at its issuance was assigned to AT&T Corporation, is directed to a system for clearing checks between banking institutions by use of a "special check imaging node" that is located within the public switched telephone network ("PSTN"). J.A. 1588, Campbell, Abstract; J.A. 1591, col.1, ll. 6 – 9, col. 2, ll. 18 – 24. Pursuant to Campbell, the check images are transported through the PSTN to a "special check imaging node" that is contained within the PSTN. J.A. 1588, Campbell, Abstract. The "special check imaging node" provides network based check clearing services, which include at least temporary storage of the check images, J.A. 1592, col. 3, ll. 53 – 598, for customers of the telephone network, and then routes the check images to intended recipients in the PSTN. J.A. 1592, Campbell, col. 3, ll. 58 – 60.

Although Campbell discloses that data can be provided to identify the sending bank, J.A. 1593, col. 5, ll. 23 – 28, it does not disclose the provision of data that identifies the subsystem of the bank that generated the check image. *See id.*

Finally, anticipation of the Patents over Campbell has previously been asserted in the U.S. Bank trial, where the jury determined that Campbell did not anticipate any of the asserted Patent claims.

## SUMMARY OF THE ARGUMENT

The Board lacked the power to institute CBM review proceedings on the '988 and '137 Patents because they are patents for technological innovations. The Patents are directed to a multi-tier network computer system that utilizes remote terminals and centralized processing and storage to capture, process, encrypt, and transmit data from documents. They detail the technological components of the inventions, including computers, servers, and a technical database structure. And the legislative history of the America Invents Act indicates that these are the types of patents that Congress intended to exclude from CBM review—computer-rooted document scanning patents whose validity has been upheld in prior administrative and judicial proceedings.

The Board improperly construed the claimed "subsystem identification information" ("SSID") term, which is included in all of the Group I claims (as defined in Argument Section IV) as merely requiring "information that identifies a subsystem." J.A. 5947, '988 Patent Decision, 10. The Board's construction is not consistent with the Patents' claims and specification, which plainly require the SSID to identify the specific remote subsystem that captures the claimed data. The

claims, for example, provide for multiple data capture subsystems at each remote location, and therefore clearly contemplate assignment of SSID's to subsystems, rather than the general assignment of a single SSID to the remote location. J.A. 233 – 234, '988 Patent, cl. 1. Although Campbell discloses the provision of a bank's identity with a check image, it does not disclose provision of the identity of the bank subsystem that captured the check image. As such, the Board's anticipation finding for the Group I claims is improper.

Additionally, all of the Group I claims, except for claims 84, 88 – 91, 119, and 122 of the '988 Patent, require encryption of the SSID. The Board improperly determined that Campbell discloses encryption of the bank's identity, the Board's perceived SSID. Campbell does not disclose encryption of the bank's identity, however, and the Board's anticipation rejection for the encryption subset of Group I is therefore improper (even under the Board's improper construction of SSID).

Campbell does not disclose encryption of the SSID, and the Board's anticipation rejection for the Group I subset that requires encryption is also improper.

The Group II claims (as defined in Argument Section V) require each remote subsystem to capture the following types of data: a "payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number,

a payee bank's routing information, and a payee's account number."  J.A. 263, '137 Patent, cl. 1.  Campbell does not disclose capture of all the claimed data types, and the Board's anticipation rejection of the Group II claims is improper.

The Group III claims (as defined in Argument Section VI) require transmission of the claimed data within at least one "intermediate data collecting subsystem."  J.A. 220, '988 Patent, cl. 42.  Campbell does not disclose this limitation, and the Board's anticipation rejection of the Group III claims is improper.

The Group IV claims (as defined in Argument Section VII) require the claimed "data" to include "data from credit card transactions, J.A. 236 – 237, '988 Patent, cl. 102, and the Group V claims (as defined in Argument Section VII) require the claimed "data" to include "data from internet transactions."  J.A. 237, '988 Patent, cl. 110.  Campbell does not disclose either of these limitations, and the Board's anticipation rejection of the Group IV and V claims is improper.

Thus, for these reasons and the reasons explained below, DataTreasury respectfully requests that the Court reverse the final decisions of the Board.

## ARGUMENT

### I.    Standard of Review

This Court reviews the Board's factual findings for substantial evidence and reviews the Board's legal conclusions de novo.  *In re Cuozzo Speed Techs., LLC,*

793 F.3d 1268, 1280 (Fed. Cir. 2015).  A factual finding is "supported by substantial evidence if a reasonable mind might accept the evidence to support the finding.  *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012) (citing *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

With regard to the limited issue of whether the Patents are eligible for CBM review, the Board's reasoning is reviewed under the arbitrary and capricious, standard while its factual determinations are subject to a substantial evidence review.  *Sightsound Technologies, LLC v. Apple, Inc.*, --- F.3d ---, 2015 U.S. App. LEXIS 21640, at *14 (Fed. Cir. Dec. 15, 2015).

The Board's claim constructions are reviewed de novo and its underlying factual determinations involving extrinsic evidence are reviewed for substantial evidence.  *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015).  Anticipation and prior art teachings present questions of fact. *In re NTP, Inc.,* 654 F.3d 1279, 1297 (Fed. Cir. 2011).  The determination of obviousness under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact.  *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009).  The Board's ultimate determination of obviousness is reviewed de novo.  *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).

## II.    Legal Overview[3]

In order to establish anticipation under 35 U.S.C. § 102, the Board must not only show that the "four corners of a single, prior art document describe every element of the claimed invention," *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008 (citing *Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1322 (Fed. Cir. 2006) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)), but must also show that the prior art document discloses the elements in the same manner as they are arranged in the claim. *Id.* (citing *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983).

When determining the meaning and scope of patent claims on appeal, the Court looks to the "words of the claims themselves, the specification, the prosecution history, and, lastly, any relevant extrinsic evidence." *Id.* (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315–17 (Fed.Cir.2005) (en banc)).

## III.    The Patents Claim Technological Innovations and Thus Are Not Covered Business Methods

---

[3] The impropriety of the Board's decision to institute CBM review has already been briefed in Appellant's Opening Brief (Document 22), filed January 7, 2016, in *DataTreasury Corp. v. Fidelity Nat'l Info. Servs, Inc.,* Case No. 16-1046.  As discussed below, DataTreasury incorporates its treatment of this issue from *Fidelity* in order to prevent redundant briefing on this issue.

The Patents should not have been subjected to CBM review, in part, because they cover technological innovations, and neither the '988 Patent nor the '137 Patent qualify as a covered business method. DataTreasury discussed at length why the Patents are not eligible for covered business method patent review in its Appellant's Opening Brief (Document 22), filed January 7, 2016, in the related pending appeal, *DataTreasury Corp. v. Fidelity Nat'l Infor. Servs, Inc.,* Case No. 16-1046. Therefore, to avoid duplicative briefing, DataTreasury adopts and incorporates by reference herein its arguments as expressed in its Appellant's Opening Brief in the *Fidelity* appeal.

**IV. The Board erred in its determination that '988 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 41, 58 – 60, 66 – 69, 84, 88 – 91, 119 – 120, and 122 and '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, and 62 - 63 are anticipated by Campbell because Campbell fails to disclose the claimed "subsystem identification information."**

'988 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 41, 58 – 60, 66 – 69, 84, 88 – 91, 119 – 120, and 122, as well as '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, and 62 – 63 each require the claimed system or method to include "subsystem identification information" ("SSID"), and can be grouped on this basis ("Group I"). *See, e.g.,* J.A. 4741 – 42, '988 Patent cl. 1. Claim 1 of the '988 patent is illustrative of the claims in Group I:

1. A system for central management, storage and report

generation of remotely captured paper transactions from documents and receipts comprising:

> *one or more remote data access subsystems for capturing and sending paper transaction data and subsystem identification information comprising at least one imaging subsystem for capturing the documents and receipts and at least one data access controller for managing the capturing and sending of the transaction data*;

> at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the *subsystem identification information* comprising a management subsystem for managing the processing, sending and storing [of the] of the transaction data; and

> at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, *with the data access subsystem providing encrypted subsystem identification information* and encrypted paper transaction data to the data processing subsystem.

J.A. 134, '988 Patent, cl. 1 (emphasis added).  As evident, this illustrative claim requires encryption of the SSID.  All of the Group I claims, except for claims 84, 88 – 91, 119, and 122 of the '988 Patent include this encryption requirement.  All of the Group I claims require an SSID.

In its Decisions, the Board determined the Group I claims were unpatentable as anticipated by Campbell.  J.A. 5949 – 5975, '988 Decision, 12 – 38; J.A. 11865 – 11889, '137 Decision, 11 – 35.   The Board's unpatentability decision was necessarily based on its determination that Campbell disclosed the claimed SSID, which the Board construed as "information that identifies a subsystem."

The Board erred in rejecting the Group I claims for two reasons. First, the Board's construction of SSID is wrong because it reads out the requirement that the SSID identify a subsystem at the remote location that captures the claimed data.[4] Second, with respect to the Group I claims requiring encryption of the SSID, the Board erred in its determination that Campbell discloses the encryption of the bank's location information (the Board's perceived SSID) prior to transmission over a network.

## A. The "subsystem identification information" must identify a remote data access subsystem.

It is not disputed that the Board is supposed to apply the broadest reasonable construction to SSID. Yet, ensuring the reasonableness of that construction is crucial in avoiding legal error. "[T]he protocol of giving claims their broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation." *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009); *see also In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) ("The broadest-construction rubric coupled with the term 'comprising' does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the

---

[4] As discussed in Appellant's Opening Brief in *DataTreasury Corp. v. Jack Henry & Assoc., Inc.*, Case Nos. 16-1050, -1052, filed contemporaneously with this brief, Jack Henry urged the Board to adopt the claim interpretation urged herein, which is the trial court's construction of this term. Specifically, the trial court's construction of SSID is "information that identifies the remote data access subsystem or a subsystem that is a part of the remote data access subsystem."

claimed invention."). Rather, "claims should always be read in light of the specification and teachings in the underlying patent." *Suitco*, 603 F.3d at 1260. Even under the broadest reasonable interpretation, the Board's construction "cannot be divorced from the specification and the record evidence." *In re NTP, Inc.,* 654 F.3d 1279, 1288 (Fed. Cir. 2011), and "must be consistent with the one that those skilled in the art would reach," *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). A construction that is "unreasonably broad" and which does not "reasonably reflect the plain language and disclosure" will not pass muster. *Suitco*, 603 F.3d at 1260.

In this instance, the Board's construction of "subsystem identification information" is unreasonably broad because it does not require that the information actually identify a *particular* subsystem, specifically the remote data access subsystem or a subsystem that is part of the remote data access subsystem. For example, the Board's construction would allow the subsystem being identified via the SSID to be *any* type of subsystem irrespective of whether that subsystem's function, place, utility or lack thereof in the context of the invention. That is error. And the Board does not even require that the SSID contain any identification information about the remote data access subsystem, which as further explained below, is crucial to the remotely captured and encrypted transaction data and subsystem identification information. The Board's construction is unreasonably

broad because, taken to its logical conclusion, even a subsystem that has nothing to do with performing or assisting with any the claimed features or functions of the invention could serve as the system being identified via the SSID.

Turning now to the starting point for claim construction, the Patent claims clearly associate SSID with the remote subsystem. Illustrative claim 1 from the '988 Patent, for example, requires a remote data access subsystem for "capturing and sending [encrypted] paper transaction data and subsystem identification information," and for further "providing [the] encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem." J.A. 233 - 34, '988 Patent, cl. 1. As its name suggests, the remote *data access* subsystem is configured to capture the SSID, encrypt it, and then send it to the *data processing* subsystem. Because the SSID is captured in the remote subsystem, it necessarily identifies either the remote subsystem or a component of such remote subsystem.

Moreover, there would be no need for the remote subsystem to transmit encrypted SSID to the data processing subsystem if the SSID were truly associated with the data processing subsystem, as the Board contends. In fact, the Board's interpretation is undermined by the claim language itself. For the Board's interpretation to be correct, the remote subsystem would first obtain non-encrypted SSID over the communication network from the data processing subsystem, then

encrypt the SSID, and return the encrypted SSID to the data processing subsystem. This would clearly undermine the claimed encryption requirement, and shows the error in the Board's construction. *See Phillips*, 415 F.3d at 1314 (stating that the "context in which a term is used in the asserted claim can be highly instructive" to its meaning).

Finally with respect to the language of the claims, the claims require "one or more remote data access systems," each further including additional subsystems, such as "imaging subsystem[s]." J.A. 233 - 234, '988 Patent, cl. 1. As such, the claims contemplate the existence of multiple SSID's at each location. Identifying only the location is not sufficient. To be useful and satisfy the claim language, the SSID must identify a particular subsystem at the remote location.

The plain and ordinary language of the claims is further supported by the specification, which emphasizes the data acquisition activities occurring at the remote location. The title of the patent, for example, is "*Remote image capture with centralized processing and storage.*" (emphasis added) J.A. 195, '988 Patent. The Abstract describes "[a] system for *remote data acquisition* and centralized processing and storage." J.A. 195, '988 Patent, Abstract (emphasis added). And, the Summary of the Invention states that it is an "object of the DataTreasury System to retrieve both paper and electronic transactions *at remote locations*," J.A. 208, '988 Patent, col. 3, ll. 58 – 60, and to "employ a scanner and a data entry

26

terminal *at a customer* site to retrieve data from paper transactions . . . ."  J.A. 208,

'988 Patent, col. 3, ll. 62 – 63 (emphasis added).

Additionally, several of the figures in the specification focus on the remote

data access subsystem, which further highlights its importance in the context of the

system.  Figure 1 of the specification describes the DataTreasury System Access

Terminal (DAT) as one of the "three major operational elements of the invention."

J.A. 208, '988 Patent, col. 4, ll. 35 – 36.  Figure 2 is "a block diagram of the DAT

architecture"; Figure 3a is a "flow chart describing image capture by the DAT";

and Figure 3b shows "a sample paper receipt which is processed by the DAT."

J.A. 208, '988 Patent, col. 4, ll. 40 – 44.  And, the detailed description of the

preferred embodiment goes into extensive discussion concerning the functionality

of remote data subsystem.  J.A. 208 – 211, '988 Patent at col 4, l. 60 – col. 10, l.

57.

Moreover, the specification reveals the identification of the remote data

access subsystem as an important concept in the claimed invention.  That is why

the preferred embodiment has a tag prepended to the ECBI (Encrypted

Compressed Bitmap Image) and that tag contains a data field called

"DAT_TERMINAL_ID" having a "7 position hexadecimal numeric value" which

"uniquely identifies the DAT 200 which is used by the customer."  J.A. 211, '988

Patent, col. 10, ll. 27 – 32, FIG. 3a.  The identity of this remote data subsystem is

encrypted as it is part of the ECBI.  J.A. 210, '988 Patent, col. 8, ll. 8 - 13 ("If the encryption is successful, it produces an Encrypted Compressed Bitmap Image (ECBI)").

The Board did not give proper weight to the emphasis on the importance of the remote data access subsystem.  For the Board to detach the vital importance of the remote data access subsystem from its construction of "subsystem identification information" is error.  By allowing any type of subsystem, irrespective of that subsystem's relevance or utility in the overall system, be identified as the SSID and by not requiring that the SSID identify the remote data access subsystem, the Board's construction is unreasonably broad.

### B. The Board's rejection is improper because Campbell does not disclose the claimed "subsystem identification information."

The Board's rejection is improper because Campbell does not disclose a system or method where the SSID identifies a remote data access subsystem or a subsystem that is part of the remote data access subsystem.  In its Decisions, the Board relies on Campbell as anticipating the Group I claims.  Campbell generally discloses a "special check imaging node" located within a PSTN that processes check images it receives from sending banks that subscribe to the service.  J.A. 1588, Campbell, Abstract.  After processing, the "special check imaging node" routes the check image to an appropriate recipient institution.  *Id.*

The Board determined that the sending bank of Campbell satisfied the "remote data processing subsystem limitation," *see* J.A. 5952 – 5954, '988 Decision, 15 – 17, presumably because it includes workstations attached to imaging equipment for capturing check images for transmission to the "special check imaging node." J.A. 1592, Campbell, col. 3, ll. 10 – 16. But, Campbell does not disclose the claimed capture and transmission of identity information for these subsystems. Rather, Campbell merely discloses the provision of the sending bank's identity as part of the TCP/IP protocol information that accompanies the check image as it is transmitted over the PSTN to the check processing node. *See* J.A. 1593, Campbell, col. 5, ll. 23 – 28. Campbell fails to disclose the capture and transmission of the identity of the sending bank's subsystem to the "special check imaging node," and Campbell therefore does not anticipate any claim in Group I. *See Net MoneyIN, Inc.*, 545 F.3d at 1369 (stating that anticipation requires a single references to disclose the claimed elements, as arranged by the claim).

### C. The Board's rejection is improper because Campbell does not disclose encryption of "subsystem identification information."

As discussed above, the Board determined Campbell's provision of the sending bank's identity for network identification purposes anticipates the SSID limitation of the Group I claims. The Board then determined that Campbell disclosed encryption of the SSID at the sending bank, thereby anticipating the

Group I claims that require encryption of the SSID. The Board's finding is inconsistent with Campbell's disclosure, and anticipation is therefore improper.

In support of its decision, the Board cited the following passage from Campbell:

> The controller 42 may read some data accompanying check images, for example, it may identify that TCP/IP protocol information accompanying those images. *That information may instruct the node 12 about the identity of the sending institution and the intended receiving institution.* That information may also identify the disposition of the check . . . .
>
> *The controller 42 may also be configured to handle information encrypted by sending institutions to provide security for the images transported by the network 38.* The controller 42 may have its own encryption and decryption equipment to provide a secure environment in the node 12.

J.A. 5954, '988 Decision, 17 (citing J.A. 1593, Campbell, col. 5, ll. 23 – 60) (emphasis added). The Board read these two excerpts in conjunction to infer that Campbell disclosed encrypting the identity of the sending bank. But, the plain reading of these passages in context does not support the Board's position.

For example, the first passage above merely indicates that the sending institution may instruct the "special check imaging node" about the identity of the sending bank, which the Board determined satisfied the SSID limitation. The second passage separately indicates that the "special check imaging node" handle information encrypted by the sending institution. Nowhere in this disclosure does

30

Campbell say that the instructions regarding the identity of the sending bank are encrypted. The Board simply inferred this, without any supporting evidence.

> **V.    The Board erred in its determination that '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36 – 41, 50 – 51, and 55 are anticipated by Campbell because it failed to make any findings regarding whether Campbell disclosed the capture of a "payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information and a payee's account number."**

Claims 1 – 2, 16, 18, 22, 26, 29, 36 – 41, 50 – 51, and 55 of the '137 Patent ("Group II") each require "one or more remote data access subsystems for capturing and sending paper transaction data including a payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer's bank draft, a check amount, a payee bank's identification number, a payee bank's routing information, *and* a payee's account number . . . ." J.A. 263, '137 Patent, cl. 1 (emphasis added). Claim 1 of the '137 Patent is illustrative of the Group II claims:

> 1.    A system for central management, storage and report generation of remotely captured paper transactions from checks comprising:
>
> *one or more remote data access subsystems for capturing and sending paper transaction data including a payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number*, and further including

subsystem identification information comprising at least one imaging subsystem for capturing the checks and at least one data access controller for managing the capturing and sending of the transaction data;

at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a data management subsystem for managing the processing, sending and storing of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

J.A. 263 – 264, 137 Patent, cl. 1 (emphasis added).

The Board failed to make any findings regarding the disclosure of each of these emphasized elements in Campbell.  Rather, the Board merely relied on passages from Dr. Knox's declaration, *see* J.A. 11884, '127 Decision at 30, which provides his opinion that "Campbell discloses capturing more than one type of transaction data [because it] discloses . . . use of imaging equipment 'available from companies such as IBM, UNISYS, or NCR.'"  J.A. 6404 (quoting J.A. 1592, Campbell, col. 3., ll. 11 – 12).  The Board's anticipation rejection of the Group II claims is improper for its failure to make findings regarding these claim limitations.  *See Net MoneyIN, Inc.*, 545 F.3d at 1369 (stating that anticipation

requires a single references to disclose the claimed elements, as arranged by the claim).

Moreover, the Board's rejection of these claims is improper because Campbell does not disclose all of the claim elements. Although Campbell generally discloses the use of imaging equipment, it only discloses the scanning a single document, specifically a check. J.A. 1592, Campbell, col. 3, ll. 5 – 7, col. 4, ll. 18 – 19. Moreover, Campbell does not address what type of information is included on the imaged check." J.A. 1588, Abstract. As such, Campbell does not disclose several relevant limitations, such as at least "a payer's bank draft," "a payee bank's identification number, a payee bank's routing information, [and] a payee's account number" J.A. 263, '137 Patent, cl. 1., and the Board's determination for the Group II claims is improper.

### VI. The Board erred in its determination that '988 Patent Claims 36, 38 – 42, 46 – 49, 73 – 74, 80, 82 – 84, and 118 – 123 and '137 Patent claims 38 – 41 are anticipated by Campbell because Campbell does not disclose the claimed transmission of data within each "intermediate data collecting subsystem."

'988 Patent claims 36, 38 – 42, 46 – 49, 73 – 74, 80, 82 – 84, and 118 – 123 and '137 Patent claims 38 – 41 ("Group III") each require an "intermediate data collecting subsystem." Claim 42 of the '988 Patent is illustrative of the Group III claims:

42. A communication network for the transmission of data *within* and between one or more remote data processing subsystems, *at least one intermediate data collecting subsystem* and at least one central subsystem forming a tiered architecture wherein each of said at least one central data processing subsystem communicate with a corresponding some of said at least one data collecting subsystem and each of said at least one data collecting subsystem communicate with a corresponding some of said one or more data processing subsystems, said data processing subsystem including an imaging subsystem for capturing images of documents and receipts, comprising:

at least one first local area network for transmitting data within a corresponding one of said one or more remote subsystems;

at least one second local area network *for transmitting data within a corresponding one of said at least one intermediate subsystem*;

at least one third local area network for transmitting data within a corresponding one of said at least one central subsystem; and

at least one wide area network for transmitting data between said one or more remote subsystems, said at least one intermediate subsystem and said at least one central subsystem.

J.A. 220, '988 Patent, cl. 42 (emphasis added).

In its Decisions, the Board acknowledged that the Group III claims require data transmission within each of the "intermediate" subsystems, but made no findings that Campbell disclosed this claimed limitation. *See* J.A. 5966 – 5967, 5969 – 5970, '988 Decision, 29 – 30, 32 – 33.

Although not entirely clear, it appears that the Board based its decision on two passages from Campbell. The first passage discloses that "[o]ne or both of

[the sending and receiving] institutions 14 and 16 may also be any intermediary institution in the forward and reverse check clearance flows between a bank of first deposit and a payor bank." J.A. 1591, Campbell, col. 2, ll. 46 – 59; *see* J.A. 5961 – 5962, 5969 – 5970, '988 Decision, 24 – 25, 32 – 33. The second passage discloses the network transmission of check images through the PSTN "via one or more trunks and one or more central offices to the check image processing node 12 . . . ." J.A. 145, Campbell, col. 3, ll. 31 – 35; *see* J.A. 5961 -5962, 5969 – 5970, '988 Decision, 24 – 25, 32 – 33.

As evident, this disclosure by Campbell does not provide the manner in which such transmissions occurs, and certainly does not disclose the transmission of such data within a perceived "intermediary." Moreover, the Board did not make any finding of such disclosure, and its rejection of the Group III claims is therefore improper.

**VII.    The Board erred in its determination that '988 Patent claims 102 and 106 – 109, 110, and 114 – 117 are anticipated by Campbell because it failed to make any findings regarding whether Campbell disclosed the claimed "credit card data" and "internet transaction data."**

'988 Patent claims 102, and 106 – 109 ("Group IV") require the claimed systems/methods to transmit "data from credit card transactions," *see* J.A. 236 – 237, '988 Patent, cl. 102. Claims 110, and 114 – 117 of the '988 Patent ("Group V") require the claimed systems/methods to transmit "data from internet

35

transactions." In its Decisions, the Board failed to make any findings regarding the presence of either of these limitations in Campbell. *See* J.A. 5966 – 5970, and 5973, '988 Decision, 29 – 32, and 36. To sustain its anticipation rejection, the Board must make findings of each claim element in Campbell. *See Net MoneyIN, Inc.*, 545 F.3d at 1369. Here, it failed to carry its burden, likely because Campbell fails to disclose the capture or use of credit card or internet transaction data.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Board erred when it concluded that the '988 and '137 Patents were CBM review eligible. After committing that jurisdictional error, it then erred on the merits, determining that '988 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 42, 46 – 49, 58 – 60, 66 – 69, 73 – 74, 80, 82 – 84, 88 – 91, 102, 106 – 110, and 114 – 123 and '137 Patent claims 1 – 2, 16, 18, 22, 26, 29, 36, 38 – 43, 50 – 51, 55, and 62 – 63 are anticipated by Campbell. Thus, DataTreasury respectfully requests that this Court reverse the Final Written Decisions of the Board.

Dated: February 9, 2016              Respectfully submitted,

_____

**CHRISTIAN HURT**

**DEREK GILLILAND**

36

**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlawfirm.com

**CHRISTIAN HURT**
**NIX PATTERSON & ROACH, L.L.P.**
5215 N. O'Connor Blvd., Suite 1900
Irving, Texas 75039
972.831.1188 (telephone)
972.444.0716 (facsimile)
christianhurt@nixlawfirm.com

*Attorneys for Appellant*
*DataTreasury Corporation*

**ADDENDUM**

Trials@uspto.gov
Tel: 571-272-7822
Paper 22
Entered:  September 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

FISERV, INC.,
Petitioner,

v.

DATATREASURY CORPORATION,
Patent Owner.
_____

CBM2014-00087
Patent 5,910,988 C1
_____

Before MICHAEL P. TIERNEY, WILLIAM V. SAINDON, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

SAINDON, *Administrative Patent Judge*.

DECISION

Final Written Decision
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

Dismissing Patent Owner's Motion to Exclude as Moot
*37 C.F.R. § 42.64(c)*

# I.  INTRODUCTION

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is entered pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

With respect to the grounds asserted in this trial, we have considered the papers submitted by the parties and the evidence cited therein.  For the reasons discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 16, 18, 22, 26, 29, 36, 38–42, 46–49, 58–60, 66–69, 73, 74, 80, 82–84, 88–91, 102, 106–110, and 114–123 of U.S. Patent No. 5,910,988 C1 (Ex. 1001, "the '988 patent") are unpatentable, but has not shown that claims 25, 45, 55, 64, 70, 75, 78, and 105 are unpatentable.[1]  In addition, for the reasons discussed below, we dismiss Patent Owner's Motion to Exclude as moot because we expunge the exhibits sought to be excluded, for being improperly filed.

## A.  Procedural History

Petitioner filed a Petition (Paper 1, "Pet.") requesting a covered business method patent review of claims 1–7, 9–27, and 29–123 of the '988 patent over five proposed grounds of unpatentability.  *See* Pet. i–iv. Petitioner filed therewith a Declaration including the testimony of James Knox, Ph.D.  Ex. 1003.  Patent Owner filed a Preliminary Response. Paper 5 ("Prelim. Resp.").  Reviewing the arguments and evidence then before us, we issued a Decision Instituting Covered Business Method Review (Paper 6, "Dec. Inst."), instituting review on claims 1, 2, 16, 18, 22,

---

[1] Patent Owner argues that the evidentiary standard is "clear and convincing proof" (Paper 9, 1), but 35 U.S.C. § 326(e) makes clear the appropriate standard is "preponderance of the evidence."

CBM2014-00087
Patent 5,910,988 C1

25, 26, 29, 36, 38–42, 45–49, 55, 58–60, 64, 66–70, 73–75, 78, 80, 82–84, 88–91, 102, 105–110, and 114–123 over one of the five proposed grounds of unpatentability.  Dec. Inst. 18.

Patent Owner subsequently filed a Response to the Petition (Paper 9, "PO Resp."), including the testimony of Paul M. Ginsberg (Ex. 2004). Petitioner filed a Reply (Paper 10, "Pet. Reply").  Upon the request of the parties, an Oral Hearing was held.  *See* Paper 21 (Transcript of the Hearing, cited as "Tr.").

Patent Owner filed a Motion to Exclude certain evidence.  Paper 16 ("PO Mot. Excl.").  Petitioner filed an Opposition to that Motion (Paper 17, "Pet. Opp. Mot. Excl."), to which Patent Owner filed a Reply (Paper 20, "PO Reply Mot. Excl.").

## B.  Related Matters

The parties indicate that the '988 patent is asserted in a number of district court actions.  Pet. xi–xii; Paper 4.  The '988 patent is the subject of an ongoing *ex parte* reexamination proceeding, 90/012,537,[2] as well as a number of proceedings before this Board, including *Fidelity National Information Services, Inc. v. DataTreasury Corp.*, Case CBM2014-00021

---

[2] Claims 42, 46–50, 84, 88–92, 97–102, 106–110, 114–117, 121, and 122 of the '988 patent are subject to the reexamination and were finally rejected in an office action mailed April 24, 2014.  That rejection was appealed, and the PTAB issued an opinion on April 28, 2015, affirming the examiner's rejections.  The prior art asserted in the reexamination is different from the prior art asserted in this proceeding.  Claims 42, 46–49, 84, 88–91, 102, 106–110, 121, and 122 are involved in both proceedings.

CBM2014-00087
Patent 5,910,988 C1

(PTAB) ("Fidelity CBM")[3] and *Jack Henry and Associates, Inc. v. DataTreasury Corp*, Case CBM2014-00057 (PTAB) ("Jack Henry CBM").[4] Paper 4.

U.S. Pat. No. 6,032,137 is a continuation-in-part of the application that issued as the '988 patent, and is also the subject of a number of district court actions and matters before the Board. Pet. xi–xii.

### C. The '988 Patent

The '988 patent is directed to a system for remote data acquisition, and centralized processing and storage of the acquired data. Ex. 1001, Abstract. An object of the invention is to provide an automated system to manage and store captured electronic and paper transactions from various activities, including banking and consumer applications. *Id.* at 3:30–35. Generally, the '988 patent describes scanning documents using a scanner attached to a general purpose network computer, which is connected via a carrier cloud to a server that inserts images and data received into a database. *Id.* at Figs. 1–2, 3:30–51, 4:60–67, 5:40–45, 16:38–45. Additionally, the general purpose network computer encrypts the images and

---

[3] In the Fidelity CBM proceeding, a Final Written Decision (Paper 34) was issued on April 29, 2015, determining claims 1–123 of the '988 patent to be unpatentable under 35 U.S.C. §§ 101 and 112, first paragraph. The Board received a Notice of Appeal to the Federal Circuit of this Decision on August 27, 2015.

[4] In the Jack Henry CBM, a Final Written Decision (Paper 37) was issued on July 8, 2015, determining claims 1, 2, 16, 18, 26, 27, 42, and 46 of the '988 patent to be unpatentable under 35 U.S.C. §§ 102 and 103. The Board received a Notice of Appeal to the Federal Circuit of this Decision on August 27, 2015.

data to provide a system with maximal security.  *Id.* at 3:30–35, 7:31–35,
8:3–5.

Figure 1 of the '988 patent, provided below, depicts a preferred
embodiment of the system having three major operational elements:



FIG. 1 ( Amended)

The '988 patent describes the tiered arrangement depicted in Figure 1 as
follows:

> FIG. **1** shows the architecture of the DataTreasury™
> System 100.  The DataTreasury™ System **100** has three
> operational elements: the DataTreasury™ System Access
> Terminal (DAT) **200** (the remote data access subsystem), the
> DataTreasury™ System Access Collector (DAC) **400** (the

> intermediate data collecting subsystem), and the
> DataTreasury™ System Processing Concentrator (DPC) **600**
> (the central data processing subsystem).

*Id.* at 4:60–67.

Figure 2 of the '988 patent, provided below, depicts a block diagram of the DAT:



**FIG. 2 ( Amended)**

As shown in Figure 2, scanner 202 is connected to workstation 210, which is connected to data system access collector 300. The workstation can be a general purpose computer and performs tasks including compressing, encrypting, and tagging a scanned bitmapped image. *Id.* at 5:40–45, 7:31–35.

The '988 patent is said to improve upon the prior art by providing an automated, reliable, secure system to process electronic and paper transactions. *Id.* at 3:25–29.

CBM2014-00087
Patent 5,910,988 C1

*D. Illustrative Claims*

Claim 1 is directed to an aspect of the '988 patent involving various subsystems and including encrypted subsystem identification information. Claim 42 is directed to an aspect of the '988 patent involving remote, intermediate, and central subsystems, each having a local area network (later referred to as a "three-tier architecture"). These two independent claims are illustrative, and are reproduced below.

> 1. A system for central management, storage and report generation of remotely captured paper transactions from documents and receipts comprising:
>
> one or more remote data access subsystems for capturing and sending paper transaction data and subsystem identification information comprising at least one imaging subsystem for capturing the documents and receipts and at least one data access controller for managing the capturing and sending of the transaction data;
>
> at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a management subsystem for managing the processing, sending and storing of the transaction data; and
>
> at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.
>
> 42.   A communication network for the transmission of data within and between one or more remote data processing subsystems, at least one intermediate data collecting subsystem and at least one central subsystem

> forming a tiered architecture wherein each of said at least one central data processing subsystem communicate with a corresponding some of said at least one data collecting subsystem and each of said at least one data collecting subsystem communicate with a corresponding some of said one or more data processing subsystems, said data processing subsystem including an imaging subsystem for capturing images of documents and receipts, comprising:
>
> at least one first local area network for transmitting data within a corresponding one of said one or more remote subsystems;
>
> at least one second local area network for transmitting data within a corresponding one of said at least one intermediate subsystem;
>
> at least one third local area network for transmitting data within a corresponding one of said at least one central subsystem; and
>
> at least one wide area network for transmitting data between said one or more remote subsystems, said at least one intermediate subsystem and said at least one central subsystem.

### E.  Asserted Grounds and Prior Art

A covered business method patent review was instituted as to claims 1, 2, 16, 18, 22, 25, 26, 29, 36, 38–42, 45–49, 55, 58–60, 64, 66–70, 73–75, 78, 80, 82–84, 88–91, 102, 105–110, and 114–123 as anticipated by Campbell under 35 U.S.C. § 102.  Dec. Inst. 18.

## II. ANALYSIS

### A.  The '988 Patent Is a Covered Business Method Patent

Patent Owner argues that the '988 patent is not eligible for covered business method patent review because one or more of its claims are

CBM2014-00087
Patent 5,910,988 C1

directed to a technological invention.  PO Resp. 21–26.  We have discussed
whether the '988 patent is eligible for covered business method patent
review at length in our Decision to Institute and Final Written Decision in
the Fidelity CBM.  *See* Fidelity CBM, Paper 14, 9–13; Fidelity CBM, Paper
34, 8–10.  For the same reasons as those we expressed in the Fidelity CBM,
we hold that the '988 patent is eligible for covered business method patent
review.

## B.  Patent Owner's Motion to Exclude

Patent Owner moves to exclude Exhibits 1062–1065.  PO Mot.
Excl. 2–3.  Petitioner filed the disputed exhibits on April 7, 2015, which was
more than two months after Petitioner filed its Reply and 22 days before oral
hearing.  *Id.*  Petitioner characterizes its submission as "supplemental
information" and "apologizes for its oversight" of the "minor procedural
defect" of not seeking authorization to file a motion for supplemental
information.  Pet. Opp. Mot. Excl. 2.  We dismiss as moot Patent Owner's
Motion to Exclude because we hereby order the expungement of Exhibits
1062–1065 for being filed without prior authorization.

## C.  Claim Construction

We interpret the claims of an unexpired patent using the broadest
reasonable interpretation in light of the specification of the patent.  37 C.F.R.
§ 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–80 (Fed.
Cir. 2015).  Under the broadest reasonable interpretation standard, claim
terms are given their ordinary and customary meaning, as would be
understood by one of ordinary skill in the art, in the context of the entire
disclosure.  *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir.

CBM2014-00087
Patent 5,910,988 C1

2007).  Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

In our Decision to Institute this trial, we determined the broadest reasonable interpretation of "subsystem identification information" is "information that identifies a subsystem."  Dec. Inst. 8.  There, as here, we relied on our prior interpretation of this term in the Jack Henry CBM.  *See* Jack Henry CBM, Paper 17, 9–10; *id.*, Paper 37, 9–12.  Notably, we determined, as an ancillary matter to construing the term, that "nothing in the claims, as would be understood by a person of ordinary skill in the art in view of the specification, requires any form of ownership or other type of corporate relationship between the various subsystems; only that they function in the manner set forth in the claims."  *Id.*, Paper 37, 12.[5]

Patent Owner does not comment specifically on or discuss our prior claim construction of "subsystem identification information" ("SSID").  Instead, Patent Owner attacks as "Completely Unacceptable" Petitioner's proposed construction in the Petition, which we did not adopt.  PO Resp. 19; Dec. Inst. 8 (adopting our prior construction of the term in the Jack Henry CBM rather than Petitioner's proposed construction); Jack Henry CBM, Paper 17, 8–10 (adopting neither Petitioner's nor Patent Owner's then-

---

[5] Our reasoning in this regard was confirmed by Patent Owner's admission during Oral Argument during the Jack Henry CBM that common ownership is not required.  *See* Jack Henry CBM, Paper 37, 11–12.  Although Petitioner impermissibly filed the transcript of this Oral Argument as Exhibit 1064, which we expunged, we are nevertheless aware of Patent Owner's admission because we took part in the Jack Henry CBM oral hearing.

CBM2014-00087
Patent 5,910,988 C1

proffered constructions of SSID).[6]  Patent Owner then suggests that we
"consider and accept" a district court construction of SSID, without
providing any explanation for why we should adopt that construction,
especially given that we have explicitly considered and did not accept that
construction before (Jack Henry CBM, Paper 17, 8–10).[7]  PO Resp. 21.
Patent Owner notes that, if we do not adopt that construction, it will "abide
by the Board's decision."  *Id*.  We decline to adopt the district court
construction, a construction previously considered and not adopted, in the
absence of arguments explaining why we should adopt that construction.

Upon consideration of the record before us, we maintain that the
broadest reasonable interpretation of "subsystem identification information"
is "information that identifies a subsystem."

---

[6] Patent Owner does not explain what errors it sees in the construction
offered by Petitioner in its Petition.  Petitioner proposed:  "Information that
identifies a remote data access subsystem, *such as the identification of a
specific branch or terminal of a banking institution*, or a subsystem or
component that is a part of a remote data access subsystem."  Pet. 7
(emphasis added).  The difference between Petitioner's and Patent Owner's
construction lies in the emphasized language, which appears to be a non-
limiting example.

[7] The difference between the district court interpretation and ours is minor
and not outcome-determinative in this case.  The district court limited the
SSID to identification of the *remote* access device, whereas our analysis
concluded that the broadest reasonable interpretation of the term did not
require limiting the SSID to identifying any particular subsystem, so long as
it identified *some* subsystem of the system.  *See* Jack Henry CBM, Paper 17,
9–10.  In application, the difference is immaterial because, in Petitioner's
ground, the alleged SSID in Campbell identifies the remote access device
(sending bank).

CBM2014-00087
Patent 5,910,988 C1

### *D. Anticipation by Campbell*

Petitioner asserts that claims 1, 2, 16, 18, 22, 25, 26, 29, 36, 38–42, 45–49, 55, 58–60, 64, 66–70, 73–75, 78, 80, 82–84, 88–91, 102, 105–110, and 114–123 are anticipated by Campbell. Pet. 10–39.[8]

Campbell discloses a system that transmits check images and routes those images between banks. Ex. 1019, Abstract. A first entity in the system lies within sending bank 14. *Id.* at Fig. 1. Within this first bank, hardware and software are configured to create a check image and other data (e.g., source and destination identifiers). *Id.* at 2:64–3:32, 5:23–28; *see also id.* at 4:10–25 (describing the same hardware and software performing the same operations for a dishonored check). The first bank sends the gathered information to a second entity of the system, node 12, over a network. *Id.* at 3:20–36; *see also id.* at 4:26–29 and 4:59–5:1 (describing the transmission in the dishonored check example). Node 12 performs various tasks with the sent information, one task being the forwarding of the check image to the appropriate receiving bank. *Id.* at 1:60–67, 2:30–32. Receiving bank 16, therefore, is a third entity in the system. *See id.* at Figs. 1, 2. The system is

---

[8] Patent Owner points out that Petitioner did not list claims 45 and 105 in its statement of unpatentability (Pet. 10), but that Petitioner does address these claims in its analysis (Pet. 23). PO Resp. 26. In our Decision to Institute, we included explicitly claims 45 and 105 in the trial. Dec. Inst. 16, 18. The Petition also lists claims 9, 19, 50, 57, 65, 72, 81, and 92 (Pet. 10), but we did not institute a review of those claims because the Petition includes no analysis of those claims. Dec. Inst. 15. Similarly, the Petition lists claims 56, 71, 79, 93, and 97–100, but we did not institute a review of those claims. *Id.*

CBM2014-00087
Patent 5,910,988 C1

equipped to send and receive encrypted information between the banks and within its own central node 12. *Id.* at 5:55–60, 6:37–38.

We have reviewed Patent Owner's arguments against Petitioner's ground (PO Resp. 29–60); the principal arguments are addressed below.

### 1. *Claim 1*

Independent claim 1 requires, *inter alia*, a remote data access subsystem that captures images of paper transaction data and provides encrypted SSID and image data. Claim 1 also requires a central data processing system and a communications network.

Petitioner reads the remote data access subsystem on the sending bank of Campbell, the central data processing subsystem on the node of Campbell, and the communications network on the communications network in Campbell. Pet. 17–21. Petitioner asserts that Campbell captures images of checks and sends that data to the central subsystem via the network. *Id.* Petitioner also asserts that Campbell transmits an encrypted SSID in the form of an endorsement or as additional identifying data sent along with the encrypted check image. *Id.* at 11–18.

With respect to independent claim 1, Patent Owner principally argues that Campbell fails to disclose a) "subsystems" and b) "encryption" of the SSID in the manner required by the claim. *See, e.g.*, PO Resp. 31, 33 (arguing "subsystem"); *id.* at 32, 34–35 (arguing "encryption").

### a. *"subsystem"*

Campbell discloses a system for transporting the images of checks. Ex. 1019, 2:18–20 ("FIG. **1** shows an example of a system for transporting images of checks"). As such, we are persuaded by Petitioner's position that

CBM2014-00087
Patent 5,910,988 C1

the various separately identifiable objects operating within this system—
namely, the first bank, the node, and the second bank—are subsystems
within this system.[9]  Except for the "encryption" aspect of the claim,
discussed below, Patent Owner raises no credible argument that the first
bank, the node, or the second bank in Campbell fail to disclose any element
of claim 1.  Instead, Patent Owner's argument appears to be that one or more
entities in Campbell are not commonly owned or are not subsystems of each
other.  *See* PO Resp. 31, 33.[10]  As we noted in our claim construction of
SSID, however, there is no ownership requirement to be a "subsystem" of
the claimed system.  Further, the claims do not require one subsystem to be a
subsystem of another subsystem, but merely that there are subsystems of the
claimed system.  Accordingly, Patent Owner's arguments are unpersuasive.
Reviewing the record before us, we are persuaded that Petitioner has
established that the "remote data access subsystem" reads on the first bank
in Campbell, and the "central data processing system" reads on the node.

> b.  *"encryption"*

Patent Owner's arguments regarding "encryption" fall into two lines:
i) arguments that Campbell does not disclose an encrypted SSID because

---

[9] "system.  A collection of components organized to accomplish a specific
function or set of functions."  *IEEE Standard Glossary of Software
Engineering Terminology* 73 (IEEE Std 610.12-1990, 1990) (Ex. 3001).
"subsystem.  A secondary or subordinate system with a larger system."  *Id.*
at 72.

[10] Patent Owner's Declarant, Mr. Ginsberg, testifies that "Petitioner (and
also the Board) mistakes the two banks in Figure 1 of the Campbell patent as
being remote data access subsystems of a single bank."  Ex. 2004 ¶ 11.  We
cannot find any such assertion by Petitioner or the Board, and neither PO nor
its Declarant direct us to where such an assertion exists.

CBM2014-00087
Patent 5,910,988 C1

Campbell does not disclose a SSID (*see, e.g.*, PO Resp. 35–36); and
ii) arguments that Campbell does not require encryption of check images
(*see, e.g.*, *id.* at 32, 34–36).

### i.    SSID

We have determined already that the hardware and software system at
the first bank is a subsystem of the check image processing system of
Campbell.  When the system of the first bank transmits the check to the
node, it includes information identifying itself.  Pet. 14–15 (quoting
Ex. 1019, 5:23–28 ("The [node] may read some data accompanying check
images, for example . . . information may instruct the node 12 about the
identity of the sending institution and the intended receiving institution.")).
Accordingly, we are persuaded by Petitioner's assertion that the first bank
transmits a SSID because it transmits information that identifies a subsystem
(the first bank subsystem).[11]  Patent Owner argues:

> Again, Campbell does not state that the identity of
> the sending and/or receiving institutions has been
> encrypted.  But even if the identity of the sending
> and/or receiving institutions were encrypted in the
> Campbell patent, a given bank such as a Sending
> Bank or a Payor Bank is simply **not** a subsystem of
> a Receiving Bank or a Bank of First Deposit.
> Thus, Campbell might be able to identify a given
> Sending Bank and/or a given Bank of First
> Deposit, but the identity of such banks does not

---

[11] Petitioner also provides an alternative reading of SSID on Campbell:  that
the endorsement printed on the check itself is a SSID.  *See* Pet. Reply 5; *see
also* Dec. Inst. 11 (pointing out that Petitioner has two readings of the term
on Campbell).  Although Patent Owner does not appear to discuss this
particular alternative reading, we do not rely on this alternative reading in
reaching our Decision.

CBM2014-00087
Patent 5,910,988 C1

> qualify as **subsystem** identification information. Placing a serial number, or other identification number, on a scanner that imaged a check in a Sending Bank or a Bank of First Deposit does not necessarily provide subsystem identification information, since it is the identification name/number of the subsystem, and not the serial number of a scanner, or a name of bank, that is encrypted in the '988 Patent.

PO Resp. 35–36.[12,13]

Patent Owner here appears to argue that the name of a bank is not a SSID because one bank is not the subsystem of another bank. Patent Owner also appears to argue that a SSID is "not the serial number of a scanner, or a name of bank" that is encrypted. PO Resp. 36. Patent Owner points to no portions of the record and provides no credible analysis in support of these assertions. We are persuaded that the bank is a subsystem; thus, the name of the bank would serve to identify that subsystem and meets the limitation of

---

[12] Patent Owner's Declarant, Mr. Ginsberg, seems to contradict Patent Owner here, by implying that the ID number of a scanner would be a SSID: "Nowhere does Campbell teach that a receiving institution would have any use for information such as the ID number of a scanner in a sending institution." Ex. 2004 ¶ 15.

[13] Patent Owner seems to take an opposite position in its Preliminary Response in another matter involving a similar term, *Fiserv, Inc. v. DataTreasury Corp.*, Case CBM2014-00088 (PTAB) (Paper 5), suggesting that information that identifies a scanner is a SSID: "claim 1 requires encrypting identification information that identifies 'at least one imaging subsystem' (such as the 3897 scanner of the IBM 3890 system . . . ) and requires identification information that identifies 'at least one data access controller' (such as a workstation that operates the 3897 scanner)." CBM2014-00088, Paper 5, 22.

claim 1 requiring a SSID.[14]  Reviewing the record before us, Patent Owner's argument that Campbell does not describe an encrypted SSID because it does not disclose a SSID is unpersuasive in view of the arguments and evidence offered by Petitioner.

*ii.    Requiring Encryption*

Campbell discusses encryption of information as follows:

> The controller **42** may read some data accompanying check images, for example, it may identify that TCP/IP protocol information accompanying those images.  That information may instruct the node **12** about the identity of the sending institution and the intended receiving institution.  That information may also identify the disposition of the check . . . .

> The controller **42** may also be configured to handle information encrypted by sending institutions to provide security for the images transported by the network **38**.  The controller **42** may have its own encryption and decryption equipment to provide a secure environment in the node **12**.

Ex. 1019, 5:14–60; *see also* Pet. 13–16, 18, 20–21 (explaining Petitioner's position regarding encrypting the SSID).  In our Decision to Institute this trial, we determined that Campbell's system "is equipped to send and

---

[14] Further, although not necessary to reach our finding here, we are persuaded by Petitioner's logic that the SSID is "particularly apt where financial institutions have myriad branches or equipment that send data to a central location."  Pet. 14.  In other words, Petitioner implies that one of ordinary skill would understand that the identifying information (SSID) in Campbell is not just a bank name but the name of a particular bank.  Our analysis of dependent claims 119 and 120, below, further address this point.

receive encrypted information between the banks," relying on the above-cited passage in Campbell.  Dec. Inst. 9 (citing Ex. 1019, 5:55–60).

With a full record, we find that the preponderance of the evidence supports Petitioner's position.  Campbell does not state that only the *image* is encrypted.  Instead, Campbell states that "*information* [is] encrypted . . . to provide security *for the images* transported."  Ex. 1019, 5:55–58 (emphasis added).  Thus, Campbell uses the terms *information* and *image* to refer to different collections of data.  Earlier in that column, Campbell also explains what it means by "information," and it is clear that this information is not just images but rather includes "information [that] *accompan[ies]* those images."  *Id.* at 5:25–26 (emphasis added).  For example, the information identifies the "sending institution," "receiving institution," and "the disposition of the check."  *Id.* at 5:26–31.  As we discussed in a prior claim construction of this term, we are persuaded that information identifying the sending institution is a SSID.  *See* Jack Henry CBM, Paper 37, 9–12.  Thus, when this information is encrypted, it is an encrypted SSID, as required by claim 1.  *See also* Ex. 1003 ¶¶ 64–65, 78–84, 91 (Petitioner's Declarant, Dr. Knox, testifying that the encrypted information in Campbell identifies the receiving institution).

Patent Owner argues that Campbell discloses that the controller *may* be configured to handle encrypted information, which means that it "does not necessarily encrypt subsystem information," and that encryption is not "necessarily always . . . accomplished."  PO Resp. 32, 34–36.[15]  Patent

---

[15] Later in its Response, Patent Owner argues that, although Campbell may "encrypt the name of th[e] bank," Campbell does not "encrypt[]

CBM2014-00087
Patent 5,910,988 C1

Owner does not provide an explanation as to how this, even if true, would preclude anticipation:  Campbell would still disclose encrypted SSIDs if it disclosed the encryption as a capability but not a necessity of the system. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983) ("The law of anticipation does not require that the reference 'teach' what the subject patent teaches.  . . . .  [I]t is only necessary that the claims under attack, as construed by the court, 'read on' something disclosed in the reference, i.e., all limitations of the claim are found in the reference, or 'fully met' by it"); *see also* Pet. Reply 5–6 (arguing that there is no requirement that the prior art mandate the use of a disclosed feature).  Notwithstanding, we disagree that Campbell only occasionally encrypts SSIDs, for the reasons explained in the prior paragraph.  Reviewing the record before us, we are persuaded that Campbell discloses transmitting an encrypted SSID.

### c.  Conclusion Regarding Claim 1

In view of the above, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 1.

### 2.  Claim 2

Claim 2 depends from claim 1 and further requires that the data access subsystem comprises a scanner.  Petitioner asserts that Campbell's imaging

---

identification information that identifies a particular subsystem of the . . . Bank." PO Resp. 45.  Thus, Patent Owner appears to recognize that, in fact, Campbell discloses encrypting the name of the bank (while disputing that the name is sufficient to be a SSID).

equipment scans the check.  Pet. 29.[16]  Patent Owner identifies the claim

language in claim 2 and argues that Petitioner's ground is deficient because

Campbell does not anticipate claim 1.  PO Resp. 37.  We determine that

Petitioner has shown, by a preponderance of the evidence, that Campbell

anticipates the subject matter of claim 2.

### 3.  Claim 16

Claim 16 depends from claim 1 and further requires that the remote

data access and data processing subsystems each contain a local area

network (LAN), and that they are connected by a wide area network (WAN).

Petitioner asserts that Campbell's imaging equipment is formed of "large

multiworkstation systems" that sends images to "a network interface" of the

remote data access subsystem (sending bank), and then subsequently sends

information to the data processing subsystem (node), which has its own

LAN 56.  Pet. 19–21 (explaining how Campbell discloses LANs and a

WAN), 21–22 (claim chart citing Ex. 1019, 2:20–22, 2:50–3:12, 3:17–20,

5:17–20; Ex. 1003 ¶ 158).  Patent Owner argues that "Campbell teaches a

single LAN 56, and does not teach a WAN."  PO Resp. 38.  Patent Owner,

aside from citing to its Declarant, Mr. Ginsberg, provides no further credible

---

[16] Petitioner misquotes the Decision to Institute as having said that:  "'Patent
Owner did not discuss these claims in its Preliminary Response and that the
claims will remain invalid unless rebutted.'  Paper 6 at 16."  Pet. Reply 11.
The cited portion of our Decision to Institute states:  "Patent Owner does not
discuss these claims at this time.  We have reviewed Petitioner's assertions
and determine that, if unrebutted, they demonstrate that these claims are
more likely than not anticipated by Campbell."

CBM2014-00087
Patent 5,910,988 C1

explanation for its argument.  We address each of these challenged

limitations below.

*a.  WAN*

A WAN is simply a network that spans geographically separated

areas.[17]  As explained by Petitioner's Declarant, Dr. Knox:

> Campbell discloses the transmission of data
> between sending bank 14 and node 12 using a
> public switched telephone network 10.  Campbell
> further discloses that the network 10 may be a
> frame relay network.  Ex. 1019, 2:61.  "Frames" is
> a general term in telecommunication, and is
> included in many protocols.   A frame relay
> network is a type of Wide Area Network.

Ex. 1003 ¶ 158.

Notably, the '988 patent also describes its WAN as using a frame

relay network over a telecommunications company network.  Ex. 1001,

12:38–39, 12:62–13:9.  Patent Owner's Declarant, Mr. Ginsberg,

acknowledges that Campbell describes transmission of signals over a public

switched telephone network, but states that "the 'central offices' are not

described as being remote from the receiving bank."  Ex. 2004 ¶ 22.  Mr.

Ginsberg appears to be discussing the portion of Campbell where it

describes the signals produced by the sending bank being transmitted on

---

[17] "Wide Area Network (WAN)[:] A data communications network that
covers geographically separated areas, typically containing cities.  Thus a
WAN is usually composed of Local Area Networks (LAN) interconnected
by other communications links hired from a PTT or other common carrier."
*Focal Dictionary of Telecommunications* (1999) *available at*
http://search.credoreference.com/content/entry/bhfidt/wide_area_network_w
an/0 (Ex. 3002).

network access lines 22 to reach telephone network 10 and, more specifically, that "[t]he signals received by the network on line **22** may be transmitted through the network **10** via . . . one or more central offices to the check image processing node **12**." Ex. 1019, 3:17–43. Mr. Ginsberg does not explain how this passage supports his conclusion. Whether the "central offices" (not relied on by Petitioner for this claim) are remote to the sending bank has no bearing, which we can see, on whether Campbell describes a WAN.

Campbell describes transmission of information between the *sending bank* and the *node* over a public switched telephone network; it is that communication that Petitioner asserts occurs over a WAN. *See* Pet. Reply 10; Pet. 21–22. A public switched telephone network covers geographically distinct locations. One of ordinary skill in the art would understand that transmitting information over such a network generally involves the sender and receiver being in different locations; likewise, the system of Campbell makes little sense if the banks and the node are all in the same location. Accordingly, Mr. Ginsberg's testimony on this point is unpersuasive. On the other hand, Petitioner's Declarant, Dr. Knox, explains how the Campbell system uses a public switched telephone network and a frame relay network, which Dr. Knox testifies is a type of WAN. Ex. 1003 ¶ 158. This testimony is persuasive, under its own reasoning and because, as we mentioned above, the WAN in the '988 patent involves a frame relay network over a telecommunications company's network.

Patent Owner's Declarant also testifies that "Campbell does not teach . . . a wide area network that transmits data within and between the [claimed subsystems]." Ex. 2004 ¶ 22. The wide area network in claim 16 does not

CBM2014-00087
Patent 5,910,988 C1

require data to be transmitted "within and between," but rather just "between," the remote and data processing subsystems. Accordingly, Mr. Ginsberg's testimony is directed to language not found in the claims (and even if it were, his conclusory statement is entitled to little or no weight).

Lastly, Patent Owner's Declarant argues that Campbell does not teach a "carrier cloud." *Id.* ¶ 23.[18] Mr. Ginsberg here directs us to the testimony of Petitioner's Declarant, Dr. Knox, at Exhibit 1003, paragraphs 174 and 175. Dr. Knox's testimony there is directed to claim 22, not claim 16; Dr. Knox does not discuss a "carrier cloud" with respect to claim 16. *See generally* Ex. 1003 ¶¶ 169–177 (Dr. Knox's testimony discussing claim 22); *see also* ¶¶ 154–158 (Dr. Knox's testimony discussing claim 16). Thus, Mr. Ginsberg's testimony is unpersuasive.

Reviewing the arguments and evidence before us, we are persuaded that Campbell discloses a WAN as claimed.

### b. LAN

Petitioner's position is that the "multiworkstation systems [at the banks] cited in Campbell necessarily include a LAN." Pet. 20 (citing Ex. 1003 ¶ 112, Ex. 1020, 2); Ex. 1019, 3:10–12 ("The imaging equipment may be large multiworkstation systems available from companies such as IBM, UNISYS, or NCR.").[19] To bolster that point, Petitioner's Declarant, Dr. Knox, testifies and offers evidence that the imaging device mentioned by Campbell and offered for sale by IBM at that time "manage[d] the

---

[18] Neither claim 16 nor claim 22 include a "carrier cloud" limitation.

[19] Petitioner's assertion that node 12 includes a LAN is supported by the evidence and does not appear to be in dispute.

CBM2014-00087
Patent 5,910,988 C1

distribution of image and coded data on the LAN." Ex. 1003 ¶ 112 (quoting Ex. 1020, 193654). We find Dr. Knox's testimony persuasive. Patent Owner offers no persuasive evidence or explanation to the contrary, merely stating that "Petitioner's claim chart . . . does not address the two LANs recited in claim 1." PO Resp. 38. Reviewing the arguments and evidence before us, we are persuaded that Campbell discloses the LANs as claimed.

### c. Conclusion for Claim 16

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 16.

### 4. Claims 18, 58, 59, and 60

Claim 18 depends from claim 1 and requires "a further management subsystem for managing the collecting and sending of the transaction data." Claims 58, 59, and 60 include similar limitations.[20] In effect, this subsystem serves as an intermediary, collecting data and then sending it on. *See* Ex. 1001, Fig. 4 (wherein the DAC collects data from the DAT and sends it to the DPC). Petitioner asserts that Campbell discloses check processing and transmitting equipment, and that banks may transmit images through one or more central offices. Pet. 22 (citing Ex. 1019, 3:32–36 (describing

---

[20] Claim 18 depends from claim 1. Claim 18 refers to "the electronic or paper transaction data" of claim 1, but there is no antecedent basis for "electronic transaction data." In addition, claim 1 limits the data to "paper transaction data"; it would be impermissible for dependent claim 18 to expand the scope of claim 1 beyond paper transaction data. 35 U.S.C. §112(d). We take no position on the definiteness of the claims but limit our application of them on the art to the "paper transaction data" aspect of the "the electronic or paper transaction data" element.

sending data to node 12), 3:17–22 (describing images collected by the imaging equipment and sent across the network), 2:64–3:12 (same)); Ex. 1003 ¶¶ 159–168 (Dr. Knox's explanation for how the limitation is met).

Reviewing Petitioner's assertions, we understand Petitioner to be asserting that the claimed "data collecting subsystem" that has the "management subsystem" is one of the intermediaries Campbell describes as between the banks and the node. *See, e.g.*, Pet. 22 (citing to portions of Campbell that discuss routing the images through intermediaries); Ex. 1003 ¶ 161 ("[S]ending bank 14 can send images indirectly to a node 12 through a trunk or central office. Ex. 1019, 3:32–36. The trunks and/or central office may be another bank 14 and/or 16.").

Patent Owner argues that, "[a]lthough Dr. Knox's analysis is interesting, claims 18, 58, 59 and 60 each depend directly from claim 1," and that "Campbell . . . does not indicate that any two banks are subsidiaries of one another." PO Resp. 39–40. As we explained above, however, the claims do not require such a "subsidiary" feature, and we have determined already claim 1 is anticipated by Campbell.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 18, 58, 59, and 60.

### 5. *Claim 22*

Claim 22 depends from claim 18 and specifies that each of the (now three) subsystems include a LAN, and that each of the subsystems are connected by a WAN. Petitioner largely points to the same things in Campbell as it did for claim 18. Pet. 22–23 (citing, *inter alia*, Ex. 1003

CBM2014-00087
Patent 5,910,988 C1

¶¶ 174–177); *see also* Ex. 1019, 3:46–48 ("The check image processing equipment [at the receiving bank] may be similar to the imaging equipment **18** located in the sending institution **14**").  Petitioner's Declarant, Dr. Knox, testifies that Campbell describes an intermediary bank being a second sending bank, which would then have its own multi-workstation system forming a LAN.  Ex. 1003 ¶ 172; *see also id.* ¶ 161 (setting forth Dr. Knox's reasons for concluding that the "trunks and/or central office may be another bank 14 and/or 16").  As we discussed above, Petitioner has shown persuasively that the banks have LANs (via multi-workstation systems) and are connected via a WAN (over the public switched telephone network).

Patent Owner argues that "Campbell simply does not mention a wide area network at all."  PO Resp. 41.  It is well established that a reference need not teach a limitation *in haec verba*.  *In re Bode*, 550 F.2d 656, 660 (CCPA 1977).  Patent Owner's argument is nothing more than observing that the term does not appear in Campbell; such is not the test for anticipation.  *See id.*  Apparently in contesting Petitioner's assertion that the frame relay network 38 shown in Figure 2 of Campbell is a WAN, Patent Owner also argues that Figure 2 "is illustrative and certainly not drawn to scale in any manner, [such that] it is impossible to conclude from the drawings that Campbell teaches anything remotely resembling a wide area network."  PO Resp. 41.  A wide area network is not defined by its size but rather by the geographic separateness of the entities communicating over it.  *See supra* n.17.  As we discussed in our analysis of claim 16, addressing whether Campbell describes a WAN, we are persuaded that frame relay network 38 (over the public switched telephone network) is a WAN, because it connects geographically separate entities.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 22.

### 6. *Claim 55, 64, 70, 75, and 78*

Claims 55, 64, 70, 75, and 78 further require that the system "automatically generates at least one of credit card statements, bank statements, and tax reports" (claims 55, 64, 70, 75) or just tax reports (claim 78). Petitioner points to the disclosure in Campbell of the data used in the billing interface: tracking the "number of checks processed, converted, stored, and transmitted." Pet. 38 (citing Ex. 1019, 5:35–38, 7:32–42). The testimony of Petitioner's Declarant, Dr. Knox, simply quotes language from Campbell, without analysis or explanation. Ex. 1003 ¶¶ 304–305.

Reviewing the arguments and evidence before us, we determine that Petitioner has not shown sufficient evidence that this billing interface information is one of the claimed statements or reports. The billing interface certainly provides reports, but the claims require the functionality to gather and present certain information in those reports. Credit card and bank statements typically are understood to refer to a list of account activities for a consumer account; a tax report is typically understood to refer to taxes. Although the number of checks processed, etc., may be related to things that eventually make it on a bank statement, Petitioner does not set forth a claim construction or analysis that would allow us to conclude, by a preponderance of the evidence, that such features are a "bank statement" as claimed (or any of the other claimed reports). As such, we determine that Petitioner has not

CBM2014-00087
Patent 5,910,988 C1

shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 55, 64, 70, 75, and 78.

### 7. Claim 26

Independent claim 26 is similar in scope to independent claim 1. Petitioner's assertions for unpatentability and Patent Owner's arguments are substantially similar to those we discussed in our analysis of claim 1. *See* Pet. 23–27; PO Resp. 42–45. We determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 26.

### 8. Claims 29, 36, and 66–69

Claim 29 depends from claim 26 and requires a plurality of remote locations and a plurality of central locations. Claim 36 depends from claim 29 and requires intermediate locations between the remote and central locations. Claims 66–69 depend from claim 26 and include similar limitations.

Petitioner asserts that there are a plurality of remote locations (banks) and a plurality of central locations (nodes). Pet. 24, 27; Ex. 1019, 2:27–29 (disclosing "network **10** contains at least one check image processing node"). Petitioner also asserts that there are intermediate locations between the bank and node. Pet. 27–28; Ex. 1019, 2:46–49 ("One or both of institutions **14** and **16** may also be any intermediary institution . . . between a bank of first deposit and a payor bank."). Patent Owner reiterates its unpersuasive arguments about the banks not being subsystems of one another. PO Resp. 45–46. Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the

CBM2014-00087
Patent 5,910,988 C1

evidence, that Campbell anticipates the subject matter of claims 29, 36, and 66–69.

### 9.  Claims 38–41

These claims depend indirectly from independent claim 26 and generally provide more detail to the steps previously recited.  Claim 41 specifically recites that the transmission between the intermediate location and the central location occurs via frames.  Petitioner asserts that Campbell describes each limitation of these claims, along the lines discussed above for similar limitations (e.g., claims 26, 29, and 36, or their analogues in claims 1, 18, and 22).  *See* Pet. 28–30.  Patent Owner's arguments for claim 38 are similar to its unpersuasive arguments above, about one bank not being a subsystem of another, or that Campbell does not describe a SSID when it transmits the bank's name.  *See* PO Resp. 47.  Patent Owner's argument for claims 39–41 is that they allegedly depend from a patentable claim or are patentable for reasons already explained.  *See id.* at 48.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 38–41.

### 10. Claims 42, 84, 102, 110, and 118

These independent claims are directed generally to a "three-tier architecture."  PO Resp. 49.  Petitioner asserts and explains how Campbell describes at least two three-tier architectures:  (1) sending bank –> node –> receiving bank, and (2) sending bank –> intermediary –> node.  Pet. 30–36.

Patent Owner first argues that the examiner in the *ex parte* reexamination proceeding 90/012,537 "has absolutely no basis for the

CBM2014-00087
Patent 5,910,988 C1

position that is stated by Petitioner." PO Resp. 50. This argument appears to be directed to Petitioner's discussion in its Petition of the current and prior reexamination proceedings involving the '988 patent. *See* Pet. 30–32. There, Petitioner points out that these claims require communication "within" a particular level (e.g., within a remote data access subsystem) and "between" different levels (e.g., between the remote data access subsystem and the central data processing subsystem) but do not require communication between subsystems at the same level. Petitioner points this out because the examiner in the prior reexamination (90/007,829) appeared to have, according to Petitioner, misconstrued these claim limitations. *Id.*

We have reviewed Patent Owner's arguments about the reexamination but are not persuaded that Petitioner's assertions are in error. Notably, we agree with Petitioner's observation that the claims do not require transmitting information between subsystems at the same level, i.e., the claims require transmitting information "within" the same level and "between" different levels. *See, e.g.*, Ex. 1001, 27:17–42 (claim 42 claiming LANs "for transmitting data *within* a corresponding one of said [subsystem]" and a WAN "for transmitting data *between* said [subsystems]") (emphasis added); *id.* at Figs. 1, 2, 4 (showing each so-called tier as only communicating with other tiers, not with other entities in the same tier).

Patent Owner next argues that the "three-tier architecture . . . in the '988 Patent is not an architecture in which a sending institution . . . is a subsystem of the Receiving Bank . . . (or vice versa)." PO Resp. 52. Patent Owner also argues that the "subsystems . . . claimed in the '988 Patent . . . are subsystems that perform various processes on data, not banking institutions." *Id.* Lastly, Patent Owner argues that the claims "further

CBM2014-00087
Patent 5,910,988 C1

specify that data is transmitted within those local area networks claims" and "specify at least one wide area network." *Id.* at 52–53.

None of Patent Owner's arguments are persuasive. We have determined previously that Campbell discloses three LANs connected by a WAN in our analysis of claim 22. All of these systems process data because they are all transmitting images and data over a network. *See, e.g.*, Ex. 1019, 5:20–31 (describing the transmission of data).

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 42, 84, 102, 110, and 118.

*11. Claims 73 and 74*

Claims 73 and 74 are similar and require that each of the "one or more" subsystems of claim 42 comprises specifically "a plurality" of that subsystem. Petitioner's analysis here is the same as it was for claims 29, 36, and 66–69, discussed above. Pet. 24, 27–28. Patent Owner argues that "Campbell does not teach or suggest a plurality of each of three different subsystems that reside within a bank" and repeats its unpersuasive argument about one bank not being a subsystem of the other bank. PO Resp. 54 (further relying on the testimony of Mr. Ginsberg at paragraph 30). Neither Patent Owner's argument nor the testimony of Mr. Ginsberg here is persuasive because it is premised either on a misinterpretation of Petitioner's ground, or a claim construction not commensurate with the broadest reasonable interpretation of the terms "system" and/or "subsystem," as we have explained above. Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence,

CBM2014-00087
Patent 5,910,988 C1

that Campbell anticipates the subject matter of claims 73 and 74.

### 12. Claims 119 and 120

Claims 119 and 120 both depend from independent claim 118 and require that the remote data processing subsystem "uniquely identifies the remote data processing subsystem" and, for claim 120, additionally "encrypts and tags the data." Petitioner asserts that these limitations are met by the functionality of Campbell that identifies the sending institution and keeps records for billing purposes. Pet. 38–39. We understand this to mean that the data accompanying the check images sent to the node is the tagged data (we have already discussed how this is encrypted), and that, because Campbell is able to bill the institutions, it must have uniquely identified them. Patent Owner argues that these claims are patentable based upon their dependency from claim 118. Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 119 and 120.

### 13. Claims 46, 88, 106, 114, and 121

Independent claim 46 requires "one or more remote subsystems," "at least one intermediate subsystem," and "at least one central subsystem" arranged in a "tiered manner." Because the scope of the phrases "one or more" and "at least one" both include "one," Petitioner reads "one or more remote subsystems" on the sending bank of Campbell, "at least one intermediate subsystem" on the node (or the intermediary), and "at least one central subsystem" on the receiving bank (or the node). Pet. 36; *see also id.* at 36–38 (addressing the additional limitations of the claims).

Patent Owner argues that "it is clear that the subsystems recited in [the claims] transmit data within and between the various subsystems." PO Resp. 56. Patent Owner does not explain, however, why it believes the particular arrangement in Campbell fails to satisfy the claim limitations. As we mentioned in our analysis of claims 42, 84, 102, 110, and 118, the transmission is within a given level and between different levels, not both for all (as Patent Owner appears to imply). Patent Owner's argument (*id.*) that Petitioner relies on "banking institutions as being subsystems of one another" is misplaced, as we do not understand Petitioner to rely on one bank being a subsystem of another to meet the claims (nor do the claims appear to preclude or require such an arrangement). *Id.*

Reviewing the record before us, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 46, 88, 106, 114, and 121.

### *14. Claims 47–49*

These claims depend from independent claim 46 and involve a more detailed breakout of prior-claimed steps, similar to claims 39–41, discussed above. Petitioner relies on the same analysis as claims 39–41. Pet. 29–30.

Of interest, claim 48 states that the intermediate location is connected "to an external communication network." Patent Owner argues that "the communication network that is disclosed in Campbell, i.e., the PSTN, is an internal communication network available within banks that have subscribed to the PSTN." PO Resp. 57–58. Patent Owner further argues that "the frame[] relay assembler/dissembler 40 is internal within node 12 of the PSTN which is internal within the banking institutions." *Id.* at 58. Patent

CBM2014-00087
Patent 5,910,988 C1

Owner concludes that "[t]he PSTN is an internal communications network, not an external communications network." *Id.*

Patent Owner's internal/external arguments are unpersuasive. The public switched telephone network is a public network; we are not persuaded that this public network is somehow "internal," whatever meaning Patent Owner ascribes to that term, to the banks or the node in Campbell. *See* Ex. 1019, 2:50–57 (explaining that the PSTN is the telephone network). Patent Owner states that Campbell discloses that "banks . . . have subscribed to the PSTN," PO Resp. 58, but fails to provide any factual support for this assertion. Instead, Campbell discloses that banks subscribe to the check image transport system described therein (i.e., "the services provided by node 12"). Ex. 1019, 5:62; *see also id.* at 5:61–6:56 (explaining how the subscription service works). Accordingly, Patent Owner's arguments are unpersuasive.

Reviewing the record before us, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 47–49.

### 15. Claims 80, 82, and 83

Claim 80 depends from independent claim 46 and requires "polling the intermediate locations." Claims 82 and 83 also depend from claim 46 and require a plurality of remote, intermediate, and central subsystems.

As to claim 80, Petitioner asserts that this limitation is met by the disclosure in Campbell that interface 52 of node 12 polls node controller 42 periodically. Pet. 38. As to claims 82 and 83, Petitioner presents the same

CBM2014-00087
Patent 5,910,988 C1

analysis as it does for claims 29, 36, 66–69, 73, and 74, discussed previously and reciting similar limitations.  Pet. 27–28.

For claim 80, Patent Owner argues that "[i]t is clearly stated at 5:1–9 of the '988 Patent that the intermediate tier . . . is engaged in polling the lowest tier."  PO Resp. 59.  Notably, Patent Owner cites to no claim limitation in support of its argument and instead attempts to incorporate unclaimed disclosures of the specification into the claims.  As we explained in our Decision to Institute, claim 80 "only require[s] that polling of the . . . intermediate locations . . . occurs, i.e., th[is] claim[] do[es] not specify whether the polling occurs between locations."  Dec. Inst. 14.[21]  Thus, Patent Owner's argument that claim 80 requires polling a lower tier is not commensurate in scope with the claim.

For claims 82 and 83, Patent Owner argues:

> The disclosure of a three-tier arrangement using three subsystems that interact with one another to extract and transmit data is wholly different than the mere transmission of an image of check, which can be stored or routed to an ultimate destination.

PO Resp. 61.

We have explained already that we are persuaded that Campbell discloses multiple banks, intermediaries, and nodes, arranged in the claimed tiered manner, in our discussions of claims 29 and 42.  Reviewing the record before us, we are persuaded that Petitioner has shown, by a preponderance

---

[21] This was in contrast to claims 56, 71, 93, and 97–100, upon which we did not institute because these claims "each require polling or calling one location by another location," and we determined that Petitioner had not shown polling between locations in Campbell.  *See* Dec. Inst. 14–15.

of the evidence, that Campbell anticipates the subject matter of claims 80, 82, and 83.

### 16. Claims 89–91, 107–109, and 115–117

These claims involve a more detailed breakout of prior-claimed steps, and are similar to claims 39–41 and 47–49, addressed above. Petitioner's position is the same. *See* Pet. 29–30. Patent Owner's arguments are repetitive of ones found unpersuasive for the reasons expressed above. *See* PO Resp. 61–63. Reviewing the record before us, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 89–91, 107–109, and 115–117.

### 17. Claims 122 and 123

These claims involve uniquely identifying the subsystem, and are similar to claims 119 and 120, addressed above. Petitioner's position is the same. *See* Pet. 38–39. Patent Owner's arguments are repetitive of ones found unpersuasive, for the reasons expressed above. *See* PO Resp. 63. Reviewing the record before us, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 122 and 123.

### 18. Claims 25, 45, and 105

These claims include further limitations wherein some of the LANs include "at least one network switch for routing transaction data within [the LAN]." Petitioner asserts that Campbell discloses multi-workstation imaging systems that form a LAN at the bank, and that a network switch is inherent to a LAN. Pet. 23 (citing Ex. 1003 ¶¶ 182–185).

CBM2014-00087
Patent 5,910,988 C1

Patent Owner argues that "Campbell is completely silent regarding network switches."  PO Resp. 64.  Petitioner's ground, however, asserts that Campbell *inherently* describes the feature; by this, Petitioner is admitting that Campbell is silent on the matter.

Patent Owner also points us to "several documents that describe means other than a network switch to operate a network," citing us to "[f]ootnote 8, at page 11, *supra.*"  *Id.*  We find no such footnote on page 11 of the Response, but find a series of URLs on page 28 in a footnote 8.  There is no indication that the documents at the URLs are in evidence, nor do we see them in the record.  *See* 37 C.F.R. § 42.63(a) ("All evidence must be filed in the form of an exhibit").  There is no explanation of what these documents contain, when and whether they were published, or how, specifically, they are relevant to the discussion at hand.  *See* 37 C.F.R. § 42.23(b) ("All arguments for the relief requested in [a Response] must be made in the [Response]"); *see also* 37 C.F.R. § 42.220(a) (indicating the Response is filed as an opposition, and, thus, subject to Rule 42.23).  The documents at these URLs are not in evidence, not discussed in a paper, and, therefore, are not considered.

Petitioner's Declarant, Dr. Knox, sets out his reasoning that network switches are a standard part of LANs, and that a person of ordinary skill in the art envisioning a LAN would also envision it having a network switch. Ex. 1003 ¶ 184 (testifying, "such as switch is a standard part of a modern local area network"); *id.* at ¶¶ 182–185 (setting forth Dr. Knox's reasoning on the network switch, which includes testimony that the claimed network switch "would be a part of virtually all of the prior art disclosing a LAN"). Whether a network switch is "standard" or in "virtually all" of the prior art,

CBM2014-00087
Patent 5,910,988 C1

however, goes to whether a network switch is obvious, not whether a network switch is inherent in Campbell.

Reviewing the record before us, we determine that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 25, 45, and 105.

### 19. Conclusion for the Campbell Anticipation Ground

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 1, 2, 16, 18, 22, 26, 29, 36, 38–42, 46–49, 58–60, 66–69, 73, 74, 80, 82–84, 88–91, 102, 106–110, and 114–123, but has not made a sufficient showing for claims 25, 45, 55, 64, 70, 75, 78, and 105.

### III. ORDER

In view of the foregoing, it is hereby:

ORDERED that claims 1, 2, 16, 18, 22, 26, 29, 36, 38–42, 46–49, 58–60, 66–69, 73, 74, 80, 82–84, 88–91, 102, 106–110, and 114–123 are unpatentable;

FURTHER ORDERED that Exhibits 1062–1065 are to be expunged;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CBM2014-00087
Patent 5,910,988 C1


For PETITIONER:

David Roodman
Emma Harty
Robert Lancaster
Bryan Cave LLP
daroodman@bryancave.com
emma.harty@bryancave.com
rglancaster@BryanCave.com


For PATENT OWNER:

Abraham Hershkovitz
Eugene Rzucidlo
HERSHKOVITZ & ASSOCIATES, PLLC
ahershkovitz@hershkovitz.net
grzucidlo@hershkovitz.net

US005910988A

# United States Patent [19]

## Ballard

[11] **Patent Number:** 5,910,988

[45] **Date of Patent:** Jun. 8, 1999

[54] **REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE**

[75] Inventor: **Claudio R. Ballard**, Lloyd Harbor, N.Y.

[73] Assignee: **CSP Holdings, Inc.**, Lloyd Harbor, N.Y.

[21] Appl. No.: **08/917,761**

[22] Filed: **Aug. 27, 1997**

[51] **Int. Cl.**[6] .......................................... **H04L 9/00**
[52] **U.S. Cl.** .............................................. **380/24**
[58] **Field of Search** ........................... 380/25, 24

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,201,978 | 5/1980 | Nally ........................... | 340/146.3 |
| 4,264,808 | 4/1981 | Owens et al. ........................... | 235/379 |
| 4,326,258 | 4/1982 | de la Guardia ........................... | 364/515 |
| 4,417,136 | 11/1983 | Rushby et al. ........................... | 235/379 |
| 4,457,015 | 6/1984 | Nally et al. ........................... | 382/45 |
| 4,500,750 | 2/1985 | Elander et al. ........................... | 380/26 |
| 4,523,330 | 6/1985 | Cain ........................... | 382/7 |
| 4,555,617 | 11/1985 | Brooks et al. ........................... | 235/379 |
| 4,578,530 | 3/1986 | Zeidler ........................... | 380/26 |
| 4,602,936 | 7/1986 | Green et al. ........................... | 382/140 |
| 4,680,803 | 7/1987 | Dilella ........................... | 382/9 |
| 4,694,147 | 9/1987 | Amemiya et al. ........................... | 235/379 |
| 4,747,058 | 5/1988 | Ho ........................... | 364/478 |
| 4,750,201 | 6/1988 | Hodgson et al. ........................... | 379/144 |
| 4,843,220 | 6/1989 | Haun ........................... | 235/380 |
| 4,888,812 | 12/1989 | Dinan et al. ........................... | 382/7 |
| 4,912,762 | 3/1990 | Lee et al. ........................... | 380/24 |
| 4,926,325 | 5/1990 | Benton et al. ........................... | 364/408 |
| 4,960,981 | 10/1990 | Benton et al. ........................... | 235/379 |
| 5,091,968 | 2/1992 | Higgins et al. ........................... | 382/30 |
| 5,122,950 | 6/1992 | Benton et al. ........................... | 364/408 |
| 5,144,115 | 9/1992 | Yoshida ........................... | 235/379 |
| 5,159,548 | 10/1992 | Caslavka ........................... | 364/408 |
| 5,173,594 | 12/1992 | McClure ........................... | 235/380 |
| 5,175,682 | 12/1992 | Higashiyama et al. ........................... | 364/408 |
| 5,187,750 | 2/1993 | Behera ........................... | 382/7 |
| 5,204,811 | 4/1993 | Bednar et al. ........................... | 364/406 |
| 5,220,501 | 6/1993 | Lawlor et al. ........................... | 364/408 |

| | | | |
|---|---|---|---|
| 5,237,158 | 8/1993 | Kern et al. ........................... | 235/379 |
| 5,274,567 | 12/1993 | Kallin et al. ........................... | 364/478 |
| 5,283,829 | 2/1994 | Anderson ........................... | 380/24 |
| 5,321,238 | 6/1994 | Kamata et al. ........................... | 235/379 |
| 5,321,751 | 6/1994 | Ray et al. ........................... | 380/23 |
| 5,345,090 | 9/1994 | Hludzinski ........................... | 250/566 |
| 5,434,928 | 7/1995 | Wagner et al. ........................... | 382/187 |
| 5,436,970 | 7/1995 | Ray et al. ........................... | 380/23 |
| 5,444,794 | 8/1995 | Uhland, Sr. ........................... | 382/137 |
| 5,457,747 | 10/1995 | Drexler et al. ........................... | 380/24 |
| 5,479,510 | 12/1995 | Olsen et al. ........................... | 380/24 |
| 5,506,691 | 4/1996 | Bednar et al. ........................... | 358/402 |
| 5,544,043 | 8/1996 | Miki et al. ........................... | 364/406 |

(List continued on next page.)

*Primary Examiner*—Salvatore Cangialosi
*Attorney, Agent, or Firm*—McGuire, Woods, Battle & Boothe LLP

[57] **ABSTRACT**

A system for remote data acquisition and centralized processing and storage is disclosed called the DataTreasury™ System. The DataTreasury™ System provides comprehensive support for the processing of documents and electronic data associated with different applications including sale, business, banking and general consumer transactions. The system retrieves transaction data at one or more remote Locations, encrypts the data, transmits the encrypted data to a central location, transforms the data to a usable form, performs identification verification using signature data and biometric data, generates informative reports from the data and transmits the informative reports to the remote location (s). The DataTreasury™ System has many advantageous features which work together to provide high performance, security, reliability, fault tolerance and low cost. First, the network architecture facilitates secure communication between the remote location(s) and the central processing facility. A dynamic address assignment algorithm performs load balancing among the system's servers for faster performance and higher utilization. Finally, a partitioning scheme improves the error correction process.

**50 Claims, 10 Drawing Sheets**



**5,910,988**
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,590,038 | 12/1996 | Pitroda | 395/241 |
| 5,602,933 | 2/1997 | Blackwell et al. | 382/116 |
| 5,604,640 | 2/1997 | Zipf et al. | 359/803 |
| 5,613,001 | 3/1997 | Bakhoum | 380/4 |
| 5,647,017 | 7/1997 | Smithies et al. | 382/119 |
| 5,657,389 | 8/1997 | Houvener | 380/23 |
| 5,657,396 | 8/1997 | Rudolph et al. | 382/190 |
| 5,673,333 | 9/1997 | Johnston | 382/137 |
| 5,751,842 | 5/1998 | Riach et al. | 382/137 |
| 5,754,673 | 5/1998 | Brooks et al. | 382/112 |
| 5,781,654 | 7/1998 | Carney | 382/137 |
| 5,784,503 | 7/1998 | Bleecker, III et al. | 382/306 |
| 5,787,403 | 7/1998 | Randle | 705/43 |



FIG. 1



FIG. 2



FIG. 3A



XEROX DATAGLYPH

OFFICE DEPOT
2110 BROAD HOLLOW ROAD
FARMINGDALE, NY 11735
516-844-0444

2.16D    9464    3305    0373 001    — 372 / 370

SALE    06/18/97    16:42    — 374

75608700053 BUSINESS PLAN PRO    89.99    — 376
MFG. LIST    $95.00

SUBTOTAL    89.99    — 378
TX 8.225% SALES TAX    7.42    — 380
TOTAL    97.41    — 382

ACCOUNT NUMBER    9999888877776666    — 384
EXPIRATION DATE    01/98    — 386
VISA    97.41
CHANGE    0.00    — 388

THANK YOU FOR SHOPPING AND SAVING AT
OFFICE DEPOT

FIG. 3B

A45

U.S. Patent

Jun. 8, 1999

Sheet 5 of 10

5,910,988

A46



**FIG. 4**



**FIG. 5**

U.S. Patent

Jun. 8, 1999

Sheet 7 of 10

5,910,988

A48



FIG. 6



FIG. 7

Case: 16-1229    Document: 22    Page: 96    Filed: 02/09/2016



FIG. 8

A50

Case: 16-1229    Document: 22    Page: 97    Filed: 02/09/2016



FIG. 9

5,910,988

1

# REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE

## FIELD OF THE INVENTION

This invention relates generally to the automated processing of documents and electronic data from different applications including sale, business, banking and general consumer transactions. More particularly, it pertains to an automated system to retrieve transaction data at remote locations, to encrypt the data, to transmit the encrypted data to a central location, to transform the data to a usable form, to generate informative reports from the data and to transmit the informative reports to the remote locations.

## BACKGROUND

This invention involves the processing of documents and electronic data which are generated, for example, from sale, business and banking transactions including credit card transactions, smart card transactions, automated teller machine (ATM) transactions, consumer purchases, business forms, W2 forms, birth certificates, deeds and insurance documents.

The enormous number of paper and electronic records generated from documents and electronic data from sale, business and banking transactions contain valuable information. First, these paper and electronic records contain information which can be used to verify the accuracy of the records maintained by consumers, merchants and bankers. For example, customers use paper receipts of sale and banking transactions to verify the information on the periodic statements which they receive from their bank or credit card institution. Merchants use paper receipts to record sale transactions for management of customer complaints. Taxpayers use paper receipts to record tax deductible contributions for use in their tax return preparation. Employees use paper receipts to record business expenses for preparation of business expense forms.

Paper and electronic records also contain information which can be used for market analysis. For example, manufacturers and retailers can determine consumer preferences in different regions as well as trends in consumer preferences from the information contained in paper and electronic records.

However, the maintenance and processing of paper and electronic records presents difficult challenges. First, paper receipts and documents could easily be lost, misplaced, stolen, damaged or destroyed. Further, the information contained in these paper and electronic records cannot be easily processed because it is scattered among individual records. For example, the market trend information contained in a group of sales records retained by merchants cannot easily be determined since this information is scattered among the individual records. Likewise, the tax information contained in a group of paper receipts of sales transactions retained by consumers cannot easily be processed.

Previous approaches have been proposed to meet the challenges associated with the maintenance and processing of paper and electronic records. For example, data archive service companies store the information from paper receipts and documents acquired from their customers on microfilm or compact disc read only memory (CD-ROM) at a central facility. Customers typically deliver the paper receipts and documents to the central facility. For sensitive documents which cannot leave the customer site, some data archive service companies perform data acquisition and transfer to

2

magnetic tapes at the customer site and deliver the tapes to the central facility.

The approach offered by these data archive service companies have disadvantages. First, the approach is costly and has poor performance because it requires an expensive, time consuming physical transportation of paper receipts or magnetic tapes from the customer site to the central facility. Further, the approach is not reliable as information can be lost or damaged during physical transportation. The approach also has limited capability as it does not process electronic records along with the paper receipts within a single system.

Other approaches have focused on the elimination of paper receipts and documents. U.S. Pat. No. 5,590,038 discloses a universal electronic transaction card (UET card) or smart card which stores transaction information on a memory embedded on the card as a substitute for a paper receipt. Similarly, U.S. Pat. No. 5,479,510 discloses a method of electronically transmitting and storing purchaser information at the time of purchase which is read at a later time to ensure that the purchased goods or services are delivered to the correct person.

While these approaches avoid the problems associated with paper receipts, they have other disadvantages. First, these approaches do not offer independent verification of the accuracy of the records maintained by consumers, merchants and bankers with a third party recipient of the transaction data. For example, if a UET card is lost, stolen, damaged or deliberately altered by an unscrupulous holder after recording sale or banking transactions, these approaches would not be able to verify the remaining records which are maintained by the other parties to the transactions.

Next, these approaches do not have the ability to process both paper and electronic records of transactions within a single, comprehensive system. Accordingly, they do not address the task of processing the enormous number of paper receipts which have been generated from sales and banking transactions. The absence of the ability to process both paper and electronic records of these approaches is a significant limitation as paper receipts and documents will continue to be generated for the foreseeable future because of concerns over the reliability and security of electronic transactions and the familiarity of consumers and merchants with paper receipts.

These approaches also have a security deficiency as they do not offer signature verification which is typically used on credit card purchases to avoid theft and fraud. For example, a thief could misappropriate money from a UET card holder after obtaining by force, manipulation or theft the user's personal identification number (PIN). Similarly, it is not uncommon for criminals to acquire credit cards in victims' names and make unlawful charges after obtaining the victim's social security number. This becomes a greater concern as that type of personal information becomes available, e.g., on the internet. Also, the signature verification performed manually by merchants for credit card purchases frequently misses forged signatures.

Even if smart cards or UET cards had the ability to store signature and other biometric data within the card for verification, the system would still have disadvantages. First, the stored biometric data on the card could be altered by a card thief to defeat the security measure. Similarly, the biometric data could be corrupted if the card is damaged. Finally, the security measure would be costly at it would require an expensive biometric comparison feature either on each card or on equipment at each merchant site.

A52

5,910,988

3

Additional biometric verification systems including signature verification systems have been proposed to address the security problem. For example, U.S. Pat. No. 5,657,393 discloses a method and apparatus for verification of handwritten signatures involving the extraction and comparison of signature characteristics including the length and angle of select component lines. In addition, U.S. Pat. No. 5,602,933 discloses a method and apparatus for the verification of remotely acquired data with corresponding data stored at a central facility.

However, none of these verification systems offer general support for transaction initiation, remote paper and electronic data acquisition, data encryption, data communication, data archival, data retrieval, data mining, manipulation and analytic services. Accordingly, there is a need for a single system which offers comprehensive support for the tasks involved in the automated processing of documents, biometric and electronic data from sale, business, banking and general consumer transactions. Further, there is a need for a single comprehensive system having the reliability, performance, fault tolerance, capacity, cost and security to satisfy the requirements of the retail, business, banking and general consumer industries.

## SUMMARY OF THE INVENTION

The invention provides an automated, reliable, high performance, fault tolerant, and low cost system with maximal security and availability to process electronic and paper transactions, and has been named the DataTreasury™ System.

It is an object of the present invention to provide a system for central management, storage and verification of remotely captured electronic and paper transactions from credit cards, smart cards, debit cards, documents and receipts involving sales, business, banking and general purpose consumer applications comprising:

   at least one remote data access subsystem for capturing and sending electronic and paper transaction data;

   at least one data collecting subsystem for collecting and sending the electronic and paper transaction data comprising a first data management subsystem for managing the collecting and sending of the transaction data;

   at least one central data processing subsystem for processing, sending and storing the electronic and paper transaction data comprising a second data management subsystem for managing the processing, sending and storing of the transaction data; and

   at least one communication network for the transmission of the transaction data within and between said at least one data access subsystem and said at least one data processing subsystem.

The DataTreasury™ System processes paper and/or electronic receipts such as credit card receipts, Automated Teller Machine (ATM) receipts, business expense receipts and sales receipts and automatically generates reports such as credit card statements, bank statements, tax reports for tax return preparation, market analyses, and the like.

It is a further object of the DataTreasury™ System to retrieve both paper and electronic transactions at remote locations.

It is a further object of the DataTreasury™ System to employ a scanner and a data entry terminal at a customer site to retrieve data from paper transactions and to enable additions or modifications to the scanned information respectively.

It is a further object of the DataTreasury™ System to provide an input device for retrieving transaction data from

4

the memory of smart cards for independent verification of the records maintained by consumers, merchants and bankers to prevent the loss of data from the loss, theft, damage or deliberate alteration of the smart card.

It is a further object of the DataTreasury™ System to retrieve and process transaction data from DataTreasury™ System anonymous smart cards which are identified by an account number and password. Since DataTreasury™ System anonymous smart card transactions can be identified without the customer's name, a customer can add money to the DataTreasury™ System anonymous smart card and make expenditures with the card with the same degree of privacy as cash acquisitions and expenditures.

It is a further object of the DataTreasury™ System to retrieve customer billing data from employee time documents and to generate customer billing statements from the billing data.

It is a further object of the DataTreasury™ System to initiate electronic transactions including transactions on the internet and to provide identification verification by capturing and comparing signature and biometric data.

It is a further object of the DataTreasury™ System of the invention to process electronic and paper transactions with a tiered architecture comprised of DataTreasury™ System Access Terminals (DATs), DataTreasury™ System Access Collectors (DACS) and DataTreasury™ System Processing Concentrators (DPCs).

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and features of the invention will be more clearly understood from the following detailed description along with the accompanying drawing figures, wherein:

FIG. 1 is a block diagram showing the three major operational elements of the invention: the DataTreasury™ System Access Terminal (DAT), the DataTreasury™ System Access Collector (DAC) and the DataTreasury™ System Processing Concentrator (DPC);

FIG. 2 is a block diagram of the DAT architecture;

FIG. 3a is a flow chart describing image capture by a DAT;

FIG. 3b displays a sample paper receipt which is processed by the DAT;

FIG. 4 is a block diagram of the DAC architecture;

FIG. 5 is a flow chart describing the polling of the DATs by a DAC;

FIG. 6 is a block diagram of the DPC architecture;

FIG. 7 is a flow chart describing the polling of the DACs by the DPC;

FIG. 8 is a flow chart describing the data processing performed by the DPC; and

FIG. 9 is a flow chart describing the data retrieval performed by the DPC.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows the architecture of the DataTreasury™ System 100. The DataTreasury™ System 100 has three operational elements: the DataTreasury™ System Access Terminal (DAT) 200 (the remote data access subsystem), the DataTreasury™ System Access Collector (DAC) 400 (the intermediate data collecting subsystem), and the DataTreasury™ System Processing Concentrator (DPC) 600 (the central data processing subsystem).

5,910,988

5

The DataTreasury™ System **100** architecture consists of three tiers. At the bottom tier, the DATs **200** retrieve data from the customer sites. At the next tier, the DACs **400** poll the DATs **200** to receive data which accumulates in the DATs **200**. At the top tier, the DPCs **600** poll the DACs **400** to receive data which accumulates in the DACs **400**. The DPCs **600** store the customer's data in a central location, generate informative reports from the data and transmit the informative reports to the customers at remote locations.

In the preferred embodiment, the DataTreasury™ System **100** complies with the Price Waterhouse SAS70 industry standard. Specifically, the DataTreasury™ System **100** meets the software development standard, the system deployment standard and the reliability standard specified by Price Waterhouse SAS70. By adhering to the Price Waterhouse SAS70 standard, the DataTreasury™ System **100** provides the security, availability and reliability required by mission critical financial applications of banks and stock brokerage companies.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** could also use other software development standard, other system deployment standards and other reliability standards as long as adherence to these alternative standards provides the security, availability and reliability required by mission critical financial applications.

FIG. 2 shows a block diagram of the DAT **200** architecture. DATs **200** are located at customer sites. The DataTreasury™ System **100** customers include merchants, consumers and bankers. The DATs **200** act as the customer contact point to the suite of services provided by the DataTreasury™ System **100**. In the preferred embodiment, the DAT **200** is custom designed around a general purpose thin client Network Computer (NC) which runs SUN Microsystem's JAVA/OS operating system. The custom designed DAT **200** comprises a DAT scanner **202**, a DAT modem **204**, DAT digital storage **206**, a DAT controller **210** (workstation), a DAT card interface **212**, an optional DAT printer **208** and a signature pad **214**.

As is known to persons of ordinary skill in the art, the DAT **200** could also be custom designed around a general purpose network computer running other operating systems as long as the chosen operating system provides support for multiprocessing, memory management and dynamic linking required by the DataTreasury™ System **100**.

The DAT scanner **202** scans a paper receipt and generates a digital bitmap image representation called a Bitmap Image (BI) of the receipt. In the preferred embodiment, the DAT scanner **202** has the ability to support a full range of image resolution values which are commonly measured in Dots Per Inch (DPI). Next, the DAT scanner **202** has the ability to perform full duplex imaging. With full duplex imaging, a scanner simultaneous captures both the front and back of a paper document. The DAT scanner **202** can also support gray scale and full color imaging at any bit per pixel depth value. The DAT scanner **202** also supports the capture of handwritten signatures for identity verification.

In addition to scanning images and text, the DAT scanner **202** also scans DataGlyph™ elements, available from Xerox Corporation. As is known to persons of ordinary skill in the art, the Xerox DataGlyph™ Technology represents digital information with machine readable data which is encoded into many, tiny, individual glyph elements. Each glyph element consists of a 45 degree diagonal line which could be as short as $\frac{1}{100}$th of an inch depending on the resolution of the scanning and printing devices. Each glyph element represents a binary 0 or 1 depending on whether it slopes

6

downward to the left or the right respectively. Accordingly, DataGlyph™ elements can represent character strings as ASCII or EBCIDIC binary representations. Further, encryption methods, as known to persons of ordinary skill in the art encrypt the data represented by the DataGlyph™ Technology.

The use of glyph technology in the DataTreasury™ System **100** improves the accuracy, cost and performance of the system. Xerox DataGlyph™ Technology includes error correction codes which can be referenced to correct scanning errors or to correct damage to the document caused by ink spills or ordinary wear. DataGlyph™ Technology also leads to decreased system cost since the system will require less manual intervention for data entry and correction because of the improved accuracy associated with DataGlyph™ elements. Since DataGlyph™ elements represent a large amount of information in a small amount of space, the DAT scanner **100** will require a small amount of time to input a large amount of information.

The DAT card interface **212** and the DAT signature pad **214** along with the internet and telephone access through the DAT modem **204** enable the DataTreasury™ System **100** customer to initiate secure sale and banking transactions via the internet or telephone with the DAT **200** using a variety of cards including debit cards, smart cards and credit cards. After selecting a purchase or a banking transaction through a standard internet interface, the DataTreasury™ System **100** customer inserts or swipes the debit card, smart card or credit card into the DAT card interface **212**.

The DAT card interface **212** retrieves the identification information from the card for subsequent transmission to the destination of the internet transaction. Further, the DAT scanner **202** could capture a hand written signature from a document or the DAT signature pad **214** could capture an electronic signature written on it with a special pen. Similarly, these security features allow a credit card recipient to activate the card with a DAT **200** located at a merchant site. The security features would detect unauthorized use of debit cards, credit cards and smart cards resulting from their unlawful interception. Accordingly, the DataTreasury™ System's **100** security features offer a more secure alternative for internet and telephone transactions than the typical methods which only require transmission of a card account number and expiration date.

As is known to persons of ordinary skill in the art, the DATs **200** could also include additional devices for capturing other biometric data for additional security. These devices include facial scans, fingerprints, voice prints, iris scans, retina scans and hand geometry.

In addition to initiating sale and banking transactions, the DAT card interface **212** also reads sale and banking transactions initiated elsewhere from the memory of smart cards to enable subsequent storage and processing by the DataTreasury™ System. If a smart card is lost, stolen, damaged or deliberately altered by an unscrupulous holder after the DAT card interface **212** reads its transaction data, the DataTreasury™ System **100** can reproduce the transaction data for the customer. Accordingly, the DAT card interface **212** provides support for independent verification of the records maintained by consumers, merchants and bankers to prevent the loss of data from the loss, theft, damage or deliberate alteration of the smart card.

The DAT card interface **212** also supports the initiation and retrieval of sale and banking transactions with the DataTreasury™ System anonymous smart cards. In contrast to standard debit cards and credit cards, the DataTreasury™

5,910,988

7

System anonymous smart card does not identify the card's holder by name. Instead, the DataTreasury™ System anonymous smart card requires only an account number and a password. Since DataTreasury™ system anonymous smart card transactions can be identified without the customer's name, a DataTreasury™ System 100 customer can purchase a DataTreasury™ System anonymous smart card, add money to the card, make expenditures with the card and monitor the card's account with the same degree of privacy as cash acquisition, expenditure and management.

The DAT scanner 202, the internet access, the signature pad 214 and other biometric data capture devices also support the remote capture of survey information and purchase orders. For example, the DAT scanner 202 captures surveys appearing on the back of checks at restaurants and bars. Similarly, the DAT scanner 202 could capture purchase orders from residences, enabling customers to make immediate purchases from their home of goods promoted through the mail. Accordingly, home marketing merchant could transmit sales in a more cost efficient and reliable manner by using the DAT scanner 202 instead of providing envelopes with prepaid postage to residences.

The DAT scanner 202 also captures receipts which are subsequently needed for tax return preparation or tax audits. Similarly, the DAT scanner 202 captures sales receipts from merchants, providing an off-site secure, reliable repository to guard against loss resulting from flooding, fire or other circumstances. This feature could also allow a merchant to automatically perform inventory in a reliable and cost-effective manner.

The DAT controller 210 performs processing tasks and Input/Output (I/O) tasks which are typically performed by a processor. The DAT controller 210 compresses, encrypts and tags the BI to form a Tagged Encrypted Compressed Bitmap Image (TECBI). The DAT controller 210 also manages the Input/Output (I/O). Specifically, the DAT controller 210 manages devices like the DAT scanner 202, the DAT digital storage 206, the optional DAT printer 208 and the DAT modem 204.

The DAT digital storage 208 holds data such as the TECBI. The DAT modem 204 transmits data from the DAT 200 to the appropriate DAC 400 as instructed by the DAT controller 210. Specifically, the DAT modem 204 transmits the TECBIs from the DAT digital storage 208 to the appropriate DAC 400. In the preferred embodiment, the DAT modem 204 is a high speed modem with dial-up connectivity. The DAT digital storage 208 is sufficiently large to store the input data before transmission to a DAC 400. The DAT digital storage 208 can be Random Access Memory (RAM) or a hard drive.

FIG. 3a is a flow chart 300 describing the operation of the DAT in detail. In step 310, the DAT scanner 202 scans paper receipts into the DAT 200 provided by an operator. In step 312, the DAT controller 210 determines whether the operation executed successfully. If the scanning is successful, the DAT scanner 202 produces a Bitmap Image (BI). If the scanning is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a BI is created, the DAT controller 210 executes a conventional image compression algorithm like the Tagged Image File Format (TIFF) program to compress the BI in step 314. In step 316, the DAT controller 210 determines whether the compression executed successfully. If the compression is successful, it produces a Compressed Bitmap Image (CBI). If the compression is unsuccessful, the DAT

8

controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a CBI is created, the DAT controller 210 executes an encryption algorithm which is well known to an artisan of ordinary skill in the field to encrypt the CBI in step 318. Encryption protects against unauthorized access during the subsequent transmission of the data which will be discussed below. In step 320, the DAT controller 210 determines whether the encryption operation executed successfully. If the encryption is successful, it produces an Encrypted Compressed Bitmap Image (ECBI). If the encryption is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If an ECBI is created, the DAT controller 210 tags the ECBI with a time stamp which includes the scanning time, an identification number to identify the merchant originating the scan and any additional useful information in step 322. In step 324, the DAT controller 210 determines whether the tagging operation executed successfully. If the tagging is successful, it produces a Tagged Encrypted Compressed Bitmap Image (TECBI). If the tagging is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a TECBI is created, the DAT controller 210 stores the TECBI in the DAT digital storage 208 in step 326. In step 328, the DAT controller 210 determines whether the storing operation executed successfully. If the storing operation is successful, the DAT digital storage 208 will contain the TECBI. If the storing operation is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If the TECBI is properly stored in the DAT digital storage 208, the DAT controller 210 determines whether all paper receipts have been scanned in step 330. If all paper receipts have not been scanned, control returns to step 310 where the next paper receipt will be processed as discussed above. If all paper receipts have been scanned, the DAT controller 210 asks the operator to verify the number of receipts scanned in step 334. If the number of scanned receipts as determined by the DAT controller 210 does not equal the number of scanned receipts as determined by the operator, the DAT controller 210 asks whether the operator desires to rescan all of the receipts in step 338.

If the operator chooses to rescan all of the receipts in step 338, the DAT controller 210 will delete all of the TECBIs associated with the batch from the DAT digital storage 208 in step 342. After the operator prepares the batch of receipts for rescan in step 346, control returns to step 310 where the first receipt in the batch will be processed as discussed above.

If the operator chooses not to rescan all of the receipts from the batch in step 338, control returns to step 334 where the DAT controller 210 asks the operator to verify the number of scanned receipts as discussed above.

If the number of scanned receipts as determined by the DAT controller 210 equals the number of scanned receipts as determined by the operator, the DAT controller 210 prints a batch ticket on the DAT printer 206 in step 350. The operator will attach this batch ticket to the batch of receipts which have been scanned. This batch ticket shall contain relevant session information such as scan time, number of receipts and an identification number for the data operator. If processing difficulties occur for a batch of receipts after the image capture of flowchart 300, the batch ticket will enable them to be quickly located for rescanning with the DAT 200.

In step 354, the DAT controller 210 determines whether the scan session has completed. If the scan session has not

5,910,988

9

completed, control returns to step **310** where the first receipt in the next batch of the scan session will be processed as discussed above. If the scan session has completed, the DAT controller **210** selectively prints a session report on the DAT printer **206** in step **358**. The DAT controller **210** writes statistical information for the session to the DAT digital storage **208** in step **362**. In step **366**, the DAT controller **210** terminates the session.

FIG. 3*b* displays a sample paper receipt which is processed by the DAT **200** as described by the flowchart in FIG. 3*a*. The sample paper receipt involves a credit card transaction which has four participants:

   A. The ISSUER: is an entity such as a bank or corporate financial institution such as GE Capital, GM or AT&T which provides the credit behind the credit card and issues the card to the consumer.

   B. The PROCESSOR: executes the processing of an inbound credit card transaction by performing basic transaction validation that includes checking with the ISSUER database to ensure that the credit card has sufficient credit to allow approval of the transaction.

   C. The ACOUIRER: specializes in the marketing, installation and support of Point Of Sale (POS) credit card terminals. The acquirer, like the DAC **400** in the DataTreasury™ System **100** acts as an electronic collection point for the initial credit card transaction as the card is inserted into the POS terminal. After acquisition, the acquirer passes the transaction to the PROCESSOR.

   D. The MERCHANT: inserts a credit card into a POS terminal and enters the amount of the transaction to initiate the credit card transaction.

In the preferred embodiment, the DAT **200** reads the following information from the sample paper receipt shown in FIG. 3i band stores the information in the format described below.

CUSTOMER_ID **370**: This field is a 7 position HEX numeric value. This field uniquely identifies the customer using the terminal. In this sample, this field would identify the credit card merchant.

TERMINAL_ID **372**: This field is a 6 position decimal numeric value. This field uniquely identifies the credit card terminal which is used to print the credit card receipt.

TRANSACTION_DATE **374**: This field contains the date and time of the credit card transaction.

TRANSACTION_LINE_ITEM **376**: This field is a variable length character string. The first three positions represent a right justified numeric field with leading zeros indicating the full length of this field. This field contains all data pertaining to the purchased item including the item's price. The DAT **200** will store a TRANSACTION_LINE_ITEM field for each transaction line item on the receipt. This field is optional since not all credit card transactions will have line items.

TRANSACTION_SUBTOTAL **378**: This field is a double precision floating point number. This field indicates the subtotal of the TRANSACTION_LINE_ITEMs.

TRANSACTION_SALES_TAX **380**: This field is a double precision floating point number. This field contains the sales tax of the TRANSACTION_SUBTOTAL.

TRANSACTION_AMOUNT **382**: This field is a double precision floating point number. This field is the sum of the TRANSACTION_SUBTOTAL and TRANSACTION_SALES_TAX.

CREDIT_CARD_ACCT_NUM **384**: This field is a 12 position decimal value. This field identifies the credit card which was used to execute this transaction.

10

CREDIT_CARD_EXP_DATE **386**: This field identifies the expiration date of the credit card.

TRANSACTION_APPROVAL_CODE **388**: This field is a 6 position numeric value. This field indicates the approval code that was given for the particular transaction.

The DAT **200** also stores additional items which are not pictured in FIG. 3*b* as described below:

ISSUER_ID: This field is a 7 position decimal numeric value. This field identifies the credit card issuer.

ACQUIRER_ID: This field is a 7 position decimal numeric value. This field identifies the acquirer.

PROCESSOR_ID: This field is a 7 position decimal numeric value. This field identifies the processor.

TRANSACTION_LINE_ITEM_CNT: This field is a 3 position decimal numeric value. This field identifies the number of transaction line items on the receipt. A value of ZERO indicates the absence of any transaction line items on the receipt.

TRANSACTION_GRATUITY: This field is a double precision floating number. This field is optional because it will only appear on restaurant or bar receipts.

FINAL_TRANSACTION_AMOUNT: This field is a double precision floating number. This field is optional because it will only appear on restaurant and bar receipts. The field is the sum of the TRANSACTION_AMOUNT and TRANSACTION_GRATUITY.

The tag prepended to the ECBI in step **322** of the flowchart of FIG. 3*a* identifies the time and place of the document's origination. Specifically, the tag consists of the following fields:

DAT_TERMINAL_ID: This field is a 7 position hexadecimal numeric value. This field uniquely identifies the DAT **200** which is used by the customer.

DAT_SESSION_DATE: This field identifies the date and time of the DAT **200** session which generated the image of the document.

DAT_USER_ID: This field is a 4 position decimal numeric value. This field identifies the individual within the CUSTOMER's organization who initiated the DAT **200** session.

DATA_GLYPH_RESULT: This field is a variable length character string. The first four positions hold a right justified numeric position with leading zero which indicate the length of the field. The fifth position indicates the DataGlyph™ element status. A value of 0 indicates that the data glyph was NOT PRESENT on the receipt. A value of 1 indicates that the data glyph WAS PRESENT and contained no errors. A value of 2 indicates that the data glyph WAS PRESENT and had nominal errors. If the fifth position of this field has a value of 2, the remaining portion of the string identifies the erroneous field numbers. As subsequently described, the DPC **600** will reference this portion of the field to capture the erroneous data from the receipt with alternate methods. A value of 3 indicates that the data glyph WAS PRESENT WITH SEVERE ERRORS. In other words, a value of 3 indicates the DataGlyph™ element was badly damaged and unreadable.

The receipt shown in FIG. 3*b* can also contain a signature which can be captured by the DAT scanner **202**. A data glyph could identify the location of the signature on the receipt.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** can also process receipts with alternate formats as long as the receipt contains the appropriate identification information such as the transaction amount, the customer, the DAT **200**, the transaction date, the transaction tax, the credit card number, the credit card expiration date, etc.

5,910,988

**11**

The DataTreasury™ System **100** partitions the paper receipt into image snippets as illustrated by the sample on FIG. **3b**. Partitioning facilitates an improvement in the process to correct errors from the scanning operation. If an error occurred during scanning, the DataTreasury™ System **100** corrects the error using manual entry. With partitioning, the DataTreasury™ System **100** focuses the correction effort on only the image snippet having the error instead of correcting the entire document. The subsequently discussed schema of the DataTreasury™ System **100** database describes the implementation of the partitioning concept in detail.

The DACs **400** form the backbone of the tiered architecture shown in FIG. 1 and FIG. 4. As shown in FIG. 1, each DAC **400** supports a region containing a group of DATs **200**. Each DAC **400** polls the DATs **200** in its region and receives TECBIs which have accumulated in the DATs **200**. The DACs **400** are located at key central sites of maximum merchant density.

In the preferred embodiment, the DAC server **402** comprises stand-alone Digital Equipment Corporation (DEC) SMP Alpha 4100 2/566 servers which are connected on a common network running Windows NT. The DEC Alpha servers manage the collection and intermediate storage of images and data which are received from the DATs **200**.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use any one of a number of different servers that are available from other computer vendors as long as the server meets the capacity, performance and reliability requirements of the system.

In the preferred embodiment, the DAC server **402** also comprises EMC **3300** SYMMETRIX CUBE Disk Storage Systems, which store the images and data collected and managed by the DEC Alpha servers. The DAC **400** architecture also uses a SYMMETRIX Remote Data Facility (SRDF), available from EMC, to enable multiple, physically separate data centers housing EMC Storage Systems to maintain redundant backups of each other across a Wide Area Network (WAN). Since SRDF performs the backup operations in the background, it does not affect the operational performance of the DataTreasury™ System **100**. The DAC server **402** also has secondary memory **410**. In the preferred embodiment, the secondary memory **410** is a small scale DLT jukebox.

The DAC Alpha servers of the DAC server **402** insert images and data received from the DATS **200** into a database which is stored on the disk storage systems using a data manipulation language as is well known to persons of ordinary skill in the art. In the preferred embodiment, the database is a relational database available from Oracle.

As is well known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use any one of a number of different database models which are available from other vendors including the entity relationship model as long as the selected database meets the storage and access efficiency requirements of the system. See, e.g., Chapter 2 of Database System Concepts by Korth and Silberschatz.

The DAC **400** architecture uses a WEB based paradigm using an enhanced Domain Name Services (DNS), the Microsoft Component Object Model (DCOM), and Windows NT Application Program Interfaces (APIs) to facilitate communication and load balancing among the servers comprising the DAC server **402**. As is known to persons of ordinary skill in the art, DNS, which is also known as Bind, statically translates name requests to Internet Protocol 4 (IP4) addresses. In the DAC **400** architecture, an enhanced DNS dynamically assigns IP4 addresses to balance the load among the servers comprising the DAC server **402**.

**12**

In the preferred embodiment, the enhanced DNS is designed and implemented using objects from Microsoft DCOM. Using the DCOM objects, the enhanced DNS acquires real-time server load performance statistics on each server comprising the DAC server **402** from the Windows NT API at set intervals. Based on these load performance statistics, the enhanced DNS adjusts the mapping of name requests to IP4 addresses to direct data toward the servers which are more lightly loaded.

A large bank of modems **404** polls the DATs **200** at the customer sites within the DAC's **400** region. In the preferred embodiment, the bank of modems **404**, available as CISCO AS5200, is an aggregate 48 modem device with Local Area Network (LAN) **406** connectivity which permits the DAC servers **402** to dial the DATs **200** without requiring 48 separate modems and serial connections.

The DAC servers **402** and the bank of modems **404** are connected on a LAN **406**. In the preferred embodiment, the LAN uses a switched 100BaseT/10BaseT communication hardware layer protocol. As is known to persons of ordinary skill in the art, the 100BaseT/10BaseT protocol is based on the Ethernet model. Further, the numbers 100 and 10 refer to the communication link speed in megabits per second. In the preferred embodiment, the CISCO Catalyst 2900 Network Switch supports the LAN **406** connectivity between the devices connected to the LAN **406** including the DAC servers **402** and the bank of modems **404**.

As is known to persons of ordinary skill in the art, alternate LAN architectures could be used to facilitate communication among the devices of the LAN **406**. For example, the LAN **406** could use a hub architecture with a round robin allocation algorithm, a time division multiplexing algorithm or a statistical multiplexing algorithm.

A Wide Area Network (WAN) router **408** connects the LAN **406** to the WAN to facilitate communication between the DACs **400** and the DPCs **600**. In the preferred embodiment, the WAN router **408** is a CISCO 4700 WAN Router. The WAN router **408** uses frame relay connectivity to connect the DAC LAN **406** to the WAN. As is known to persons of ordinary skill in the art, alternate devices, such as the NORTEL Magellen Passport "50" Telecommunication Switch, could be used to facilitate communication between the DACs **400** and the DPCs **600** as long as the selected router meets the performance and quality communication requirements of the system.

As is known to persons of ordinary skill in the art, frame relay is an interface protocol for statistically multiplexed packet-switched data communications in which variable-sized packets (frames) are used that completely enclose the user packets which they transport. In contrast to dedicated point to point links that guarantee a specific data rate, frame relay communication provides bandwidth on-demand with a guaranteed minimum data rate. Frame relay communication also allows occasional short high data rate bursts according to network availability.

Each frame encloses one user packet and adds addressing and verification information. Frame relay data communication typically has transmission rates between 56 kilobytes per second (kb/s) and 1.544 megabytes per second (Mb/s). Frames may vary in length up to a design limit of approximately 1 kilobyte.

The Telco Carrier Cloud **412** is a communication network which receives the frames destined for the DPC **600** sent by the WAN router **408** from the DACs **400**. As is known to persons of ordinary skill in the art, carriers provide communication services at local central offices. These central offices contain networking facilities and equipment to inter-

A57

5,910,988

13

connect telephone and data communications to other central offices within its own network and within networks of other carriers.

Since carriers share the component links of the interconnection network, data communication must be dynamically assigned to links in the network according to availability. Because of the dynamic nature of the data routing, the interconnection network is referred to as a carrier cloud of communication bandwidth.

All the DAC **400** equipment is on fully redundant on-line UPS power supplies to insure maximum power availability. Further, to minimize the time for trouble detection, trouble analysis and repair, all the DAC **400** equipment incorporates trouble detection and remote reporting/diagnostics as is known to an artisan of ordinary skill in the art.

FIG. **5** is a flow chart **500** describing the polling of the DATs **200** by a DAC **400** and the transmission of the TECBIs from the DATs **200** to the DAC **400**. In step **502**, the DAC server **402** reads the address of the first DAT **200** in its region for polling. In step **504**, a modem in the modem bank **404** dials the first DAT **200**. The DAC **400** determines whether the call to the first DAT **200** was successful in step **506**. If the call to the first DAT **200** was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the call to the first DAT **200** was successful, the DAC **400** will verify that the DAT **200** is ready to transmit in step **508**. If the DAT **200** is not ready to transmit, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the DAT **200** is ready to transmit in step **508**, the DAT **200** will transmit a TECBI packet header to the DAC **400** in step **510**. The DAC **400** will determine whether the transmission of the TECBI packet header was successful in step **512**. If the transmission of the TECBI packet header was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the transmission of the TECBI packet header was successful in step **512**, the DAT **200** will transmit a TECBI packet to the DAC **400** in step **514**. The DAC **400** will determine whether the transmission of the TECBI packet was successful in step **516**. If the transmission of the TECBI packet header was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the transmission of the TECBI packet was successful in step **516**, the DAC **400**, in step **518**, will compare the TECBI packet header transmitted in step **510** to the TECBI packet transmitted in step **514**. If the TECBI packet header does not match the TECBI packet, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the TECBI packet header matched the TECBI packet in step **518**, the DAC **400** will set the status of the TECBI packet to indicate that it is ready for transmission to the DPC **600** in step **520**. The DAC **400** will also transmit the status to the DAT **200** to indicate successful completion of the polling and transmission session in step **520**. Next, the DAC **400** will determine whether TECBIs have been transmitted from all of the DATs **200** in its region in step **524**. If all DATs **200** in the DAC's **400** region have transmitted TECBIs to the DAC **400**, the DAC **400** will compile a DAT **200** status report in step **528** before terminating the session.

If one or more DATs **200** in the DAC's **400** region have not transmitted TECBIs to the DAC **400**, the DAC **400** will get the address of the next DAT **200** in the region in step **526**.

14

Next, control returns to step **504** where the next DAT **200** in the DAC's **400** region will be polled as previously discussed.

In the preferred embodiment, the DAC server **402** initiates the polling and data transmission at optimum toll rate times to decrease the cost of data transmission. In addition to the raid drives and redundant servers, the DAC **400** will also have dual tape backup units which will periodically backup the entire data set. If there is a catastrophic failure of the DAC **400**, the tapes can be retrieved and sent directly to the DPC **600** for processing. As the DAT **200** polling and data transmission progresses, the DAC **400** will periodically update the DPC **600** with its status. If there is a catastrophic failure with the DAC **400**, the DPC **600** would know how much polling and backup has been done by the failing DAC **400**. Accordingly, the DPC **600** can easily assign another DAC **400** to complete the polling and data transmission for the DATs **200** in the failed DAC's **400** region.

FIG. **6** is a block diagram of the DPC **600** architecture. The DPC **600** accumulates, processes and stores images for later retrieval by DataTreasury™ System retrieval customers who have authorization to access relevant information. DataTreasury™ System retrieval customers include credit card merchants, credit card companies, credit information companies and consumers. As shown in FIG. 6 and FIG. 1, the DPC **600** polls the DACs **400** and receives TECBIs which have accumulated in the DACs **400**.

In the preferred embodiment, the DPC server **602** comprises stand-alone Digital Equipment Corporation (DEC) SMP Alpha 4100 4/566 servers which are connected on a common network running Windows NT. The DEC Alpha servers manage the collection and intermediate storage of images and data which are received from the DACs **400**.

In the preferred embodiment, the DPC server **602** also comprises EMC **3700** SYMMETRIX CUBE Disk Storage Systems, which store the images and data collected and managed by the DEC Alpha servers. Like the DAC **400** architecture, the DPC **600** architecture uses a SYMMETRIX Remote Data Facility (SRDF), available from EMC, to enable multiple, physically separate data centers housing EMC Storage Systems to maintain redundant backups of each other across a Wide Area Network (WAN).

Like the DAC **400** architecture, the DPC **600** architecture uses a WEB based paradigm using an enhanced Domain Name Services (DNS), the Microsoft Component Object Model (DCOM), and Windows NT Application Program Interfaces (APIs) to facilitate communication and load balancing among the servers comprising the DPC server **602** as described above in the discussion of the DAC **400** architecture.

The workstation **604** performs operation control and system monitoring and management of the DPC **600** network. In the preferred embodiment, the workstation **604**, available from Compaq, is an Intel platform workstation running Microsoft Windows NT 4.x. The workstation **604** should be able to run Microsoft Windows NT 5.x when it becomes available. The workstation **604** executes CA Unicenter TNG software to perform network system monitoring and management. The workstation **604** executes SnoBound Imaging software to display and process TECBIs.

The workstation **604** also performs identification verification by comparing signature data retrieved remotely by the DATs **200** with signature data stored at the DPC **600**. In the preferred embodiment, signature verification software, available from Communications Intelligence Corporation of Redwood Shores, Calif. executing on the workstation **604**

A58

5,910,988

15

performs the identification verification. As is known to persons of ordinary skill in the art, the workstation **604** could execute other software to perform identification verification by comparing biometric data including facial scans, fingerprints, retina scans, iris scans and hand geometry. Thus, the DPC **600** could verify the identity of a person who is making a purchase with a credit card by comparing the biometric data captured remotely with the biometric data stored at the DPC **600**.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use workstations with central processing units from other integrated circuit vendors as long as the chosen workstation has the ability to perform standard operations such as fetching instructions, fetching data, executing the fetched instructions with the fetched data and storing results. Similarly, the DataTreasury™ System **100** could use alternate windows operating systems and network monitoring software as long as the selected software can monitor the status of the workstations and links in the network and display the determined status to the operator.

The Remote Data Entry Gateway **614** and the Remote Offsite Data Entry Facilities **616** correct errors which occurred during data capture by the DAT **200**. Since the DataTreasury™ System **100** partitions the document as described in the discussion of the sample receipt of FIG. 3*b*, the operator at the Remote Data Entry Gateway **614** or the Remote Offsite Date Entry Facilities **616** only needs to correct the portion of the document or image snippet which contained the error.

Partitioning improves system performance, decreases system cost and improves system quality. With partitioning, the DPC Server **602** only sends the portion of the document containing the error to the Remote Data Entry Gateway **614** or the Remote Offsite Data Entry Facilities **616**. Since the operator at these data entry locations only sees the portion of the document which contained the error, she can quickly recognize and correct the error. Without partitioning, the operator would have to search for the error in the entire document. With this inefficient process, the operator would need more time and would be more likely to make a mistake by missing the error or making a modification in the wrong location. Accordingly, partitioning improves system performance and quality by increasing the speed and accuracy of the error correction process.

Similarly, partitioning decreases the traffic on the DPC LAN **606** and the Telco Carrier Cloud **412** because the DPC Server **602** only sends the image snippet containing the error to the Remote Offsite Data Entry Facility **616** or the Remote Data Entry Gateway **614**. Accordingly, partitioning decreases system cost by reducing the bandwidth requirement on the interconnection networks.

A DPC LAN **606** facilitates communication among the devices which are connected to the LAN **606** including the DPC server **602** and the network workstation **604**. In the preferred embodiment, the DPC LAN **606** uses a switched 100BaseT/10BaseT communication hardware layer protocol like the DAC LAN **406** discussed earlier. In the preferred embodiment, the DPC LAN **406** is a high speed OC2 network topology backbone supporting TCP/IP. The CISCO Catalyst 5500 Network Switch supports the DPC LAN **606** connectivity among the devices connected to the LAN **606**.

As is known to persons of ordinary skill in the art, alternate LAN architectures could be used to facilitate communication among the devices of the LAN **406**. For example, the LAN **406** could use a hub architecture with a round robin allocation algorithm, a time division multiplexing algorithm or a statistical multiplexing algorithm.

16

A Wide Area Network (WAN) router **612** connects the DPC LAN **606** to the WAN to facilitate communication between the DACs **400** and the DPCs **600**. In the preferred embodiment, the WAN router **612** is a CISCO 7507 WAN Router. The WAN router **612** uses frame relay connectivity to connect the DPC LAN **612** to the WAN. As is known to persons of ordinary skill in the art, alternate devices, such as the NORTEL Magellen Passport "50" Telecommunication Switch, could be used to facilitate communication between the DACs **400** and the DPCs **600** as long as the selected router meets the performance and quality communication requirements of the system

The DPC **600** has a three tier storage architecture to support the massive storage requirement on the DataTreasury™ System **100**. In the preferred embodiment, the storage architecture consists of Fiber Channel RAID technology based EMC Symmetrix Enterprise Storage Systems where individual cabinets support over 1 Terabyte of storage. After TECBI images have been processed and have been on-line for 30 days, they will be moved to DVD based jukebox systems. After the TECBI images have been on-line for 90 days, they will be moved to Write Once Read Many (WORM) based jukebox systems **608** for longer term storage of up to 3 years in accordance with customer requirements.

In an alternate embodiment, the DPC **600** is intended to also configure a High Density Read Only Memory (HD-ROM) when it becomes available from NORSAM Technologies, Los Alamos, N. Mex., into optical storage jukebox systems **610**, such as that which is available from Hewlett Packard, to replace the DVD components for increased storage capacity. The HD-ROM conforms to CD-ROM form factor metallic WORM disc. The HD-ROM currently has a very large storage capacity of over 320 giga bytes (320 GB) on a single platter and has an anticipated capacity of several terabytes (TB) on a single platter. The DPC **600** uses IBM and Philips technology to read from the HD-ROM and to write to the HD-ROM.

The DPC Alpha servers of the DPC server **602** insert images and data received from the DACs **400** into a single database which is stored on the Digital Storage Works Systems using a data manipulation language as is well known to persons of ordinary skill in the art. In the preferred embodiment, the database is the V8.0 Oracle relational database which was designed to support both data and image storage within a single repository.

As known to persons of ordinary skill in the art, a relational database consists of a collection of tables which have a unique name. See, e.g., Chapter Three of Database System Concepts by Korth and Silberschatz. A database schema is the logical design of the database. Each table in a relational database has attributes. A row in a table represents a relationship among a set of values for the attributes in the table. Each table has one or more superkeys. A superkey is a set of one or more attributes which uniquely identify a row in the table. A candidate key is a superkey for which no proper subset is also a superkey. A primary key is a candidate key selected by the database designer as the means to identify a row in a table.

As is well known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use other database models available from other vendors including the entity relationship model as long as the selected database meets the storage and access efficiency requirements of the system. See, e.g., Chapter 2 of Database System Concepts by Korth and Silberschatz.

An exemplary DPC **600** basic schema consists of the tables listed below. Since the names of the attributes are

5,910,988

**17**

descriptive, they adequately define the attributes' contents. The primary keys in each table are identified with two asterisks (**). Numeric attributes which are unique for a particular value of a primary key are denoted with the suffix, "NO". Numeric attributes which are unique within the entire relational database are denoted with the suffix, "NUM".

I. CUSTOMER: This table describes the DataTreasury™ System customer.

    A. **CUSTOMER__ID
    B. COMPANY__NAME
    C. CONTACT
    D. CONTACT__TITLE
    E. ADDR1
    F. ADDR2
    G. CITY
    H. STATE__CODE
    I. ZIP__CODE
    J. COUNTRY__CODE
    K. VOX__PHONE
    L. FAX__PHONE
    M. CREATE__DATE

II. CUSTOMER__MAIL__TO: This table describes the mailing address of the DataTreasury™ System customer.

    A. **MAIL__TO__NO
    B. **CUST__ID
    C. CUSTOMER__NAME
    D. CONTACT
    E. CONTACT__TILE
    F. ADDR1
    G. ADDR2
    H. CITY
    I. STATE__CODE
    J. ZIP__CODE
    K. COUNTRY__CODE
    L. VOX__PHONE
    M. FAX__PHONE
    N. CREATE__DATE
    O. COMMENTS

III. CUSTOMER__DAT__SITE: This table describes the DAT location of the DataTreasury™ System customer.

    A. **DAT__SITE__NO
    B. **CUST__ID
    C. CUSTOMER__NAME
    D. CONTACT
    E. CONTACT__TILE
    F. ADDR1
    G. ADDR2
    H. CITY
    I. STATE__CODE
    J. ZIP__CODE
    K. COUNTRY__CODE
    L. VOX__PHONE
    M. FAX__PHONE
    N. CREATE__DATE
    O. COMMENTS

IV. CUSTOMER__SITE__DAT: This table describes the DAT site(s) of the DataTreasury™ System customer.

    A. **DAT__TERMINAL__ID
    B. **DAT__SITE__NO

**18**

    C. **CUST__ID
    D. INSTALL__DATE
    E. LAST__SERVICE__DATE
    F. CREATE__DATE
    G. COMMENTS

V. DATA__SPEC: This table provides data specifications for document partitioning and extraction.

    A. **DATA__SPEC__ID
    B. **CUST__ID
    C. DESCR
    D. RECORD__LAYOUT__RULES
    E. CREATE__DATE
    F. COMMENTS

VI. DATA__SPEC__FIELD: This table provides field data specifications for document partitioning and extraction.

    A. **DATA__SPEC__NO
    B. **DATA__SPEC__ID
    C. FIELD__NAME
    D. DESCR
    E. DATA__TYPE
    F. VALUE__MAX
    G. VALUE__MIN
    H. START__POS
    I. END__POS
    J. FIELD__LENGTH
    K. RULES
    L. CREATE__DATE
    M. COMMENTS

VII. TEMPL__DOC: This table specifies the partitioning of a predefined document.

    A. **TEMPL__DOC__NUM
    B. DATA__SPEC__ID
    C. DESCR
    D. RULES
    E. CREATE__DATE
    F. COMMENTS

VIII. TEMPL__FORM: This table defines the location of forms on a predefined document.

    A. **TEMPL__FORM__NO
    B. **TEMPL__DOC__NUM
    C. SIDES__PER__FORM
    D. MASTER__IMAGE__SIDE__A
    E. MASTER__IMAGE__SIDE__B
    F. DISPLAY__ROTATION__A
    G. DISPLAY__ROTATION__B
    H. DESCR
    I. RULES
    J. CREATE__DATE

IX. TEMPL__PANEL: This table specifies the location of panels within the forms of a predefined document.

    A. **TEMPL__PANEL__NO
    B. **TEMPL__SIDE__NO
    C. **TEMPL__FORM__NO
    D. **TEMPL__DOC__NUM
    E. DISPLAY__ROTATION
    F. PANEL__UL__X
    G. PANEL__UL__Y
    H. PANEL__LR__X

5,910,988

## 19

I. PANEL__LR__Y

J. DESCR

K. RULES

L. CREATE__DATE

X. TEMPL__FIELD: This table defines the location of fields within the panels of a form of a predefined document.

  A. **TEMPL__FIELD__NO

  B. **TEMPL__PANEL__NO

  C. **TEMPL__SIDE__NO

  D. **TEMPL__FORM__NO

  E. **TEMPL__DOC__NUM

  F. DISPLAY__ROTATION

  G. FLD__UL__X

  H. FLD__UL__Y

  I. FLD__LR__X

  J. FLD__LR__Y

  K. DESCR

  L. RULES

  M. CREATE__DATE

XI. DAT__BATCH: This table defines batches of documents which were processed during a DAT session.

  A. **DAT__BATCH__NO

  B. **DAT__SESSION__NO

  C. **DAT__SESSION__DATE

  D. **DAT__TERMINAL__ID

  E. DAT__UNIT__CNT

  F. CREATE__DATE

XII. DAT__UNIT: This table defines the unit in a batch of documents which were processed in a DAT session.

  A. **DAT__UNIT__NUM

  B. **DAT__BATCH__NO

  C. **DAT__SESSION__NO

  D. **DAT__SESSION__DATE

  E. **DAT__TERMINAL__ID

  F. FORM__CNT

  G. DOC__CNT

  H. CREATE__DATE

XIII. DAT__DOC: This table defines documents in the unit of documents which were processed in a DAT session.

  A. **DAT__DOC__NO

  B. **DAT__UNIT__NUM

  C. DOC__RECORD__DATA

  D. CREATE__DATE

The DATA__SPEC, DATA__SPEC__FIELD, TEMPL__DOC, TEMPL__FORM, TEMPL__PANEL and TEMPL__FIELD tables implement the document partitioning algorithm mentioned above in the discussion of the sample receipt of FIG. 3b. The cross product of the DATA__SPEC and DATA__SPEC__FIELD tables partition arbitrary documents while the cross product of the TEMPL__DOC, TEMPL__FORM, TEMPL__PANEL and TEMPL__FIELD tables partition predefined documents of the DataTreasury™ System **100**. The TEMPL-FORM defines the location of forms on a predefined document. The TEMPL-PANEL defines the location of panels within the forms of a predefined document. Finally, the TEMPL__FIELD table defines the location of fields within the panels of a form of a predefined document.

The DPC **600** performs data mining and report generation for a wide variety of applications by returning information from the data base. For example, the DPC **600** generates

## 20

market trend analysis reports and inventory reports for merchants by analyzing the data from receipts captured by the DAT **200**. The DPC **600** also can provide important tax information to the taxpayer in the form of a report or to software applications like tax preparation software by retrieving tax information from the database which originally resided on receipts, documents and electronic transactions captured by the DAT **200**. Similarly, the DPC **600** can also provide tax information for particular periods of time for a tax audit.

FIG. 7 is a flow chart **700** describing the polling of the DACs **300** by a DPC **600** and the transmission of the TECBIs from the DACs **300** to the DPC **600**. In step **702**, the DPC **600** reads the address of the first DAC **300** in its region for polling. In step **704**, the DPC **600** connects with a DAC **300** for transmission. The DPC **600** determines whether the connection to the DAC **300** was successful in step **706**. If the call to the DAC **300** was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

If the connection to the DAC **300** was successful, the DPC **600** will verify that the DAC **300** is ready to transmit in step **708**. If the DAC **300** is not ready to transmit, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

If the DAC **300** is ready to transmit in step **708**, the DAC **300** will transmit a TECBI packet header to the DPC **600** in step **710**. The DPC **600** will determine whether the transmission of the TECBI packet header was successful in step **712**. If the transmission of the TECBI packet header was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

If the transmission of the TECBI packet header was successful in step **712**, the DAC **300** will transmit a TECBI packet to the DPC **600** in step **714**. The DPC **600** will determine whether the transmission of the TECBI packet was successful in step **716**. If the transmission of the TECBI packet header was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

If the transmission of the TECBI packet was successful in step **716**, the DPC **600**, in step **718**, will compare the TECBI packet header transmitted in step **710** to the TECBI packet transmitted in step **714**. If the TECBI packet header does not match the TECBI packet, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

If the TECBI packet header matched the TECBI packet in step **718**, the DPC **600** will set the status of the TECBI packet to indicate that it was received at the DPC **600** in step **720**. The DPC **600** will also transmit the status to the DAC **300** to indicate successful completion of the polling and transmission session in step **720**. Next, the DPC **600** will determine whether TECBIs have been transmitted from all of the DACs **300** in its region in step **724**. If all DACs **300** in the DPC's **600** region have transmitted TECBIs to the DPC **600**, the DPC **600** will compile a DAC **300** status report in step **728** before terminating the session.

If one or more DACs **300** in the DPC's **600** region have not transmitted TECBIs to the DPC **600**, the DPC **600** will get the address of the next DAC **300** in the region in step **726**. Next, control returns to step **704** where the next DAC **300** in the DPC's **600** region will be polled as previously discussed.

FIG. 8 is a flow chart **800** describing the data processing performed by the DPC **600**. In step **802**, the DPC **600** fetches

5,910,988

21

the first TECBI packet. Next, the DPC **600** extracts the first TECBI from the TECBI packet in step **804**. In step **806**, the DPC **600** inserts the TECBI into the database. In step **808**, the DPC **600** extracts the tag header which includes the customer identifier, the encryption keys and the template identifier from the TECBI to obtain the ECBI.

In step **810**, the DPC **600** decrypts the ECBI image to obtain the CBI. In step **812**, the DPC **600** uncompresses the CBI to obtain the BI. In step **814**, the DPC **600** fetches and applies the BI template against the BI. Further the DPC **600** divides the BI into image snippets and tags the BI template with data capture rules in step **814** to form the Tagged Bitmap Image Snippets (TBIS). In step **816**, the DPC **600** submits the TBISs for data capture operations to form the IS Derived Data Record (ISDATA). The DPC **600** discards the TBISs upon completion of the data capture operations in step **816**. In step **818**, the DPC **600** updates the TECBI record in the database with the IS Derived Data.

In step **820**, the DPC **600** determines whether it has processed the last TECBI in the TECBI packet. If the last TECBI in the TECBI packet has not been processed, the DPC **600** extracts the next TECBI from the TECBI packet in step **822**. Next, control returns to step **806** where the next TECBI will be processed as described above.

If the last TECBI in the TECBI packet has been processed, the DPC **600** determines whether the last TECBI packet has been processed in step **824**. If the last TECBI packet has not been processed, the DPC **600** fetches the next TECBI packet in step **826**. Next, control returns to step **804** where the next TECBI packet will be processed as described above. If the last TECBI packet has been processed in step **824**, the DPC **600** terminates data processing.

As is known to persons of ordinary skill in the art, a user can request information from a relational database using a query language. See, e.g., Chapter Three of Database System Concepts by Korth and Silberschatz. For example, a user can retrieve all rows of a database table having a primary key with particular values by specifying the desired primary key's values and the table name on a select operation. Similarly, a user can retrieve all rows from multiple database tables having primary keys with particular values by specifying the desired primary keys' values and the tables with a select operation.

The DataTreasury™ System provides a simplified interface to its retrieval customers to enable data extraction from its relational database as described in FIG. 9. For example, a DataTreasury™ System customer can retrieve the time, date, location and amount of a specified transaction.

The DPC **600** performs data mining and report generation for a wide variety of applications by returning information from the data base. For example, the DPC **600** generates market trend analysis reports and inventory reports for merchants by analyzing the data from receipts captured by the DAT **200**. The DPC **600** also can provide important tax information to the taxpayer in the form of a report or to tax preparation software by retrieving tax information from the database which originally resided on receipts, documents and electronic transactions captured by the DAT **200**. Similarly, the DPC **600** can also provide tax information for particular periods of time for a tax audit.

FIG. **9** is a flowchart **900** describing the data retrieval performed by the DPC **600**. In step **902**, the DPC **600** receives a TECBI retrieval request. In step **904**, the DPC **600** obtains the customer identifier. In step **906**, the DPC **600** determines whether the customer identifier is valid. If the customer identifier is not valid, control returns to step **904** where the DPC **600** will obtain another customer identifier.

22

If the customer identifier is valid in step **906**, the DPC **600** will obtain the customer security profile in step **908**. In step **910**, the DPC **600** receives a customer retrieval request. In step **912**, the DPC **600** determines whether the customer retrieval request is consistent with the customer security profile. If the customer retrieval request is not consistent with the customer security profile, control returns to step **910** where the DPC **600** will obtain another customer retrieval request. If the customer retrieval request is consistent with the customer security profile, the DPC **600** will transmit the results to the customer as indicated by the customer security profile in step **914**.

While the above invention has been described with reference to certain preferred embodiments, the scope of the present invention is not limited to these embodiments. One skilled in the art may find variations of these preferred embodiments which, nevertheless, fall within the spirit of the present invention, whose scope is defined by the claims set forth below.

What is claimed is:

1. A system for central management, storage and report generation of remotely captured paper transactions from documents and receipts comprising:

one or more remote data access subsystems for capturing and sending paper transaction data and subsystem identification information comprising at least one imaging subsystem for capturing the documents and receipts and at least one data access controller for managing the capturing and sending of the transaction data;

at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a management subsystem for managing the processing, sending and storing of the of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

2. A system as in claim **1** wherein said one or more data access subsystems further comprise at least one scanner for capturing the paper transaction data.

3. A system as in claim **2** wherein said one or more data access subsystems also capture electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, further comprising:

at least one card interface for capturing the electronic transaction data;

at least one signature interface for capturing an electronic signature; and

at least one biometric interface for capturing biometric data.

4. A system as in claim **3** wherein said at least one data access controller successively transforms the captured transaction data to a bitmap image, a compressed bitmap image, an encrypted, compressed bitmap image and an encrypted, compressed bitmap image tagged with information identifying a location and time of the transaction data capture.

5. A system as in claim **4** wherein said one or more data access subsystems further comprise digital storage for storing the tagged, encrypted, compressed bitmap image.

6. A system as in claim **5** wherein said at least one card interface initiates the electronic transaction.

5,910,988

23

**7.** A system as in claim **6** wherein said one or more data access subsystems further comprise at least one printer for printing the paper transaction initiated by said at least one card interface.

**8.** A system as in claim **7** wherein the paper transaction printed by said at least one printer includes data glyphs.

**9.** A system as in claim **1** wherein said data management subsystem of said at least one data processing subsystem comprises:

at least one server for polling said one or more remote data access subsystems for transaction data;

a database subsystem for storing the transaction data in a useful form;

a report generator for generating reports from the transaction data and providing data to software applications;

at least one central processing unit for managing the storing of the transaction data;

a domain name services program for dynamically assigning one of said at least one server to receive portions of the transaction data for balancing the transaction data among said at least one server; and

a memory hierarchy.

**10.** A system as in claim **9** wherein said at least one server also polls for biometric and signature data, said database stores the biometric data and the signature data, and said at least one central processing unit verifies the biometric data and the signature data.

**11.** A system as in claim **9** wherein said memory hierarchy comprises at least one primary memory for storage of recently accessed transaction data and at least one secondary memory for storage of other transaction data.

**12.** A system as in claim **11** wherein said at least one secondary memory comprises at least one write once read many jukebox and at least one optical storage jukebox.

**13.** A system as in claim **12** wherein said at least one optical storage jukebox comprises read only memory technology including compact disc read only memory form factor metallic write once read many disc.

**14.** A system as in claim **9** wherein said database subsystem comprises at least one predefined template for partitioning the stored transaction data into panels and identifying locations of the panels.

**15.** A system as in claim **14** wherein said data processing subsystem further comprises a data entry gateway for correcting errors in the panels of stored transaction data.

**16.** A system as in claim **1** wherein said at least one communication network comprises:

at least one first local area network for transmitting data within a corresponding one of said one or more remote data access subsystems;

at least one second local area network for transmitting data within a corresponding one of said at least one data processing subsystem; and

at least one wide area network for transmitting data between said one or more remote data access subsystems and said at least one data processing subsystem.

**17.** A system as in claim **16** wherein said at least one communication network further comprises:

at least one modem for connecting said at least one first local area network of said one or more data access subsystems to a corresponding one of said at least one second local area network of said at least one data processing subsystem through said at least one wide area network; and

24

at least one bank of modems for connecting said at least one second local area network of said at least one data processing subsystem to a corresponding some of said at least one first local area network of said one or more data access subsystems through said at least one wide area network.

**18.** A system as in claim **1** further comprising at least one data collecting subsystem for collecting and sending the electronic or paper transaction data comprising a further management subsystem for managing the collecting and sending of the transaction data.

**19.** A system as in claim **18** wherein said further data management subsystem of said at least one data collecting subsystem comprises:

at least one server for polling said one or more remote data access subsystems for transaction data;

a database for storing the transaction data in a useful form;

at least one central processing unit for managing the collecting of the transaction data;

a domain name services program for dynamically assigning one of said at least one server to receive portions of the transaction data for balancing the transaction data among said at least one server; and

a memory hierarchy.

**20.** A system as in claim **19** wherein said memory hierarchy comprises at least one primary memory for collecting transaction data and at least one secondary memory for backup storage of the transaction data.

**21.** A system as in claim **20** wherein said at least one secondary memory comprises at least one DLT jukebox.

**22.** A system as in claim **18** wherein said at least one communication network comprises:

at least one first local area network for transmitting data within a corresponding one of said one or more remote data access subsystems;

at least one second local area network for transmitting data within a corresponding one of said at least one data collection subsystem;

at least one third local area network for transmitting data within a corresponding one of said at least one data processing subsystem; and

at least one wide area network for transmitting data between said one or more remote data access subsystems, said at least one data collection subsystem and said at least one data processing subsystem.

**23.** A system as in claim **22** wherein said at least one communication network further comprises:

at least one first modem for connecting said at least one first local area network of said one or more data access subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one data collection subsystem to a corresponding some of said at least one first local area network of said one or more data access subsystems through said at least one wide area network;

at least one first wide area network router for connecting a corresponding one of said at least one second local area network of said at least one data collecting subsystem to said at least one wide area network; and

at least one second wide area network router for connecting a corresponding one of said at least one third local area network of said at least one data processing subsystem to said at least one wide area network.

5,910,988

25

**24.** A system as in claim **23** wherein said at least one first wide area network and said at least one second wide area network comprises a carrier cloud, said carrier cloud using a frame relay method for transmitting the transaction data.

**25.** A system as in claim **22** wherein said at least one second local area network and said at least one third local area network further comprises a corresponding one of at least one network switch for routing transaction data within said at least one second local area network and said at least one third local area network.

**26.** A method for central management, storage and verification of remotely captured paper transactions from documents and receipts comprising the steps of:

capturing an image of the paper transaction data at one or more remote locations and sending a captured image of the paper transaction data;

managing the capturing and sending of the transaction data;

collecting, processing, sending and storing the transaction data at a central location;

managing the collecting, processing, sending and storing of the transaction data;

encrypting subsystem identification information and the transaction data; and

transmitting the transaction data and the subsystem identification information within and between the remote location(s) and the central location.

**27.** The method as in claim **26** wherein said managing the capturing and sending step comprises the steps of:

successively transforming the captured transaction data to a bitmap image, a compressed bitmap image, an encrypted, compressed bitmap image and an encrypted, compressed bitmap image tagged with information identifying a location and time of the transaction data capturing; and

storing the tagged, encrypted, compressed bitmap image.

**28.** The method as in claim **27** wherein said managing the capturing and sending step also captures electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, further comprising the steps of:

initiating an electronic transaction;

capturing signature data;

capturing biometric data; and

printing a paper transaction with data glyphs for the initiated electronic transaction.

**29.** A method as in claim **26** wherein:

said capturing and sending step occurs at a plurality of remote locations; and

said collecting, processing, sending and storing step occurs at a plurality of central locations.

**30.** A method as in claim **29** wherein said collecting, processing, sending and storing step comprises the steps of:

polling the remote locations for transaction data with servers at the central locations;

storing the transaction data at the central location in a memory hierarchy, said storing maintains recently accessed transaction data in a primary memory and other transaction data in a secondary memory; and

dynamically assigning the servers at the central location to receive portions of the transaction data for balancing the transaction data among the servers; and

generating reports from the transaction data and providing data to software applications.

**31.** A method as in claim **30** wherein said storing the transaction data step comprises the steps of:

26

partitioning the stored transaction data with predefined templates into panels; and

identifying locations of the panels.

**32.** A method as in claim **31** wherein said managing the collecting, processing, sending and storing of the transaction data step comprises correcting errors in the panels of stored transaction data.

**33.** A method as in claim **32** further comprising the steps of:

polling the remote locations for captured electronic data, captured signature data and captured biometric data with servers at the central locations; and

comparing the captured signature data and the captured biometric data to stored signature data and stored biometric data respectively for identification verification.

**34.** A method as in claim **32** wherein said transmitting the transaction data step comprises the steps of:

transmitting data within the remote locations;

transmitting data from each remote location to a corresponding central location; and

transmitting data within the central locations.

**35.** A method as in claim **34** wherein said transmitting data from each remote location to a corresponding central location step comprises the steps of:

connecting each remote location to a corresponding central location; and

connecting each central location to corresponding remote locations.

**36.** A method as in claim **29** further comprising the steps of:

collecting and sending the electronic or paper transaction data at intermediate locations;

managing the collecting and sending of the transaction data; and

transmitting the transaction data within the intermediate location and between the intermediate locations and the remote locations and the central locations.

**37.** A method as in claim **36** wherein said managing the collecting and sending step comprises the steps of:

polling the remote locations for transaction data with servers in the intermediate locations;

storing the transaction data in the intermediate locations in a useful form, said storing maintains the transaction data in a primary memory of a memory hierarchy and performs backup storage of the transaction data into a secondary memory of the memory hierarchy; and

dynamically assigning the servers to receive portions of the transaction data for balancing the transaction data among the servers.

**38.** The method as in claim **36** wherein said transmitting the transaction data step comprises the steps of:

transmitting data within the remote locations;

transmitting data from each remote location to a corresponding intermediate location;

transmitting data within the intermediate locations;

transmitting data from each intermediate location to corresponding central locations; and

transmitting data within the central locations.

**39.** A method as in claim **38** wherein said transmitting data from each remote location to corresponding intermediate locations step comprises the steps of:

connecting each remote location to a corresponding intermediate location; and

5,910,988

27

connecting the intermediate locations to corresponding remote locations.

**40.** A method as in claim **38** wherein said transmitting data from each intermediate location to corresponding central locations comprises the steps of:

connecting each intermediate location to an external communication network; and

connecting the corresponding central locations to the communication network.

**41.** A method as in claim **40** wherein said transmitting data from each intermediate location to corresponding central locations step further comprises the steps of:

packaging the transaction data into frames; and

transmitting the frames through the external communication network.

**42.** A communication network for the transmission of data within and between one or more remote data processing subsystems, at least one intermediate data collecting subsystem and at least one central subsystem forming a tiered architecture wherein each of said at least one central data processing subsystem communicate with a corresponding some of said at least one data collecting subsystem and each of said at least one data collecting subsystem communicate with a corresponding some of said one or more data processing subsystems, said data processing subsystem including an imaging subsystem for capturing images of documents and receipts, comprising:

at least one first local area network for transmitting data within a corresponding one of said one or more remote subsystems;

at least one second local area network for transmitting data within a corresponding one of said at least one intermediate subsystem;

at least one third local area network for transmitting data within a corresponding one of said at least one central subsystem; and

at least one wide area network for transmitting data between said one or more remote subsystems, said at least one intermediate subsystem and said at least one central subsystem.

**43.** A communication network as in claim **42** further comprising:

at least one first modem for connecting said at least one first local area network of said one or more remote subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one intermediate subsystem to a corresponding some of said at least one first local area network of said one or more remote subsystems through said at least one wide area network;

at least one first wide area network router for connecting a corresponding one of said at least one second local area network of said at least one intermediate subsystem to said at least one wide area network; and

at least one second wide area network router for connecting a corresponding one of said at least one third local

28

area network of said at least one central subsystem to said at least one wide area network.

**44.** A system as in claim **43** wherein said at least one first wide area network and said at least one second wide area network comprises a carrier cloud which utilizes a frame relay method for transmitting the transaction data.

**45.** A system as in claim **44** wherein said at least one second local area network and said at least one third local area network further comprises a corresponding one of at least one network switch for routing transaction data within said at least one second local area network and said at least one third local area network; and further wherein said data comprises (a) electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, or (b) paper transactions from documents and receipts.

**46.** A method for transmitting data within and between one or more remote subsystems, at least one intermediate subsystem and at least one central subsystem in a tiered manner wherein each of the central subsystems communicate with at least one intermediate subsystem and each of the intermediate subsystems communicate with at least one remote subsystems comprising the steps of:

capturing an image of documents and receipts and extracting data therefrom;

transmitting data within the remote locations;

transmitting data from each remote location to corresponding intermediate location;

transmitting data within the intermediate locations;

transmitting data from each intermediate location to corresponding central locations; and

transmitting data within the central locations.

**47.** A method as in claim **46** wherein said transmitting data from each remote location to corresponding intermediate locations step comprises the steps of:

connecting each remote location to a corresponding intermediate location; and

connecting the intermediate locations to corresponding remote locations.

**48.** A method as in claim **47** wherein said transmitting data from each intermediate location to corresponding central locations comprises the steps of:

connecting each intermediate location to an external communication network; and

connecting the corresponding central locations to the external communication network.

**49.** A method as in claim **48** wherein said transmitting data from each intermediate location to corresponding central locations step further comprises the steps of:

packaging the transaction data into frames; and

transmitting the frames through the external communication network.

**50.** A method as in claim **46** wherein said data is obtained from (a) electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, or (b) paper transactions from documents and receipts.

\*  \*  \*  \*  \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :  5,910,988

DATED      :  June 8, 1999

INVENTOR(S) :  Claudio R. Ballard

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

On the title page: item (56) References Cited  Delete "4,602,936" and insert —5,602,936—.

On the title page: Abstract  Delete "Locations" after the words more remote and insert — locations —.

Column 4, Line 26: Delete "(DACS)" after the word Collectors and insert —(DACs)—.

Column 9, Line 35: Delete "3i band" after the word in FIG. and insert —3b and—.

Column 23, Line 23: Delete "subsystems" after the word remote and insert —subsystem—.

Signed and Sealed this

Twelfth Day of October, 1999

*Attest:*

Q. TODD DICKINSON

*Attesting Officer*                *Acting Commissioner of Patents and Trademarks*

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5957th)

# United States Patent

Ballard

(10) **Number:** US 5,910,988 C1

(45) **Certificate Issued:** Oct. 23, 2007

(54) **REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE**

(75) Inventor: **Claudio R. Ballard**, Lloyd Harbor, NY (US)

(73) Assignee: **DataTreasury Corporation**, Melville, NY (US)

**Reexamination Request:**
No. 90/007,829, Nov. 25, 2005

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **5,910,988** |
| Issued: | **Jun. 8, 1999** |
| Appl. No.: | **08/917,761** |
| Filed: | **Aug. 27, 1997** |

Certificate of Correction issued Oct. 12, 1999.

(51) **Int. Cl.**
| | |
|---|---|
| *G06K 9/00* | (2006.01) |
| *G06K 17/00* | (2006.01) |
| *G06Q 20/00* | (2006.01) |
| *H04L 9/00* | (2006.01) |

(52) **U.S. Cl.** ........................................................ **705/75**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,205,780 | A | 6/1980 | Burns et al. |
| 4,264,808 | A | 4/1981 | Owens et al. |
| 4,268,715 | A | 5/1981 | Atalla |
| 4,321,672 | A | 3/1982 | Braun et al. |
| 4,404,649 | A | 9/1983 | Nunley et al. |
| 4,652,990 | A | 3/1987 | Pailen et al. |
| 4,675,815 | A | 6/1987 | Kuroki et al. |
| 4,723,283 | A | 2/1988 | Nagasawa et al. |
| 4,745,267 | A | 5/1988 | Davis et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2131667 | 6/1995 |
| EP | 0593209 A | 4/1994 |
| EP | 0661654 A2 | 7/1995 |
| WO | WO 90/04837 A | 5/1990 |
| WO | WO 91/06058 A | 5/1991 |
| WO | WO 97/07468 | 2/1997 |
| WO | WO 97/22060 | 6/1997 |
| WO | WO 98/47100 A | 10/1998 |
| WO | WO 98/58356 A | 12/1998 |

OTHER PUBLICATIONS

"About FSTC: FSTC History," FSTC, 2003.
American National Standard For Financial Image Interchange ("ANSI"): Architecture, Overview and System Design Specification, X9.xx 0.7, dated: 1994.
Anderson, "Electronic Check and Check Law," letter to Robert Ballen, Apr. 8, 1996.

(Continued)

*Primary Examiner*—Peter C. English

(57) **ABSTRACT**

A system for remote data acquisition and centralized processing and storage is disclosed called the DataTreasury™ System. The DataTreasury™ System provides comprehensive support for the processing of documents and electronic data associated with different applications including sale, business, banking and general consumer transactions. The system retrieves transaction data at one or more remote locations, encrypts the data, transmits the encrypted data to a central location, transforms the data to a usable form, performs identification verification using signature data and biometric data, generates informative reports from the data and transmits the informative reports to the remote location(s). The DataTreasury™ System has many advantageous features which work together to provide high performance, security, reliability, fault tolerance and low cost. First, the network architecture facilitates secure communication between the remote location(s) and the central processing facility. A dynamic address assignment algorithm performs load balancing among the system's servers for faster performance and higher utilization. Finally, a partitioning scheme improves the error correction process.



(Amended)

## US 5,910,988 C1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,748,557 | A | 5/1988 | Tamada et al. |
| 4,755,940 | A | 7/1988 | Brachtl et al. |
| 4,757,543 | A | 7/1988 | Tamada et al. |
| 4,771,460 | A | 9/1988 | Tamada et al. |
| 4,858,121 | A | 8/1989 | Barber et al. |
| 4,882,779 | A | 11/1989 | Rahtgen |
| 4,910,774 | A | 3/1990 | Barakat |
| 4,922,503 | A | 5/1990 | Leone |
| 4,941,125 | A | 7/1990 | Boyne |
| 4,961,142 | A | 10/1990 | Elliott et al. |
| 4,962,531 | A | 10/1990 | Sipman et al. |
| 4,977,595 | A | 12/1990 | Ohta et al. |
| 4,985,921 | A | 1/1991 | Schwartz |
| 5,003,594 | A | 3/1991 | Shinagawa |
| 5,014,311 | A | 5/1991 | Schrenk |
| 5,016,277 | A | 5/1991 | Hamilton |
| 5,053,607 | A | 10/1991 | Carlson et al. |
| 5,054,096 | A | 10/1991 | Beizer |
| 5,081,680 | A | 1/1992 | Bennett |
| 5,123,047 | A | 6/1992 | Rosenow |
| 5,159,548 | A | 10/1992 | Caslayka |
| 5,163,098 | A | 11/1992 | Dahbura |
| 5,168,444 | A | 12/1992 | Cukor et al. |
| 5,170,466 | A | 12/1992 | Rogan et al. |
| 5,175,766 | A | 12/1992 | Hamilton |
| 5,185,798 | A | 2/1993 | Hamada et al. |
| 5,195,133 | A | 3/1993 | Kapp et al. |
| 5,200,993 | A | 4/1993 | Wheeler |
| 5,214,697 | A | 5/1993 | Saito |
| 5,233,656 | A | 8/1993 | Langrand et al. |
| 5,235,433 | A | 8/1993 | Clarkson et al. |
| 5,241,600 | A | 8/1993 | Hillis |
| 5,256,863 | A | 10/1993 | Ferguson et al. |
| 5,259,025 | A | 11/1993 | Monroe et al. |
| 5,274,567 | A | 12/1993 | Kallin |
| 5,287,497 | A | 2/1994 | Behera |
| 5,317,637 | A | 5/1994 | Pichlmaier et al. |
| 5,321,816 | A | 6/1994 | Rogan et al. |
| 5,326,959 | A | 7/1994 | Perazza |
| 5,337,358 | A | 8/1994 | Axelrod et al. |
| 5,341,428 | A | 8/1994 | Schatz |
| 5,343,529 | A | 8/1994 | Goldfine et al. |
| 5,373,550 | A | 12/1994 | Campbell et al. |
| 5,396,558 | A | 3/1995 | Ishiguro et al. |
| 5,408,531 | A | 4/1995 | Nakajima |
| 5,440,634 | A | 8/1995 | Jones et al. |
| 5,446,796 | A | 8/1995 | Ishiguro et al. |
| 5,454,575 | A | 10/1995 | Del Buono |
| 5,473,143 | A | 12/1995 | Vak et al. |
| 5,484,988 | A | 1/1996 | Hills et al. |
| 5,502,765 | A | 3/1996 | Ishiguro et al. |
| 5,506,691 | A | 4/1996 | Bednar |
| 5,524,073 | A | 6/1996 | Stambler |
| 5,528,705 | A | 6/1996 | Reasoner, Jr. et al. |
| 5,539,822 | A | 7/1996 | Lett |
| 5,539,825 | A | 7/1996 | Akiyama et al. |
| 5,544,043 | A | 8/1996 | Miki |
| 5,544,255 | A | 8/1996 | Smithies et al. |
| 5,557,518 | A | 9/1996 | Rosen |
| 5,577,121 | A | 11/1996 | Davis et al. |
| 5,596,642 | A | 1/1997 | Davis et al. |
| 5,602,936 | A | 2/1997 | Green et al. |
| 5,604,802 | A | 2/1997 | Holloway |
| 5,608,800 | A | 3/1997 | Hoffmann et al. |
| 5,615,269 | A | 3/1997 | Micali |
| 5,621,796 | A | 4/1997 | Davis et al. |
| 5,621,797 | A | 4/1997 | Rosen |
| 5,623,547 | A | 4/1997 | Jones et al. |
| 5,625,694 | A | 4/1997 | Lee et al. |
| 5,629,981 | A | 5/1997 | Nerlikar |
| 5,633,930 | A | 5/1997 | Davis et al. |
| 5,642,419 | A | 6/1997 | Rosen |
| 5,659,616 | A | 8/1997 | Sudia |
| 5,668,897 | A | 9/1997 | Stolfo |
| 5,682,549 | A | 10/1997 | Tanaka et al. |
| 5,708,810 | A | 1/1998 | Kern et al. |
| 5,754,673 | A | 5/1998 | Brooks |
| 5,760,916 | A | 6/1998 | Dellert et al. |
| 5,784,610 | A | 7/1998 | Copeland, III et al. |
| 5,790,260 | A | 8/1998 | Meyers |
| 5,832,463 | A | 11/1998 | Funk |
| 5,832,464 | A | 11/1998 | Houvener et al. |
| 5,857,034 | A | 1/1999 | Tsuchiya et al. |
| 5,870,725 | A | 2/1999 | Bellinger et al. |
| 5,884,271 | A | 3/1999 | Pitroda |
| 5,926,288 | A | 7/1999 | Dellert et al. |
| 5,930,778 | A | 7/1999 | Geer |
| 5,973,731 | A | 10/1999 | Schwab |
| 6,032,137 | A | 2/2000 | Ballard |
| 6,108,104 | A | 8/2000 | Tesavis |
| 6,115,509 | A | 9/2000 | Yeskel |
| 6,145,738 | A | 11/2000 | Stinson et al. |

### OTHER PUBLICATIONS

Ansi6v4[1].ppt—PowerPoint Presentation—FSTC—Financial Services Technology Consortium, Sep. 30 to Oct. 1, 1996.

"AT&T Global offers one–step imaging," American Banker, vol. 159, No. 39, p. 14A(1), Feb. 28, 1994.

"AT&T Partners with Fiserv to Form Single Source Provider for Leading Image Item Processing Solutions," PR Newswire, at 913CL011, Sep. 13, 1995.

ATZEL, (email to Hambro, Oct. 9, 2001).

"At Your Service . . . ," Federal Reserve Bank of Kansas City, 1995.

"Baby boomers, Generation X are both addicted to ATM," AT&T News Release, Feb. 28, 1995.

"BancTec Inc. has received another order for its image statement processing product (First National Bank of Chicago orders)," Nov. 13, 1991.

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Check Image Processing Archive and Retrieval System," Jul. 8, 1994, JPMC–BANCT 002960–003299 and JPMC–BANCT 001017–001144.

Banet, B., "Document image processing, 1991: The imaging edge," Seybold Rep. on Publishing Systs, vol. 20, No. 19, Jun. 24, 1991.

"Bank Automation News," Finance & Banking Newsletter, vol. 9, Iss. 6, Apr. 2, 1997.

"Banks to Check Out Imaging (Solutions)," Communications Week International, 1992, No. 093, p. 46, Oct. 19, 1992.

Barhel, M., "NCR and Unisys exchange check images in a pivotal test (computer makers test compatibility of check imaging systems)," American Banker, vol. 158, No. 67, p. 3(1), Apr. 8, 1993.

Barthel, Matt, "Unisys, Banctec offer PC–based imaging: high–tech check statements produced; community banks are market," American Banker, vol. 157, No. 195, p. 3(1), Oct. 8, 1992.

Bartholomew, D., "More Checks on Checks—Bank of America plan to convert to an IBM imaging system that screens checks faster and more thoroughly (spotlight)," Informationweek, 1994, No. 504, p. 32, Dec. 5, 1994.

"Bill Processing: US West Re–Engineers with $7.2 Million Unisys Image–based Remittance Processing Solution," EDGE, on & about AT&T, vol. 10, No. 378, Oct. 23, 1995.

Blankenhorn, D., "Cincinnati Bell and Unisys go into bank imaging," Newsbytes, p. NEW10240020, Oct. 24, 1990.

Block, V., "USAA Federal gets imaging system," American Banker, vol. 159, No. 49, p. 6A(1), Mar. 14, 1994.

Booker, E., "Bank to test scalable NCR imaging for check processing," Computerworld, p. 66, Dec. 14, 1992.

Brown, J., "Imaging may dramatically alter bank data networks," Network World, vol. 6, No. 19, p. 6(2), May 15, 1989.

Buchok, J., "OCR gets processing credit," Computing Canada, vol. 19, No. 26, Dec. 20, 1993.

"Chase's New Image," Information Week, No. 517, at 14, Mar. 6, 1995.

Check[1].ptt—PowerPoint Presentation—Current Check Flow, Dec. 12, 1995.

"Check Image Exchange Project (a.k.a. Interbank Check Imaging Project)," at www.fstc.org/projects/imaging/index-.cfm.

"Check–Image Interchange Inches Closer," Bank Technology News, vol. 10, No. 1, p. 19+, Jan. 1997.

"Checks & Checking: Check Imaging at the Teller Station (Alliance Integration & Services Introduces Imaging System that can be Installed at Bank Teller Stations)," Bank Technology News, vol. 9, No. 10, at 37, Oct. 1996.

"Chemical Chooses IBM Check Imaging (Chemical Banking Corp to install IBM's Image Plus High Performance Transaction System to process 9 mil checks daily)," Bank Technology News, vol. 8, No. 9, p. 11, Sep. 1995.

"Cincinnati Bell: CBIS & Unisys in Major Imaging Agreement," EDGE, on & about AT&T, vol., 5, No. 118, Oct. 29, 1990.

"Cincinnati Bell Information Systems (Integrator Briefs)," Computer Reseller News, 1993, No. 534, p. 129, Jul. 12, 1993.

Complaint in DataTreasury Corp. v. Bank One Corp., Cause No. 3–03CV0059–K, In the United States District Court for the Northern District of Texas, Dallas Division.

Complaint in DataTreasury Corp. v. First Data Corporation, et al., Cause No. 502CV094, In the United States District Court for the Eastern District of Texas, Texarkana Division.

Complaint in Data Treasury Corp. v. RDM Corp., a.k.a. Research Development and Manufacturing Corp., Cause No. 3–02CV2641–M, in the United States District Court for the Northern District of Texas, Dallas Division.

Complaint in DataTreasury Corp. v. Ingenico S.A., et al., Cause No. 502CV095, In the United States District Court for the Eastern District of Texas, Texarkana Division.

Complaint in DataTreasury Corp. v. J.P. Morgan Chase & Co., et al., Cause No. 502CV124, In the United States District Court for the Eastern District of Texas, Texarkana Division.

"Computerm Announces Remote Check Imaging Support for VMC 8200 High–Speed Channel Extension System," PR Newswire at 408LAM012, Apr. 8, 1996.

"Computerm Eases Remote Imaging," American Banker, vol. 158, No. 156, at 13A(1), Aug. 16, 1993.

"Computerm Enables Boatmen's Bancshares to Execute Remote Check Imaging," PR Newswire at 408LAM013, Apr. 8, 1996.

Cooney, M., "Frame relay comes to Computer extenders," Network World, Jun. 28, 1993.

Cortese, Amy, "Image Yields Interest at Banks (Collaboration Results in Imaging System to Automate Check Processing," ComputerWorld, at 6, Mar. 19, 1990.

Costanzo, C., "As Banks Cling to the Conventional, Check–Imaging Struts Its Stuff," Bank Technology News, p. 1, Mar. 1994.

Crockett, B., "Systematics to use deposited–check imaging; installation at firm's N.J. center would be the first to outsourcer," American Banker, vol. 158, No. 95, p. 3(1), May 19, 1993.

Crone, "Reducing Data Processing Costs with a Remote Item Processing System," Bank Administration, Oct. 1986, pp. 44–46.

Daly, B., "Unisys Acquires Visual Impact Solution for Check Processing, Archive and Image Delivery," Business Wire, p. 9181204, Sep. 18, 1997.

Daly, B., "Unisys provides services to Bank of the West to support retail banking," Business Wire, p. 9180098, Sep. 18, 1995.

"Data Compression Over Frame Relay Implementation Agreement FRF.9," Jan. 22, 1996, downloaded at http://www.frforum.com/5000/Approved/FRF.9/frf9.pdf.

"Defendants' Final Invalidity Construction Pursuant to Fourth Amended Docket Control Order and Patent Local Rules 3–3 and 3–6," pp. 1–21, Civil Action No. 5:03–CV–039 (DF), Dec. 13, 2005.

"Defendants Ingenico S.A. and Ingenico, Inc.'s Preliminary Invalidity Contentions," in DataTreasury Corp. v. Ingenico S.A., et al., Cause No. 502CV095, In the United States District Court of Texas, Texarkana Division.

"Defendants' Preliminary Invalidity Construction Pursuant to Patent Local Rules 3–3 and 3–4," in DataTreasury Corp., v. First Data Corporation, et al., Cause No. 502CV094, In the United States District Court of Texas, Texarkana Division.

Depompa, Barbara, "IBM Adds Image–Based Check Processing," MIS Week, vol. 11, No. 12, at 12(1), Mar. 19, 1990.

Description of the IBM "3174 Network Processor," Oct. 7, 1992, found on the web at the URL: http://ecc400.com/ibm/controllers/314prod.htm and http://www.commercecomputer.com/3174.html.

Dinan, Painter & Rodite, "ImagePlus High Performance Transaction System," IBM Systems Journal, vol. 20, No. 3, 1990, pp. 421–434.

Document Image Report, IntraFed Touts Remote Services, vol. 6, Issue 25, Dec. 11, 1996.

Dowell, "Security," email to fstc–image, Apr. 27, 1996.

Durham, D., "Broadway & Seymour to Invest in Two Strategic Initiatives," Business Ire, p. 03151248, Mar. 15, 1995.

eCheck: Homepage, 2003.

Electronic Imaging '88—Advanced Printing of Paper Summaries, vol. 1, Anaheim, California, Mar. 1988.

Electronic Imaging '88—Advanced Printing of Paper Summaries, vol. 1, Oct. 3–6, 1988, Boston, MA.

E–mail of May 10, 2006 titled "USPTO Reexam. C.N 90/007,829, Requested Date: Nov. 25, 2005" from "PT" <admin@patentrakker.com>.

"Entrust Encryption and Digital Signature Explained," date unknown.

**US 5,910,988 C1**

Page 4

Evankovitch, S., "Computer earns MCI 'Level 1' approval; Computer's industry exclusive native Frame Relay interface passes test for interoperability with MCI's Frame Relay services," Business Wire, Apr. 12, 1995.

Evans, J., "The end of the paper wait: document imaging (includes related articles on successful document imaging implementations at Borgess Medical Center, the Huntington Internal Medicine Group, the University of Alabama Health Services Foundation and Quest Diagnostic) (Industry Trend or Event)," Health Management Technology, vol. 18, No. 2, p. 16(5), Feb. 1997.

Fassett, W., "Impact of Imaging," Bank Management, vol. 67, No. 11, p. 56, Nov. 1991.

Federal Reserve Bank of Boston, "Request For Proposal For Check Image Processing And Archival And Retrieval Systems For The Federal Reserve," Apr. 21, 1994, JPMC 152558–152803.

Feighery, M., "NCR demonstrates systems for Insurance and accounting industry," AT&T News Release, May 31, 1992.

Feighery, M. and Bochonko, K., "NCR demonstrates full line of retail products at NRF conference," AT&T News Release, Jan. 18, 1993.

FileNet Product Brochure, "Introducing the Age of Document–Image Processing," The PC Connection, and Wide–Area Image Communication and System Networking, 1998, 14 pages.

"Financial EDI over the Internet," Bank of America, 1996.

Financial Services Technology Consortium ("FSTC") Interbank Check Imaging Project White Paper, dated: Jun. 20, 1994.

Fisher, M., "IBM, Customers continue work on document image processor," Datamation, vol. 34, No. 19, Oct. 1, 1988.

Fitch, "Digital image systems speed return items, exceptions," Corporate Cashflow, May 1996.

Fitch, T., "Check image capture speeds up positive pay reconcilement," Corporate Cashflow, Feb. 1995.

Friedman, D., "Nixdorf Computer Introduced DCPA Image—A Sophisticated Document Image Processing System With Unique Capabilities," PR Newswire, Aug. 15, 1989.

FSTC Check Image Interchange Project, dated: May 25, 1995.

FSTC Check Image Interchange Project Pilot Phase 1A: Preliminary Architecture and Project Plan, dated: Jun. 30, 1995.

"FSTC Check Image Quality Subproject," date unknown.

FSTC Compilation of ANSI X9.46, Data Structure Reference, dated: Jul. 31, 1995.

"FSTC Demonstrate Interbank Check Image Pilot; Multi–Vendor Sysetm Speeds check Clearing, Cuts Fraud—FSTC Pilot Lays Foundation for Paper Check Truncation," at www.fstc.org/projects/imageing/public/information.cfm, Dec. 12, 1995.

"FSTC Image Exchange," May 21, 1996.

FSTC Image Quality Functional Requirements, dated: Jul. 26, 1995.

FSTC Interbank Check Imaging: Unisys Monthly Status Report, Jun. 26, 1996.

"FSTC Interbank check imaging: Unisys Monthly Status Report," Jul. 22, 1996.

FSTC Pilot Overview, dated: Apr. 3, 1995.

"FSTC: Projects—Check Image Exchange Project—Project Participants," at www.fstc.org/projects/imaging/participants.cfm.

FSTC Projects: The Bank Internet Payment System (BIPS): Leading the Way to Electronic Commerce, FSTC, 2003.

Garvey, M., "Check Processing Goes Digital—Chase Manhattan Bank to store checks electronically, saving time and money," Informationweek, 1997, No. 648, p. 20, Sep. 15, 1997.

Gawen, "PC Based Document Image Processing and Signature Verification," Proceedings of the Information & Image Management Conference, 1991, pp. 389–391.

"Global Concepts—Payment Systems Consulting," at www.global–concepts.com/image_archive.htm.

Griffith, M. and Mazzola, J., "National City, NCR form strategic imaging partnership," AT&T News Release, Nov. 9, 1992.

Gullo, K., "NCR, Unisys plan check imaging for IBM Systems," American Banker, vol. 156, No. 249, p. 1(2), Dec. 30, 1991.

Haig, J., "Unisys integrates retail/wholesale lockbox solution for remittance processors," Business Wire, p. 03251075, Mar. 25, 1997.

Haig, J., "Unisys solution will support check processing at Vermont Federal," Business Wire, p. 5201185, May 20, 1996.

Helm, Sylvia, "Banks check into image processing," Computers in Banking, vol. 7, No. 3, p. 25(7), Mar. 1, 1990.

Helm, S., "Who's doing what in image processing (includes definition of image processing," ABA Banking Journal, vol. 83, No. 1, p. 31(3), January, 1991.

"High Volume Data Capture Sans Paper"0 in Bank Systems Technology, May, 1996, p. 35.

Homa, "MICR Technology Helps Eliminate POS Check Fraud," Chain Store Age Executive, Sep. 1991.

Horine, J., "AT&T and Fiserv team to offer imaging solutions," Sep. 13, 1995.

"Huntington BancShares in the Forefront of Technology with Purchase of Unisys Check Imaging System," PR Newswire, p. 1, Oct. 11, 1989.

IBM Electronic Payment Systems Support/Check Processing Control Systems: Progress Reference and Operations Manual, dated: June, 1986.

"IBM FSTC Pilot Status".

IBM Product Announcement 190–040, (IBM 3898 Image Processor), dated: Mar. 13, 1990.

IBM's Proposal to the Federal Reserve Bank of Boston, Nov. 7, 1991, "IBM Proposal For FRB Phase Four: Image Archive System," JPMC 279955–280128, Yeskel Exhibit 1.

IBM Systems Journal, vol. 29, No. 3, 1990 (entire journal).

"IBM X9.46 Pilot Status—Summary," date unknown.

"Ibnamed, A Load Balancing Name Server Written in Perl," Sep. 17, 1995, located at the web at URL www.standford.edu/~schemers/docs/Ibnamed/Ibnamed.html.

"Ibnamed, A Load Balancing Name Server Written in Perl," Oct. 15, 2002, found on the web at the URL www.stanford.edu/~schemers/docs/Ibnamed/Ibnamed.html.

"ICI Project Security Work Session," May 10, 1996.

Image Archive Forum Flow Nos. 1–13, Sep. 1997.

Image Archive Forum Methodology and Value, Sep. 19, 1997.

Image Archive Forum, "Payment Systems Task Force Economic Framework," Jan. 27, 1998.

ImagePlus brochure by IBM, 1991.

"Image Processing Survival Guide, vol. 11: Sure–Fire Strategies for Implementing Image Remittance," Philips Business Information, Inc., 1996.

**US 5,910,988 C1**
Page 5

"Image systems garner NOAC spotlight (American Bankers' Association's National Operations and Automation Conference)," Computer in Banking, vol. 6, No. 7, p. 8(4), Jul., 1989.

"Imaging products. Check Processing—IBM's ImagePlus High Performance Transaction System," United States Banker, vol. 100, No. 8, p. 23(3), Aug. 1990.

"Imaging vendors shape processing," Banking Management, vol. 69, No. 4, p. 29, Apr. 1993.

Imwalle, C. and Pratt, J., "250 U.S. banks to use NCR, Cincinnati Bell financial systems," AT&T News Release, May 4, 1993.

"Industry Security Leader Racal Supports Visa/Mastercard Proposal for Internet," PR Newswire, Apr. 17, 1996.

INSPEC search with abstracts.

"Item processing leaps ahead with VisualImpact and Windows NT (Sponsored Supplement: Unlock Your Bank Office with Microsoft Back Office)," US Banker, vol. 105, No. 6, p. S4(3), Jun. 1995.

Janusky, "FSTC Interbank Check Imaging," Apr. 29, 1996.

Janusky, "FSTC Interbank Check Imaging," May 22, 1996.

Joint Marketing & Referral Agreement Between ACS Image Solutions, Inc. and JPMorgan Chase Bank.

Jones, J., "Broadway & Seymour Announces Client/Server Product for Item and Image Processing," Business Wire, p. 03201186, Mar. 20, 1995.

Jones, J., "Broadway & Seymour announces new VISUALIMPACT release," Business Wire, p. 3291274, Mar. 29, 1996.

Klein, M., "Terminal Data to supply NCR with document microfilmers," AT&T News Release, Oct. 13, 1993.

Kraynak Maxfield, J., "Signet Processes Over 2,500 Documents/Hour in Unisys Check Imaging Tests," PR Newswire, p. 0409P8428, Apr. 9, 1991.

Kriskern, J., "Engineering a visionary solution," Datamation, vol. 36, No. 8, Apr. 15, 1990.

Kutler, J., "AT&T, IBM, Unisys join bank research group," American Banker, vol., 159, No. 124, p. 14(1), Jun. 29, 1994.

Lubetkin, S., "Unisys enters image processing market with two new products and major financial and industrial customers (product announcement)," PR Newswire, p. 1011PH009, Oct. 11, 1989.

Mantel, K., "Notes Gets in the Picture," Datamation, Jul. 15, 1992.

Marjanovic, "Payment Groups Square Off Over Electronic Check Plan," American Banker, date unknown.

Marjanovic, S., "Mich. National streamlines imaging with IBM system (check imaging)," American Banker, vol. 160, No. 176, Sep. 13, 1995.

Marjanovic, Steven, "Home Loan Bank to Offer Check-Image Statements to Members' Customers," American Banker, vol. 159, No. 248, at 14(1), Dec. 29, 1994.

Mazzola, J., "NCR and NYCH to develop image–based check notification system," AT&T News Release, Aug. 24, 1992.

Mazzola, J. and Hendrickson, L., "NCR deposit processing technology speeds banking operations," AT&T News Release, Dec. 7, 1992.

Mazzola, J. and Hendrickson, L., "Wachovia tests NCR's new imaging item processing system," AT&T News Release, Nov. 15, 1991.

Mazzola, J., Hendrickson, L. and Gatati, G., "NCR signs DSI alliance for imaging statement processing," AT&T News Release, Jul. 20, 1992.

Mazzola, J., Hendrickson, L., and Waters, R., "NCR, CKI to market image–based credit card chargeback system," Jan. 6, 1993.

Mazzola, J. and O'Donohue, M., "Frost National Bank selects NCR over old mainframe environment," AT&T News Release, Apr. 28, 1993.

McGinn, Janice, "IBM ImagePlus High Performance Transaction System (IBM Harnesses Image Processing to Make its 389x/XP Cheque Processors More Efficient)," Computergram International, No. 1389, at CG103210008, Mar. 21, 1990.

McKee, K., and Gundlach, D., "Retail Banking Solution enhanced," AT&T News Release, May 21, 1990.

Messmer, E., "Hurdles stand in way of electronic banking," Network World, p. 33, Sep. 4, 1995.

"Microsoft Introduces SNA Server Version 3.0, Begins Beta Testing," Microsoft Press Release, Aug. 29, 2006, found at: http://www.microsoft.com/presspass/press/1996/jun96/sna30pr.mspx.

Moore, J., "IBM, Unisys test check systems for Fed Reserve," Federal Computer Week, vol. 6, No. 21, p. 6(2), Jul. 27, 1992.

Moreau, Thierry, "Payment by Authenticated Facsimile Transmission, a Check Replacement Technology for Small and Medium Enterprises," Nov. 25, 2006, found at: http://connotech.com/PAYPROC.HTM.

Morris, H.M. and Orth, R.H., Image system communications, IBM Systems Journal, vol. 29, No. 3, 1990, pp. 371–383.

Murphy, P., "POD Check Imaging Faces Challenges (In 1995, vs. 1996, banks raised Investment in check imaging by 9% from $198 mil and $215 mil; new lost cost POD technology keeps costs down)," Bank Technology News, vol. 10, No. 3, p. 23, Mar. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 1, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 2, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 3, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 4, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 5, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 6, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 7, NCR, 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 8, NCR, 1997.

NCR 7780 Brochure, copyrighted 1989.

"NCR—Hardware—7780 Mid–Range Item Processing Transport," at www.ncr.com/products/hardware/hw__7780__product.htm.

"NCR—Hardware—7780, Technical Specifications," at www.ncr.com/products/hardware/nw__7780        ts__product.htm.

"NCR offers new image–based Document Management System," AT&T News Release, Jun. 23, 1992.

"NCR Unveils Client–Server Check Imaging," Bank Technology News, vol. 9, No. 3, p. 23, Mar. 1, 1996.

US 5,910,988 C1

Page 6

Nixon, B., "Is check imaging for you? (automation in banking) (includes related article)," Savings & Community Banker, vol. 2, No. 10, p. 28(6), Oct. 1993.

No1016v4[1].ppt—PowerPoint Presentation—FSTC—Interbank Check Image Project, Sep. 30 to Oct. 1, 1996.

"NSSDC's Mass Storage System Evolves," March 1995, found on the web at the URL: http://nssdc.gsfc.nasa.gov/nssdc_news/march95/09__i_behnke_0395.html.

O'Heney, S., "Prepare for the image revolution (Banker and Vendors) (image processing: includes related article listing image processing products) (buyers guide)," Computers in Banking, vol. 6, No. 10, p. 24(6), Oct. 1989.

"On the imaging technology front," American Banker, vol. CLXI, No. 68, p. 26, Apr. 10, 1996.

PACESBusReq3[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Business Requirement," Apr. 3, 1998.

PacesOverview40[1].ppt.—PowerPoint Presentation.

PACESPRO[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Project Proposal," Apr. 23, 1998.

PACESRequirements[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Requirements Document," Apr. 3, 1998.

Plesums, C.A. and Bartels, R. W., Large Scale Image Systems: USAA Case Study, IBM Systems Journal, vol. 29, No. 3, 1990, pp. 343–355.

"Preliminary Invalidity Contentions of Defendants J.P. Morgan Chase & Co. and JPMorgan Chase Bank," in DataTreasury Corp. v. J.P. Morgan Chase& Co., et al., Cause No. 502CV124, In the United States District Court for the Eastern District of Texas, Texarkana Division.

"Press Release, Cisco Partners with AT&T on Network Switch Manufacturing," Sep. 26, 1995, found on the web at http://www.lucent.com/press/0995/950926.mma.html.

Press Release, "NCR Document Management System Includes Kodak, Ricoh Products," Apr. 6, 1993.

Press Release, "NCR Introduces Scalable Image Item Processing Solution," Jan. 19, 1996.

"Regions Bank Selects ImageSoft to Provide Image Solutions," Business Wire, at 9161220, Sep. 16, 1997.

Rivest, R.L., Shamir, A., Adleman, L., "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems," date unknown.

Robinson, G., "Universal Card purchases BancTec Image–FIRST system," AT&T News Release, Dec. 22, 1992.

Roldan, Jr., "Image Quality White Paper," FSTC, 1999.

Roldan, M., "Paperless Automated Check Exchange and Settlement (PACBS) (status update) (PACES completes specification and design of image exchange environment and is accepted as part of SVPCO Image Strategy," FSTC, at www.fstc.org/projects/paces/index.cfm, Jun. 22, 2000.

Roldan, Mariano, Financial Services Technology Consortium, "PACES Paperless Automated Check Exchange & Settlement Project Overview, PACES Planning Meeting, New York City," Dec. 19, 1997.

Schwartz, J., "Banks to Test Imaging for Clearing Checks," Communications Week, No. 420, p. 35, Sep. 14, 1992.

Search Report for PCT/US00/33010, Jun. 21, 2002.

Softhec Licenses 'Envision' Image Solution to West Suburban Bank, PR Newswire, at 116SETUU002, Jan. 16, 1996.

"Special Report: Fine Tunning of the Terminal Picture," Computerworld, Aug. 1983.

Spencer, H., "Scanning goes vertical: a big future for specialized check scanning; check scanning technology," Advanced Imaging, No. 10, vol. 12, p. 54, Oct. 1997.

Stellwag, C., "New ATM from AT&T GIS features automated document processing," AT&T News Release, Nov. 29, 1994.

Stellwag, C. and Bochonko, K., "NCR and Cincinnati Bell offer image processing service," AT&T News Release, Jan. 11, 1994.

Stellwag, C. and Bochonko, K., "Norwest Bank selects NCR item processing systems for lockbox," AT&T News Release, Aug. 2, 1993.

Stellwag, C., Graves, T., and Bochonko, K., "New Mexico uses NCR imaging systems for tax, revenue processing," AT&T News Release, Jul. 12, 1993.

Stellwag, C., Proto, J., and Bochonko, K., "CashFlex selects NCR item processing systems for lockbox," AT&T News Release, Jul. 12, 1993.

Stellwag, C., Roedel, R, and Bochonko, K., "NCR and Arkansas Systems announce strategic alliance," AT&T News Release, Jul. 12, 1993.

Stellwag, C., Sanders, G., and Bochonko, K., "NCR and Signet Banking to provide item processing services," AT&T News Release, Jul. 13, 1993.

"SurePOS ACE Electronic Payment Support PRPQ for 4690 OS," Version 1, Release 5, IBM, 1998, 2002.

"The Check Information Age: Vision Executive Summary Image Archive Forum, Payment System Task Force," Jan. 27, 1998.

"The Wachovia Story," Research, Development Manufacturing Corporation, 1993.

Tracey, Brian, "IBM Unveils First Stage of Image–Check System," Computers in Banking, vol. 7, No. 4, at 12(3), Apr. 1990.

Tucker, T., "Broadway rolls out check imaging system for community banks," American Banker, vol. 160, No. 61, p. 14(1), Mar. 30, 1995.

"Understanding EDI," 1996.

"Unisys Enhances Check Imager (Unisys Corp makes effort to appeal to wider range of financial institutions)," American Banker, vol. CLIX, No. 205, p. 15A, Oct. 24, 1994.

Unisys, New York Clearing House, "A Proposal for an Image–Based Return Item Processing System," Jun.1991, Unisys Document No. PDC 1010–16, JPMC–NYCH018091–018216.

"Unisys Wins Contract to Supply Imaging Solution to Chase Manhattan/FISER V Check Processing Alliance," Business Wire, at 6121175, Jun. 12, 1995.

"Unix–Based Image Statement Software," ABA Banking Journal, vol. 85, No. 2, at 80(1), Feb. 1993.

"Verifone Software Links PCs to the Point of Sale," American Banker, vol. 158, No. 156, at 13A(1), Aug. 16, 1993.

Vermeire, "Prosecution of Check Image Patent," letter to Hanna, Jul. 11, 1997.

Wagner, M., "Banc One checks out Web," Computerworld, vol. 30, No. 35, p. 69, Aug. 26, 1996.

Western Bank purchases NCR's Document Managing system, AT&T News Release, Aug. 31, 1993.

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Check Image Processing Archive and Retrieval System," Jul. 8, 1994, JPMC–BANCT 002960–003299.

A72

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Total Solution Overview" Jul. 8, 1994, JPMC–BANCT 001017–001144.

"Interbank Check Imaging," FSTC General Meeting, Orlando, FL, Apr. 17, 1997 (Exhibit 20).

"MAGTEK© Company Background & Product Guide," date unknown (Exhibit MagTek D–7).

"MagTek Unveils Excella, a Dual–side Scanner for Check 21 Applications," May 10, 2004 (Exhibit MagTek D–8).

"PACES Models—FSTC Project," presentation by Mariano Roldan on Jul. 17, 1997 (Exhibit 21).

"PACES Paperless Automated Check Exchange & Settlement Next Step," presentation by John Fricke at New York, NY on Aug. 12, 1997 (Exhibit 19).

Press Release "MagTek Adds Enhanced Reading to Micrimage TM," Jan. 9, 2003 (Exhibit MagTek D–11).

Press Release "MagTek Upgrades Its MicrimageTM Check Reader/Scanner," Jun. 12, 2002 (Exhibit MagTek D–9).

Press Release "MagTek's MICRImage Transmits Check Images at Speed of Ethernet," Feb. 14, 2002 (Exhibit D–10).

"The New Era of Check Scanning Technology," 2005 (Exhibit MagTek D–6).

"Imaging in Corporate Environments: Technology and Communication," Daniel Minoli, McGraw Hill, 1994.

"ANSI/ABA X9.46–1995, Draft version 0.13, American National Standard For Financial Image Interchange: Architecture, Overview and System Design Specification."

"ANSI/ABA X9.46–1997, American National Standard For Financial Image Interchange, Architecture, Overview and System Design Specification." Copyright 1996.



Fig. 1 (Amended)



FIG. 2 (Amended)

Case: 16-1229    Document: 22    Page: 122    Filed: 02/09/2016



**FIG. 3A    (Amended)**



**FIG. 6  (Amended)**

US 5,910,988 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 6, lines 7–19:

The use of glyph technology in the DataTreasury™ System **100** improves the accuracy, cost and performance of the system. Xerox DataGlyph™ Technology includes error correction codes which can be referenced to correct scanning errors or to correct damage to the document caused by ink spills or ordinary wear. DataGlyph™ Technology also leads to decreased system cost since the system require less manual intervention for data entry and correction because of the improved accuracy associated with DataGlyph™ elements. Since DataGlyph™ elements represent a large amount of information in a small amount of space, the DAT scanner **[100]** *202* will require a small amount of time to input a large amount of information.

Column 15, lines 53–62:

A DPC LAN **606** facilitates communication among the devices which are connected to the LAN **606** including the DPC server **602** and the network workstation **604**. In the preferred embodiment, the DPC LAN **606** uses a switched 100BaseT/10BaseT communication hardware layer protocol like the DAC LAN **406** discussed earlier. In the preferred embodiment, the DPC LAN **[406]** *606* is a high speed OC**2** network topology backbone supporting TCP/IP. The CISCO Catalyst 5500 Network Switch supports the DPC LAN **606** connectivity among the devices connected to the LAN **606**.

Column 20, lines 11–20:

FIG. **7** is a flow chart **700** describing the polling of the DACs **[300]** *400* by a DPC **600** and the transmission of the TECBIs from the DACs **[300]** *400* to the DPC **600**. In step **702**, the DPC **600** reads the address of the first DAC **[300]** *400* in its region for polling. In step **704**, the DPC **600** connects with a DAC **[300]** *400* for transmission. The DPC **600** determines whether the connection to the DAC **[300]** *400* was successful in step **706**. If the call to the DAC **[300]** *400* was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

Column 20, lines 21–25:

If the connection to the DAC **[300]** *400* was successful, the DPC **600** will verify that the DAC **[300]** *400* is ready to transmit in step **708**. If the DAC **[300]** *400* is not ready to transmit, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

Column 20, lines 26–33:

If the DAC **[300]** *400* is ready to transmit in step **708**, the DAC **[300]** *400* will transmit a TECBI packet header to the DPC **600** in step **710**. The DPC **600** will determine whether the transmission of the TECBI packet header was successful

**2**

in step **712**. If the transmission of the TECBI packet header was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

Column 20, lines 34–41:

If the transmission of the TECBI packet header was successful in step **712**, the DAC **[300]** *400* will transmit a TECBI package to the DPC **600** in step **714**. The DPC **600** will determine whether the transmission of the TECBI packet was successful in step **716**. If the transmission of the TECBI packet header was unsuccessful, the DPC **600** will record the error condition in the session summary report and will report the error to the DPC **600** manager in step **722**.

Column 20, lines 49–59:

If the TECBI packet header matched the TECBI packet in step **718**, the DPC **600** will set the status of the TECBI packet to indicate that it was received at the DPC **600** in step **720**. The DPC **600** will also transmit the status to the DAC **[300]** *400* to indicate successful completion of the polling and transmission session in step **720**. Next, the DPC **600** will determine whether TECBIs have been transmitted from all of the DACs **[300]** *400* in its region in step **724**. If all DACs **[300]** *400* in the DPC's **600** region have transmitted TECBIs to the DPC **600**, the DPC **600** will compile a DAC **[300]** *400* status report in step **728** before terminating the session.

Column 20, lines 60–65:

If one or more DACs **[300]** *400* in the DPC's **600** region have not transmitted TECBIs to the DPC **600**, the DPC **600** will get the address of the next DAC **[300]** *400* in the region in step **726**. Next, control returns to step **704** where the next DAC **[300]** *400* in the DPC's **600** region will be polled as previously discussed.

THE DRAWING FIGURES HAVE BEEN
CHANGED AS FOLLOWS:

Reference number **100** added to FIG. **1**.
Reference number **300** changed to **400** in FIG. **2**.
Reference number **300** added to FIG. **3**A.
Text "D.A.C." changed to "D.P.C." in box **602** of FIG. **6**.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **26–50** is confirmed.

Claim **1** is determined to be patentable as amended.

Claims **2–25**, dependent on an amended claim, are determined to be patentable.

New claims **51–123** are added and determined to be patentable.

**1**. A system for central management, storage and report generation of remotely captured paper transactions from documents and receipts comprising:

one or more remote data access subsystems for capturing and sending paper transaction data and subsystem identification information comprising at least one imaging subsystem for capturing the documents and receipts and at least one data access controller for managing the capturing and sending of the transaction data;

at least one central data processing subsystem for processing, sending, verifying and storing the paper

US 5,910,988 C1

**3**

transaction data and the subsystem identification information comprising a management subsystem for managing the processing, sending and storing [of the] of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

*51. A system as in claim 1 wherein said one or more data access subsystems also capture electronic transactions from at least one of credit cards and debit cards.*

*52. A system as in claim 1 further comprising at least one card interface for capturing electronic transaction data.*

*53. A system as in claim 1 further comprising at least one signature interface for capturing an electronic signature.*

*54. A system as in claim 1 further comprising at least one biometric interface for capturing biometric data.*

*55. A system as in claim 1 wherein the system automatically generates at least one of credit card statements, bank statements, and tax reports.*

*56. A system as in claim 1 wherein said at least one central data processing subsystem polls said one or more remote data access subsystems for transaction data.*

*57. A system as in claim 1 wherein said transaction data comprises more than one type of transaction data.*

*58. A system as in claim 1 further comprising at least one data collecting subsystem for collecting and sending electronic transaction data and paper transaction data, the at least one data collecting subsystem further comprising a management subsystem for managing the collecting and sending of the electronic transaction data and the paper transaction data.*

*59. A system as in claim 1 further comprising at least one data collecting subsystem for collecting and sending at least electronic transaction data, the at least one data collecting subsystem further comprising a management subsystem for managing the collecting and sending of the at least electronic transaction data.*

*60. A system as in claim 1 further comprising at least one data collecting subsystem for collecting and sending at least the paper transaction data, the at least one data collecting subsystem further comprising a management subsystem for managing the collecting and sending of at least the paper transaction data.*

*61. A method as in claim 26 further comprising capturing electronic transaction data.*

*62. A method as in claim 26 further comprising capturing an electronic signature.*

*63. A method as in claim 26 further comprising capturing biometric data.*

*64. A method as in claim 26 further comprising automatically generating at least one of credit card statements, bank statements, and tax reports.*

*65. A method as in claim 26 wherein said transaction data comprises more than one type of transaction data.*

*66. A method as in claim 26 wherein said capturing and sending occurs at a plurality of remote locations; said collecting, processing, sending and storing occurs at a plurality of central locations; and further comprising:*

collecting and sending transaction data at a plurality of intermediate locations;

managing the collecting and sending of the transaction data; and

transmitting the transaction data within the intermediate locations and between the intermediate locations and the remote locations and the central locations.

**4**

*67. A method as in claim 26 wherein said capturing and sending occurs at a plurality of remote locations; said collecting, processing, sending and storing occurs at a plurality of central locations; and further comprising:*

collecting and sending the paper transaction data at a plurality of intermediate lcoations;

managing the collecting and sending of the paper transaction data; and

transmitting the paper transaction data within the intermediate locations and between the intermediate locations and the remote locations and the central locations.

*68. A method as in claim 26 wherein said capturing and sending occurs at a plurality of remote locations; said collecting, processing, sending and storing occurs at a plurality of central locations; and further comprising:*

collecting and sending electronic transaction data at a plurality of intermediate locations;

managing the collecting and sending of the electronic transaction data; and

transmitting the electronic transaction data within the intermediate locations and between the intermediate locations and the remote locations and the central locations.

*69. A method as in claim 26 wherein said capturing and sending occurs at a plurality of remote locations; said collecting, processing, sending and storing occurs at a plurality of central locations; and further comprising:*

collecting and sending electronic transaction data and the paper transaction data at a plurality of intermediate locations;

managing the collecting and sending of the electronic transaction data and the paper transaction data; and

transmitting the paper transaction data and the electronic transaction data within the intermediate locations and between the intermediate locations and the remote locations and the central locations.

*70. A communcation network as in claim 42 wherein said at least one central data processing subsystem automatically generates at least one of credit card statements, bank statements, and tax reports.*

*71. A communication network as in claim 42 wherein said at least one central data processing subsystem polls said at least one intermediate data collecting subsystem for transaction data.*

*72. A communication network as in claim 42 wherein the said data comprises more than one type of transaction data.*

*73. A communication network as in claim 42 wherein said one or more remote data processing subsystems comprise a plurality of remote data processing subsystems and said at least one intermediate data collecting subsystem comprises a plurality of intermediate data collecting subsystems.*

*74. A communication network as in claim 42 wherein said one or more remote data processing subsystems comprise a plurality of remote data processing subsystems, said at least one intermediate data collecting subsystem comprises a plurality of intermediate data collecting subsystems, and said at least one central subsystem comprises a plurality of central subsystems.*

*75. A method as in claim 46 further comprising automatically generating at least one of credit card statements, bank statements, and tax reports.*

*76. A method as in claim 46 further comprising automatically generating credit card statements.*

A79

US 5,910,988 C1

**5**

77. A method as in claim 46 further comprising automatically generating bank statements.

78. A method as in claim 46 further comprising automatically generating tax reports.

79. A method as in claim 46 further comprising polling the remote locations.

80. A method as in claim 46 further comprising polling the intermediate locations.

81. A method as in claim 46 wherein said data comprises more than one type of transaction data.

82. A method as in claim 46 wherein said one or more remote subsystems comprise a plurality of remote subsystems and said at least one intermediate subsystem comprises a plurality of intermediate subsystems.

83. A method as in claim 46 wherein said one or more remote subsystems comprise a plurality of remote subsystems, said at least one intermediate subsystem comprises a plurality of intermediate subsystems and said at least one central subsystem comprises a plurality of central subsystems.

84. A communication network for the transmission of data within and between one or more remote data processing subsystems that provide remote data processing subsystem identification information, at least one intermediate data collecting subsystem and at least one central data processing subsystem forming a tiered architecture wherein each of said at least one central data processing subsystem communicate with a corresponding some of said at least one intermediate data collecting subsystem and each of said at least one intermediate data collecting subsystem communicate with a corresponding some of said one or more remote data processing subsystems, said remote data processing subsystem including an imaging subsystem for capturing images of documents and receipts, comprising:

at least one first local area network for transmitting data within a corresponding one of said one or more remote data processing subsystems;

at least one second local area network for transmitting data within a corresponding one of said at least one intermediate data collecting subsystem;

at least one third local area network for transmitting data within a corresponding one of said at least one central data processing subsystem; and

at least one wide area network for transmitting data between said one or more remote data processing subsystems, said at least one intermediate data collecting subsystem and said at least one central data processing subsystem.

85. A communication network as in claim 84 further comprising:

at least one first modem for connecting said at least one first local area network of said one or more remote data processing subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one intermediate data collecting subsystem to a corresponding some of said at least one first local area network of said one or more remote data processing subsystems through said at least one wide area network;

at least one first wide area network router for connecting a corresponding one of said at least one second local area network of said at least one intermediate data collecting subsystem to said at least one wide area network; and

**6**

at least one second wide area network router for connecting a corresponding one of said at least one third local area network of said at least one central data processing subsystem to said at least one wide area network.

86. A communication network as in claim 85 wherein said at least one first wide area network and said at least one second wide area network comprise a carrier cloud which utilizes a frame relay method for transmitting the transaction data.

87. A communication network as in claim 86 wherein said at least one second local area network and said at least one third local area network further comprise a corresponding one of at least one network switch for routing data within said at least one second local area network and said at least one third local area network; and further wherein said data comprises at least one of, (a) electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, and (b) paper transactions from documents and receipts.

88. A method for transmitting data within and between one or more remote subsystems that provide remote subsystem identification information, at least one intermediate subsystem and at least one central subsystem in a tiered manner wherein each of the central subsystems communicate with at least one intermediate subsystem and each of the intermediate subsystems communicate with at least one remote subsystems comprising:

capturing an image of documents and receipts and extracting data therefrom;

transmitting data within remote locations;

transmitting data from each remote location to corresponding intermediate locations;

transmitting data within the intermediate locations;

transmitting data from each intermediate location to corresponding central locations; and

transmitting data within the central locations.

89. A method as in claim 88 wherein said transmitting data from each remote location to corresponding intermediate locations step comprises:

connecting each remote location to a corresponding intermediate location; and

connecting the intermediate locations to corresponding remote locations.

90. A method as in claim 89 wherein said transmitting data from each intermediate location to corresponding central locations comprises:

connecting each intermediate location to an external communication network; and connecting the corresponding central locations to the external communication network.

91. A method as in claim 90 wherein said transmitting data from each intermediate location to corresponding central locations step further comprises:

packaging the transaction data into frames; and

transmitting the frames through the external communication network.

92. A method as in claim 88 wherein said data is obtained from at least one of, (a) electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, and (b) paper transactions from documents and receipts.

93. A communication network for the transmission of data within and between one or more remote data processing subsystems, at least one intermediate data collecting sub-

7

system and at least one central data processing subsystem
forming a tiered architecture wherein each of said at least
one central data processing subsystem communicate with a
corresponding some of said at least one intermediate data
collecting subsystem and each of said at least one interme-
diate data collecting subsystem communicate with a corre-
sponding some of said one or more remote data processing
subsystems, said remote data processing subsystem includ-
ing an imaging subsystem for capturing images of docu-
ments and receipts, comprising:

at least one first local area network for transmitting data
within a corresponding one of said one or more remote
data processing subsystems;

at least one second local area network for transmitting
data within a corresponding one of said at least one
intermediate data collecting subsystem;

at least one third local area network for transmitting data
within a corresponding one of said at least one central
data processing subsystem; and

at least one wide area network for transmitting data
between said one or more remote data processing
subsystems, said at least one intermediate data collect-
ing subsystem and said at least one central data
processing subsystem;

wherein the at least one intermediate data collecting
subsystem calls the one or more remote data processing
subsystems.

94. A communication network as in claim 93 further
comprising:

at least one first modem for connecting said at least one
first local area network of said one or more remote data
processing subsystems to a corresponding one of said
at least one second local area network through said at
least one wide area network;

at least one bank of modems for connecting said at least
one second local area network of said at least one
intermediate data collecting subsystem to a corre-
sponding some of said at least one first local area
network of said one or more remote data processing
subsystems through said at least one wide area net-
work;

at least one first wide area network router for connecting
a corresponding one of said at least one second local
area network of said at least one intermediate data
collecting subsystem to said at least one wide area
network; and

at least one second wide area network router for con-
necting a corresponding one of said at least one third
local area network of said at least one central sub-
system to said at least one wide area network.

95. A communication network as in claim 94 wherein said
at least one first wide area network and said at least one
second wide area network comprise a carrier cloud which
utilizes a frame relay method for transmitting the data.

96. A communication network as in claim 95 wherein said
at least one second local area network and said at least one
third local area network further comprise a corresponding
one of at least one network switch for routing data within
said at least one second local area network and said at least
one third local area network; and further wherein said data
comprises at least one of, (a) electronic transactions from
credit cards, smart cards and debit cards, signature data or
biometric data, and (b) paper transactions from documents
and receipts.

8

97. A method for transmitting data within and between
one or more remote subsystems, at least one intermediate
subsystem and at least one central subsystem in a tiered
manner wherein each of the central subsystems communi-
cate with at least one intermediate subsystem and each of the
intermediate subsystems communicate with at least one
remote subsystems comprising:

capturing an image of documents and receipts and
extracting data therefrom;

transmitting data within remote locations;

transmitting data from each remote location to corre-
sponding intermediate locations;

transmitting data within the intermediate locations;

the intermediate locations calling the remote locations;

transmitting data from each intermediate location to
corresponding central locations; and

transmitting data within the central locations.

98. A method as in claim 97 wherein said transmitting
data from each remote location to corresponding interme-
diate locations step comprises:

connecting each remote location to a corresponding inter-
mediate location; and

connecting the intermediate locations to corresponding
remote locations.

99. A method as in claim 98 wherein said transmitting
data from each intermediate location to corresponding
central locations comprises:

connecting each intermediate location to an external
communication network; and

connecting the corresponding central locations to the
external communication network.

100. A method as in claim 99 wherein said transmitting
data from each intermediate location to corresponding
central locations further comprises:

packaging the data into frames; and

transmitting the frames through the external communica-
tion network.

101. A method as in claim 97 wherein said data is
obtained from at least one of, (a) electronic transactions
from credit cards, smart cards and debit cards, signature
data or biometric data, and (b) paper transactions from
documents and receipts.

102. A communication network for the transmission of
data comprising data from credit card transactions within
and between one or more remote data processing
subsystems, at least one intermediate data collecting sub-
system and at least one central data processing subsystem
forming a tiered architecture wherein each of said at least
one central data processing subsystem communicate with a
corresponding some of said at least one intermediate data
collecting subsystem and each of said at least one data
collecting subsystem communicate with a corresponding
some of said one or more remote data processing
subsystems, said remote data processing subsystem includ-
ing an imaging subsystem for capturing images of docu-
ments and receipts, comprising:

at least one first local area network that transmits data
comprising data from credit card transactions within a
corresponding one of said one or more remote data
processing subsystems;

at least one second local area network that transmits data
comprising data from credit card transactions within a
corresponding one of said at least one intermediate
data collecting subsystem;

US 5,910,988 C1

**9**

at least one third local area network that transmits data comprising data from credit card transactions within a corresponding one of said at least one central data processing subsystem; and

at least one wide area network that transmits data comprising data from credit card transactions between said one or more remote data processing subsystems, said at least one intermediate data collecting subsystem and said at least one central data processing subsystem.

103. A communication network as in claim 102 further comprising:

at least one first modem for connecting said at least one first local area network of said one or more remote data processing subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one intermediate subsystem to a corresponding some of said at least one first local area network of said one or more remote data processing subsystems through said at least one wide area network;

at least one first wide area network router for connecting a corresponding one of said at least one second local area network of said at least one intermediate data collecting subsystem to said at least one wide area network; and

at least one second wide area network router for connecting a corresponding one of said at least one third local area network of said at least one central data processing subsystem to said at least one wide area network.

104. A communication network as in claim 103 wherein said at least one first wide area network and said at least one second wide area network comprise a carrier cloud which utilizes a frame relay method for transmitting the data.

105. A communication network as in claim 104 wherein said at least one second local area network and said at least one third local area network further comprise a corresponding one of at least one network switch for routing data within said at least one second local area network and said at least one third local area network; and wherein said transmitted data further comprises data from at least one of, (a) electronic transactions from smart cards and debit cards, signature data or biometric data, or (b) paper transactions from documents and receipts.

106. A method for transmitting data comprising data from credit card transactions within and between one or more remote subsystems, at least one intermediate subsystem and at least one central subsystem in a tiered manner wherein each of the central subsystems communicate with at least one intermediate subsystem and each of the intermediate subsystems communicate with at least one remote subsystems, comprising:

capturing an image of documents and receipts and extracting data comprising data from credit card transactions therefrom;

transmitting data comprising data from credit card transactions within remote locations;

transmitting data comprising data from credit card transactions from each remote location to corresponding intermediate locations;

transmitting data comprising data from credit card transactions within the intermediate locations;

**10**

transmitting data comprising data from credit card transactions from each intermediate location to corresponding central locations; and

transmitting data comprising data from credit card transactions within the central locations.

107. A method as in claim 106 wherein said transmitting data from each remote location to corresponding intermediate locations step comprises:

connecting each remote location to a corresponding intermediate location; and

connecting the intermediate locations to corresponding remote locations.

108. A method as in claim 107 wherein said transmitting data from each intermediate location to corresponding central locations comprises:

connecting each intermediate location to an external communication network; and

connecting the corresponding central locations to the external communication network.

109. A method as in claim 108 wherein said transmitting data from each intermediate location to corresponding central locations step further comprises:

packaging the data into frames; and

transmitting the frames through the external communication network.

110. A communication network for the transmission of data comprising data from internet transactions within and between one or more remote data processing subsystems, at least one intermediate data collecting subsystem and at least one central data processing subsystem forming a tiered architecture wherein each of said at least one central data processing subsystem communicate with a corresponding some of said at least one intermediate data collecting subsystem and each of said at least one intermediate data collecting subsystem communicate with a corresponding some of said one or more remote data processing subsystems, said remote data processing subsystem including an imaging subsystem for capturing images of documents and receipts, comprising:

at least one first local area network that transmits data comprising data from internet transactions within a corresponding one of said one or more remote data processing subsystems;

at least one second local area network that transmits data comprising data from internet transactions within a corresponding one of said at least one intermediate data collecting subsystem;

at least one third local area network that transmits data comprising data from internet transactions within a corresponding one of said at least one central data processing subsystem; and

at least one wide area network that transmits data comprising data from internet transactions between said one or more remote data processing subsystems, said at least one intermediate data collecting subsystem and said at least one central data processing subsystem.

111. A communication network as in claim 110 further comprising:

at least one first modem for connecting said at least one first local area network of said one or more remote data processing subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one

A82

**11**

intermediate data collecting subsystem to a corre-
sponding some of said at least one first local area
network of said one or more remote data processing
subsystems through said at least one wide area net-
work;

at least one first wide area network router for connecting
a corresponding one of said at least one second local
area network of said at least one intermediate data
collecting subsystem to said at least one wide area
network; and

at least one second wide area network router for con-
necting a corresponding one of said at least one third
local area network of said at least one central data
processing subsystem to said at least one wide area
network.

112. A communication network as in claim 111 wherein
said at least one first wide area network and said at least one
second wide area network comprise a carrier cloud which
utilizes a frame relay method for transmitting the data.

113. A communication network as in claim 112 wherein
said at least one second local area network and said at least
one third local area network further comprise a correspond-
ing one of at least one narrow switch for routing data within
said at least one second local area network and said at least
one third local area network; and wherein said transmitted
data further comprises data from at least one of, (a) elec-
tronic transactions from credit cards, smart cards and debit
cards, signature data or biometric data, and (b) paper
transactions from documents and receipts.

114. A method for transmitting data comprising data from
internet transactions within and between one or more
remote subsystems, at least one intermediate subsystem and
at least one central subsystem in a tiered manner wherein
each of the central subsystems communicate with at least
one intermediate subsystem and each of the intermediate
subsystems communicate with at least one remote sub-
systems comprising:

capturing an image of documents and receipts and
extracting data comprising data from internet transac-
tions therefrom;

transmitting data comprising data from internet transac-
tions within remote locations;

transmitting data comprising data from internet transac-
tions from each remote location to corresponding inter-
mediate locations;

transmitting data comprising data from internet transac-
tions within the intermediate locations;

transmitting data comprising data from internet transac-
tions from each intermediate location to corresponding
central locations; and

transmitting data comprising data from internet transac-
tions within the central locations.

115. A method as in claim 114 wherein said transmitting
data from each remote location to corresponding interme-
diate locations comprises:

connecting each remote location to a corresponding inter-
mediate location; and

connecting the intermediate locations to corresponding
remote locations.

116. A method as in claim 115 wherein said transmitting
data from each intermediate location to corresponding
central locations comprises:

connecting each intermediate location to an external
communication network; and

connecting the corresponding central locations to the
external communication network.

**12**

117. A method as in claim 116 wherein said transmitting
data from each intermediate location to corresponding
central locations step further comprises:

packaging the data into frames; and

transmitting the frames through the external communica-
tion network.

118. A communication network for the transmission of
data in a secure manner comprising:

at least one remote data processing subsystem;

at least one intermediate data collecting subsystem;

at least one central data processing subsystem;

said at least one remote data processing subsystem, said
at least one intermediate data collecting subsystem,
and said at least one central data processing subsystem
forming a tiered architecture;

said data being transmitted in a secure manner within and
between said at least one remote data processing
subsystem, said at least one intermediate data collect-
ing subsystem, and said at least one central data
processing subsystem;

wherein each of said at least one central data processing
subsystem communicate with a corresponding some of
said at least one intermediate data collecting sub-
system and each of said at least one intermediate data
collecting subsystem communicate with a correspond-
ing some of said at least one remote data processing
subsystem;

said remote data processing subsystem including an
imaging subsystem for capturing images of documents
and receipts;

said communication network further including:

at least one first local area network for transmitting
data within a corresponding one of said at least one
remote data processing subsystem;

at least one second local area network for transmitting
data within a corresponding one of said at least one
intermediate data collecting subsystem;

at least one third local area network for transmitting
data within a corresponding one of said at least one
central data processing subsystem; and

at least one wide area network for transmitting data
between said at least one remote data processing
subsystem, said at least one intermediate data col-
lecting subsystem and said at least one central data
processing subsystem.

119. A communication network as in claim 118 wherein
said at least one remote data processing subsystem uniquely
identifies the remote data processing subsystem used by a
customer.

120. A communication network as in claim 118 wherein
said at least one remote data processing subsystem uniquely
identifies the remote data processing subsystem used by a
customer and at least one of, encrypts and tags the data.

121. A method for transmitting data in a secure manner
within and between at least one remote subsystem, at least
one intermediate subsystem and at least one central
subsystem, said method comprising:

arranging said at least one remote subsystem, said at
least one intermediate subsystem, and said at least one
central subsystem in a tiered manner;

each of said at least one central subsystem communicat-
ing with said at least one intermediate subsystem;

US 5,910,988 C1

**13**

each of said at least one intermediate subsystem communicating with said at least one remote subsystem;

capturing an image of documents and receipts and extracting data therefrom;

transmitting data within remote locations;

transmitting data from each remote location to corresponding intermediate locations;

transmitting data within the intermediate locations;

transmitting data from each intermediate location to corresponding central locations; and

**14**

transmitting data within the central locations.

122. The method as in claim 121 further comprising uniquely identifying the at least one remote subsystem used by a customer.

123. The method as in claim 121 further comprising:

uniquely identifying the at least one remote subsystem used by a customer; and

at least one of, encrypting and tagging data.

\* \* \* \* \*

Trials@uspto.gov                                                    Paper 22
Tel: 571-272-7822                          Entered:  September 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

FISERV, INC.,
Petitioner,

v.

DATATREASURY CORPORATION,
Patent Owner.

——————————

CBM2014-00088
Patent 6,032,137 C1

——————————

Before MICHAEL P. TIERNEY, WILLIAM V. SAINDON, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

SAINDON, *Administrative Patent Judge*.

DECISION

Final Written Decision
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*


Dismissing Patent Owner's Motion to Exclude as Moot
*37 C.F.R. § 42.64(c)*

# I. INTRODUCTION

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is entered pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

With respect to the grounds asserted in this trial, we have considered the papers submitted by the parties and the evidence cited therein. For the reasons discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 16, 18, 22, 25, 26, 29, 36, 38–43, 50, 51, 55, 62, and 63 of U.S. Patent No. 6,032,137 C1 (Ex. 1002, "the '137 patent") are unpatentable, but has not shown that claims 9, 19, 48, 54, 60, and 66 are unpatentable.[1] In addition, for the reasons discussed below, we dismiss Patent Owner's Motion to Exclude as moot because we expunge the exhibits sought to be excluded, for being improperly filed.

## A. *Procedural History*

Petitioner filed a Petition (Paper 1, "Pet.") requesting a covered business method patent review of claims 1–7, 9–27, and 29–67 of the '137 patent over five proposed grounds of unpatentability. *See* Pet. i–iii. Petitioner filed therewith a Declaration including the testimony of James Knox, Ph.D. Ex. 1003. Patent Owner filed a Preliminary Response. Paper 5 ("Prelim. Resp."). Reviewing the arguments and evidence then before us, we issued a Decision Instituting Covered Business Method Review (Paper 6, "Dec. Inst."), instituting review on claims 1, 2, 9, 16, 18, 19, 22, 25, 26, 29,

---

[1] Patent Owner argues that the evidentiary standard is "clear and convincing proof" (Paper 9, 2) but 35 U.S.C. § 326(e) makes clear the appropriate standard is "preponderance of the evidence."

36, 38–43, 48, 50, 51, 54, 55, 60, 62, 63, and 66 over one of the five proposed grounds of unpatentability.  Dec. Inst. 15.

Patent Owner subsequently filed a Response to the Petition (Paper 9, "PO Resp."), including the testimony of Paul M. Ginsberg (Ex. 2004). Petitioner filed a Reply (Paper 10, "Pet. Reply").  Upon the request of the parties, an Oral Hearing was held.  *See* Paper 21 (Transcript of the Hearing, cited as "Tr.").

Patent Owner filed a Motion to Exclude certain evidence.  Paper 16 ("PO Mot. Excl.").  Petitioner filed an Opposition to that Motion (Paper 17, "Pet. Opp. Mot. Excl."), to which Patent Owner filed a Reply (Paper 20, "PO Reply Mot. Excl.").

*B.  Related Matters*

The parties indicate that the '137 patent is asserted in a number of district court actions.  Pet. xi–xii; Paper 4.  The '137 patent is the subject of a number of proceedings before this Board, including *Fidelity National Information Services, Inc. v. DataTreasury Corp.*, Case CBM2014-00020 (PTAB) ("Fidelity CBM")[2] and *Jack Henry and Associates, Inc. v. DataTreasury Corp*, Case CBM2014-00056 (PTAB) ("Jack Henry CBM").[3] Paper 4.

---

[2] In the Fidelity CBM proceeding, a Final Written Decision (Paper 34) was issued on April 29, 2015 determining claims 1–67 of the '137 patent to be unpatentable under 35 U.S.C. §§ 101 and 112, first paragraph.  The Board received a Notice of Appeal to the Federal Circuit of this Decision on August 27, 2015.

[3] In the Jack Henry CBM, a Final Written Decision (Paper 37) was issued on July 8, 2015 determining claims 42 and 43 of the '137 patent to be

The '137 patent is a continuation-in-part of the application that issued as U.S. Patent No. 5,910,988 C1, which is also the subject of a number of district court actions and matters before the Board.  Pet. xi–xii.

### C. The '137 Patent

The '137 patent is directed to a system for remote data acquisition, and centralized processing and storage of the acquired data.  Ex. 1002, Abstract.  An object of the invention is to provide an automated system to manage and store captured electronic and paper transactions from various activities including banking and consumer applications.  *Id.* at 3:22–26.  Generally, the '137 patent describes scanning documents using a scanner attached to a general purpose network computer that is connected via a carrier cloud to a server that inserts images and data received into a database.  *Id.* at Figs. 1–2, 3:37–58, 4:65–5:15, 5:45–51, 16:53–60.  Additionally, the general purpose network computer encrypts the images and data to provide a system with maximal security.  *Id.* at 3:30–36, 7:38–46, 8:10–15.

---

unpatentable under 35 U.S.C. § 102.  The Board received a Notice of Appeal to the Federal Circuit of this Decision on August 27, 2015.

Figure 1 of the '137 patent, provided below, depicts a preferred embodiment of the system having three major operational elements:



FIG. 1 (Amended)

The '137 patent describes the tiered arrangement depicted in Figure 1 as follows:

> FIG. 1 shows the architecture of the DataTreasury™ System **100**. The DataTreasury™ System **100** has three operational elements: the DataTreasury™ System Access Terminal (DAT) **200** (the remote data access subsystem), the DataTreasury™ System Access Collector (DAC) **400** (the intermediate data collecting subsystem), and the DataTreasury™ System Processing

CBM2014-00088
Patent 6,032,137 C1

> Concentrator (DPC) **600** (the central data
> processing subsystem).

*Id.* at 4:66–5:6.

Figure 2 of the '137 patent, provided below, depicts a block diagram
of the DAT:



**FIG. 2 ( Amended)**

As shown in Figure 2, scanner 202 is connected to workstation 210, which is
connected to data system access collector 400. The workstation can be a
general purpose computer and performs tasks including compressing,
encrypting, and tagging a scanned bitmapped image. *Id.* at 5:40–45, 7:31–
35.

The specification of the '137 patent states that the disclosed system
improves upon the prior art by providing an automated, reliable, secure
system to process electronic and paper transactions. *Id.* at 3:32–37.

CBM2014-00088
Patent 6,032,137 C1

*D. Illustrative Claims*

Of the claims challenged, claims 1, 26, 42, and 43 are independent.

Claims 42 and 43 are illustrative:

> 42. A system for central management, storage and report generation of remotely captured paper transactions from checks comprising:
>
> > one or more remote data access subsystems for capturing and sending paper transaction data and verifying transaction data from the checks comprising at least one imaging subsystem for capturing the checks and at least one data access controller for managing the capturing and sending of the transaction data;
> >
> > at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a management subsystem for managing the processing, sending and storing of the . . . transaction data; and
> >
> > at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

> 43. A method for central management, storage and verification of remotely captured paper transactions from checks comprising the steps of:
>
> > capturing an image of the check at one or more remote locations sending a captured image of the check;
> >
> > managing the capturing and sending of the transaction data;
> >
> > collecting, processing, sending and storing the transaction data at a central location;
> >
> > managing the collecting, processing, sending and storing of the transaction data;

>    encrypting subsystem identification information
> and the transaction data;
>    verifying the transaction data from the check;
> and
>    transmitting the transaction data and the
> subsystem identification information within and between
> the remote location(s) and the central location.

### E. Asserted Grounds and Prior Art

A covered business method patent review was instituted as to claims 1, 2, 9, 16, 18, 19, 22, 25, 26, 29, 36, 38–43, 48, 50, 51, 54, 55, 60, 62, 63, and 66 as anticipated by Campbell under 35 U.S.C. § 102. Dec. Inst. 15.

## II. ANALYSIS

### A. The '137 Patent Is a Covered Business Method Patent

Patent Owner argues that the '137 patent is not eligible for covered business method patent review because one or more of its claims are directed to a technological invention. PO Resp. 22–26. We have discussed whether the '137 patent is eligible for covered business method patent review at length in our Decision to Institute and Final Written Decision in the Fidelity CBM. *See* Fidelity CBM, Paper 13, 9–13; *id.* at Paper 34, 8–9. For the same reasons as those we expressed in the Fidelity CBM, we hold that the '137 patent is eligible for covered business method patent review.

### B. Patent Owner's Motion to Exclude

Patent Owner moves to exclude Exhibits 1062–1065, filed by Petitioner on April 7, 2015, over two months after Petitioner filed its Reply and 22 days before oral hearing. PO Mot. Excl. 2–3. Petitioner characterizes its submission as "supplemental information" and "apologizes

CBM2014-00088
Patent 6,032,137 C1

for its oversight" of the "minor procedural defect" of not seeking authorization to file a motion for supplemental information. Pet. Opp. Mot. Excl. 2. We dismiss as moot Patent Owner's Motion to Exclude because we hereby order the expungement of Exhibits 1062–1065 for being filed without prior authorization.

### C. Claim Construction

We interpret the claims of an unexpired patent using the broadest reasonable interpretation in light of the specification of the patent. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–80 (Fed. Cir. 2015). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art, in the context of the entire disclosure. *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

In our Decision to Institute this trial, we determined the broadest reasonable interpretation of "subsystem identification information" is "information that identifies a subsystem." Dec. Inst. 8. There, as here, we relied on our prior interpretation of this term in the Jack Henry CBM. *See id.*; *see also* Jack Henry CBM, Paper 17, 9–10 (explaining that we adopt neither Petitioner's nor Patent Owner's proposed constructions); *id.*, Paper 37, 8–11 (keeping the same construction, based upon Patent Owner's admission and a more developed record). Notably, we determined, as an ancillary matter to construing the term, that "nothing in the claims, as would

CBM2014-00088
Patent 6,032,137 C1

be understood by a person of ordinary skill in the art in view of the specification, requires any form of ownership or other type of corporate relationship between the various subsystems; only that they function in the manner set forth in the claims." *Id.*, Paper 37, 10.[4]

Patent Owner does not comment specifically on or discuss our prior claim construction of "subsystem identification information" ("SSID"). Instead, Patent Owner attacks as "Completely Unacceptable" Petitioner's proposed construction in the Petition, which we did not adopt. PO Resp. 20; Dec. Inst. 8 (adopting our prior construction of the term in the Jack Henry CBM rather than Petitioner's proposed construction); Jack Henry CBM, Paper 17, 8–10 (adopting neither Petitioner's nor Patent Owner's then-proffered constructions of SSID).[5] Patent Owner then suggests that we consider and accept a district court construction of SSID, without providing any explanation for why we should adopt that construction, especially given that we have explicitly considered and did not accept that construction

---

[4] Our reasoning in this regard was confirmed by Patent Owner's admission during Oral Argument during the Jack Henry CBM that common ownership is not required. *See* Jack Henry CBM, Paper 37, 10. Although Petitioner impermissibly filed the transcript of this Oral Argument as Exhibit 1064, which we expunged, we are nevertheless aware of Patent Owner's admission because we took part in the Jack Henry CBM oral hearing.

[5] Patent Owner does not explain what errors it sees in the construction offered by Petitioner in its Petition. Petitioner proposed: "Information that identifies a remote data access subsystem, *such as the identification of a specific branch or terminal of a banking institution*, or a subsystem or component that is a part of a remote data access subsystem." Pet. 7 (emphasis added). The difference between Petitioner's and Patent Owner's construction lies in the emphasized language, which appears to be a non-limiting example.

CBM2014-00088
Patent 6,032,137 C1

before (Jack Henry CBM, Paper 17, 9–10).[6]  PO Resp. 21–22.  Patent Owner notes that, if we do not adopt that construction, it will "abide by the Board's decision." *Id.* at 21.  We decline to adopt the district court construction, a construction previously considered and not adopted, in the absence of arguments explaining why we should adopt that construction, and in the presence of a statement that Patent Owner will abide by our construction should we not choose to adopt that construction.

Upon consideration of the record before us, we maintain that the broadest reasonable interpretation of "subsystem identification information" is "information that identifies a subsystem."

### D. Anticipation by Campbell

Petitioner asserts that claims 1, 2, 9, 16, 18, 19, 22, 25, 26, 29, 36, 38–43, 48, 50, 51, 54, 55, 60, 62, 63, and 66 are anticipated by Campbell.  Pet. 10–39.[7]

Campbell discloses a system that transmits check images and routes those images between banks.  Ex. 1019, Abstract.  A first entity in the system lies within sending bank 14.  *Id.* at Fig. 1.  Within this first bank,

---

[6] The difference between the district court interpretation and ours is minor and not outcome-determinative in this case.  The district court limited the SSID to identification of the remote access device, whereas our analysis concluded that the broadest reasonable interpretation of the term did not require limiting the SSID to identifying any particular subsystem, so long as it identified *some* subsystem of the system.  *See* Jack Henry CBM, Paper 17, 9–10.  In application to this case, the difference is immaterial because, in Petitioner's ground, the alleged SSID in Campbell identifies the remote access device (sending bank).

[7] The Petition also lists claims 49 and 61 (Pet. 13), but we did not institute a review of those claims.  Dec. Inst. 13.

hardware and software are configured to create a check image and other data (e.g., source and destination identifiers). *Id.* at 2:64–3:32, 5:23–28; *see also id.* at 4:10–25 (describing the same hardware and software performing the same operations for a dishonored check). The first bank sends the gathered information to a second entity of the system, node 12, over a network. *Id.* at 3:20–36; *see also id.* at 4:26–29 and 4:59–5:1 (describing the transmission in the dishonored check example). Node 12 performs various tasks with the sent information, one task being the forwarding of the check image to the appropriate receiving bank. *Id.* at 1:60–67, 2:30–32. Receiving bank 16, therefore, is a third entity in the system. *See id.* at Figs. 1, 2. The system is equipped to send and receive encrypted information between the banks and within its own central node 12. *Id.* at 5:55–60, 6:37–38.

We have reviewed Patent Owner's arguments against Petitioner's ground (PO Resp. 28–60); the principal arguments are addressed below.

### 1. Claim 1

Independent claim 1 requires, *inter alia*, a remote data access subsystem that captures images of paper transaction data and provides encrypted SSID and image data. Claim 1 also requires a central data processing system and a communications network.

Petitioner reads the remote data access subsystem on the sending bank of Campbell, the central data processing subsystem on the node of Campbell, and the communications network on the communications network in Campbell. Pet. 28 (addressing the particular limitations found in claim 1 but directing the reader to its analysis of claim 42), 19–24 (setting forth Petitioner's assertions for these limitations as also found in independent

CBM2014-00088
Patent 6,032,137 C1

claim 42).  Petitioner asserts that Campbell captures images of checks and
sends that data to the central subsystem via the network.  *Id.* at 19–24.
Petitioner also asserts that Campbell transmits an encrypted SSID in the
form of an endorsement or as additional identifying data sent along with the
encrypted check image.  *Id.* at 13–19.

With respect to independent claim 1, Patent Owner principally argues
that Campbell fails to disclose a) "subsystems" and b) "encryption" of the
SSID in the manner required by the claim.  *See, e.g.*, PO Resp. 30–31, 33,
35, 36 (arguing "subsystem"); *id.* at 31–32, 33–36 (arguing "encryption").

*a. "subsystem"*

Campbell discloses a system for transporting the images of checks.
Ex. 1019, 2:18–20 ("FIG. **1** shows an example of a system for transporting
images of checks").  As such, we are persuaded by Petitioner's position that
the various separately identifiable objects operating within this system—
namely, the first bank, the node, and the second bank—are subsystems
within this system.[8]  Except for the "encryption" aspect of the claim,
discussed below, Patent Owner raises no credible argument that the first
bank, the node, or the second bank in Campbell fail to disclose any element
of claim 1.  Instead, Patent Owner's argument appears to be that one or more
entities in Campbell are not commonly owned or are not subsystems of each

---

[8] "system.  A collection of components organized to accomplish a specific
function or set of functions."  *IEEE Standard Glossary of Software
Engineering Terminology* 73 (IEEE Std 610.12-1990, 1990) (Ex. 3001).
"subsystem.  A secondary or subordinate system with a larger system."  *Id.*
at 72.

CBM2014-00088
Patent 6,032,137 C1

other. *See, e.g.*, PO Resp. 31, 33.[9]  As we noted in our claim construction of
SSID, however, there is no ownership requirement to be a "subsystem" of
the claimed system.  Further, the claims do not require one subsystem to be a
subsystem of another subsystem, but merely that there are subsystems of the
claimed system.  Accordingly, Patent Owner's arguments are unpersuasive.
Reviewing the record before us, we are persuaded that Petitioner has
established that the "remote data access subsystem" reads on the first bank
in Campbell, and the "central data processing system" reads on the node.

### b.  *"encryption"*

Patent Owner's arguments regarding "encryption" fall in two lines:
i) arguments that Campbell does not disclose an encrypted SSID because
Campbell does not disclose a SSID (*see, e.g.*, PO Resp. 31, 35); and
ii) arguments that Campbell does not require encryption of check images
(*see, e.g.*, *id.* at 32, 33, 36).

### i.    SSID

We have determined already that the hardware and software system at
the first bank is a subsystem of the check image processing system of
Campbell.  When the system of the first bank transmits the check to the
node, it includes information identifying itself.  Pet. 14–19, 20–21; s*ee also
id.* at 28 (stating that the analysis for claims 42 applies to claim 1); Ex. 1019,
5:23–28 ("The [node] may read some data accompanying check images, for

---

[9] Patent Owner's Declarant, Mr. Ginsberg, testifies that "Petitioner (and also
the Board) mistakes the two banks in Figure 1 of the Campbell patent as
being remote data access subsystems of a single bank."  Ex. 2004 ¶ 11.  We
cannot find any such assertion by Petitioner or the Board, and neither PO nor
its Declarant direct us to where such an assertion exists.

CBM2014-00088
Patent 6,032,137 C1

example . . . information may instruct the node 12 about the identity of the sending institution and the intended receiving institution."). Accordingly, we are persuaded by Petitioner's assertion that the first bank transmits a SSID because it transmits information that identifies a subsystem (the first bank subsystem).[10] Patent Owner argues:

> Again, Campbell does not state that the identity of the sending and/or receiving institutions has been encrypted. But even if the identity of the sending and/or receiving institutions were encrypted in the Campbell patent, a given bank such as a Sending Bank or a Payor Bank is simply **not** a subsystem of a Receiving Bank or a Bank of First Deposit. Thus, Campbell might be able to identify a given Sending Bank and/or a given Bank of First Deposit, but the identity of such banks does not qualify as **subsystem** identification information. Placing a serial number, or other identification number, on a scanner that imaged a check in a Sending Bank or a Bank of First Deposit does not necessarily provide subsystem identification information, since it is the identification name/number of the subsystem, and not the serial number of a scanner, or a name of bank, that is encrypted in the '137 Patent.

PO Resp. 35.[11,12]

---

[10] Petitioner also provides an alternative reading of SSID on Campbell: that the endorsement printed on the check itself is a SSID. *See* Pet. Reply 5–6; *see also* Dec. Inst. 10 (pointing out that Petitioner has two readings of the term on Campbell). Although Patent Owner does not appear to discuss this particular alternative reading, we do not rely on this alternative reading in reaching our Decision.

[11] Patent Owner's Declarant, Mr. Ginsberg, seems to contradict Patent Owner here, by implying that the ID number of a scanner would be a SSID:

CBM2014-00088
Patent 6,032,137 C1

Patent Owner here appears to argue that the name of a bank is not a SSID because one bank is not the subsystem of another bank. Patent Owner also appears to argue that a SSID is "not the serial number of a scanner, or a name of bank" that is encrypted. *Id.* Patent Owner points to no portions of the record and provides no credible analysis in support of these assertions. We are persuaded that the bank is a subsystem; thus, the name of the bank would serve to identify that subsystem and meets the limitation of claim 1 requiring a SSID.[13] Reviewing the record before us, Patent Owner's argument that Campbell does not describe an encrypted SSID because it does not disclose a SSID is unpersuasive in view of the arguments and evidence offered by Petitioner.

---

"Nowhere does Campbell teach that a receiving institution would have any use for information such as the ID number of a scanner in a sending institution." Ex. 2004 ¶ 15.

[12] Patent Owner seems to have taken an opposite position in its Preliminary Response, suggesting that information that identifies a scanner is a SSID: "claim 1 requires encrypting identification information that identifies 'at least one imaging subsystem' (such as the 3897 scanner of the IBM 3890 system . . . ) and requires identification information that identifies 'at least one data access controller' (such as a workstation that operates the 3897 scanner)." Prelim. Resp. 22.

[13] Further, although not necessary to reach our finding here, we are persuaded by Petitioner's logic that the SSID is "particularly apt where financial institutions have myriad branches or equipment that send data to a central location." Pet. 16. In other words, Petitioner implies that one of ordinary skill would understand that the identifying information (SSID) in Campbell is not just a bank name but the name of a particular bank.

16

*ii.    Requiring Encryption*

Campbell discusses encryption of information as follows:

> The controller **42** may read some data accompanying check images, for example, it may identify that TCP/IP protocol information accompanying those images. That information may instruct the node **12** about the identity of the sending institution and the intended receiving institution. That information may also identify the disposition of the check . . . .
>
> The controller **42** may also be configured to handle information encrypted by sending institutions to provide security for the images transported by the network **38**. The controller **42** may have its own encryption and decryption equipment to provide a secure environment in the node **12**.

Ex. 1019, 5:14–60; *see also* Pet. 13–19 (explaining Petitioner's position regarding encrypting the SSID). In our Decision to Institute this trial, we determined that Campbell's system "is equipped to send and receive encrypted information between the banks," relying on the above-cited passage in Campbell. Dec. Inst. 8–9 (citing Ex. 1019, 5:55–60).

With a full record, we find that the preponderance of the evidence supports Petitioner's position. Campbell does not state that only the *image* is encrypted. Instead, Campbell states that "*information* [is] encrypted . . . to provide security *for the images* transported." Ex. 1019, 5:55–58 (emphasis added). Thus, Campbell uses the terms *information* and *image* to refer to different collections of data. Earlier in that column, Campbell also explains what it means by "information," and it is clear that this information is not just images but rather includes "information [that] *accompan[ies]* those images." *Id.* at 5:25–26 (emphasis added). For example, the information

CBM2014-00088
Patent 6,032,137 C1

identifies the "sending institution," "receiving institution," and "the disposition of the check." *Id.* at 5:26–31. As we discussed in a prior claim construction of this term, we are persuaded that information identifying the sending institution is a SSID. *See* Jack Henry CBM, Paper 37, 8–11. Thus, when this information is encrypted, it is an encrypted SSID, as required by claim 1. *See also* Ex. 1003 ¶¶ 64–65, 78–84, 91 (Petitioner's Declarant, Dr. Knox, testifying that the encrypted information in Campbell identifies the receiving institution).

Patent Owner argues that Campbell discloses that the controller *may* be configured to handle encrypted information, which means that it "does not necessarily encrypt subsystem information" and that encryption is not "necessarily always . . . accomplished." PO Resp. 32–34.[14] Patent Owner does not provide an explanation as to how this, even if true, would preclude anticipation: Campbell would still disclose encrypted SSIDs if it disclosed the encryption as a capability but not a necessity of the system. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983) ("The law of anticipation does not require that the reference 'teach' what the subject patent teaches. . . . . [I]t is only necessary that the claims under attack, as construed by the court, 'read on' something disclosed in the reference, i.e., all limitations of the claim are found in the reference, or 'fully met' by it"); *see also* Pet. Reply 5–6 (arguing that there is no requirement that the prior

---

[14] Later in its Response, Patent Owner argues that, although Campbell may "encrypt the name of th[e] bank," Campbell does not "encrypt[] identification information that identifies a particular subsystem of the . . . Bank." PO Resp. 48–49. Thus, Patent Owner appears to recognize that in fact Campbell discloses encrypting the name of the bank (while disputing that the name is sufficient to be a SSID).

CBM2014-00088
Patent 6,032,137 C1

art mandate the use of a disclosed feature).  Notwithstanding, we disagree that Campbell only occasionally encrypts SSIDs, for the reasons explained in the prior paragraph.  Reviewing the record before us, we are persuaded that Campbell discloses transmitting an encrypted SSID.

### c.  Conclusion Regarding Claim 1

In view of the above, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 1.

### 2.  Claim 2

Claim 2 depends from claim 1 and further requires that the data access subsystem comprises a scanner.  Petitioner asserts that Campbell's imaging equipment scans the check.  Pet. 29.[15]  Patent Owner identifies the claim language in claim 2 and argues that Petitioner's ground is deficient because Campbell does not anticipate claim 1.  PO Resp. 36.  We determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 2.

### 3.  Claims 9 and 19

Claim 9 depends from claim 1 and further requires "at least one server for polling said one or more remote data access subsystems for transaction

---

[15] Petitioner misquotes the Decision to Institute as having said that:  "'Patent Owner did not discuss these claims in its Preliminary Response and that the claims will remain invalid unless rebutted.'  Paper 6, p. 13."  Pet. Reply 9. The cited portion of our Decision to Institute states:  "Patent Owner does not discuss these claims at this time.  Prelim. Resp. 24.  We have reviewed Petitioner's assertions and determine that, if unrebutted, they demonstrate that these claims are more likely than not anticipated by Campbell."

data." Claim 19 includes the same limitation. Petitioner asserts that "billing interface in the interface 52 will periodically poll the node controller 42." Pet. 29 (citing Ex. 1019, 7:33–42). Patent Owner argues that polling for information about billing is not the same thing as polling the remote data access subsystems for transaction data. PO Resp. 37–38.

Patent Owner's argument is persuasive. The portions of Campbell Petitioner cites are directed to a component of the node polling another component of the node, not the remote data access subsystems as claimed. Petitioner offers no further analysis in its Petition; Petitioner only cites to the above-noted portion of Campbell. In its Reply, Petitioner explains how Campbell describes polling for various types of information, but does not explain how the node polls the remote data access subsystem in Campbell (i.e., the bank). *See* Pet. Reply 9–10. Accordingly, we determine that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 9 and 19.

### *4. Claim 16*

Claim 16 depends from claim 1 and further requires that the remote data access and data processing subsystems each contain a local area network (LAN) and that they are connected by a wide area network (WAN). Petitioner asserts that Campbell's imaging equipment is formed of "large multiworkstation systems" that sends images to "a network interface" of the remote data access subsystem (sending bank) and then subsequently sends information to the data processing subsystem (node), which has its own LAN 56. Pet. 23–24, 30–32 (explaining how Campbell discloses LANs and a WAN). Patent Owner argues that "Campbell teaches a single LAN 56, and

CBM2014-00088
Patent 6,032,137 C1

does not teach a WAN." PO Resp. 39–40. Patent Owner, aside from citing to its Declarant, Mr. Ginsberg, provides no further credible explanation for its argument. We address each of these challenged limitations below.

*a. WAN*

A WAN is simply a network that spans geographically separated areas.[16] As explained by Petitioner's Declarant, Dr. Knox:

> Campbell discloses the transmission of data between sending bank 14 and node 12 using a public switched telephone network 10. Campbell further discloses that the network 10 may be a frame relay network. Ex. 1019, 2:61. "Frames" is a general term in telecommunication, and is included in many protocols. A frame relay network is a type of Wide Area Network.

Ex. 1003 ¶ 158.

Notably, the '137 patent also describes its WAN as using a frame relay network over a telecommunications company network. Ex. 1002, 12:50–61. Patent Owner's Declarant, Mr. Ginsberg, acknowledges that Campbell describes transmission of signals over a public switched telephone network, but states that "the 'central offices' are not described as being remote from the receiving bank." Ex. 2004 ¶ 22. Mr. Ginsberg appears to be discussing the portion of Campbell where it describes the signals

---

[16] "Wide Area Network (WAN)[:] A data communications network that covers geographically separated areas, typically containing cities. Thus a WAN is usually composed of Local Area Networks (LAN) interconnected by other communications links hired from a PTT or other common carrier." *Focal Dictionary of Telecommunications* (1999) *available at* http://search.credoreference.com/content/entry/bhfidt/wide_area_network_wan/0 (Ex. 3002).

21

CBM2014-00088
Patent 6,032,137 C1

produced by the sending bank being transmitted on network access lines 22 to reach telephone network 10 and, more specifically, that "[t]he signals received by the network on line **22** may be transmitted through the network **10** via . . . one or more central offices to the check image processing node **12**." Ex. 1019, 3:17–43.  Mr. Ginsberg does not explain how this passage supports his conclusion.  Whether the "central offices" (not relied on by Petitioner for this claim) are remote to the sending bank has no bearing, which we can see, on whether Campbell describes a WAN.

Campbell describes transmission of information between the *sending bank* and the *node* over a public switched telephone network; it is that communication that Petitioner asserts occurs over a WAN.  *See* Pet. Reply 11–12; Pet. 30–31.  A public switched telephone network covers geographically distinct locations.  One of ordinary skill in the art would understand that transmitting information over such a network generally involves the sender and receiver being in different locations; likewise, the system of Campbell makes little sense if the banks and the node are all in the same location.[17]  Accordingly, Mr. Ginsberg's testimony on this point is unpersuasive.  On the other hand, Petitioner's Declarant, Dr. Knox, explains how the Campbell system uses a public switched telephone network and a frame relay network, which Dr. Knox testifies is a type of WAN.  Ex. 1003 ¶ 158.  This testimony is persuasive, under its own reasoning and because, as

---

[17] *See also* PO Resp. 47, "Patent Owner also agrees in principle that Campbell's sending institution may be considered to be a *remote location*" (emphasis added).

CBM2014-00088
Patent 6,032,137 C1

we mentioned above, the WAN in the '137 patent involves a frame relay network over a telecommunications company's network.

Patent Owner's Declarant also testifies that "Campbell does not teach . . . a wide area network that transmits data within and between the [claimed subsystems]." Ex. 2004 ¶ 22. The wide area network in claim 16 does not require data to be transmitted "within and between," but rather just "between," the remote and data processing subsystems. Accordingly, Mr. Ginsberg's testimony is directed to language not found in the claims (and even if it were, his conclusory statement is entitled to little or no weight).

Lastly, Patent Owner's Declarant argues that Campbell does not teach a "carrier cloud." *Id.* ¶ 23.[18] Mr. Ginsberg here directs us to the testimony of Petitioner's Declarant, Dr. Knox, at Exhibit 1003, paragraphs 174 and 175. Dr. Knox's testimony there is directed to claim 22, not claim 16; Dr. Knox does not discuss a "carrier cloud" with respect to claim 16. *See generally* Ex. 1003 ¶¶ 169–177 (Dr. Knox's testimony discussing claim 22); *see also* ¶¶ 154–158 (Dr. Knox's testimony discussing claim 16). Thus, Mr. Ginsberg's testimony is unpersuasive.

Reviewing the arguments and evidence before us, we are persuaded that Campbell discloses a WAN as claimed.

### b. LAN

Petitioner's position is that the "multiworkstation systems [at the banks] cited in Campbell necessarily include a LAN." Pet. 23 (citing Ex. 1003 ¶ 112, Ex. 1020, 2); Ex. 1019, 3:10–12 ("The imaging equipment may be large multiworkstation systems available from companies such as IBM,

---

[18] Neither claim 16 nor claim 22 include a "carrier cloud" limitation.

UNISYS, or NCR.").[19]  To bolster that point, Petitioner's Declarant, Dr. Knox, testifies and offers evidence that the imaging device mentioned by Campbell and offered for sale by IBM at that time "manage[d] the distribution of image and coded data on the LAN."  Ex. 1003 ¶ 112 (quoting Ex. 1020, 193654).  We find Dr. Knox's testimony persuasive.  Patent Owner offers no persuasive evidence or explanation to the contrary, merely stating that Petitioner's claim chart "simply does not address the two LANs recited in claim 1."  PO Resp. 40.  Reviewing the arguments and evidence before us, we are persuaded that Campbell discloses the LANs as claimed.

### c.  Conclusion for Claim 16

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 16.

### 5.  Claim 18

Claim 18 depends from claim 1 and requires "a further management subsystem for managing the collecting and sending of the transaction data."[20]  In effect, this subsystem serves as an intermediary, collecting data

---

[19] Petitioner's assertion that node 12 includes a LAN is supported by the evidence and does not appear to be in dispute.

[20] Claim 18 depends from claim 1 and refers to "the electronic or paper transaction data" of claim 1 but there is no antecedent basis for "electronic transaction data."  In addition, claim 1 limits the data to "paper transaction data"; it would be impermissible for dependent claim 18 to expand the scope of claim 1 beyond paper transaction data.  35 U.S.C. §112(d).  We take no position on the definiteness of the claims but limit our application of them on the art to the "paper transaction data" aspect of the "the electronic or paper transaction data" element.

CBM2014-00088
Patent 6,032,137 C1

and then sending it on. *See* Ex. 1002, Fig. 4 (wherein the DAC collects data from the DAT and sends it to the DPC). Petitioner asserts that Campbell discloses check processing and transmitting equipment and that banks may transmit images through one or more central offices. Pet. 31 (citing Ex. 1019, 3:32–41 (describing sending data to node 12), 3:17–20 (describing images collected by the imaging equipment and sent across the network)); Ex. 1003 ¶¶ 159–168 (Dr. Knox's explanation for how the limitation is met).

Reviewing Petitioner's citations, we understand Petitioner to be asserting that the claimed "data collecting subsystem" that has the "management subsystem" is one of the intermediaries Campbell describes as between the banks and the node. *See, e.g.*, Pet. 31 (citing to portions of Campbell that discuss routing the images through intermediaries); Ex. 1003 ¶ 161 ("sending bank 14 can send images indirectly to a node 12 through a trunk or central office. Ex. 1019, 3:32–36. The trunks and/or central office may be another bank 14 and/or 16.").

Patent Owner argues that, "[a]lthough Dr. Knox's analysis is interesting, it is irrelevant and without support, since claim 18 depends directly from claim 1," and that "Campbell . . . does not indicate that any two banks are subsidiaries of one another." PO Resp. 41. As we explained above, however, the claims do not require such a "subsidiary" feature, and we have determined already claim 1 is anticipated by Campbell.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 18.

CBM2014-00088
Patent 6,032,137 C1

*6. Claim 22*

Claim 22 depends from claim 18 and specifies that each of the (now three) subsystems include a LAN, and that each of the subsystems are connected by a WAN. Petitioner largely points to the same things in Campbell as it did for claim 18. Pet. 31–33; *see also* Ex. 1019, 3:46–48 ("The check image processing equipment [at the receiving bank] may be similar to the imaging equipment **18** located in the sending institution **14**"). Petitioner's Declarant, Dr. Knox, testifies that Campbell describes an intermediary bank being a second sending bank, which would then have its own multi-workstation system forming a LAN. Ex. 1003 ¶ 172; *see also id.* ¶ 161 (setting forth Dr. Knox's reasons for concluding that the "trunks and/or central office may be another bank 14 and/or 16"). As we discussed above, Petitioner has shown persuasively that the banks have LANs (via multi-workstation systems) and are connected via a WAN (over the public switched telephone network).

Patent Owner argues that "Campbell simply does not mention a wide area network at all." PO Resp. 42. It is well established that a reference need not teach a limitation *in haec verba*. *In re Bode*, 550 F.2d 656, 660 (CCPA 1977). Patent Owner's argument is nothing more than observing that the term does not appear in Campbell; such is not the test for anticipation. *See id.* Apparently in contesting Petitioner's assertion that the frame relay network 38 shown in Figure 2 of Campbell is a WAN, Patent Owner also argues that Figure 2 "is illustrative and certainly not drawn to scale in any manner, [such that] it is impossible to conclude from the drawings that Campbell teaches anything remotely resembling a wide area network." PO Resp. 42. A wide area network is not defined by its size but

rather by the geographic separateness of the entities communicating over it. *See supra* n.16. As we discussed in our analysis of claim 16, addressing whether Campbell describes a WAN, we are persuaded that frame relay network 38 (over the public switched telephone network) is a WAN, because it connects geographically separate entities.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 22.

### 7. *Claim 25*

Claim 25 depends from claim 1 and further specifies that the LANs recited in claim 22 include "at least one network switch for routing transaction data within [the LAN]." Petitioner asserts that Campbell discloses multi-workstation imaging systems that form a LAN at the bank and that a network switch is inherent to a LAN. Pet. 33 (citing Ex. 1003 ¶¶ 182–185).

Patent Owner argues that "Campbell is completely silent regarding network switches." PO Resp. 43. Petitioner's ground, however, asserts that Campbell *inherently* describes the feature; by this, Petitioner is admitting that Campbell is silent on the matter.

Patent Owner also points us to "several documents that describe means other than a network switch to operate a network," citing us to "[f]ootnote 5, at page 10, *supra*." *Id.* We find no such footnote on page 10 of the Response, but find a series of URLs on page 28 in a footnote 5. There is no indication that the documents at the URLs are in evidence, nor do we see them in the record. *See* 37 C.F.R. § 42.63(a) ("All evidence must be

filed in the form of an exhibit"). There is no explanation of what these documents contain, when and whether they were published, or how, specifically, they are relevant to the discussion at hand. *See* 37 C.F.R. § 42.23(b) ("All arguments for the relief requested in [a Response] must be made in the [Response]"); *see also* 37 C.F.R. § 42.220(a) (indicating the Response is filed as an opposition, and thus subject to Rule 42.23). The documents at these URLs are not in evidence, not discussed in a paper, and, therefore, are not considered.

Petitioner's Declarant, Dr. Knox, sets out his reasoning that network switches are a standard part of LANs and that a person of ordinary skill in the art envisioning a LAN would also envision it having a network switch. Ex. 1003 ¶ 184 (testifying, "such a switch is a standard part of a modern local area network"); *id.* at ¶¶ 182–185 (setting forth Dr. Knox's reasoning on the network switch, which includes testimony that the claimed network switch "would be a part of virtually all of the prior art disclosing a LAN"). Whether a network switch is "standard" or in "virtually all" of the prior art, however, goes to whether a network switch is obvious, not whether a network switch is inherent in Campbell.

Reviewing the record before us, we determine that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 25.

### 8. Claim 48

Claim 48 depends from claim 1 and further requires that the system "automatically generates at least one of credit card statements, bank statements, and tax reports." Petitioner points to the disclosure in Campbell

CBM2014-00088
Patent 6,032,137 C1

of the data used in the billing interface: tracking the "number of checks processed, converted, stored, and transmitted." Pet. 37 (citing Ex. 1019, 5:35–38, 7:33–42). The testimony of Petitioner's Declarant, Dr. Knox, simply quotes language from Campbell, without analysis or explanation. Ex. 1003 ¶¶ 304–305.

Reviewing the arguments and evidence before us, we determine that Petitioner has not shown sufficient evidence that this billing interface information is, or produces, one of the claimed statements or reports. The billing interface certainly provides reports, but the claims require the functionality to gather and present certain information in those reports. Credit card and bank statements typically are understood to refer to a list of account activities for a consumer account; a tax report is typically understood to refer to taxes. Although the number of checks processed, etc., may be related to things that eventually make it on a bank statement, Petitioner does not set forth a claim construction or analysis that would allow us to conclude, by a preponderance of the evidence, that such features are a "bank statement" as claimed (or any of the other claimed reports). As such, we determine that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 48.

### 9. Claim 50

Claim 50 depends from claim 1 and specifies that the "transaction data comprises more than one type of transaction data." Petitioner cites to the description in Campbell of the multi-workstation imaging systems as well as the testimony of Dr. Knox. Pet. 37–38 (citing Ex. 1019, 2:64–66, 3:10–12; Ex. 1003 ¶¶ 689–690). At the cited portion of Dr. Knox's

29

CBM2014-00088
Patent 6,032,137 C1

testimony, we are directed to "the discussion above regarding the '988 Patent, Claim 57." At that portion of his testimony, Dr. Knox characterizes the various types of transaction data as "including images, [Magnetic Ink Character Recognition] codeline data and various types of transaction data derived through optical character recognition." Ex. 1003 ¶ 308; *see also id.* ¶¶ 307–309 (setting out Dr. Knox's testimony regarding this limitation). Patent Owner argues that Petitioner's claim chart "fails to address" this limitation and that claim 50 is not anticipated by way of its dependency from claim 1. PO Resp. 45–46. On the contrary, however, Petitioner does address the limitation in the claim chart, and we have determined already that Campbell anticipates claim 1. Petitioner's unrebutted assertion that the image and magnetic data types are the claimed more than one types of transaction data is persuasive. We determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 50.

### 10. Claim 26

Independent claim 26 is similar in scope to independent claim 1. Petitioner's assertions for unpatentability and Patent Owner's arguments are substantially similar to those we discussed in our analysis of claim 1. *See* Pet. 24–28; PO Resp. 46–49. For the reasons expressed above, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 26.

### 11. Claims 29, 36, and 38–41

Claim 29 depends from claim 26 and requires a plurality of remote locations and a plurality of central locations. Claim 36 depends from claim

29 and requires intermediate locations between the remote and central locations. Claims 38–41 depend indirectly from independent claim 26 and generally provide more detail to the steps previously recited. Claim 41, in particular, specifically recites that the transmission between the intermediate location and the central location occurs via frames.

For claim 29, Petitioner asserts that there are a plurality of remote locations (banks) and a plurality of central locations (nodes). Pet. 33–34; Ex. 1019, 2:27–29 (disclosing "network **10** contains at least one check image processing node"). For claim 36, Petitioner also asserts that there are intermediate locations between the bank and node. Pet. 34–35; Ex. 1019, 2:46–49 ("One or both of institutions **14** and **16** may also be any intermediary institution . . . between a bank of first deposit and a payor bank."). For claims 38–40, Petitioner's position is largely the same as for claims 29 and 36. *See* Pet. 35–36. For claim 41, Petitioner asserts that Campbell describes a frame relay network transmitting data between the banks and the node. *Id.* at 37.

For claims 29 and 36, Patent Owner reiterates its unpersuasive arguments about the banks not being subsystems of one another. *See* PO Resp. 49–51. For claims 38–41, Patent Owner argues that the claims require "transmitting data within and between subsystems," or depend from a patentable parent claim. *Id.* at 51–53. Patent Owner's arguments are unpersuasive because we have determined already the parent claims are shown to be unpatentable and because none of these claims require transmission between subsystems of the same tier, as Patent Owner implies. Specifically, claims 26, 29, 36, and 38–41 do not require transmitting information between subsystems at the same level, i.e., the claims require

transmitting information "within" the same level and "between" different levels. *See, e.g.*, Ex. 1002, 27:23–32 (claim 38 claiming transmitting data "within the [remote/intermediate/central] locations" and separately claiming transmitting data "from [remote/intermediate] location to a corresponding [intermediate/central] location"); *id.* at Figs. 1, 2, 4 (showing each so-called tier as only communicating with other tiers, not with other entities in the same tier).

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 29, 36, and 38–41.

## 12. Claim 51

Claim 51 depends from claim 26 and further requires "capturing electronic transaction data." Petitioner asserts that Campbell discloses this limitation where it describes the multi-workstation imaging equipment. Pet. 38 (citing Ex. 1019, 2:64–66, 3:10–12; Ex. 1003 ¶¶ 691–693). Dr. Knox's Declaration discusses his understanding of the term to read on "any transaction data that is in electronic form, [i.e.,] a scanned image [of a check]." Ex. 1003 ¶ 310.

Patent Owner appears to consent to this construction because Patent Owner argues that Campbell "does not necessarily produce electrical signals representing the image of a check" because Campbell teaches that "optical signals may represent the image of a check" and the optical signals are "converted for transmission" over the network. PO Resp. 54 (citing Ex. 1019, 2:65–3:48. The portion of Campbell cited by Patent Owner, however, makes clear that "check imaging equipment . . . produce[d] *electrical or*

*optical* signals representing the image of a check." Ex. 1019, 2:64–66 (emphasis added). Those signals are then converted "into signals suitable for transmission on the telephone network," for example, "*digital* transmission." *Id.* at 3:17–31 (emphasis added). Based on these disclosures, Patent Owner's arguments are unpersuasive. Instead, we are persuaded that Campbell discloses capture of *electronic* transaction data in the form of digital data.

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 51.

### 13. Claim 54

Claim 54 is similar in scope to claim 48 above, requiring the generation of reports. Petitioner's position is the same unpersuasive position it took for claim 48. Pet. 37. Accordingly, for the reasons discussed above with respect to claim 48, we determine that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 54.

### 14. Claim 55

Claim 55 is similar in scope to claim 50 above, requiring two or more types of transaction data. Petitioner's position is the same position it took for claim 50. Pet. 37–38. Patent Owner's argument is also the same. PO Resp. 55–56. Accordingly, for the reasons discussed above with respect to claim 50, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 54.

*15. Claims 42, 60, and 62*

Independent claim 42 is similar to independent claim 1.  PO Resp. 56. Petitioner's analysis of claims 1 and 42 are virtually the same.  Pet. 28 (Petitioner's assertions for claim 1 relying on those for claim 42); *id.* at 19–24 (setting forth Petitioner's assertions for the limitations in claim 42). Patent Owner's arguments are the same as those we addressed with respect to claim 1 above.  *See* PO Resp. 56.

Claim 60 depends from claim 42 and, similar to claim 48, requires the generation of reports.  Petitioner's and Patent Owner's positions are the same as for claim 48.  Pet. 37; PO Resp. 56–57.

Claim 62 depends from claim 42 and, similar to claim 50, requires two or more transaction data types.  Petitioner's and Patent Owner's positions are the same as for claim 50.  Pet 37–38; PO Resp. 57.

For the reasons we discussed above with respect to claims 1, 48, and 50, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 42 and 62, but that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 60.

*16. Claims 43, 63, and 66*

These claims are similar to claims 1, 51 (electronic transaction data), and 48 (reports), respectively.  Petitioner asserts that claims 43, 63, and 66 are anticipated for much the same reasons as we have discussed above with respect to claims 1, 51, and 48.  Pet. 24–28 (setting forth Petitioner's assertions for claim 43); *id.* 37 (setting forth Petitioner's assertions for claims 48, 54, 60, and 66); *id.* at 38 (setting forth Petitioner's assertions for

claims 51 and 63). Patent Owner's arguments for claims 43 and 63 are the same unpersuasive arguments we have addressed already in our discussions of claims 1 (encryption, subsystem), claims 29, 36, and 38–41 (within and between), and claim 51 (electronic transaction data). PO Resp. 58–60. Patent Owner's arguments for claim 66, regarding the generation of reports, are persuasive for the reasons expressed above with respect to claim 48. *See id.* at 60.

For the reasons we discussed above with respect to claims 1, 29, 36, 38–41, and 51, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 43 and 63, but that Petitioner has not shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claim 66.

### *17. Conclusion for the Campbell Anticipation Ground*

Reviewing the arguments and evidence before us, we determine that Petitioner has shown, by a preponderance of the evidence, that Campbell anticipates the subject matter of claims 1, 2, 16, 18, 22, 25, 26, 29, 36, 38–43, 50, 51, 55, 62, and 63, but has not made a sufficient showing for claims 9, 19, 48, 54, 60, and 66.

### III. ORDER

In view of the foregoing, it is hereby:

ORDERED that claims 1, 2, 16, 18, 22, 25, 26, 29, 36, 38–43, 50, 51, 55, 62, and 63 are unpatentable;

FURTHER ORDERED that Exhibits 1062–1065 are to be expunged;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed as moot; and

CBM2014-00088
Patent 6,032,137 C1

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

David Roodman
Emma Harty
Robert Lancaster
Bryan Cave LLP
daroodman@bryancave.com
emma.harty@bryancave.com
rglancaster@BryanCave.com

For PATENT OWNER:

Abraham Hershkovitz
Eugene Rzucidlo
HERSHKOVITZ & ASSOCIATES, PLLC
ahershkovitz@hershkovitz.net
grzucidlo@hershkovitz.net

US006032137A

# United States Patent [19]

## Ballard

[11] **Patent Number:** 6,032,137

[45] **Date of Patent:** *Feb. 29, 2000

[54] **REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE**

[75] Inventor: **Claudio R. Ballard**, Lloyd Harbor, N.Y.

[73] Assignee: **CSP Holdings, LLC**, Lloyd Harbor, N.Y.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/081,012**

[22] Filed: **May 19, 1998**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/917,761, Aug. 27, 1997, Pat. No. 5,910,988.

[51] **Int. Cl.**[7] ........................................ **H04L 9/00**

[52] **U.S. Cl.** ................................................. **705/75**

[58] **Field of Search** ........................ 380/24, 25; 705/75

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,201,978 | 5/1980 | Nally ..................................... 340/146.3 |
| 4,264,808 | 4/1981 | Owens et al. ......................... 235/379 |
| 4,326,258 | 4/1982 | de la Guardia ....................... 364/515 |
| 4,417,136 | 11/1983 | Rushby et al. ....................... 235/379 |
| 4,457,015 | 6/1984 | Nally et al. ........................... 382/45 |
| 4,523,330 | 6/1985 | Cain ...................................... 382/7 |
| 4,555,617 | 11/1985 | Brooks et al. ........................ 235/379 |
| 4,680,803 | 7/1987 | Dilella ................................... 382/9 |
| 4,694,147 | 9/1987 | Amemiya et al. .................... 235/379 |
| 4,747,058 | 5/1988 | Ho ......................................... 364/478 |
| 4,750,201 | 6/1988 | Hodgson et al. ..................... 379/144 |
| 4,843,220 | 6/1989 | Haun .................................... 235/380 |
| 4,858,121 | 8/1989 | Barber et al. ......................... 364/406 |
| 4,888,812 | 12/1989 | Dinan et al. .......................... 382/7 |
| 4,926,325 | 5/1990 | Benton et al. ........................ 364/408 |
| 4,960,981 | 10/1990 | Benton et al. ........................ 235/379 |
| 5,091,968 | 2/1992 | Higgins et al. ....................... 382/30 |
| 5,122,950 | 6/1992 | Benton et al. ........................ 364/408 |

| | | |
|---|---|---|
| 5,144,115 | 9/1992 | Yoshida ................................ 235/379 |
| 5,159,548 | 10/1992 | Caslavka .............................. 364/408 |
| 5,173,594 | 12/1992 | McClure ............................... 235/380 |
| 5,175,682 | 12/1992 | Higashiyama et al. .............. 364/408 |
| 5,187,750 | 2/1993 | Behera .................................. 382/7 |
| 5,204,811 | 4/1993 | Bednar et al. ........................ 364/406 |
| 5,220,501 | 6/1993 | Lawlor et al. ........................ 364/408 |
| 5,237,158 | 8/1993 | Kern et al. ............................ 235/379 |
| 5,274,567 | 12/1993 | Kallin et al. .......................... 364/478 |
| 5,283,829 | 2/1994 | Anderson .............................. 380/24 |
| 5,321,238 | 6/1994 | Kamata et al. ....................... 235/379 |
| 5,321,751 | 6/1994 | Ray et al. ............................. 380/23 |
| 5,326,959 | 7/1994 | Perazza ................................. 235/379 |
| 5,345,090 | 9/1994 | Hludzinski ........................... 250/566 |

(List continued on next page.)

*Primary Examiner*—Salvatore Cangialosi
*Attorney, Agent, or Firm*—J. Michael Martinea de Andino; McGuire, Woods, Battle & Boothe, LLP

[57] **ABSTRACT**

A system for remote data acquisition and centralized processing and storage is disclosed called the DataTreasury™ System. The DataTreasury™ System provides comprehensive support for the processing of documents and electronic data associated with different applications including sale, business, banking and general consumer transactions. The system retrieves transaction data such as credit card receipts checks in either electronic or paper form at one or more remote locations, encrypts the data, transmits the encrypted data to a central location, transforms the data to a usable form, performs identification verification using signature data and biometric data, generates informative reports from the data and transmits the informative reports to the remote location(s). The DataTreasury™ System has many advantageous features which work together to provide high performance, security, reliability, fault tolerance and low cost. First, the network architecture facilitates secure communication between the remote location(s) and the central processing facility. A dynamic address assignment algorithm performs load balancing among the system's servers for faster performance and higher utilization. Finally, a partitioning scheme improves the error correction process.

**43 Claims, 11 Drawing Sheets**



**6,032,137**
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,434,928 | 7/1995 | Wagner et al. | 382/187 |
| 5,436,970 | 7/1995 | Ray et al. | 380/23 |
| 5,444,794 | 8/1995 | Uhland, Sr. | 382/137 |
| 5,457,747 | 10/1995 | Drexler et al. | 380/24 |
| 5,479,510 | 12/1995 | Olsen et al. | 380/24 |
| 5,484,988 | 1/1996 | Hills et al. | 235/379 |
| 5,506,691 | 4/1996 | Bednar et al. | 358/402 |
| 5,544,043 | 8/1996 | Miki et al. | 364/406 |
| 5,590,038 | 12/1996 | Pitroda | 395/241 |
| 5,602,933 | 2/1997 | Blackwell et al. | 382/116 |
| 5,604,640 | 2/1997 | Zipf et al. | 359/803 |
| 5,613,001 | 3/1997 | Bakhoum | 380/4 |
| 5,647,017 | 7/1997 | Smithies et al. | 382/119 |
| 5,657,389 | 8/1997 | Houvener | 380/23 |
| 5,657,396 | 8/1997 | Rudolph et al. | 382/190 |
| 5,673,333 | 9/1997 | Johnston | 382/137 |
| 5,751,842 | 5/1998 | Riach et al. | 382/137 |
| 5,754,673 | 5/1998 | Brooks et al. | 382/112 |
| 5,781,654 | 7/1998 | Carney | 382/137 |
| 5,784,503 | 7/1998 | Bleecker, III et al. | 382/306 |
| 5,787,403 | 7/1998 | Randle | 705/43 |
| 5,910,988 | 6/1999 | Ballard | 380/24 |



FIG. 1



U.S. Patent

Feb. 29, 2000

Sheet 2 of 11

6,032,137

A124

FIG. 2



FIG. 3A



XEROX DATAGLYPH

OFFICE DEPOT
2110 BROAD HOLLOW ROAD
FARMINGDALE, NY 11735
516-844-0444

2.16D    9464    3305    0373 001

SALE    06/18/97    16:42

75608700053 BUSINESS PLAN PRO    89.99
MFG. LIST    $95.00
SUBTOTAL    89.99
TX 8.225% SALES TAX    7.42
TOTAL    97.41

ACCOUNT NUMBER    9999888877776666
EXPIRATION DATE    01/98
VISA    97.41
CHANGE    0.00

THANK YOU FOR SHOPPING AND SAVING AT
OFFICE DEPOT

— 372
— 370
— 374
— 376
— 378
— 380
— 382

— 384
— 386

— 388

FIG. 3B

A126

U.S. Patent

Feb. 29, 2000

Sheet 5 of 11

6,032,137

A127



FIG. 4

FIG. 5

U.S. Patent

Feb. 29, 2000

Sheet 7 of 11

6,032,137

A129



**FIG. 6**



FIG. 7



FIG. 8

A131





**FIG. 9**



*FIG. 10*

6,032,137

1

# REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation in part of application Ser. No. 08/917,761 filed Aug. 27, 1997, now U.S. Pat. No. 5,910,988.

## FIELD OF THE INVENTION

This invention relates generally to the automated processing of documents and electronic data from different applications including sale, business, banking and general consumer transactions. More particularly, it pertains to an automated system to retrieve transaction data at remote locations, to encrypt the data, to transmit the encrypted data to a central location, to transform the data to a usable form, to generate informative reports from the data and to transmit the informative reports to the remote locations.

## BACKGROUND

This invention involves the processing of documents and electronic data which are generated, for example, from sale, business and banking transactions including credit card transactions, smart card transactions, automated teller machine (ATM) transactions, consumer purchases, business forms, W2 forms, birth certificates, deeds and insurance documents.

The enormous number of paper and electronic records generated from documents and electronic data from sale, business and banking transactions contain valuable information. First, these paper and electronic records contain information which can be used to verify the accuracy of the records maintained by consumers, merchants and bankers. For example, customers use paper receipts of sale and banking transactions to verify the information on the periodic statements which they receive from their bank or credit card institution. Merchants use paper receipts to record sale transactions for management of customer complaints. Taxpayers use paper receipts to record tax deductible contributions for use in their tax return preparation. Employees use paper receipts to record business expenses for preparation of business expense forms.

Paper and electronic records also contain information which can be used for market analysis. For example, manufacturers and retailers can determine consumer preferences in different regions as well as trends in consumer preferences from the information contained in paper and electronic records.

However, the maintenance and processing of paper and electronic records presents difficult challenges. First, paper receipts and documents could easily be lost, misplaced, stolen, damaged or destroyed. Further, the information contained in these paper and electronic records cannot be easily processed because it is scattered among individual records. For example, the market trend information contained in a group of sales records retained by merchants cannot easily be determined since this information is scattered among the individual records. Likewise, the tax information contained in a group of paper receipts of sales transactions retained by consumers cannot easily be processed.

Previous approaches have been proposed to meet the challenges associated with the maintenance and processing of paper and electronic records. For example, data archive

2

service companies store the information from paper receipts and documents acquired from their customers on microfilm or compact disc read only memory (CD-ROM) at a central facility. Customers typically deliver the paper receipts and documents to the central facility. For sensitive documents which cannot leave the customer site, some data archive service companies perform data acquisition and transfer to magnetic tapes at the customer site and deliver the tapes to the central facility.

The approach offered by these data archive service companies have disadvantages. First, the approach is costly and has poor performance because it requires an expensive, time consuming physical transportation of paper receipts or magnetic tapes from the customer site to the central facility. Further, the approach is not reliable as information can be lost or damaged during physical transportation. The approach also has limited capability as it does not process electronic records along with the paper receipts within a single system.

Other approaches have focused on the elimination of paper receipts and documents. U.S. Pat. No. 5,590,038 discloses a universal electronic transaction card (UET card) or smart card which stores transaction information on a memory embedded on the card as a substitute for a paper receipt. Similarly, U.S. Pat. No. 5,479,510 discloses a method of electronically transmitting and storing purchaser information at the time of purchase which is read at a later time to ensure that the purchased goods or services are delivered to the correct person.

While these approaches avoid the problems associated with paper receipts, they have other disadvantages. First, these approaches do not offer independent verification of the accuracy of the records maintained by consumers, merchants and bankers with a third party recipient of the transaction data. For example, if a UET card is lost, stolen, damaged or deliberately altered by an unscrupulous holder after recording sale or banking transactions, these approaches would not be able to verify the remaining records which are maintained by the other parties to the transactions.

Next, these approaches do not have the ability to process both paper and electronic records of transactions within a single, comprehensive system. Accordingly, they do not address the task of processing the enormous number of paper receipts which have been generated from sales and banking transactions. The absence of the ability to process both paper and electronic records of these approaches is a significant limitation as paper receipts and documents will continue to be generated for the foreseeable future because of concerns over the reliability and security of electronic transactions and the familiarity of consumers and merchants with paper receipts.

These approaches also have a security deficiency as they do not offer signature verification which is typically used on credit card purchases to avoid theft and fraud. For example, a thief could misappropriate money from a UET card holder after obtaining by force, manipulation or theft the user's personal identification number (PIN). Similarly, it is not uncommon for criminals to acquire credit cards in victims' names and make unlawful charges after obtaining the victim's social security number. This becomes a greater concern as that type of personal information becomes available, e.g., on the internet. Also, the signature verification performed manually by merchants for credit card purchases frequently misses forged signatures.

Even if smart cards or UET cards had the ability to store signature and other biometric data within the card for

6,032,137

3

verification, the system would still have disadvantages. First, the stored biometric data on the card could be altered by a card thief to defeat the security measure. Similarly, the biometric data could be corrupted if the card is damaged. Finally, the security measure would be costly at it would require an expensive biometric comparison feature either on each card or on equipment at each merchant site.

Additional biometric verification systems including signature verification systems have been proposed to address the security problem. For example, U.S. Pat. No. 5,657,393 discloses a method and apparatus for verification of handwritten signatures involving the extraction and comparison of signature characteristics including the length and angle of select component lines. In addition, U.S. Pat. No. 5,602,933 discloses a method and apparatus for the verification of remotely acquired data with corresponding data stored at a central facility.

However, none of these verification systems offer general support for transaction initiation, remote paper and electronic data acquisition, data encryption, data communication, data archival, data retrieval, data mining, manipulation and analytic services. Accordingly, there is a need for a single system which offers comprehensive support for the tasks involved in the automated processing of documents, biometric and electronic data from sale, business, banking and general consumer transactions. Further, there is a need for a single comprehensive system having the reliability, performance, fault tolerance, capacity, cost and security to satisfy the requirements of the retail, business, banking and general consumer industries.

## SUMMARY OF THE INVENTION

The invention provides an automated, reliable, high performance, fault tolerant, and low cost system with maximal security and availability to process electronic and paper transactions, and has been named the DataTreasury™ System.

It is an object of the present invention to provide a system for central management, storage and verification of remotely captured electronic and paper transactions from credit cards, smart cards, debit cards, documents and receipts involving sales, business, banking and general purpose consumer applications comprising:

at least one remote data access subsystem for capturing and sending electronic and paper transaction data;

at least one data collecting subsystem for collecting and sending the electronic and paper transaction data comprising a first data management subsystem for managing the collecting and sending of the transaction data;

at least one central data processing subsystem for processing, sending and storing the electronic and paper transaction data comprising a second data management subsystem for managing the processing, sending and storing of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said at least one data access subsystem and said at least one data processing subsystem.

The DataTreasury™ System processes paper and/or electronic receipts such as credit card receipts, Automated Teller Machine (ATM) receipts, business expense receipts and sales receipts and automatically generates reports such as credit card statements, bank statements, tax reports for tax return preparation, market analyses, and the like.

It is a further object of the DataTreasury™ System to retrieve both paper and electronic transactions at remote locations.

4

It is a further object of the DataTreasury™ System to employ a scanner and a data entry terminal at a customer site to retrieve data from paper transactions and to enable additions or modifications to the scanned information respectively.

It is a further object of the DataTreasury™ System to provide an input device for retrieving transaction data from the memory of smart cards for independent verification of the records maintained by consumers, merchants and bankers to prevent the loss of data from the loss, theft, damage or deliberate alteration of the smart card.

It is a further object of the DataTreasury™ System to retrieve and process transaction data from DataTreasury™ System anonymous smart cards which are identified by an account number and password. Since DataTreasury™ System anonymous smart card transactions can be identified without the customer's name, a customer can add money to the DataTreasury™ System anonymous smart card and make expenditures with the card with the same degree of privacy as cash acquisitions and expenditures.

It is a further object of the DataTreasury™ System to retrieve customer billing data from employee time documents and to generate customer billing statements from the billing data.

It is a further object of the DataTreasury™ System to initiate electronic transactions including transactions on the internet and to provide identification verification by capturing and comparing signature and biometric data.

It is a further object of the DataTreasury™ System of the invention to process electronic and paper transactions with a tiered architecture comprised of DataTreasury™ System Access Terminals (DATs), DataTreasury™ System Access Collectors (DACs) and DataTreasury™ System Processing Concentrators (DPCs).

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and features of the invention will be more clearly understood from the following detailed description along with the accompanying drawing figures, wherein:

FIG. 1 is a block diagram showing the three major operational elements of the invention: the DataTreasury™ System Access Terminal (DAT), the DataTreasury™ System Access Collector (DAC) and the DataTreasury™ System Processing Concentrator (DPC).

FIG. 2 is a block diagram of the DAT architecture;

FIG. 3*a* is a flow chart describing image capture by a DAT;

FIG. 3*b* displays a sample paper receipt which is processed by the DAT;

FIG. 4 is a block diagram of the DAC architecture;

FIG. 5 is a flow chart describing the polling of the DATs by a DAC;

FIG. 6 is a block diagram of the DPC architecture;

FIG. 7 is a flow chart describing the polling of the DACs by the DPC;

FIG. 8 is a flow chart describing the data processing performed by the DPC; and

FIG. 9 is a flow chart describing the data retrieval performed by the DPC; and

FIG. 10 is a flow chart describing the use of the DataTreasury™ system to process personal checks.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows the architecture of the DataTreasury™ System 100. The DataTreasury™ System 100 has three

6,032,137

<table>
<tr><td>5</td><td>6</td></tr>
</table>

operational elements: the DataTreasury™ System Access Terminal (DAT) **200** (the remote data access subsystem), the DataTreasury™ System Access Collector (DAC) **400** (the intermediate data collecting subsystem), and the DataTreasury™ System Processing Concentrator (DPC) **600** (the central data processing subsystem). The DataTreasury™ System **100** architecture consists of three tiers. At the bottom tier, the DATs **200** retrieve data from the customer sites. At the next tier, the DACs **400** poll the DATs **200** to receive data which accumulates in the DATs **200**. At the top tier, the DPCs **600** poll the DACs **400** to receive data which accumulates in the DACs **400**. The DPCs **600** store the customer's data in a central location, generate informative reports from the data and transmit the informative reports to the customers at remote locations.

In the preferred embodiment, the DataTreasury™ System **100** complies with the Price Waterhouse SAS70 industry standard. Specifically, the DataTreasury™ System **100** meets the software development standard, the system deployment standard and the reliability standard specified by Price Waterhouse SAS70. By adhering to the Price Waterhouse SAS70 standard, the DataTreasury™ System **100** provides the security, availability and reliability required by mission critical financial applications of banks and stock brokerage companies.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** could also use other software development standard, other system deployment standards and other reliability standards as long as adherence to these alternative standards provides the security, availability and reliability required by mission critical financial applications.

FIG. 2 shows a block diagram of the DAT **200** architecture. DATs **200** are located at customer sites. The DataTreasury™ System **100** customers include merchants, consumers and bankers. The DATs **200** act as the customer contact point to the suite of services provided by the DataTreasury™ System **100**. In the preferred embodiment, the DAT **200** is custom designed around a general purpose thin client Network Computer (NC) which runs SUN Microsystem's JAVA/OS operating system. The custom designed DAT **200** comprises a DAT scanner **202**, a DAT modem **204**, DAT digital storage **206**, a DAT controller **210** (workstation), a DAT card interface **212**, an optional DAT printer **208** and a signature pad **214**.

As is known to persons of ordinary skill in the art, the DAT **200** could be custom designed around a general purpose network computer running other operating systems as long as the chosen operating system provides support for multiprocessing, memory management and dynamic linking required by the DataTreasury™ System **100**.

The DAT scanner **202** scans a paper receipt and generates a digital bitmap image representation called a Bitmap Image (BI) of the receipt. In the preferred embodiment, the DAT scanner **202** has the ability to support a full range of image resolution values which are commonly measured in Dots Per Inch (DPI). Next, the DAT scanner **202** has the ability to perform full duplex imaging. With full duplex imaging, a scanner simultaneous captures both the front and back of a paper document. The DAT scanner **202** can also support gray scale and full color imaging at any bit per pixel depth value. The DAT scanner **202** also supports the capture of handwritten signatures for identity verification.

In addition to scanning images and text, the DAT scanner **202** also scans DataGlyph™ elements, available from Xerox Corporation. As is known to persons of ordinary skill in the art, the Xerox DataGlyph™ Technology represents digital information with machine readable data which is encoded into many, tiny, individual glyph elements. Each glyph element consists of a 45 degree diagonal line which could be as short as 1/100th of an inch depending on the resolution of the scanning and printing devices. Each glyph element represents a binary 0 or 1 depending on whether it slopes downward to the left or the right respectively. Accordingly, DataGlyph™ elements can represent character strings as ASCII or EBCIDIC binary representations. Further, encryption methods, as known to persons of ordinary skill in the art encrypt the data represented by the DataGlyph™ Technology.

The use of glyph technology in the DataTreasury™ System **100** improves the accuracy, cost and performance of the system. Xerox DataGlyph™ Technology includes error correction codes which can be referenced to correct scanning errors or to correct damage to the document caused by ink spills or ordinary wear. DataGlyph™ Technology also leads to decreased system cost since the system will require less manual intervention for data entry and correction because of the improved accuracy associated with DataGlyph elements.

Since DataGlyph elements represent a large amount of information in a small amount of space, the DAT scanner **100** will require a small amount of time to input a large amount of information.

The DAT card interface **212** and the DAT signature pad **214** along with the internet and telephone access through the DAT modem **204** enable the DataTreasury™ System **100** customer to initiate secure sale and banking transactions via the internet or telephone with the DAT **200** using a variety of cards including debit cards, smart cards and credit cards. After selecting a purchase or a banking transaction through a standard internet interface, the DataTreasury™ System **100** customer inserts or swipes the debit card, smart card or credit card into the DAT card interface **212**.

The DAT card interface **212** retrieves the identification information from the card for subsequent transmission to the destination of the internet transaction. Further, the DAT scanner **202** could capture a hand written signature from a document or the DAT signature pad **214** could capture an electronic signature written on it with a special pen. Similarly, these security features allow a credit card recipient to activate the card with a DAT **200** located at a merchant site. The security features would detect unauthorized use of debit cards, credit cards and smart cards resulting from their unlawful interception. Accordingly, the DataTreasury™ System's **100** security features offer a more secure alternative for internet and telephone transactions than the typical methods which only require transmission of a card account number and expiration date.

As is known to persons of ordinary skill in the art, the DATs **200** could also include additional devices for capturing other biometric data for additional security. These devices include facial scans, fingerprints, voice prints, iris scans, retina scans and hand geometry.

In addition to initiating sale and banking transactions, the DAT card interface **212** also reads sale and banking transactions initiated elsewhere from the memory of smart cards to enable subsequent storage and processing by the DataTreasury™ System. If a smart card is lost, stolen, damaged or deliberately altered by an unscrupulous holder after the DAT card interface **212** reads its transaction data, the DataTreasury™ System **100** can reproduce the transaction data for the customer. Accordingly, the DAT card interface **212** provides support for independent verification

6,032,137

7                                                    8

of the records maintained by consumers, merchants and bankers to prevent the loss of data from the loss, theft, damage or deliberate alteration of the smart card.

The DAT card interface 212 also supports the initiation and retrieval of sale and banking transactions with the DataTreasury™ System anonymous smart cards. In contrast to standard debit cards and credit cards, the DataTreasury™ System anonymous smart card does not identify the card's holder by name. Instead, the DataTreasury™ System anonymous smart card requires only an account number and a password. Since DataTreasury™ System anonymous smart card transactions can be identified without the customer's name, a DataTreasury™ System 100 customer can purchase a DataTreasury™ System anonymous smart card, add money to the card, make expenditures with the card and monitor the card's account with the same degree of privacy as cash acquisition, expenditure and management.

The DAT scanner 202, the internet access, the signature pad 214 and other biometric data capture devices also support the remote capture of survey information and purchase orders. For example, the DAT scanner 202 captures surveys appearing on the back of checks at restaurants and bars. Similarly, the DAT scanner 202 could capture purchase orders from residences, enabling customers to make immediate purchases from their home of goods promoted through the mail. Accordingly, home marketing merchant could transmit sales in a more cost efficient and reliable manner by using the DAT scanner 202 instead of providing envelopes with prepaid postage to residences.

The DAT scanner 202 also captures receipts which are subsequently needed for tax return preparation or tax audits. Similarly, the DAT scanner 202 captures sales receipts from merchants, providing an off-site secure, reliable repository to guard against loss resulting from flooding, fire or other circumstances. This feature could also allow a merchant to automatically perform inventory in a reliable and cost-effective manner.

The DAT controller 210 performs processing tasks and Input/Output (I/O) tasks which are typically performed by a processor. The DAT controller 210 compresses, encrypts and tags the BI to form a Tagged Encrypted Compressed Bitmap Image (TECBI). The DAT controller 210 also manages the Input/Output (I/O). Specifically, the DAT controller 210 manages devices like the DAT scanner 202, the DAT digital storage 206, the optional DAT printer 208 and the DAT modem 204.

The DAT digital storage 208 holds data such as the TECBI. The DAT modem 204 transmits data from the DAT 200 to the appropriate DAC 400 as instructed by the DAT controller 210. Specifically, the DAT modem 204 transmits the TECBIs from the DAT digital storage 208 to the appropriate DAC 400. In the preferred embodiment, the DAT modem 204 is a high speed modem with dial-up connectivity. The DAT digital storage 208 is sufficiently large to store the input data before transmission to a DAC 400. The DAT digital storage 208 can be Random Access Memory (RAM) or a hard drive.

FIG. 3a is a flow chart 300 describing the operation of the DAT in detail. In step 310, the DAT scanner 202 scans paper receipts into the DAT 200 provided by an operator. In step 312, the DAT controller 210 determines whether the operation executed successfully. If the scanning is successful, the DAT scanner 202 produces a Bitmap Image (BI). If the scanning is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a BI is created, the DAT controller 210 executes a conventional image compression algorithm like the Tagged Image File Format (TIFF) program to compress the BI in step 314. In step 316, the DAT controller 210 determines whether the compression executed successfully. If the compression is successful, it produces a Compressed Bitmap Image (CBI). If the compression is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a CBI is created, the DAT controller 210 executes an encryption algorithm which is well known to an artisan of ordinary skill in the field to encrypt the CBI in step 318. Encryption protects against unauthorized access during the subsequent transmission of the data which will be discussed below. In step 320, the DAT controller 210 determines whether the encryption operation executed successfully. If the encryption is successful, it produces an Encrypted Compressed Bitmap Image (ECBI). If the encryption is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If an ECBI is created, the DAT controller 210 tags the ECBI with a time stamp which includes the scanning time, an identification number to identify the merchant originating the scan and any additional useful information in step 322. In step 324, the DAT controller 210 determines whether the tagging operation executed successfully. If the tagging is successful, it produces a Tagged Encrypted Compressed Bitmap Image (TECBI). If the tagging is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If a TECBI is created, the DAT controller 210 stores the TECBI in the DAT digital storage 208 in step 326. In step 328, the DAT controller 210 determines whether the storing operation executed successfully. If the storing operation is successful, the DAT digital storage 208 will contain the TECBI. If the storing operation is unsuccessful, the DAT controller 210 notifies the operator of the trouble and prompts the operator for repair in step 370.

If the TECBI is properly stored in the DAT digital storage 208, the DAT controller 210 determines whether all paper receipts have been scanned in step 330. If all paper receipts have not been scanned, control returns to step 310 where the next paper receipt will be processed as discussed above. If all paper receipts have been scanned, the DAT controller 210 asks the operator to verify the number of scanned receipts in step 334. If the number of scanned receipts as determined by the DAT controller 210 does not equal the number of scanned receipts as determined by the operator, the DAT controller 210 asks whether the operator desires to rescan all of the receipts in step 338.

If the operator chooses to rescan all of the receipts in step 338, the DAT controller 210 will delete all of the TECBIs associated with the batch from the DAT digital storage 208 in step 342. After the operator prepares the batch of receipts for rescan in step 346, control returns to step 310 where the first receipt in the batch will be processed as discussed above.

If the operator chooses not to rescan all of the receipts from the batch in step 338, control returns to step 334 where the DAT controller 210 asks the operator to verify the number of scanned receipts as discussed above.

If the number of scanned receipts as determined by the DAT controller 210 equals the number of scanned receipts as determined by the operator, the DAT controller 210 prints a batch ticket on the DAT printer 206 in step 350. The operator will attach this batch ticket to the batch of receipts which

A137

6,032,137

<table>
<tr><td>9</td><td>10</td></tr>
</table>

have been scanned. This batch ticket shall contain relevant session information such as scan time, number of receipts and an identification number for the data operator. If processing difficulties occur for a batch of receipts after the image capture of flowchart **300**, the batch ticket will enable them to be quickly located for rescanning with the DAT **200**.

In step **354**, the DAT controller **210** determines whether the scan session has completed. If the scan session has not completed, control returns to step **310** where the first receipt in the next batch of the scan session will be processed as discussed above. If the scan session has completed, the DAT controller **210** selectively prints a session report on the DAT printer **206** in step **358**. The DAT controller **210** writes statistical information for the session to the DAT digital storage **208** in step **362**. In step **366**, the DAT controller **210** terminates the session.

FIG. **3b** displays a sample paper receipt which is processed by the DAT **200** as described by the flowchart in FIG. **3a**. The sample paper receipt involves a credit card transaction which has four participants:

A. The ISSUER: is an entity such as a bank or corporate financial institution such as GE Capital, GM or AT&T which provides the credit behind the credit card and issues the card to the consumer.

B. The PROCESSOR: executes the processing of an inbound credit card transaction by performing basic transaction validation that includes checking with the ISSUER database to ensure that the credit card has sufficient credit to allow approval of the transaction.

C. The ACOUIRER: specializes in the marketing, installation and support of Point Of Sale (POS) credit card terminals. The acquirer, like the DAC **400** in the DataTreasury™ System **100** acts as an electronic collection point for the initial credit card transaction as the card is inserted into the POS terminal. After acquisition, the acquirer passes the transaction to the PROCESSOR.

D. The MERCHANT: inserts a credit card into a POS terminal and enters the amount of the transaction to initiate the credit card transaction.

In the preferred embodiment, the DAT **200** reads the following information from the sample paper receipt shown in FIG. **3b** and stores the information in the format described below.

CUSTOMER_ID **370**: This field is a **7** position HEX numeric value. This field uniquely identifies the customer using the terminal. In this sample, this field would identify the credit card merchant.

TERMINAL__ID **372**: This field is a **6** position decimal numeric value. This field uniquely identifies the credit card terminal which is used to print the credit card receipt.

TRANSACTION_DATE **374**: This field contains the date and time of the credit card transaction.

TRANSACTION_LINE__ITEM **376**: This field is a variable length character string. The first three positions represent a right justified numeric field with leading zeros indicating the full length of this field. This field contains all data pertaining to the purchased item including the item's price. The DAT **200** will store a TRANSACTION_LINE__ITEM field for each transaction line item on the receipt. This field is optional since not all credit card transactions will have line items.

TRANSACTION_SUBTOTAL **378**: This field is a double precision floating point number. This field indicates the subtotal of the TRANSACTION_LINE_ ITEMs.

TRANSACTION_SALES_TAX **380**: This field is a double precision floating point number. This field contains the sales tax of the TRANSACTION_ SUBTOTAL.

TRANSACTION_AMOUNT **382**: This field is a double precision floating point number. This field is the sum of the TRANSACTION_SUBTOTAL and TRANSACTION_SALES_TAX.

CREDIT_CARD_ACCT__NUM **384**: This field is a **12** position decimal value. This field identifies the credit card which was used to execute this transaction.

CREDIT_CARD_EXP__DATE **386**: This field identifies the expiration date of the credit card.

TRANSACTION_APPROVAL_CODE **388**: This field is a **6** position numeric value. This field indicates the approval code that was given for the particular transaction.

The DAT **200** also stores additional items which are not pictured in FIG. **3b** as described below:

ISSUER__ID: This field is a **7** position decimal numeric value. This field identifies the credit card issuer.

ACQUIRER__ID: This field is a **7** position decimal numeric value. This field identifies the acquirer.

PROCESSOR__ID: This field is a **7** position decimal numeric value. This field identifies the processor.

TRANSACTION_LINE__ITEM__CNT: This field is a **3** position decimal numeric value. This field identifies the number of transaction line items on the receipt. A value of ZERO indicates the absence of any transaction line items on the receipt.

TRANSACTION_GRATUITY: This field is a double precision floating number. This field is optional because it will only appear on restaurant or bar receipts.

FINAL_TRANSACTION_AMOUNT: This field is a double precision floating point number. This field is optional because it will only appear on restaurant and bar receipts. The field is the sum of the TRANSACTION_ AMOUNT and TRANSACTION_GRATUITY.

The tag prepended to the ECBI in step **322** of the flowchart of FIG. **3a** identifies the time and place of the document's origination. Specifically, the tag consists of the following fields:

DAT_TERMINAL__ID: This field is a **7** position hexadecimal numeric value. This field uniquely identifies the DAT **200** which is used by the customer.

DAT_SESSION_DATE: This field identifies the date and time of the DAT **200** session which generated the image of the document.

DAT_USER_ID: This field is a **4** position decimal numeric value. This field identifies the individual within the CUSTOMER's organization who initiated the DAT **200** session.

DATA__GLYPH__RESULT: This field is a variable length character string. The first four positions hold a right justified numeric position with leading zero which indicate the length of the field. The fifth position indicates the DataGlyph™ element status. A value of 0 indicates that the data glyph was NOT PRESENT on the receipt. A value of 1 indicates that the data glyph WAS PRESENT and contained no errors. A value of 2 indicates that the data glyph WAS PRESENT and had nominal errors. If the fifth position of this field has a value of 2, the remaining portion of the string identifies the erroneous field numbers. As subsequently described, the DPC **600** will reference this portion of

6,032,137

**11**

the field to capture the erroneous data from the receipt with alternate methods. A value of 3 indicates that the data glyph WAS PRESENT WITH SEVERE ERRORS. In other words, a value of 3 indicates the DataGlyph™ element was badly damaged and unreadable.

The receipt shown in FIG. 3b can also contain a signature which can be captured by the DAT scanner 202. A data glyph could identify the location of the signature on the receipt.

As is known to persons of ordinary skill in the art, the DataTreasury™ System 100 can also process receipts with alternate formats as long as the receipt contains the appropriate identification information such as the transaction amount, the customer, the DAT 200, the transaction date, the transaction tax, the credit card number, the credit card expiration date, etc.

The DataTreasury™ System 100 partitions the paper receipt into image snippets as illustrated by the sample in FIG. 3b. Partitioning facilitates an improvement in the process to correct errors from the scanning operation. If an error occurred during scanning, the DataTreasury™ System 100 corrects the error using manual entry. With partitioning, the DataTreasury™ System 100 focuses the correction effort on only the image snippet having the error instead of correcting the entire document. The subsequently discussed schema of the DataTreasury™ System 100 database describes the implementation of the partitioning concept in detail.

The DACs 400 form the backbone of the tiered architecture shown in FIG. 1 and FIG. 4. As shown in FIG. 1, each DAC 400 supports a region containing a group of DATs 200. Each DAC 400 polls the DATs 200 in its region and receives TECBIs which have accumulated in the DATs 200. The DACs 400 are located at key central sites of maximum merchant density.

In the preferred embodiment, the DAC server 402 comprises stand-alone Digital Equipment Corporation (DEC) SMP Alpha 4100 2/566 servers which are connected on a common network running Windows NT. The DEC Alpha servers manage the collection and intermediate storage of images and data which are received from the DATs 200.

As is known to persons of ordinary skill in the art, the DataTreasury™ System 100 could use any one of a number of different servers that are available from other computer vendors as long as the server meets the capacity, performance and reliability requirements of the system.

In the preferred embodiment, the DAC server 402 also comprises EMC 3300 SYMMETRIX CUBE Disk Storage Systems, which store the images and data collected and managed by the DEC Alpha servers. The DAC 400 architecture also uses a SYMMETRIX Remote Data Facility (SRDF), available from EMC, to enable multiple, physically separate data centers housing EMC Storage Systems to maintain redundant backups of each other across a Wide Area Network (WAN). Since SRDF performs the backup operations in the background, it does not affect the operational performance of the DataTreasury™ System 100. The DAC server 402 also has secondary memory 410. In the preferred embodiment, the secondary memory 410 is a small scale DLT jukebox.

The DAC Alpha servers of the DAC server 402 insert images and data received from the DATs 200 into a database which is stored on the disk storage systems using a data manipulation language as is well known to persons of ordinary skill in the art. In the preferred embodiment, the database is a relational database available from Oracle.

As is well known to persons of ordinary skill in the art, the DataTreasury™ System 100 could use any one of a number

**12**

of different database models which are available from other vendors including the entity relationship model as long as the selected database meets the storage and access efficiency requirements of the system. See, e.g., Chapter 2 of Database System Concepts by Korth and Silberschatz.

The DAC 400 architecture uses a WEB based paradigm using an enhanced Domain Name Services (DNS), the Microsoft Component Object Model (DCOM), and Windows NT Application Program Interfaces (APIs) to facilitate communication and load balancing among the servers comprising the DAC server 402. As is known to persons of ordinary skill in the art, DNS, which is also known as Bind, statically translates name requests to Internet Protocol 4 (IP4) addresses. In the DAC 400 architecture, an enhanced DNS dynamically assigns IP4 addresses to balance the load among the servers comprising the DAC server 402.

In the preferred embodiment, the enhanced DNS is designed and implemented using objects from Microsoft DCOM. Using the DCOM objects, the enhanced DNS acquires real-time server load performance statistics on each server comprising the DAC server 402 from the Windows NT API at set intervals. Based on these load performance statistics, the enhanced DNS adjusts the mapping of name requests to IP4 addresses to direct data toward the servers which are more lightly loaded.

A large bank of modems 404 polls the DATs 200 at the customer sites within the DAC's 400 region. In the preferred embodiment, the bank of modems 404, available as CISCO AS5200, is an aggregate 48 modem device with Local Area Network (LAN) 406 connectivity which permits the DAC servers 402 to dial the DATs 200 without requiring 48 separate modems and serial connections.

The DAC servers 402 and the bank of modems 404 are connected on a LAN 406. In the preferred embodiment, the LAN uses a switched 100BaseT/10BaseT communication hardware layer protocol. As is known to persons of ordinary skill in the art, the 100BaseT/10BaseT protocol is based on the Ethernet model. Further, the numbers 100 and 10 refer to the communication link speed in megabits per second. In the preferred embodiment, the CISCO Catalyst 2900 Network Switch supports the LAN 406 connectivity between the devices connected to the LAN 406 including the DAC servers 402 and the bank of modems 404.

As is known to persons of ordinary skill in the art, alternate LAN architectures could be used to facilitate communication among the devices of the LAN 406. For example, the LAN 406 could use a hub architecture with a round robin allocation algorithm, a time division multiplexing algorithm or a statistical multiplexing algorithm.

A Wide Area Network (WAN) router 408 connects the LAN 406 to the WAN to facilitate communication between the DACs 400 and the DPCs 600. In the preferred embodiment, the WAN router 408 is a CISCO 4700 WAN Router. The WAN router 408 uses frame relay connectivity to connect the DAC LAN 406 to the WAN. As is known to persons of ordinary skill in the art, alternate devices, such as the NORTEL Magellen Passport "50" Telecommunication Switch, could be used to facilitate communication between the DACs 400 and the DPCs 600 as long as the selected router meets the performance and quality communication requirements of the system.

As is known to persons of ordinary skill in the art, frame relay is an interface protocol for statistically multiplexed packet-switched data communications in which variable-sized packets (frames) are used that completely enclose the user packets which they transport. In contrast to dedicated point to point links that guarantee a specific data rate, frame

6,032,137

13

14

relay communication provides bandwidth on-demand with a guaranteed minimum data rate. Frame relay communication also allows occasional short high data rate bursts according to network availability.

Each frame encloses one user packet and adds addressing and verification information. Frame relay data communication typically has transmission rates between 56 kilobytes per second (kb/s) and 1.544 megabytes per second (Mb/s). Frames may vary in length up to a design limit of approximately 1 kilobyte.

The Telco Carrier Cloud **412** is a communication network which receives the frames destined for the DPC **600** sent by the WAN router **408** from the DACs **400**. As is known to persons of ordinary skill in the art, carriers provide communication services at local central offices. These central offices contain networking facilities and equipment to interconnect telephone and data communications to other central offices within its own network and within networks of other carriers.

Since carriers share the component links of the interconnection network, data communication must be dynamically assigned to links in the network according to availability. Because of the dynamic nature of the data routing, the interconnection network is referred to as a carrier cloud of communication bandwidth.

All the DAC **400** equipment is on fully redundant on-line UPS power supplies to insure maximum power availability. Further, to minimize the time for trouble detection, trouble analysis and repair, all the DAC **400** equipment incorporates trouble detection and remote reporting/diagnostics as is known to an artisan of ordinary skill in the art.

FIG. **5** is a flow chart **500** describing the polling of the DATs **200** by a DAC **400** and the transmission of the TECBIs from the DATs **200** to the DAC **400**. In step **502**, the DAC server **402** reads the address of the first DAT **200** in its region for polling. In step **504**, a modem in the modem bank **404** dials the first DAT **200**. The DAC **400** determines whether the call to the first DAT **200** was successful in step **506**. If the call to the first DAT **200** was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the call to the first DAT **200** was successful, the DAC **400** will verify that the DAT **200** is ready to transmit in step **508**. If the DAT **200** is not ready to transmit, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the DAT **200** is ready to transmit in step **508**, the DAT **200** will transmit a TECBI packet header to the DAC **400** in step **510**. The DAC **400** will determine whether the transmission of the TECBI packet header was successful in step **512**. If the transmission of the TECBI packet header was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the transmission of the TECBI packet header was successful in step **512**, the DAT **200** will transmit a TECBI packet to the DAC **400** in step **514**. The DAC **400** will determine whether the transmission of the TECBI packet was successful in step **516**. If the transmission of the TECBI packet header was unsuccessful, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the transmission of the TECBI packet was successful in step **516**, the DAC **400**, in step **518**, will compare the TECBI packet header transmitted in step **510** to the TECBI packet transmitted in step **514**. If the TECBI packet header does not match the TECBI packet, the DAC **400** will record the error condition in the session summary report and will report the error to the DPC **600** in step **522**.

If the TECBI packet header matched the TECBI packet in step **518**, the DAC **400** will set the status of the TECBI packet to indicate that it is ready for transmission to the DPC **600** in step **520**. The DAC **400** will also transmit the status to the DAT **200** to indicate successful completion of the polling and transmission session in step **520**. Next, the DAC **400** will determine whether TECBIs have been transmitted from all of the DATs **200** in its region in step **524**. If all DATs **200** in the DAC's **400** region have transmitted TECBIs to the DAC **400**, the DAC **400** will compile a DAT **200** status report in step **528** before terminating the session.

If one or more DATs **200** in the DAC's **400** region have not transmitted TECBIs to the DAC **400**, the DAC **400** will get the address of the next DAT **200** in the region in step **526**. Next, control returns to step **504** where the next DAT **200** in the DAC's **400** region will be polled as previously discussed.

In the preferred embodiment, the DAC server **402** initiates the polling and data transmission at optimum toll rate times to decrease the cost of data transmission. In addition to the raid drives and redundant servers, the DAC **400** will also have dual tape backup units which will periodically backup the entire data set. If there is a catastrophic failure of the DAC **400**, the tapes can be retrieved and sent directly to the DPC **600** for processing. As the DAT **200** polling and data transmission progresses, the DAC **400** will periodically update the DPC **600** with its status. If there is a catastrophic failure with the DAC **400**, the DPC **600** would know how much polling and backup has been done by the failing DAC **400**. Accordingly, the DPC **600** can easily assign another DAC **400** to complete the polling and data transmission for the DATs **200** in the failed DAC's **400** region.

FIG. **6** is a block diagram of the DPC **600** architecture. The DPC **600** accumulates, processes and stores images for later retrieval by DataTreasury™ System retrieval customers who have authorization to access relevant information. DataTreasury™ System retrieval customers include credit card merchants, credit card companies, credit information companies and consumers. As shown in FIG. **6** and FIG. **1**, the DPC **600** polls the DACs **400** and receives TECBIs which have accumulated in the DACs **400**.

In the preferred embodiment, the DPC server **602** comprises stand-alone Digital Equipment Corporation (DEC) SMP Alpha 4100 4/566 servers which are connected on a common network running Windows NT. The DEC Alpha servers manage the collection and intermediate storage of images and data which are received from the DACs **400**.

In the preferred embodiment, the DPC server **602** also comprises EMC 3700 SYMMETRIX CUBE Disk Storage Systems, which store the images and data collected and managed by the DEC Alpha servers. Like the DAC **400** architecture, the DPC **600** architecture uses a SYMMETRIX Remote Data Facility (SRDF), available from EMC, to enable multiple, physically separate data centers housing EMC Storage Systems to maintain redundant backups of each other across a Wide Area Network (WAN).

Like the DAC **400** architecture, the DPC **600** architecture uses a WEB based paradigm using an enhanced Domain Name Services (DNS), the Microsoft Component Object Model (DCOM), and Windows NT Application Program Interfaces (APIs) to facilitate communication and load balancing among the servers comprising the DPC server **602** as described above in the discussion of the DAC **400** architecture.

The workstation **604** performs operation control and system monitoring and management of the DPC **600** net-

A140

6,032,137

15

work. In the preferred embodiment, the workstation **604**, available from Compaq, is an Intel platform workstation running Microsoft Windows NT 4.x. The workstation **604** should be able to run Microsoft Windows NT 5.x when it becomes available. The workstation **604** executes CA Unicenter TNG software to perform network system monitoring and management. The workstation **604** executes SnoBound Imaging software to display and process TECBIs.

The workstation **604** also performs identification verification by comparing signature data retrieved remotely by the DATs **200** with signature data stored at the DPC **600**. In the preferred embodiment, signature verification software, available from Communications Intelligence Corporation of Redwood Shores, Calif. executing on the workstation **604** performs the identification verification. As is known to persons of ordinary skill in the art, the workstation **604** could execute other software to perform identification verification by comparing biometric data including facial scans, fingerprints, retina scans, iris scans and hand geometry. Thus, the DPC **600** could verify the identity of a person who is making a purchase with a credit card by comparing the biometric data captured remotely with the biometric data stored at the DPC **600**.

As is known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use workstations with central processing units from other integrated circuit vendors as long as the chosen workstation has the ability to perform standard operations such as fetching instructions, fetching data, executing the fetched instructions with the fetched data and storing results. Similarly, the DataTreasury™ System **100** could use alternate windows operating systems and network monitoring software as long as the selected software can monitor the status of the workstations and links in the network and display the determined status to the operator. The Remote Data Entry Gateway **614** and the Remote Offsite Data Entry Facilities **616** correct errors which occurred during data capture by the DAT **200**. Since the DataTreasury™ System **100** partitions the document as described in the discussion of the sample receipt of FIG. **3**_b_, the operator at the Remote Data Entry Gateway **614** or the Remote Offsite Date Entry Facilities **616** only needs to correct the portion of the document or image snippet which contained the error.

Partitioning improves system performance, decreases system cost and improves system quality. With partitioning, the DPC Server **602** only sends the portion of the document containing the error to the Remote Data Entry Gateway **614** or the Remote Offsite Data Entry Facilities **616**. Since the operator at these data entry locations only sees the portion of the document which contained the error, she can quickly recognize and correct the error. Without partitioning, the operator would have to search for the error in the entire document. With this inefficient process, the operator would need more time and would be more likely to make a mistake by missing the error or making a modification in the wrong location. Accordingly, partitioning improves system performance and quality by increasing the speed and accuracy of the error correction process.

Similarly, partitioning decreases the traffic on the DPC LAN **606** and the Telco Carrier Cloud **412** because the DPC Server **602** only sends the image snippet containing the error to the Remote Offsite Data Entry Facility **616** or the Remote Data Entry Gateway **614**. Accordingly, partitioning decreases system cost by reducing the bandwidth requirement on the interconnection networks.

A DPC LAN **606** facilitates communication among the devices which are connected to the LAN **606** including the

16

DPC server **602** and the network workstation **604**. In the preferred embodiment, the DPC LAN **606** uses a switched 100BaseT/10BaseT communication hardware layer protocol like the DAC LAN **406** discussed earlier. In the preferred embodiment, the DPC LAN **406** is a high speed OC2 network topology backbone supporting TCP/IP. The CISCO Catalyst 5500 Network Switch supports the DPC LAN **606** connectivity among the devices connected to the LAN **606**.

As is known to persons of ordinary skill in the art, alternate LAN architectures could be used to facilitate communication among the devices of the LAN **406**. For example, the LAN **406** could use a hub architecture with a round robin allocation algorithm, a time division multiplexing algorithm or a statistical multiplexing algorithm.

A Wide Area Network (WAN) router **612** connects the DPC LAN **606** to the WAN to facilitate communication between the DACs **400** and the DPCs **600**. In the preferred embodiment, the WAN router **612** is a CISCO 7507 WAN Router. The WAN router **612** uses frame relay connectivity to connect the DPC LAN **612** to the WAN. As is known to persons of ordinary skill in the art, alternate devices, such as the NORTEL Magellen Passport "50" Telecommunication Switch, could be used to facilitate communication between the DACs **400** and the DPCs **600** as long as the selected router meets the performance and quality communication requirements of the system.

The DPC **600** has a three tier storage architecture to support the massive storage requirement on the DataTreasury™ System **100**. In the preferred embodiment, the storage architecture consists of Fiber Channel RAID technology based EMC Symmetrix Enterprise Storage Systems where individual cabinets support over 1 Terabyte of storage. After TECBI images have been processed and have been on-line for 30 days, they will be moved to DVD based jukebox systems. After the TECBI images have been on-line for 90 days, they will be moved to Write Once Read Many (WORM) based jukebox systems **608** for longer term storage of up to 3 years in accordance with customer requirements.

In an alternate embodiment, the DPC **600** is intended to also configure a High Density Read Only Memory (HD-ROM) when it becomes available from NORSAM Technologies, Los Alamos, N. Mex., into optical storage jukebox systems **610**, such as that which is available from Hewlett Packard, to replace the DVD components for increased storage capacity. The HD-ROM conforms to CD-ROM form factor metallic WORM disc. The HD-ROM currently has a very large storage capacity of over 320 giga bytes (320 GB) on a single platter and has an anticipated capacity of several terabytes (TB) on a single platter. The DPC **600** uses IBM and Philips technology to read from the HD-ROM and to write to the HD-ROM.

The DPC Alpha servers of the DPC server **602** insert images and data received from the DACs **400** into a single database which is stored on the Digital Storage Works Systems using a data manipulation language as is well known to persons of ordinary skill in the art. In the preferred embodiment, the database is the V8.0 Oracle relational database which was designed to support both data and image storage within a single repository.

As known to persons of ordinary skill in the art, a relational database consists of a collection of tables which have a unique name. See, e.g., Chapter Three of Database System Concepts by Korth and Silberschatz. A database schema is the logical design of the database. Each table in a relational database has attributes. A row in a table represents a relationship among a set of values for the attributes

A141

6,032,137

## 17

in the table. Each table has one or more superkeys. A superkey is a set of one or more attributes which uniquely identify a row in the table. A candidate key is a superkey for which no proper subset is also a superkey. A primary key is a candidate key selected by the database designer as the means to identify a row in a table.

As is well known to persons of ordinary skill in the art, the DataTreasury™ System **100** could use other database models available from other vendors including the entity relationship model as long as the selected database meets the storage and access efficiency requirements of the system. See, e.g., Chapter 2 of Database System Concepts by Korth and Silberschatz.

An exemplary DPC **600** basic schema consists of the tables listed below. Since the names of the attributes are descriptive, they adequately define the attributes' contents. The primary keys in each table are identified with two asterisks (**). Numeric attributes which are unique for a particular value of a primary key are denoted with the suffix, "NO". Numeric attributes which are unique within the entire relational database are denoted with the suffix, "NUM".

| I. | CUSTOMER: This table describes the DataTreasury ™ System customer. | |
|---|---|---|
| | A. | **CUSTOMER__ID |
| | B. | COMPANY__NAME |
| | C. | CONTACT |
| | D. | CONTACT__TITLE |
| | E. | ADDR1 |
| | F. | ADDR2 |
| | G. | CITY |
| | H. | STATE__CODE |
| | I. | ZIP__CODE |
| | J. | COUNTRY__CODE |
| | K. | VOX__PHONE |
| | L. | FAX__PHONE |
| | M. | CREATE__DATE |
| II. | CUSTOMER__MAIL__TO: This table describes the mailing address of the DataTreasury ™ System customer. | |
| | A. | **MAIL__TO__NO |
| | B. | **CUST__ID |
| | C. | CUSTOMER__NAME |
| | D. | CONTACT |
| | E. | CONTACT__TILE |
| | F. | ADDR1 |
| | G. | ADDR2 |
| | H. | CITY |
| | I. | STATE__CODE |
| | J. | ZIP__CODE |
| | K. | COUNTRY__CODE |
| | L. | VOX__PHONE |
| | M. | FAX__PHONE |
| | N. | CREATE__DATE |
| | O. | COMMENTS |
| III. | CUSTOMER__DAT__SITE: This table describes the DAT location of the DataTreasury ™ System customer. | |
| | AA. | **DAT__SITE__NO |
| | B. | **CUST__ID |
| | C. | CUSTOMER__NAME |
| | D. | CONTACT |
| | E. | CONTACT__TILE |
| | F. | ADDR1 |
| | G. | ADDR2 |
| | H. | CITY |
| | I. | STATE__CODE |
| | J. | ZIP__CODE |
| | K. | COUNTRY__CODE |
| | L. | VOX__PHONE |
| | M. | FAX__PHONE |
| | N. | CREATE__DATE |
| | O. | COMMENTS |

## 18

-continued

| IV. | CUSTOMER__SITE__DAT: This table describes the DAT site(s) of the DataTreasury ™ System customer. | |
|---|---|---|
| | A. | **DAT__TERMINAL__ID |
| | B. | **DAT__SITE__NO |
| | C. | **CUST__ID |
| | D. | INSTALL__DATE |
| | E. | LAST__SERVICE__DATE |
| | F. | CREATE__DATE |
| | G. | COMMENTS |
| V. | DATA__SPEC: This table provides data specifications for document partitioning and extraction. | |
| | A. | **DATA__SPEC__ID |
| | B. | **CUST__ID |
| | C. | DESCR |
| | D. | RECORD__LAYOUT__RULES |
| | E. | CREATE__DATE |
| | F. | COMMENTS |
| VI. | DATA__SPEC__FIELD: This table provides field data specifications for document partitioning and extraction. | |
| | A. | **DATA__SPEC__NO |
| | B. | **DATA__SPEC__ID |
| | C. | FIELD__NAME |
| | D. | DESCR |
| | E. | DATA__TYPE |
| | F. | VALUE__MAX |
| | G. | VALUE__MIN |
| | H. | START__POS |
| | I. | END__POS |
| | J. | FIELD__LENGTH |
| | K. | RULES |
| | L. | CREATE__DATE |
| | M. | COMMENTS |
| VII. | TEMPL__DOC: This table specifies the partitioning of a predefined document. | |
| | A. | **TEMPL__DOC__NUM |
| | B. | DATA__SPEC__ID |
| | C. | DESCR |
| | D. | RULES |
| | E. | CREATE__DATE |
| | F. | COMMENTS |
| VIII. | TEMPL__FORM: This table defines the location of forms on a predefined document. | |
| | A. | **TEMPL__FORM__NO |
| | B. | **TEMPL__DOC__NUM |
| | C. | SIDES__PER__FORM |
| | D. | MASTER__IMAGE__SIDE__A |
| | E. | MASTER__IMAGE__SIDE__B |
| | F. | DISPLAY__ROTATION__A |
| | G. | DISPLAY__ROTATION__B |
| | H. | DESCR |
| | I. | RULES |
| | J. | CREATE__DATE |
| IX. | TEMPL__PANEL: This table specifies the location of panels within the forms of a predefined document. | |
| | A. | **TEMPL__PANEL__NO |
| | B. | **TEMPL__SIDE__NO |
| | C. | **TEMPL__FORM__NO |
| | D. | **TEMPL__DOC__NUM |
| | E. | DISPLAY__ROTATION |
| | F. | PANEL__UL__X |
| | G. | PANEL__UL__Y |
| | H. | PANEL__LR__X |
| | I. | PANEL__LR__Y |
| | J. | DESCR |
| | K. | RULES |
| | L. | CREATE__DATE |
| X. | TEMPL__FIELD: This table defines the location of fields within the panels of a form of a predefined document. | |
| | A. | **TEMPL__FIELD__NO |
| | B. | **TEMPL__PANEL__NO |
| | C. | **TEMPL__SIDE__NO |
| | D. | **TEMPL__FORM__NO |
| | E. | **TEMPL__DOC__NUM |
| | F. | DISPLAY__ROTATION |
| | G. | FLD__UL__X |

6,032,137

<table>
<tr><td colspan="2"></td><td colspan="2">19</td></tr>
<tr><td colspan="4">-continued</td></tr>
<tr><td></td><td>H.</td><td colspan="2">FLD__UL__Y</td></tr>
<tr><td></td><td>I.</td><td colspan="2">FLD__LR__X</td></tr>
<tr><td></td><td>J.</td><td colspan="2">FLD__LR__Y</td></tr>
<tr><td></td><td>K.</td><td colspan="2">DESCR</td></tr>
<tr><td></td><td>L.</td><td colspan="2">RULES</td></tr>
<tr><td></td><td>M.</td><td colspan="2">CREATE__DATE</td></tr>
<tr><td>XI.</td><td colspan="3">DAT__BATCH: This table defines batches of documents which were processed during a DAT session.</td></tr>
<tr><td></td><td>A.</td><td colspan="2">**DAT__BATCH__NO</td></tr>
<tr><td></td><td>B.</td><td colspan="2">**DAT__SESSION__NO</td></tr>
<tr><td></td><td>C.</td><td colspan="2">**DAT__SESSION__DATE</td></tr>
<tr><td></td><td>D.</td><td colspan="2">**DAT__TERMINAL__ID</td></tr>
<tr><td></td><td>E.</td><td colspan="2">DAT__UNIT__CNT</td></tr>
<tr><td></td><td>F.</td><td colspan="2">CREATE__DATE</td></tr>
<tr><td>XII.</td><td colspan="3">DAT__UNIT: This table defines the unit in a batch of documents which were processed in a DAT session.</td></tr>
<tr><td></td><td>A.</td><td colspan="2">**DAT__UNIT__NUM</td></tr>
<tr><td></td><td>B.</td><td colspan="2">**DAT__BATCH__NO</td></tr>
<tr><td></td><td>C.</td><td colspan="2">**DAT__SESSION__NO</td></tr>
<tr><td></td><td>D.</td><td colspan="2">**DAT__SESSION__DATE</td></tr>
<tr><td></td><td>E.</td><td colspan="2">**DAT__TERMINAL__ID</td></tr>
<tr><td></td><td>F.</td><td colspan="2">FORM__CNT</td></tr>
<tr><td></td><td>G.</td><td colspan="2">DOC__CNT</td></tr>
<tr><td></td><td>H.</td><td colspan="2">CREATE__DATE</td></tr>
<tr><td>XIII.</td><td colspan="3">DAT__DOC: This table defines documents in the unit of documents which were processed in a DAT session.</td></tr>
<tr><td></td><td>A.</td><td colspan="2">**DAT__DOC__NO</td></tr>
<tr><td></td><td>B.</td><td colspan="2">**DAT__UNIT__NUM</td></tr>
<tr><td></td><td>C.</td><td colspan="2">DOC__RECORD__DATA</td></tr>
<tr><td></td><td>D.</td><td colspan="2">CREATE__DATE</td></tr>
</table>

The DATA_SPEC, DATA_SPEC_FIELD, TEMPL_DOC, TEMPL_FORM, TEMPL_PANEL and TEMPL_FIELD tables implement the document partitioning algorithm mentioned above in the discussion of the sample receipt of FIG. 3*b*. The cross product of the DATA_SPEC and DATA_SPEC_FIELD tables partition arbitrary documents while the cross product of the TEMPL_DOC, TEMPL_FORM, TEMPL_PANEL and TEMPL_FIELD tables partition predefined documents of the DataTreasury™ System 100. The TEMPL_FORM defines the location of forms on a predefined document. The TEMPL_PANEL defines the location of panels within the forms of a predefined document. Finally, the TEMPL_FIELD table defines the location of fields within the panels of a form of a predefined document.

The DPC 600 performs data mining and report generation for a wide variety of applications by returning information from the data base. For example, the DPC 600 generates market trend analysis reports and inventory reports for merchants by analyzing the data from receipts captured by the DAT 200. The DPC 600 also can provide important tax information to the taxpayer in the form of a report or to software applications like tax preparation software by retrieving tax information from the database which originally resided on receipts, documents and electronic transactions captured by the DAT 200. Similarly, the DPC 600 can also provide tax information for particular periods of time for a tax audit.

FIG. 7 is a flow chart 700 describing the polling of the DACs 300 by a DPC 600 and the transmission of the TECBIs from the DACs 300 to the DPC 600. In step 702, the DPC 600 reads the address of the first DAC 300 in its region for polling.

In step 704, the DPC 600 connects with a DAC 300 for transmission. The DPC 600 determines whether the connection to the DAC 300 was successful in step 706. If the call to the DAC 300 was unsuccessful, the DPC 600 will record

the error condition in the session summary report and will report the error to the DPC 600 manager in step 722.

If the connection to the DAC 300 was successful, the DPC 600 will verify that the DAC 300 is ready to transmit in step 708. If the DAC 300 is not ready to transmit, the DPC 600 will record the error condition in the session summary report and will report the error to the DPC 600 manager in step 722.

If the DAC 300 is ready to transmit in step 708, the DAC 300 will transmit a TECBI packet header to the DPC 600 in step 710. The DPC 600 will determine whether the transmission of the TECBI packet header was successful in step 712. If the transmission of the TECBI packet header was unsuccessful, the DPC 600 will record the error condition in the session summary report and will report the error to the DPC 600 manager in step 722.

If the transmission of the TECBI packet header was successful in step 712, the DAC 300 will transmit a TECBI packet to the DPC 600 in step 714. The DPC 600 will determine whether the transmission of the TECBI packet was successful in step 716. If the transmission of the TECBI packet header was unsuccessful, the DPC 600 will record the error condition in the session summary report and will report the error to the DPC 600 manager in step 722.

If the transmission of the TECBI packet was successful in step 716, the DPC 600, in step 718, will compare the TECBI packet header transmitted in step 710 to the TECBI packet transmitted in step 714. If the TECBI packet header does not match the TECBI packet, the DPC 600 will record the error condition in the session summary report and will report the error to the DPC 600 manager in step 722.

If the TECBI packet header matched the TECBI packet in step 718, the DPC 600 will set the status of the TECBI packet to indicate that it was received at the DPC 600 in step 720. The DPC 600 will also transmit the status to the DAC 300 to indicate successful completion of the polling and transmission session in step 720. Next, the DPC 600 will determine whether TECBIs have been transmitted from all of the DACs 300 in its region in step 724. If all DACs 300 in the DPC's 600 region have transmitted TECBIs to the DPC 600, the DPC 600 will compile a DAC 300 status report in step 728 before terminating the session.

If one or more DACs 300 in the DPC's 600 region have not transmitted TECBIs to the DPC 600, the DPC 600 will get the address of the next DAC 300 in the region in step 726. Next, control returns to step 704 where the next DAC 300 in the DPC's 600 region will be polled as previously discussed.

FIG. 8 is a flow chart 800 describing the data processing performed by the DPC 600. In step 802, the DPC 600 fetches the first TECBI packet. Next, the DPC 600 extracts the first TECBI from the TECBI packet in step 804. In step 806, the DPC 600 inserts the TECBI into the database. In step 808, the DPC 600 extracts the tag header which includes the customer identifier, the encryption keys and the template identifier from the TECBI to obtain the ECBI.

In step 810, the DPC 600 decrypts the ECBI image to obtain the CBI. In step 812, the DPC 600 uncompresses the CBI to obtain the BI. In step 814, the DPC 600 fetches and applies the BI template against the BI. Further the DPC 600 divides the BI into image snippets and tags the BI template with data capture rules in step 814 to form the Tagged Bitmap Image Snippets (TBIS). In step 816, the DPC 600 submits the TBIs for data capture operations to form the IS Derived Data Record (ISDATA). The DPC 600 discards the TBISs upon completion of the data capture operations in step 816. In step 818, the DPC 600 updates the TECBI record in the database with the IS Derived Data.

6,032,137

21

In step **820**, the DPC **600** determines whether it has processed the last TECBI in the TECBI packet. If the last TECBI in the TECBI packet has not been processed, the DPC **600** extracts the next TECBI from the TECBI packet in step **822**. Next, control returns to step **806** where the next TECBI will be processed as described above.

If the last TECBI in the TECBI packet has been processed, the DPC **600** determines whether the last TECBI packet has been processed in step **824**. If the last TECBI packet has not been processed, the DPC **600** fetches the next TECBI packet in step **826**. Next, control returns to step **804** where the next TECBI packet will be processed as described above. If the last TECBI packet has been processed in step **824**, the DPC **600** terminates data processing.

As is known to persons of ordinary skill in the art, a user can request information from a relational database using a query language. See, e.g., Chapter Three of Database System Concepts by Korth and Silberschatz. For example, a user can retrieve all rows of a database table having a primary key with particular values by specifying the desired primary key's values and the table name on a select operation. Similarly, a user can retrieve all rows from multiple database tables having primary keys with particular values by specifying the desired primary keys' values and the tables with a select operation.

The DataTreasury™ System provides a simplified interface to its retrieval customers to enable data extraction from its relational database as described in FIG. 9. For example, a DataTreasury™ System customer can retrieve the time, date, location and amount of a specified transaction.

The DPC **600** performs data mining and report generation for a wide variety of applications by returning information from the data base. For example, the DPC **600** generates market trend analysis reports and inventory reports for merchants by analyzing the data from receipts captured by the DAT **200**. The DPC **600** also can provide important tax information to the taxpayer in the form of a report or to tax preparation software by retrieving tax information from the database which originally resided on receipts, documents and electronic transactions captured by the DAT **200**. Similarly, the DPC **600** can also provide tax information for particular periods of time for a tax audit.

FIG. **9** is a flowchart **900** describing the data retrieval performed by the DPC **600**. In step **902**, the DPC **600** receives a TECBI retrieval request. In step **904**, the DPC **600** obtains the customer identifier. In step **906**, the DPC **600** determines whether the customer identifier is valid. If the customer identifier is not valid, control returns to step **904** where the DPC **600** will obtain another customer identifier.

If the customer identifier is valid in step **906**, the DPC **600** will obtain the customer security profile in step **908**. In step **910**, the DPC **600** receives a customer retrieval request. In step **912**, the DPC **600** determines whether the customer retrieval request is consistent with the customer security profile. If the customer retrieval request is not consistent with the customer security profile, control returns to step **910** where the DPC **600** will obtain another customer retrieval request. If the customer retrieval request is consistent with the customer security profile, the DPC **600** will transmit the results to the customer as indicated by the customer security profile in step **914**.

FIG. **10** is a flow chart describing the use of the DataTreasury™ system to process checks. In step **1004**, the DataTreasury™ system captures the check at the payer's remote location in the preferred embodiment before the payer presents the check to the payee. Alternatively, the payer simply presents or mails the check to the payee. The capture

22

of the check at the payer's remote location in step **1004** enables subsequent comparison of the check as written by the payer with the check as received by the payee. In other words, this step enables the detection of check alteration from fraudulent check schemes where a check is intercepted before receipt by the payee and chemically washed to allow the perpetrator to work with a blank check.

In step **1006**, the DataTreasury™ system captures the check and the payer's biometric data at the payee's remote location. In an alternate embodiment, the DataTreasury™ system sends electronic transaction data representing the check from the payer's remote location to the payer's remote location. In step **1008**, the DataTreasury™ system performs verification of the check and biometric data by comparing the remotely captured data with the data stored at a central location. The validation further includes checking the courtesy amount and the payer's signature.

In step **1010**, the DataTreasury™ system determines whether the verification was successful. If the verification of step **1010** was not successful, the system transmits an error message to the remote locations in step **1012** and returns to step **1004** for resubmission. If the verification of step **1010** was successful, the system creates an electronic transaction representing the check at a central location in step **1014**. The electronic transaction representing the check consists of the payer bank's identification number, routing information, the payer's account number, a payer's check, a payer bank's draft, the amount of the check or draft, the payee bank's identification number, the payee bank's routing information, and the payee's account number. In step **1016**, the electronic transaction representing the check is transmitted to the payee bank. In step **1018**, the payee bank transmits the electronic transaction representing the check to the payer bank.

In step **1020**, the payer bank verifies the electronic transaction representing the check and determines whether to approve a fund transfer. If the payee bank grants approval in step **1020**, the payer bank transfers the funds from the payer bank to the payee bank in step **1022**. In step **1024**, the DataTreasury™ system notifies the payee bank and the remote locations as to the status of the transfer.

While the above invention has been described with reference to certain preferred embodiments, the scope of the present invention is not limited to these embodiments. One skilled in the art may find variations of these preferred embodiments which, nevertheless, fall within the spirit of the present invention, whose scope is defined by the claims set forth below.

What is claimed is:

1. A system for central management, storage and report generation of remotely captured paper transactions from checks comprising:

one or more remote data access subsystems for capturing and sending paper transaction data including a payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number, and further including subsystem identification information comprising at least one imaging subsystem for capturing the checks and at least one data access controller for managing the capturing and sending of the transaction data;

at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a data management subsystem for

6,032,137

23

managing the processing, sending and storing of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

2. A system as in claim 1 wherein said one or more data access subsystems further comprise at least one scanner for capturing the paper transaction data.

3. A system as in claim 2 wherein said one or more data access subsystems also capture electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, further comprising:

at least one card interface for capturing the electronic transaction data;

at least one signature interface for capturing an electronic signature; and

at least one biometric interface for capturing biometric data.

4. A system as in claim 3 wherein said at least one data access controller successively transforms the captured transaction data to a bitmap image, a compressed bitmap image, an encrypted, compressed bitmap image and an encrypted, compressed bitmap image tagged with information identifying a location and time of the transaction data capture.

5. A system as in claim 4 wherein said one or more data access subsystems further comprise digital storage for storing the tagged, encrypted, compressed bitmap image.

6. A system as in claim 5 wherein said at least one card interface initiates the electronic transaction.

7. A system as in claim 6 wherein said one or more data access subsystems further comprise at least one printer for printing the paper transaction initiated by said at least one card interface.

8. A system as in claim 7 wherein the paper transaction printed by said at least one printer includes data glyphs.

9. A system as in claim 1 wherein said data management subsystem of said at least one data processing subsystem comprises:

at least one server for polling said one or more remote data access subsystems for transaction data;

a database subsystem for storing the transaction data in a useful form;

a report generator for generating reports from the transaction data and providing data to software applications;

at least one central processing unit for managing the storing of the transaction data;

a domain name services program for dynamically assigning one of said at least one server to receive portions of the transaction data for balancing the transaction data among said at least one server; and

a memory hierarchy.

10. A system as in claim 9 wherein said at least one server also polls for biometric and signature data, said database stores the biometric data and the signature data, and said at least one central processing unit verifies the biometric data and the signature data.

11. A system as in claim 9 wherein said memory hierarchy comprises at least one primary memory for storage of recently accessed transaction data and at least one secondary memory for storage of other transaction data.

12. A system as in claim 11 wherein said at least one secondary memory comprises at least one write once read many jukebox and at least one optical storage jukebox.

24

13. A system as in claim 12 wherein said at least one optical storage jukebox comprises read only memory technology including compact disc read only memory form factor metallic write once read many disc.

14. A system as in claim 9 wherein said database subsystem comprises at least one predefined template for partitioning the stored transaction data into panels and identifying locations of the panels.

15. A system as in claim 14 wherein said data processing subsystem further comprises a data entry gateway for correcting errors in the panels of stored transaction data.

16. A system as in claim 1 wherein said at least one communication network comprises:

at least one first local area network for transmitting data within a corresponding one of said one or more remote data access subsystems;

at least one second local area network for transmitting data within a corresponding one of said at least one data processing subsystem; and

at least one wide area network for transmitting data between said one or more remote data access subsystems and said at least one data processing subsystem.

17. A system as in claim 16 wherein said at least one communication network further comprises:

at least one modem for connecting said at least one first local area network of said one or more data access subsystems to a corresponding one of said at least one second local area network of said at least one data processing subsystem through said at least one wide area network; and

at least one bank of modems for connecting said at least one second local area network of said at least one data processing subsystem to a corresponding some of said at least one first local area network of said one or more data access subsystems through said at least one wide area network.

18. A system as in claim 1 further comprising at least one data collecting subsystem for collecting and sending the electronic or paper transaction data comprising a further management subsystem for managing the collecting and sending of the transaction data.

19. A system as in claim 18 wherein said data management subsystem of said at least one data collecting subsystem comprises:

at least one server for polling said one or more remote data access subsystems for transaction data;

a database for storing the transaction data in a useful form;

at least one central processing unit for managing the collecting of the transaction data;

a domain name services program for dynamically assigning one of said at least one server to receive portions of the transaction data for balancing the transaction data among said at least one server; and

a memory hierarchy.

20. A system as in claim 19 wherein said memory hierarchy comprises at least one primary memory for collecting transaction data and at least one secondary memory for backup storage of the transaction data.

21. A system as in claim 20 wherein said at least one secondary memory comprises at least one DLT jukebox.

22. A system as in claim 18 wherein said at least one communication network comprises:

at least one first local area network for transmitting data within a corresponding one of said one or more remote data access subsystems;

6,032,137

25

at least one second local area network for transmitting data within a corresponding one of said at least one data collection subsystem;

at least one third local area network for transmitting data within a corresponding one of said at least one data processing subsystem; and

at least one wide area network for transmitting data between said one or more remote data access subsystems, said at least one data collection subsystem and said at least one data processing subsystem.

23. A system as in claim 22 wherein said at least one communication network further comprises:

at least one first modem for connecting said at least one first local area network of said one or more data access subsystems to a corresponding one of said at least one second local area network through said at least one wide area network;

at least one bank of modems for connecting said at least one second local area network of said at least one data collection subsystem to a corresponding some of said at least one first local area network of said one or more data access subsystems through said at least one wide area network;

at least one first wide area network router for connecting a corresponding one of said at least one second local area network of said at least one data collecting subsystem to said at least one wide area network; and

at least one second wide area network router for connecting a corresponding one of said at least one third local area network of said at least one data processing subsystem to said at least one wide area network.

24. A system as in claim 23 wherein said at least one first wide area network and said at least one second wide area network comprises a carrier cloud, said carrier cloud using a frame relay method for transmitting the transaction data.

25. A system as in claim 22 wherein said at least one second local area network and said at least one third local area network further comprises a corresponding one of at least one network switch for routing transaction data within said at least one second local area network and said at least one third local area network.

26. A method for central management, storage and verification of remotely captured paper transactions from checks comprising the steps of:

capturing an image of the paper transaction data at one or more remote locations said transaction data including a payer bank's identification number, a payer bank's routing number, a payer bank's routing information, a payer's account number, a payer's check, a payer bank's draft, a check amount, a payee bank's identification number, a payee bank's routing information, and a payee's account number; and sending a captured image of the paper transaction data;

managing the capturing and sending of the transaction data;

collecting, processing, sending and storing the transaction data at a central location;

managing the collecting, processing, sending and storing of the transaction data;

encrypting subsystem identification information and the transaction data; and

transmitting the transaction data and the subsystem identification information within and between the remote location(s) and the central location.

27. The method as in claim 26 wherein said managing the capturing and sending step comprises the steps of:

26

successively transforming the captured transaction data to a bitmap image, a compressed bitmap image, an encrypted, compressed bitmap image and an encrypted, compressed bitmap image tagged with information identifying a location and time of the transaction data capturing; and

storing the tagged, encrypted, compressed bitmap image.

28. The method as in claim 27 wherein said managing the capturing and sending step also captures electronic transactions from credit cards, smart cards and debit cards, signature data or biometric data, further comprising the steps of:

initiating an electronic transaction;

capturing signature data;

capturing biometric data; and

printing a paper transaction with data glyphs for the initiated electronic transaction.

29. A method as in claim 26 wherein:

said capturing and sending step occurs at a plurality of remote locations; and

said collecting, processing, sending and storing step occurs at a plurality of central locations.

30. A method as in claim 29 wherein said collecting, processing, sending and storing step comprises the steps of:

polling the remote locations for transaction data with servers at the central locations;

storing the transaction data at the central location in a memory hierarchy, said storing maintains recently accessed transaction data in a primary memory and other transaction data in a secondary memory; and

dynamically assigning the servers at the central location to receive portions of the transaction data for balancing the transaction data among the servers; and

generating reports from the transaction data and providing data to software applications.

31. A method as in claim 30 wherein said storing transaction data step comprises the steps of:

partitioning the stored transaction data with predefined templates into panels; and

identifying locations of the panels.

32. A method as in claim 31 wherein said managing the collecting, processing, sending and storing of the transaction data step comprises correcting errors in the panels of stored transaction data.

33. A method as in claim 32 further comprising the steps of:

polling the remote locations for captured electronic data, captured signature data and captured biometric data with servers at the central locations; and

comparing the captured signature data and the captured biometric data to stored signature data and stored biometric data respectively for identification verification.

34. A method as in claim 32 wherein said transmitting the transaction data step comprises the steps of:

transmitting data within the remote locations;

transmitting data from each remote location to a corresponding central location; and

transmitting data within the central locations.

35. A method as in claim 34 wherein said transmitting data from each remote location to a corresponding central location step comprises the steps of:

connecting each remote location to a corresponding central location; and

connecting each central location to corresponding remote locations.

A146

6,032,137

27

**36**. A method as in claim **29** further comprising the steps of:

collecting and sending the electronic or paper transaction data at intermediate locations;

managing the collecting and sending of the transaction data; and

transmitting the transaction data within the intermediate location and between the intermediate locations and the remote locations and the central locations.

**37**. A method as in claim **36** wherein said managing the collecting and sending step comprises the steps of:

polling the remote locations for transaction data with servers in the intermediate locations;

storing the transaction data in the intermediate locations in a useful form, said storing maintains the transaction data in a primary memory of a memory hierarchy and performs backup storage of the transaction data into a secondary memory of the memory hierarchy; and

dynamically assigning the servers to receive portions of the transaction data for balancing the transaction data among the servers.

**38**. The method as in claim **36** wherein said transmitting the transaction data step comprises the steps of:

transmitting data within the remote locations;

transmitting data from each remote location to a corresponding intermediate location;

transmitting data within the intermediate locations;

transmitting data from each intermediate location to corresponding central locations; and

transmitting data within the central locations.

**39**. A method as in claim **38** wherein said transmitting data from each remote location to corresponding intermediate locations step comprises the steps of:

connecting each remote location to a corresponding intermediate location; and

connecting the intermediate locations to corresponding remote locations.

**40**. A method as in claim **38** wherein said transmitting data from each intermediate location to corresponding central locations comprises the steps of:

connecting each intermediate location to an external communication network; and

connecting the corresponding central locations to the communication network.

28

**41**. A method as in claim **40** wherein said transmitting data from each intermediate location to corresponding central locations step further comprises the steps of:

packaging the transaction data into frames; and

transmitting the frames through the external communication network.

**42**. A system for central management, storage and report generation of remotely captured paper transactions from checks comprising:

one or more remote data access subsystems for capturing and sending paper transaction data and verifying transaction data from the checks comprising at least one imaging subsystem for capturing the checks and at least one data access controller for managing the capturing and sending of the transaction data;

at least one central data processing subsystem for processing, sending, verifying and storing the paper transaction data and the subsystem identification information comprising a management subsystem for managing the processing, sending and storing of the of the transaction data; and

at least one communication network for the transmission of the transaction data within and between said one or more data access subsystems and said at least one data processing subsystem, with the data access subsystem providing encrypted subsystem identification information and encrypted paper transaction data to the data processing subsystem.

**43**. A method for central management, storage and verification of remotely captured paper transactions from checks comprising the steps of:

capturing an image of the check at one or more remote locations and sending a captured image of the check;

managing the capturing and sending of the transaction data;

collecting, processing, sending and storing the transaction data at a central location;

managing the collecting, processing, sending and storing of the transaction data;

encrypting subsystem identification information and the transaction data;

verifying the transaction data from the check; and

transmitting the transaction data and the subsystem identification information within and between the remote location(s) and the central location.

*   *   *   *   *

A147

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6063rd)

# United States Patent

Ballard

(10) **Number:** US 6,032,137 C1

(45) **Certificate Issued:** Dec. 25, 2007

(54) **REMOTE IMAGE CAPTURE WITH CENTRALIZED PROCESSING AND STORAGE**

(75) Inventor: **Claudio R. Ballard**, Lloyd Harbor, NY (US)

(73) Assignee: **Datatreasury Corporation**, Melville, NY (US)

**Reexamination Request:**
No. 90/007,830, Nov. 25, 2005

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,032,137** |
| Issued: | **Feb. 29, 2000** |
| Appl. No.: | **09/081,012** |
| Filed: | **May 19, 1998** |

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/917,761, filed on Aug. 27, 1997, now Pat. No. 5,910,988.

(51) **Int. Cl.**

| | |
|---|---|
| *G06Q 20/00* | (2006.01) |
| *G06K 9/00* | (2006.01) |
| *G06K 17/00* | (2006.01) |
| *H04L 9/00* | (2006.01) |

(52) **U.S. Cl.** ....................................................... **705/75**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,205,780 | A | 6/1980 | Burns et al. |
| 4,264,808 | A | 4/1981 | Owens et al. |
| 4,268,715 | A | 5/1981 | Atalla |
| 4,321,672 | A | 3/1982 | Braun et al. |
| 4,404,649 | A | 9/1983 | Nunley et al. |
| 4,500,750 | A | 2/1985 | Elander et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2131667 | 6/1995 |
| EP | 0593209 A | 4/1994 |
| EP | 0661654 A2 | 7/1995 |
| WO | WO 90/04837 A | 5/1990 |
| WO | WO 91/06058 A | 5/1991 |
| WO | WO 97/07468 | 2/1997 |
| WO | WO 97/22060 | 6/1997 |
| WO | WO 98/47100 A | 10/1998 |
| WO | WO 98/58356 A | 12/1998 |

OTHER PUBLICATIONS

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Check Image Processing Archive and Retrieval System," Jul. 8, 1994, JPMC–BANCT 002960–003299.

(Continued)

*Primary Examiner*—Peter C. English

(57) **ABSTRACT**

A system for remote data acquisition and centralized processing and storage is disclosed called the Data Treasury™ System. The DataTreasury™ System provides comprehensive support for the processing of documents and electronic data associated with different applications including sale, business, banking and general consumer transactions. The system retrieves transaction data such as credit card receipts checks in either electronic or paper form at one or more remote locations, encrypts the data, transmits the encrypted data to a central location, transforms the data to a usable form, performs identification verification using signature data and biometric data, generates informative reports from the data and transmits the informative reports to the remote locations(s). The DataTreasury™ System has many advantageous features which work together to provide high performance, security, reliability, fault tolerance and low cost. First, the network architecture facilitates secure communication between the remote location(s) and the central processing facility. A dynamic address assignment algorithm performs load balancing among the system's servers for faster performance and higher utilization. Finally, a partitioning scheme improves the error correction process.



US 6,032,137 C1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,578,530 | A | 3/1986 | Zeidler |
| 4,602,936 | A | 7/1986 | Green et al. |
| 4,652,990 | A | 3/1987 | Pailen et al. |
| 4,675,815 | A | 6/1987 | Kuroki et al. |
| 4,723,283 | A | 2/1988 | Nagasawa et al. |
| 4,745,267 | A | 5/1988 | Davis et al. |
| 4,748,557 | A | 5/1988 | Tamada et al. |
| 4,755,940 | A | 7/1988 | Brachtl et al. |
| 4,757,543 | A | 7/1988 | Tamada et al. |
| 4,771,460 | A | 9/1988 | Tamada et al. |
| 4,882,779 | A | 11/1989 | Rahtgen |
| 4,910,774 | A | 3/1990 | Barakat |
| 4,912,762 | A | 3/1990 | Lee et al. |
| 4,922,503 | A | 5/1990 | Leone |
| 4,941,125 | A | 7/1990 | Boyne |
| 4,961,142 | A | 10/1990 | Elliott et al. |
| 4,962,531 | A | 10/1990 | Sipman et al. |
| 4,977,595 | A | 12/1990 | Ohta et al. |
| 4,985,921 | A | 1/1991 | Schwartz |
| 5,003,594 | A | 3/1991 | Shinagawa |
| 5,014,311 | A | 5/1991 | Schrenk |
| 5,016,277 | A | 5/1991 | Hamilton |
| 5,053,607 | A | 10/1991 | Carlson et al. |
| 5,054,096 | A | 10/1991 | Beizer |
| 5,081,680 | A | 1/1992 | Bennett |
| 5,123,047 | A | 6/1992 | Rosenow |
| 5,159,548 | A | 10/1992 | Caslavka |
| 5,163,098 | A | 11/1992 | Dahbura |
| 5,168,444 | A | 12/1992 | Cukor et al. |
| 5,170,466 | A | 12/1992 | Rogan et al. |
| 5,175,766 | A | 12/1992 | Hamilton |
| 5,185,798 | A | 2/1993 | Hamada et al. |
| 5,195,133 | A | 3/1993 | Kapp et al. |
| 5,200,993 | A | 4/1993 | Wheeler et al. |
| 5,214,697 | A | 5/1993 | Saito |
| 5,233,656 | A | 8/1993 | Landgrand et al. |
| 5,235,433 | A | 8/1993 | Clarkson et al. |
| 5,241,600 | A | 8/1993 | Hillis |
| 5,256,863 | A | 10/1993 | Ferguson et al. |
| 5,259,025 | A | 11/1993 | Monroe et al. |
| 5,274,567 | A | 12/1993 | Kallin |
| 5,287,497 | A | 2/1994 | Behera |
| 5,317,637 | A | 5/1994 | Pichlmaier et al. |
| 5,321,816 | A | 6/1994 | Rogan et al. |
| 5,337,358 | A | 8/1994 | Axelrod et al. |
| 5,341,428 | A | 8/1994 | Schatz |
| 5,343,529 | A | 8/1994 | Goldfine et al. |
| 5,373,550 | A | 12/1994 | Campbell et al. |
| 5,396,558 | A | 3/1995 | Ishiguro et al. |
| 5,408,531 | A | 4/1995 | Nakajima |
| 5,440,634 | A | 8/1995 | Jones et al. |
| 5,446,796 | A | 8/1995 | Ishiguro et al. |
| 5,454,575 | A | 10/1995 | Del Buono |
| 5,473,143 | A | 12/1995 | Vak et al. |
| 5,502,765 | A | 3/1996 | Ishiguro et al. |
| 5,506,691 | A | 4/1996 | Bednar et al. |
| 5,524,073 | A | 6/1996 | Stambler |
| 5,528,705 | A | 6/1996 | Reasoner, Jr. et al. |
| 5,539,822 | A | 7/1996 | Lett |
| 5,539,825 | A | 7/1996 | Akiyama et al. |
| 5,544,043 | A | 8/1996 | Miki et al. |
| 5,544,255 | A | 8/1996 | Smithies et al. |
| 5,557,518 | A | 9/1996 | Rosen |
| 5,577,121 | A | 11/1996 | Davis et al. |
| 5,596,642 | A | 1/1997 | Davis et al. |
| 5,602,936 | A | 2/1997 | Green et al. |
| 5,604,802 | A | 2/1997 | Holloway |
| 5,608,800 | A | 3/1997 | Hoffmann et al. |
| 5,615,269 | A | 3/1997 | Micali |
| 5,621,796 | A | 4/1997 | Davis et al. |
| 5,621,797 | A | 4/1997 | Rosen |
| 5,623,547 | A | 4/1997 | Jones et al. |
| 5,625,694 | A | 4/1997 | Lee et al. |
| 5,629,981 | A | 5/1997 | Nerlikar |
| 5,633,930 | A | 5/1997 | Davis et al. |
| 5,642,419 | A | 6/1997 | Rosen |
| 5,659,616 | A | 8/1997 | Sudia |
| 5,668,897 | A | 9/1997 | Stolfo |
| 5,682,549 | A | 10/1997 | Tanaka et al. |
| 5,708,810 | A | 1/1998 | Kern et al. |
| 5,754,673 | A | 5/1998 | Brooks et al. |
| 5,760,916 | A | 6/1998 | Dellert et al. |
| 5,784,610 | A | 7/1998 | Copeland, III et al. |
| 5,790,260 | A | 8/1998 | Myers |
| 5,832,463 | A | 11/1998 | Funk |
| 5,832,464 | A | 11/1998 | Houvener et al. |
| 5,857,034 | A | 1/1999 | Tsuchiya et al. |
| 5,870,725 | A | 2/1999 | Bellinger et al. |
| 5,884,271 | A | 3/1999 | Pitroda |
| 5,926,288 | A | 7/1999 | Dellert et al. |
| 5,973,731 | A | 10/1999 | Schwab |
| 6,032,137 | A | 2/2000 | Ballard |
| 6,108,104 | A | 8/2000 | Tesavis |
| 6,115,509 | A | 9/2000 | Yeskel |
| 6,145,738 | A | 11/2000 | Stinson et al. |

## OTHER PUBLICATIONS

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Total Solution Overview" Jul. 8, 1994, JPMC–BANCT 001017–001144.

Federal Reserve Bank of Boston, "Request for Proposal for Check Image Processing and Archival and Retrieval Systems for The Federal Reserve," Apr. 21, 1994, JPMC 152558–152803.

IBM's Proposal to the Federal Reserve Bank of Boston, Nov. 7, 1991, "IBM Proposal For FRB Phase Four: Image Archive System," JPMC 279955–280128, Yeskel Exhibit 1.

"Interbank Check Imaging," FSTC General Meeting, Orlando, FL, Apr. 17th, 1997 (Exhibit 20).

"MAGTEK® Company Background & Product Guide," date unknown (Exhibit MagTek D–7).

"MagTek Unveils Excella, a Dual–side Scanner foe Check 21 Applications," May 10, 2004 (Exhibit MagTek D–8).

"PACES Models—FSTC Project," presentation by Mariano Roldan on Jul. 17, 1997 (Exhibit 21).

"PACES Paperless Automated Check Exchange & Settlement NEXT STEP," presentation by John Fricke at New York, NY on August 12, 1997 (Exhibit 19).

Press Release "MagTek Adds Enhanced Reading to MicrimageTM," Jan. 9, 2003 (Exhibit MagTek D–11).

Press Release "MagTek Upgrades Its MicrimageTM Check Reader/Scanner," Jun. 12, 2002 (Exhibit MagTek D–9).

Press Release "MagTek's MICRImage Transmits Check Images at Speed of Ethernet," Feb. 14, 2002 (Exhibit D–10).

"The New Era of Check Scanning Technology," 2005 (Exhibit MagTek D–6).

Unisys, New York Clearing House, "A Proposal for an Image–Based Return Item Processing System," Jun. 1991, Unisys Document No. PDC 1010–16, JPMC–NYCH018091–018216.

"About FSTC: FSTC History," FSTC, 2003.

American National Standard For Financial Image Interchange ("ANSI"): Architecture, Overview and System Design Specification, X9,xx 0.7, dated: 1994.

Anderson, "Electronic Check and Check Law," letter to Robert Ballen, Apr. 8, 1996.

Ansi6v4[1].ppt—PowerPoint Presentation—FSTC—Financial Services Technology Consortium, Sep. 30 to Oct. 1, 1996.

"AT&T Global offers one–step imaging," American Banker, vol. 159, No. 39, p. 14A(1), Feb. 28, 1994.

"AT&T Partners with Fiserv to Form Single Source Provider for Leading Image Item Processing Solutions," PR Newswire, at 913CL011, Sep. 13, 1995.

ATZEL, (email to Hambro, Oct. 9, 2001).

"At Your Service. . . ," Federal Reserve Bank of Kansas City, 1995.

"Baby boomers, Generation X are both addicted to ATM," AT&T News Release, Feb. 28, 1995.

"BancTec Inc. has received another order for its image statement processing product (First National Bank of Chicago orders)," Nov. 13, 1991.

BancTec's Proposal to the Federal Reserve Bank of Boston, "Technical Volume: Check Image Processing Archive and Retrieval System," Jul. 8, 1994, JPMC–BANCT 002960–003299 and JPMC–BANCT 001017–001144.

Banet, B., "Document image processing, 1991: The imaging edge," Seybold Rep. on Publishing Systs, vol. 20, No. 19, Jun. 24 1991.

"Bank Automation News," Finance & Banking Newsletter, vol. 9, Iss. 6, Apr. 2, 1997.

"Banks to Check Out Imaging (Solutions)," Communications Week International, 1992, No. 093, p. 46, Oct. 19, 1992.

Barhel, M., "NCR and Unisys exchange check images in a pivotal test (computer makers test compatibility of check imaging systems)," American Banker, vol. 158, No. 67, p. 3(1), Apr. 8, 1993.

Barthel, Matt, "Unisys, Banctec offer PC–based imaging: high–tech check statements produced; community banks are market," American Banker, vol. 157, No. 195, p. 3(1), Oct. 8, 1992.

Bartholomew, D., "More Checks on Checks—Bank of America plan to convert to an IBM imaging system that screens checks faster and more thoroughly (spotlight)," Informationweek, 1994, No. 504, p. 32, Dec. 5, 1994.

"Bill Processing: US West Re–Engineers with $7.2 Million Unisys Image–based Remittance Processing Solution," EDGE, on & about AT&T, vol. 10, No. 378, Oct. 23, 1995.

Blankenhorn, D., "Cincinnati Bell and Unisys go into bank imaging," Newsbytes, p. NEW10240020, Oct. 24, 1990.

Block, V., "USAA Federal gets imaging system," American Banker, vol. 159, No. 49, p. 6A(1), Mar. 14, 1994.

Booker, E., "Bank to test scalable NCR imaging for check processing," Computerworld, pp. 66, Dec. 14, 1992.

Brown, J., "Imaging may dramatically alter bank data networks," Network World, vol. 6, No. 19, p. 6(2), May 15, 1989.

Buchok, J., "OCR gets processing credit," Computing Canada, vol. 19, No. 26, Dec. 20, 1993.

"Chase's New Image," Information Week, No. 517, at 14, Mar. 16, 1995.

Check[1].ppt—Powerpoint Presentation—Current Check Flow, Dec. 12, 1995.

"Check Image Exchange Project (a.k.a. Interbank Check Imaging Project)," at www.fstc.org/projects/imaging/index.cfm.

"Check–Image Interchange Inches Closer," Bank Technology News, vol. 10, No. 1, p. 19+, Jan. 1997.

"Checks & Checking: Check Imaging at the Teller Station (Alliance Integration & Services Inroduces Imaging System that can be Installed at Bank Teller Stations)," Bank Technology News, vol. 9, No. 10, at 37, Oct. 1996.

"Chemical Chooses IBM Check Imaging (Chemical Banking Corp to install IBM's ImagePlus High Performance Transaction System to process 9 mil checks daily," Bank Technology News, vol. 8, No. 9, p. 1, Sep. 11, 1995.

"Cincinnati Bell: CBIS & Unisys in Major Imaging Agreement," EDGE, on & about AT&T, vol. 5, No. 118, Oct. 29, 1990.

"Cincinnati Bell Information Systems (Integrator Briefs)," Computer Reseller News, 1993, No. 534, p. 129, Jul. 12, 1993.

Complaint in *Data Treasury Corp.* v. *Bank One Corp.*, Cause No. 3–03CV0059–K, In the United States District Court for the Northern District of Texas, Dallas Division.

Complaint in *Data Treasury Corp.* v. *First Data Corporation, et al.*, Cause No. 502CV094, In the United States District Court for the Eastern District of Texas, Texarkana Division.

Complaint in *Data Treasury Corp.* v. *RDM Corp., a.k.a. Research Development and Manufacturing Corp.*, Cause No. 3–02CV2641–M, in the United States District Court for the Northern District of Texas, Dallas Division.

Complaint in *Data Treasury Corp.* v. *Ingenico S.A., et al.*, Cause No. 502CV095, In the United States Dstrict Court for the Eastern District of Texas, Texarkana Division.

Complaint in *Data Treasury Corp.* v. *J.P. Morgan Chase & Co., et al.*, Cause No. 502CV124, In the United States District Court for the Eastern District of Texas, Texarkana Division.

"Computerm Announces Remote Check Imaging Support for VMC 8200 High–Speed Channel Extension System," PR Newswire at 408LAM012, Apr. 8, 1996.

"Computerm Eases Remote Imaging," American Banker, vol. 158, No. 156, at 13A(1), August 16, 1993.

"Computerm Enables Boatmen's Bancshares to Execute Remote Check Imaging," PR Newswire at 408LAM013, Apr. 8, 1996.

Cooney, M., "Frame relay comes to Computer extenders," Network World, Jun. 28, 1993.

Cortese, Amy, "Image Yields Interest at Banks (Collaboration Results in Imaging System to Automate Check Processing," ComputerWorld, at 6, Mar. 19, 1990.

Costanzo, C., "As Banks Cling to the Conventional, Check–Imaging Struts Its Stuff," Bank Technology News, p. 1, Mar. 1994.

Crockett, B., "Systematics to use deposited–check imaging; installation at firm's N.J. center would be the first to outsourcer," American Banker, vol. 158, No. 95, p. 3(1), May 19, 1993.

Crone, "Reducing Data Processing Costs with a Remote Item Processing System," Bank Administration, Oct. 1986, pp. 44–46.

Daly, B., "Unisys Acquires Visual Impact Solution for Check Processing, Archive and Image Delivery," Business Wire, p. 9181204, Sep. 18, 1997.

Daly, B., "Unisys provides services to Bank of the West to support retail banking," Business Wire, p. 9180098, Sep. 18, 1995.

"Data Compression Over Frame Relay Implementation Agreement FRF.9," Jan. 22, 1996, downloaded at http://www.frforum.com/5000/Approved/FRF.9/frf9.pdf.

"Defendants' Final Invalidty Construction Pursuant to Fourth Amended Docket Control Order and Patent Local Rules 3–3 and 3–6," pp. 1–21, Civil Action No. 5:03–CV–039 (DF), Dec. 13, 2005.

"Defendants Ingenico S.A. and Ingenico, Inc.'s Preliminary Invalidity Contentions," in *Data Treasury Corp.* v. *Ingenico S.A. et al.,* Cause No. 502CV095, In the United States District Court of Texas, Texarkana Division.

"Defendants' Preliminary Invalidity Construction Pursuant to Patent Local Rules 3–3 and 3–4," in *Data Treasury Corp.,* v. *First Data Corporation, et al.* Cause No. 502CV094, In the United States District Court of Texas, Texarkana Division.

Depompa, Barbara, "IBM Adds Image–Based Check Processing," MIS Week, vol. 11, No. 12, at 12(1), Mar. 19, 1990.

Description of the IBM "3174 Network Processor," Oct. 7, 1992, found on the web at the URL: http://ecc400.com/ibm/controllers/314prod.htm and http://www.commercecomputer.com/3174.html.

Dinan, Painter & Rodite, "ImagePlus High Performance Transaction System," IBM Systems Journal, vol. 29, No. 3, 1990, pp. 421–434.

Document Image Report, IntraFed Touts Remote Services, vol. 6, Issue 25, Dec. 11, 1996.

Dowell, "Security," email to fstc–image, Apr. 27, 1996.

Durham, D., "Broadway & Seymour to Invest in Two Strategic Initiatives," Business Ire, p. 03151248, Mar. 15, 1995.

eCheck: Homepage, 2003.

Electronic Imaging '88—Advanced Printing of Paper Summaries, vol. 1, Anaheim, California, Mar. 1998.

Electronic Imaging'88—Advanced Printing of Paper Summaries, vol. 1, Oct. 3–6, 1988, Boston, MA.

E–mail of May 10, 2006 titled "USPTO Reexam. C.N 90/007,829, Requested Date: Nov. 25, 2005" from "PT" <admin@patentrakker.com>.

"Entrust Ecryption and Digital Signature Explained," date unknown.

Evankovits, S., "Computer earns MCI 'Level' approval; Computer's industry exclusive native Frame Relay interface passes test for interoperability with MCI's Frame Relay services," Business Wire, Apr. 12, 1995.

Evans, J., "The end of the paper wait: document imaging (includes related articles on successful document imaging implementations at Borgess Medical Center, the Huntington Internal Medicine Group, the University of Alabama Health Services Foundation and Quest Diagnostic) (Industry Trend or Event)," Health Management Technology, vol. 18, No. 2, p. 16(5), Feb. 1997.

Fassett, W., "Impact of Imaging," Bank Management, vol. 67, No. 11, p. 56, Nov. 1991.

Federal Reserve Bank of Boston, "Request for Proposal for Check Image Processing and Archival and Retrieval Systems For The Federal Reserve," Apr. 21, 1994, JPMC 152558–152803.

Feighery, M., "NCR demonstrates systems for Insurance and accounting industry," AT&T News Release, May 31, 1992.

Feihery, M. and Brochonko, K., "NCR demonstrates full line of retail products at NRF conference," AT&T News Release, Jan. 18, 1993.

FileNet Product Brochure, "Introducing the Age Document–Image Processing," The PC Connection, and Wide–Area Image Communication and System Networking, 1998, 14 pages.

"Financial EDI over the Internet," Bank of America, 1996. Financial Services Technology Consortium ("FSTC") Interbank Check Imaging Project White Paper, dated: Jun. 20, 1994.

Fisher, M., "IBM, Consumers continue work on document image processor," Datamation, vol. 34, No. 19, Oct. 1, 1988.

Fitch, "Digital image system speed return items, exceptions," Corporate Cashflow, May 1996.

Fitch, T., "Check image capture speeds up positive pay reconcilement," Corporate Cashflow, Feb. 1995.

Friedman, D., "Nixdorf Computer Imtroduces DCPA Image—A Sophisticated Document Image Processing System with Unique Capabilities," PR Newswire, Aug. 15, 1989.

FSTC Check Image Interchange Project, dated: May 25, 1995.

FSTC Check Image Interchange Project Pilot Phase 1A: Preliminary Architecture and Project Plan, dated: Jun. 30, 1995.

"FSTC Check Image Quality Subproject," date unknown.

FSTC Compilation of ANSI X9.46, Data Structure Reference, dated: Jul. 31, 1995.

FSTC Demonstrates Interbank Check Image Pilot; Multi–Vendor System Speeds check Clearing, Cuts Fraud—FSTC Pilot Lays Foundation for "Paper Check Truncation," www.ftsc.org/projects/imaging/public/information.cfm, Dec. 12, 1995.

"FSTC Image Exchange," May 21, 1996.

FSTC Image Quality Functional Requirements, dated: Jul. 26, 1995.

FSTC Interbank Check Imaging: Unisys Monthly Status Report, Jun. 26, 1996.

"FSTC Interbank Check Imaging: Unisys Monthly Status Report," Jul. 22, 1996.

FSTC Pilot Overview, dated: Apr. 3, 1995.

"FSTC: Projects—Check Image Exchange Project—Project Participants," at www.fstc.org/projects/imaging/participants/cfin.

FSTC Projects: The Bank Internet Payment System (BIPS): Leading the Way to Electronic Commerce, FSTC, 2003.

Garvey, M., "Check Processing Goes Digital—Chase Manhattan Bank to store checks electronically, saving time and money," Informationweek, 1997, No. 648, p. 20, Sep. 15, 1997.

Gawen, "PC Based Document Image Processing and Signature Verification," Proceedings of the Information & Image Management Conference, 1991, pp. 389–391.

"Global Concepts—Payment Systems Consulting," at www.global–concepts.com/image_archive.htm.

Griffith, M. and Mazzola, J., "National City, NCR form strategic imaging partnership," AT&T News Release, Nov. 9, 1992.

Gullo, K., "NCR, Unisys plan check imaging for IBM Systems," American Banker, vol. 156, No. 249, p. 1(2), Dec. 30, 1991.

Haig, J., "Unisys integrates retail/wholesale lockbox solution for remittance processors," Business Wire, p. 03251075, Mar. 25, 1997.

## US 6,032,137 C1

Page 5

Haig, J., "Unisys solution will support check processing at Vermont Federal," Business Wire, p. 5201185, May 20, 1996.

Helm, Sylvia, "Banks check into image processing," Computers in Banking, vol. 7, No. 3, p. 25(7), Mar. 1, 1990.

Helm, S., "Who's doing what in image processing (includes definition of image processing," ABA Banking Journal, vol. 83, No. 1, p. 31(3), Jan. 1991.

"High Volume Data Capture Sans Paper" in Bank Systems Technology, May, 1996, p. 35.

Homa, "MICR Technology Helps Eliminate POS Check Fraud," Chain Store Age Executive, Sep. 1991.

Horine, J., "AT&T and Fiserv team to offer imaging solutions," Sep. 13, 1995.

"Huntington BancShares in the Forefront of Technology with Purchase of Unisys Check Imaging System," PR Newswire, p. 1, Oct. 11, 1989.

IBM Electronic Payment System Support/Check Processing Control Systems: Progress Reference and Operations Manual, dated: Jun. 1986.

"IBM FSTC Pilot Status".

IBM Product Announcement 190–040, (IBM 3898 Image Processor), dated: Mar. 13, 1990.

IBM Systems Journal, vol. 29, No. 3, 1990 (entire journal).

"IBM X9.46 Pilot Status—Summary," date unknown.

"Ibnamed, A Load Balancing Name Server Written in Perl," Sep. 17, 1995, located at the web at URL www.standford.edu.~schemers/docs/Ibnamed/Ibnamed.html.

"Ibnamed, A Load Balancing Name Server Written in Perl," Oct. 15, 2002, found on the web at the URL www.stanford.edu/~schemers/docs/Ibnamed/Ibnamed.html.

"ICI Project Security Work Session," May 10, 1996.

Image Archive Forum Flow Nos. 1–13, Sep. 1997.

Image Archive Forum Methology and Value, Sep. 19, 1997.

Image Archive Forum, "Payment System Task Force Economic Framework," Jan. 27, 1998.

ImagePlus brochure by IBM, 1991.

"Image Processing Survival Guide, vol. 11; Sure–Fire Strategies for Implementing Image Remittance," Philips Business Information, Inc., 1996.

"Image systems garner NOAC spotlight (American Bankers' Association's National Operations and Automation Conference)," Computer in Banking, vol. 6, No. 7, p. 8(4), Jul. 1989.

"Imaging products. Check Processing—IBM's ImagePlus High Performance Transaction System," United States Banker, vol. 100, No. 8, p. 23(3), Aug. 1990.

"Imaging vendors shape processing," Banking Management, vol. 69, No. 4, p. 29, Apr. 1993.

Imwalle, C. and Pratt, J., "250 U.S. banks to use NCR, Cincinnati Bell financial systems," AT&T News Release, May 4, 1993.

"Industry Security Leader Racal Supports Visa/Mastercard Proposal for Internet," PR Newswire Apr. 17, 1996.

INSPEC search with abstracts.

"Item processing leaps ahead with VisualImpact and Windows NT (Sponsored Supplement: Unlock Your Back Office with Microsoft Back Office)," US Banker, vol. 105, No. 6, p. S4(3), Jun. 1995.

Janusky, "FSTC Interbank Check Imaging," Apr. 29, 1996.

Janusky, "FSTC Interbank Check Imaging," May 22, 1996.

Joint Marketing & Referral Agreement Between ACS Image Solutions, Inc. and JPMorgan Chase Bank.

Jones, J., "Broadway & Seymour Announces Client/Server Product for Item and Image Processing," Business Wire, p. 03201186, Mar. 20, 1995.

Jones, J., "Broadway & Seymour announces new VISUAL-IMPACT release," Business Wire, p. 3291274, Mar. 29, 1996.

Klein, M., "Terminal Data to supply NCR with document microfilmers," AT&T News Release, Oct. 13, 1993.

Kraynak Maxfield, J., "Signet Processes Over 2,500 Documents/Hour in Unisys Check Imaging Tests," PR Newswire, p. 0409P8428, Apr. 9, 1991.

Kriskern, J., "Engineering a visionary solution," Datamation, vol. 36, No. 8, Apr. 15, 1990.

Kutler, J. "AT&T, IBM, Unisys join bank research group," American Banker, vol., 159, No. 124, p. 14(1), Jun. 29, 1994.

Lubetkin, S., "Unisys enters image processing market with two new products and major financial and industrial customers (product announcement)," PR Newswire, p. 1011PH009, Oct. 11, 1989.

Mantel, K., "Notes Gets in the Picture," Datamation, Jul. 15, 1992.

Marjanovic, "Payment Groups Square Off Over Electronic Check Plan," American Banker, date unknown.

Marjanovic, S., "Mich. National streamlines imaging with IBM system (check imaging)," American Banker, vol. 160, No. 176, Sep. 13, 1995.

Marjanovic, Steven, "Home Loan Bank to Offer Check–Image Statements to Members' Customers," American Banker, vol. 159, No. 248, at(1), Dec. 29, 1994.

Mazzola, J., "NCR and NYCH to develop image–based check notification system," AT&T News Release, Aug. 24, 1992.

Mazzola, J. and Hendrickson, L., "NCR deposit processing technology speeds banking operations," AT&T News Release, Dec. 7, 1992.

Mazzola, J. and Hendrickson, L., "Wachovia tests NCR's new imaging item processing system," AT&T News Release, Nov. 15, 1991.

Mazzola, J., Hendrickson, L. and Gatati, G., "NCR signs DSI alliance for imaging statement processing," AT&T News Release, Jul. 20, 1992.

Mazzola, J., Hendrickson, L., and Waters, R., "NCR, CKI to market image–based credit card chargeback system," Jan. 6, 1993.

Mazzola, J. and O'Donohue, M., "Frost National Bank selects NCR over old mainframe environment," AT&T News Release, Apr. 28, 1993.

McGinn, Janice, "IBM ImagePlus High Performance Transaction System (IBM Harness Image Processing to Make its 389x/XP Cheque Processor More Efficient),"Computergram International, No. 1389, at CG103210008, Mar. 21, 1990.

McKee, K., and Gundlach, D., "Retail Banking Solution enhanced," AT&T News Release, May 21, 1990.

Messmer, K., "Hurdles stand in way of electronic banking," Network World, p. 33, Sep. 4, 1995.

"Microsoft Introduces SNA Server Version 3.0, Begins Beta Testing," Microsoft Press Release, Aug. 29, 2006, found at: http://www.microsoft.com/presspass/press/1996/jun96/sna30pr.mspx.

Moore, J., "IBM, Unisys test check systems for Fed Reserve," Federal Computer Week, vol. 6, No. 21, p. 6(2), Jul. 27, 1992.

Moreau, Thierry, "Payment by Authenticated Facsimile Transmission, a Check Replacement Technology for Small and Medium Enterprises," Nov. 25, 2006, found at: http://www.connotech.com/PAYPROC.HTM.

Morris, H.M. and Orth, R.H., Image system communications, IBM Systems Journal, vol. 29, No. 3, 1990, pp. 371–383.

Murphy, P., "POD Check Imaging Faces Challenges (In 1995, vs. 1996, banks raised Investment in check imaging by 9% from $198 mil and $215 mil; new lost cost POD technology keeps costs down)," Bank Technology News, vol. 10, No. 3, p. 23, Mar. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 1, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 2, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 3, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 4, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," Issue 5, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 6, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 7, NCR, Jan. 1997.

"NCReports: Financial Services Trends and Technologies," vol. 1, Issue 8, NCR, 1999.

NCR 7780 Brochure, copyrighted 1989.

"NCR—Hardware—7780 Mid–Range Item Processing Transport," at www.ncr.com/products/hardware/hw__7780__product.htm.

"NCR—Hardware—7780, Technical Specifications," at www.ncr.com/products/hardware/nw__7780__ts_product.htm.

"NCR offers new image–based Document Management System," AT&T News Release, Jun. 23, 1992.

"NCR Unveils Client–Server Check Imaging," Bank Technology News, vol. 9, No. 3, p. 23, Mar. 1, 1996.

Nixon, B., "Is check imaging for you? (automation in banking) (includes related article)," Savings & Community Banker, vol. 2, No. 10, p. 28(6), Oct. 1993.

No1016v4[1].ppt—PowerPoint Presentation—FSTC—Interbank Check Image Project, Sep. 30 to Oct. 1, 1996.

"NSSDC's Mass Storage System Evolves," Mar. 1995, found on the web at the URL: http://nssdc.gsfc.nasa.gov.nssdc__news.march95/09__i__behnke__0395.html.

O'Heney, S., "Prepare for the image revolution (Banker and Vendors) (image processing: includes related article listing image processing products) (buyers guide)," Computers in Banking, vol. 6, No. 10, p. 24(6), Oct. 1989.

"On the imaging technology front," American Banker, vol. CLXI, No. 68, p. 26, Apr. 10, 1996.

PACESBusReq3[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Business Requirement," Apr. 3, 1998.

PacesOverview40[1].ppt.—PowerPoint Presentation.

PACESPRO[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Project Proposal," Apr. 23, 1998.

PACESRequirements[1].doc—Microsoft Word Doc—"PACES Paperless Automated Check Exchange & Settlement—Requirements Document," Apr. 23, 1998.

Plesums, C.A. and Bartels, R.W., Large Scale Image Systems: USAA Case Study, IBM Systems Journal, vol. 29, No. 3, 1990, pp. 343–355.

"Preliminary Invalidity Contentions of Defendant's J.P. Morgan Chase & Co. and JPMorgan Chase Bank," in *Data Treasury Corp.* v. *J.P. Morgan Chase & Co., et al.,* Cause No. 502CV124, In the United States District Court for the Eastern District of Texas, Texarkana Division.

"Press Release, Cisco Partners with AT&T on Network Switch Manufacturing," Sep. 26, 1995, found on the web at http://www.lucent.com/press/0995/950926.mma.html.

Press Release, "NCR Document Management System Includes Kodak, Ricoh Products," Apr. 6, 1993.

Press Release, "NCR Inroduces Scalable Image Item Processing Solution," Jan. 19, 1996.

"Regions Bank Selects ImageSoft to Provide Image Solutions," Business Wire, at 9161220, Sep. 16, 1997.

Rivest, R.L., Shamir, A., Adleman, L., "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems," date unknown.

Robinson, G., "Universal Card purchases BancTec Image-FIRST system," AT&T News Release, Dec. 22, 1992.

Roldan, Jr., "Image Quality White Paper," FSTC, 1999.

Roldan, M., "Paperless Automated Check Exchange and Settlement (PACBS) (status update) (PACES completes specification and design of image exchange environment and is accepted as part of SVPCO Image Strategy," FSTC, at www.fstc.org/project/paces/index.cfm, Jun. 22, 2000.

Roldan, Mariano, Financial Services Technology Consortium, "PACES Paperless Automated Check Exchange & Settlement Project Overview, PACES Planning Meeting, New York City," Dec. 19, 1997.

Schwartz, J., "Banks to Test Imaging for Clearing Checks," Communications Week, No. 420, p. 35, Sep. 14, 1992.

Search Report for PCT/US00/33010, Jun. 21, 2002.

Softchec Licenses 'Envision' Image Solution to West Suburban Bank, PR Newswire, at 116SETUU002, Jan. 16, 1996.

"Special Report: Fire Tunning of the Terminal Picture," Computerworld, Aug. 1983.

Spencer, H., "Scanning goes vertical: a big future for specialized check scanning; check scanning technology," Advanced Imaging, No. 10, vol. 12, p. 54, Oct. 1997.

Stellwag, C., "New ATM from AT&T GIS features automated document processing," AT&T News Release, Nov. 29, 1994.

Stellwag, C. and Bochonko, K., "NCR and Cincinnati Bell offer image processing service," AT&T News Release, Jan. 11, 1994.

Stellwag, C. and Bochonko, K., "Norwest Bank selects NCR item processing systems for lockbox," AT&T News Release, Aug. 2, 1993.

Stellwag, C., Graves, T., and Brochonko, K., "New Mexico uses NCR imaging systems for tax, revenue processing, " AT&T News Release, Jul. 12, 1993.

Stellwag, C., Proto, J., and Bochonko, K., "CashFlex selects NCR item processing system for lockbox," AT&T News Release, Jul. 12, 1993.

Stellwag, C., Roedel, R, and Bochonko, K., NCR and Arkansas Systems announce strategic alliance, AT&T News Release, Jul. 12, 1993.

Stellwag, C., Sanders, G., and Bochonko, K., "NCR and Signet Banking to provide item processing services," AT&T News Release, Jul. 13, 1993.

**US 6,032,137 C1**

Page 7

"SurePOS ACE Electronic Payment Support PRPQ for 4690 OS," Version 1, Release 5, IBM, 1998, 2002.

"The Check Information Age: Vision Executive Summary Image Archive Forum, Payment System Task Force," Jan. 27, 1998.

"The Wachovia Story," Research, Development Manufacturing Corporation, 1993.

Tracey, Brian, "IBM Unveils First Stage of Image–Check System," Computers in Banking, vol. 7, No. 4, at 12(3), Apr. 1990.

Tucker, T., "Broadway rolls out check imaging system for community banks," American Banker, vol. 160, No. 61, p. 14(1), Mar. 30, 1995.

"Understanding EDI," 1996.

"Unisys Enhances Check Imager (Unisys Corp makes effort to appeal to wider range of financial institutions)," American Banker, vol. CLIX, No. 205, p. 15A, Oct. 24, 1994.

"Unisys Wins Contract to Supply Imaging Solution to Chase Manhattan/FISER V Check Processing Alliance," Business Wire, at 6121175, Jun. 12, 1995.

"Unix–Based Image Statement Software," ABA Banking Journal, vol. 85, No. 2, at 80(1), Feb. 1993.

"Verifone Software Links PCs to the Point of Sale," American Banker, vol. 158, No. 156, at 13A(1), Aug. 16, 1993.

Vermeire, "Prosecution of Check Image Patent," letter to Hanna, Jul. 11, 1997.

Wagner, M., "Banc One checks out Web," Computerworld, vol. 30, No. 35, p. 69, Aug. 26, 1996.

Western Bank purchases NCR's Document Managing system, AT&T News Release, Aug. 31, 1993.

"Imaging in Corporate Environments: Technology and Communication," Daniel Minoli, McGraw Hill, 1994.

"ANSI/ABA X9.46–1995, Draft version 0.13, American National Standard For Financial Image Interchange: Architecture, Overview and System Design Specification."

"ANSI/ABA X9.46–1997, American National Standard For Financial Image Interchange, Architecture, Overview and System Design Specification." Copyright 1996.



**FIG. 1 ( Amended)**



FIG. 2 ( Amended)



**FIG. 3A ( Amended)**



FIG. 6 ( Amended)

US 6,032,137 C1

# 1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 6, lines 23–26:

Since [DataGlyph] *DataGlyph*™ elements represent a
large amount of information in a small amount of space, the
DAT scanner [100] *202* will require a small amount of time
to input a large amount of information.

Column 19, lines 59–63:

FIG. **7** is a flow chart **700** describing the polling of the
DACs [300] *400* by a DPC **600** and the transmission of the
TECBIs from the DACs [300] *400* to the DPC **600**. In step
**702**, the DPC **600** reads the address of the first DAC [300]
*400* in its region for polling.

Column 19, line 64 to column 20, line 2:

In step **704**, the DPC **600** connects with a DAC [300] *400*
for transmission. The DPC **600** determines whether the
connection to the DAC [300] *400* was successful in step **706**.
If the call to the DAC [300] *400* was unsuccessful, the DPC
**600** will record the error condition in the session summary
report and will report the error to the DPC **600** manager in
step **722**.

Column 20, lines 3–7:

If the connection to the DAC [300] *400* was successful,
the DPC **600** will verify that the DAC [300] *400* is ready to
transmit in step **708**. If the DAC [300] *400* is not ready to
transmit, the DPC **600** will record the error condition in the
session summary report and will report the error to the DPC
**600** manager in step **722**.

Column 20, lines 8–15:

If the DAC [300] *400* is ready to transmit in step **708**, the
DAC [300] *400* will transmit a TECBI packet header to the
DPC **600** in step **710**. The DPC **600** will determine whether
the transmission of the TECBI packet header was successful
in step **712**. If the transmission of the TECBI packet header
was unsuccessful, the DPC **600** will record the error con-
dition in the session summary report and will report the error
to the DPC **600** manager in step **722**.

Column 20, lines 16–23:

If the transmission of the TECBI packet header was
successful in step **712**, the DAC [300] *400* will transmit a
TECBI packet to the DPC **600** in step **714**. The DPC **600**
will determine whether the transmission of the TECBI
packet was successful in step **716**. If the transmission of the
TECBI packet header was unsuccessful, the DPC **600** will
record the error condition in the session summary report and
will report the error to the DPC **600** manager in step **722**.

Column 20, lines 31–41:

If the TECBI packet header matched the TECBI packet in
step **718**, the DPC **600** will set the status of the TECBI
packet to indicate that it was received at the DPC **600** in step
**720**. The DPC **600** will also transmit the status to the DAC

# 2

[300] *400* to indicate successful completion of the polling
and transmission session in step **720**. Next, the DPC **600** will
determine whether TECBIs have been transmitted from all
of the DACs [300] *400* in its region in step **724**. If all DACs
[300] *400* in the DPC's **600** region have transmitted TECBIs
to the DPC **600**, the DPC **600** will compile a DAC [300] *400*
status report in step **728** before terminating the session.

Column 20, lines 42–47:

If one or more DACs [300] *400* in the DPC's **600** region
have not transmitted TECBIs to the DPC **600**, the DPC **600**
will get the address of the next DAC [300] *400* in the region
in step **726**. Next, control returns to step **704** where the next
DAC [300] *400* in the DPC's **600** region will be polled as
previously discussed.

Column 22, lines 8–17:

In step **1006**, the DataTreasury™ system captures the
check and the payer's biometric data at the payee's remote
location. In an alternate embodiment, the DataTreasury™
system sends electronic transaction data representing the
check from the payer's remote location to the [payer's]
*payee's* remote location. In step **1008**, the DataTreasury™
system performs verification of the check and biometric data
by comparing the remotely captured data with the data
stored at a central location. The validation further includes
checking the courtesy amount and the payer's signature.

THE DRAWING FIGURES HAVE BEEN
CHANGED AS FOLLOWS:

FIG. **1**, reference number **100** added; FIG. **2**, reference
number **300** changed to **400**; FIG. **3**A, reference number **300**
added; FIG. **6** "D.A.C." changed to "D.P.C." in box **602**.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**–**43** is confirmed.

New claims **44**–**67** are added and determined to be
patentable.

   *44. A system as in claim 1 wherein said one or more
remote data access subsystems also capture electronic trans-
actions from at least one of credit cards and debit cards.*
   *45. A system as in claim 1 further comprising at least one
card interface for capturing electronic transaction data.*
   *46. A system as in claim 1 further comprising at least one
signature interface for capturing an electronic signature.*
   *47. A system as in claim 1 further comprising at least one
biometric interface for capturing biometric data.*
   *48. A system as in claim 1 wherein the system automati-
cally generates at least one of credit card statements, bank
statements, and tax reports.*
   *49. A system as in claim 1 wherein said at least one
central data processing subsystem polls said one or more
remote data access subsystems for transaction data.*
   *50. A system as in claim 1 wherein said transaction data
comprises more than one type of transaction data.*
   *51. A method as in claim 26 further comprising capturing
electronic transaction data.*
   *52. A method as in claim 26 further comprising capturing
an electronic signature.*
   *53. A method as in claim 26 further comprising capturing
biometric data.*
   *54. A method as in claim 26 further comprising automati-
cally generating at least one of credit card statements, bank
statements, and tax reports.*

US 6,032,137 C1

**3**

*55. A method as in claim 26 wherein said transaction data comprises more than one type of transaction data.*

*56. A system as in claim 42 wherein said one or more remote data access subsystems also capture electronic transactions from at least one of credit cards and debit cards.*

*57. A system as in claim 42 further comprising at least one card interface for capturing electronic transaction data.*

*58. A system as in claim 42 further comprising at least one signature interface for capturing an electronic signature.*

*59. A system as in claim 42 further comprising at least one biometric interface for capturing biometric data.*

*60. A system as in claim 42 wherein the system automatically generates at least one of credit card statements, bank statements, and tax reports.*

*61. A system as in claim 42 wherein said at least one central data processing subsystem polls said one or more remote data access subsystems for transaction data.*

**4**

*62. A system as in claim 42 wherein said transaction data comprises more than one type of transaction data.*

*63. A method as in claim 43 further comprising capturing electronic transaction data.*

*64. A method as in claim 43 further comprising capturing an electronic signature.*

*65. A method as in claim 43 further comprising capturing biometric data.*

*66. A method as in claim 43 further comprising automatically generating at least one of credit card statements, bank statements, and tax reports.*

*67. A method as in claim 43 wherein said transaction data comprises more than one type of transaction data.*

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

*DataTreasury Corporation v. Fiserv, Inc.,* 2016-1229, -1230

## CERTIFICATE OF SERVICE

I, Christian Hurt, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **February 9, 2016** I electronically filed the foregoing **BRIEF OF THE APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

David A. Roodman                    Robert G. Lancaster
(Principal Counsel)                 Bryan Cave LLP
Elizabeth C. Carver                 120 Broadway, Suite 300
Emma C. Harty                       Santa Monica, CA 90401
Nick E. Williamson                  310-576-2100
Bryan Cave LLP                      rglancaster@bryancave.com
211 North Broadway
One Metropolitan Square, Suite 3600
St. Louis, MO 63102
314-259-2000
daroodman@bryancave.com
eccarver@bryancave.com
emma.harty@bryancave.com
nick.williamson@bryancave.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

February 9, 2016                                    /s/ Christian Hurt

## **CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 8,354, excluding the parts  of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac in Times New Roman 14 point font.


Date: February 9, 2016

_____

Christian Hurt
*Attorney for Plaintiff-Appellant*